

**APPENDIX A:**

**FINAL JUDGMENTS**

**(Ordered by Year Judgment Entered)**

U.S. v. DELAWARE, LACKAWANNA & WESTERN RAILROAD CO., ET AL.
Civil No.: 297
Year Judgment Entered: 1915

IN THE DISTRICT COURT OF THE UNITED STATES FOR
THE DISTRICT OF NEW JERSEY.

In Equity 297.

UNITED STATES OF AMERICA, PETITIONER,

vs.

THE DELAWARE, LACKAWANNA & WESTERN RAILROAD
COMPANY, AND THE DELAWARE, LACKAWANNA & WEST-
ERN COAL COMPANY, DEFENDANTS.

FINAL DECREE

This cause having come on for hearing before this
court and having been determined by a decree entered

A-2

U. S. v. DELA., LACKAWANNA & WEST'N R. R. CO. 471

April 24, 1914, from which the petitioner appealed to the Supreme Court of the United States, which has reversed the decree of this court and issued its mandate filed herein July 8, 1915, remanding the cause:

Now, therefore, upon motion of the petitioner, it is, this 6th day of August, 1915, ordered, adjudged, and decreed as follows:

SECTION 1. That the aforesaid decree of this court entered April 24, 1914, is in all respects set aside and reversed.

SEC. 2. That the defendant The Delaware, Lackawanna & Western Railroad Company, before and at the time of the filing of the petition herein, was transporting in interstate commerce coal mined or purchased by it, from which it had not dissociated itself before the transportation, and, therefore, was violating the commodities clause of the act to regulate commerce (34 Stat., 584, c. 3591).

SEC. 3. That the defendant The Delaware, Lackawanna & Western Railroad Company, in transporting in interstate commerce coal mined and purchased by it and purporting to have been sold to the defendant The Delaware, Lackawanna & Western Coal Company under the contract of August 2, 1909, referred to in the petition, is violating the commodities clause of the act to regulate commerce (34 Stat., 584, c. 4591).

Wherefore, the defendant railroad company, its officers, directors, agents, servants, and employees, are hereby enjoined and restrained from further transporting in interstate commerce coal thus mined or purchased by it and purporting to have been sold to the defendant coal company under the aforesaid contract of August 2, 1909.

SEC. 4. That the aforesaid contract of August 2, 1909, violates the antitrust act of July 2, 1890 (26 Stat., 209, c. 647).

Wherefore, the defendant railroad company and the defendant coal company, their officers, directors, agents, servants, and employees, are hereby enjoined and restrained from further carrying out or enforcing the provisions of the said contract.

SEC. 5. That this decree is without prejudice to the right of the United States to institute further proceedings based on any matter, thing, or transaction mentioned in the petition and not hereby specifically adjudged unlawful and enjoined.

SEC. 6. That petitioner is entitled to its costs in this court and may have execution therefor.

JOS. BUFFINGTON,
JOHN B. MCPHERSON,
*United States Circuit Judges.*

U.S. v. KLAXON CO.
Civil No.: 2005
Year Judgment Entered: 1918

UNITED STATES vs. KLAXON COMPANY.

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF NEW JERSEY.

Equity No. 2006.

THE UNITED STATES OF AMERICA, PLAINTIFF,

vs.

KLAXON COMPANY, DEFENDANT.

DECREE.

This cause having come on for hearing upon the motion
of the petitioner for a decree, the court, upon considera-
tion of the pleadings and of the consent of the defendant
in open court, finds, orders and decrees as follows:

1. That defendant Klaxon Company has created and engaged in an unlawful combination with the jobbers of automobile accessories who distribute warning signals manufactured by the defendant (hereinafter called Klaxon warning signals), in violation of the Act of Congress approved July 2, 1890, entitled "An Act to protect trade and commerce against unlawful restraints and monopolies," by entering into uniform contracts with said jobbers (the form of which for the year 1918 is annexed as an exhibit to the petition filed herein), by which it is provided, among other stipulations, that the defendant will sell Klaxon warning signals only through the jobbers entering into such contracts, and further that the jobbers shall resell Klaxon warning signals purchased by them from the defendant at the uniform prices fixed by the defendant, section 11 of the contracts reading:

The DISTRIBUTOR agrees to sell Klaxon warning signals on the following terms: At retail at the current list prices published by MANUFACTURER, and at wholesale at the following discounts:

25% from current list prices on orders amounting to $50, or less.

33-1/3% from current list prices on orders amounting to more than $50 list, and less than $300 list.

40% from current list prices on all orders amounting to $300 list, or more.

2. The defendant, its officers, agents and employees, are perpetually enjoined and restrained from doing any act in furtherance of the above described combination, and particularly from in any wise enforcing or attempting to enforce said stipulation, and from creating or entering into any similar combination or any similar stipulation, contract, agreement or understanding in the future.

3. The defendant shall pay the costs of this proceeding to be taxed.

JOHN RELLSTAB,
*Judge*

December 3, 1918.

U.S. v. SCHERING CORP., ET AL.
Civil No.: 1919
Year Judgment Entered: 1941

## U. S. v. SCHERING CORP., ET AL.

IN THE DISTRICT COURT OF THE UNITED STATES FOR
THE DISTRICT OF NEW JERSEY.

Civil Action No. 1919.

### UNITED STATES OF AMERICA, PLAINTIFF

vs.

SCHERING CORPORATION, JULIUS WELTZIEN, GREGORY
STRAGNELL, ROCHE-ORGANON, INC., ELMER H. BOBST,
CIBA PHARMACEUTICAL PRODUCTS, INC., VINCENT A.
BURGHER, RARE CHEMICALS, INC., E. T. FRITZSCHING,
DEFENDANTS.

#### FINAL JUDGMENT.

The complainant, United States of America, having
filed its complaint herein on December 17, 1941, the de-
fendants having appeared and filed their answers to
such complaint denying the substantive allegations there-
of; all parties hereto by their attorneys herein having
severally consented to the entry of this final decree
herein without trial or adjudication of any issue of fact
or law herein and without admission by any party in
respect of any such issue:

Now, therefore, before any testimony has been taken herein, and without trial or adjudication of any issue of fact or law herein, and upon consent of all parties hereto, it is hereby

ORDERED, ADJUDGED AND DECREED as follows:

I

That this Court has jurisdiction of the subject matter herein and of all the parties hereto; that the complaint states a cause of action against each of the defendants under the Act of Congress of July 2, 1890, entitled, "An Act to Protect Trade and Commerce Against Unlawful Restraints and Monopolies," and the acts amendatory thereof and supplemental thereto.

II

Defendant companies, their successors, subsidiaries, officers and employees, and all persons acting for or in behalf of said companies, are hereby enjoined and restrained from agreeing, combining, or conspiring:

1. To fix, determine, maintain or adhere to prices, mark-ups, discounts or rebates in connection with the sale, purchase, or distribution of hormones, hormone products or other pharmaceuticals;

2. To prevent or restrain any defendant company or any other person from manufacturing hormones in the United States, or from importing or exporting hormones or hormone products into or from the United States, except the prosecution in good faith of legal proceedings.

3. To divide or allocate among themselves or with other companies the various countries of the world, or to allocate markets within such countries, including the United States, as markets for the sale or distribution of hormones or hormone products or to divide or allocate types of hormones or particular hormone products to be sold within such markets; provided, however, that nothing in this Paragraph II

(3) shall prohibit the defendants, their successors and subsidiaries, from doing any of the following acts in any territory outside the United States, its territories and possessions:

(a) Establishing exclusive agents, resellers or customers, or terminating such arrangements; or (b) securing the manufacture of their products or any parts thereof, or the packing thereof, locally; provided that such arrangements do not place the defendants under any obligation not to sell or not to have their products sold outside the area covered by such arrangements, and do not involve any agreement to withdraw from, or refrain from entering into, any foreign market with respect to defendants' products of commercially unlike character to those distributed under such arrangement.

4. To enter into or to enforce any provision of any contract which provides for the regular exchange or disclosure of information; or to exchange or disclose information relative to individual costs, the prices to be charged, the distributors or retailers to be used, or the methods to be employed in the distribution of hormones or hormone products.

5. To audit the books of any defendant company or its successors or subsidiaries, except with respect to a valid licensing agreement which does not involve the enforcement of any restrictive provision enjoined by this decree, and then only by an independent auditor who shall report solely the amount of royalties due and payable under such license agreement;

6. To enter into or enforce any agreement or arrangement with respect to terms or conditions of sale, the agents or resellers to be employed, or the types or kinds of articles to be sold in the United States, or in connection with imports or exports, directly or indirectly, to or from the United States, its territories or possessions;

7. To agree or to follow the practice of carrying out any prior agreement as to the standard provisions

or the standard practices in connection with license agreements;

8. To enter into or to enforce any provision in any licensing agreement relating to hormones or hormone products under which any licensee has a right to restrict in any manner the number of licenses to be issued under any patent, or to designate licensees, or receives any portion of the royalties charged by the licensor in connection with other licenses;

9. To enter into or to enforce any provision of any licensing agreement or arrangement relating to hormones or hormone products whereby any defendant company, its subsidiaries or successors, is obligated to exchange patents, patent applications, inventions, or processes with any other company, but this Section II-9 shall not affect rights on existing patents, patent applications, or licenses already vested at the time of the entry of this decree;

10. To enter into or to enforce any provision of any license under any existing patent relating to hormones or hormone products where such provision attempts to restrict the licensee as to the area in which he may sell, the type or conditions of sale, or the prices to be charged by the licensee in such sale;

11. To confer as to prices to be charged for hormones or hormone products, or the methods of distribution to be employed, or to confer in any other manner when the purpose and effect is to violate any of the provisions of this decree.

### III

1. Each defendant company, its successors, subsidiaries, officers, and employees and all persons acting for or on behalf of said company, is hereby individually enjoined and restrained:

A. From enforcing any provision in any existing licensing agreement under which any licensee has a right to restrict in any manner the number of licenses to be issued under any patent, or to designate licen-

U. S. v. SCHERING CORPORATION     2481

sees, or receives any portion of the royalties charged by the licensor in connection with other licenses;

B. From enforcing any provision of any existing licensing agreement or arrangement whereby any defendant company, its subsidiaries or successors, is obligated to exchange patents, patent applications, inventions, processes, or other rights with any other company, but this Section III-1-B shall not affect rights on existing patents, patent applications, or licenses already vested at the time of the entry of this decree;

C. From enforcing any provision of any existing licensing agreement where such provision attempts to restrict the licensee as to the area in which he may sell, the type or conditions of sale, or the prices to be charged by the licensee in such sale;

D. From following the policy of adhering to any restrictions agreed upon by others, including but not limited to, any foreign cartel, as to territories for sale, the terms or conditions of sale or any other matters affecting trade or commerce within, to or from the United States of America, its territories and possessions.

2. Each defendant company, its successors, subsidiaries, officers, and employees and all persons acting for or on behalf of said company, is hereby individually ordered to file with the Department of Justice copies of all contracts, agreements, or arrangements, not hitherto filed, affecting the business of said defendants and entered into or adhered to by any company affiliated with or connected with said defendants where said contracts, agreements, or arrangements restrict or determine territories for sale or the terms or conditions of sale. The failure of the Attorney General of the United States or the Assistant Attorney General in charge of the Antitrust Division to take any action following the receipt of any such information from any defendant pursuant to this Paragraph III shall not be construed as an approval of the matters and things so informed, and shall

A-13

not operate as a bar to any action or proceeding, civil or criminal, which may later be brought pursuant to any law of the United States based on the matters and things so informed.

The four agreements to which the defendant Schering Corporation is a party, entered into as of January 1, 1938, and known as "the royalty agreement," "the alkali-hormonate agreement," "the Bassorit agreement," and "the Bassorit fee agreement," and the agreement entered into by the defendant Schering Corporation on October 21, 1938, and known as "the raw materials agreement" and any and all amendments or supplements thereto, are declared and adjudged to be unlawful under the antitrust laws of the United States, and the defendant Schering and its successors or subsidiaries and all of them be and they hereby are enjoined and restrained from carrying out or enforcing any of the aforesaid contracts or any supplements, amendments, or modifications thereof, or making any royalty payments, or any other payments pursuant to said agreements and each of them, without express order from this Court.

Provided, however, that this Paragraph IV shall not affect the title of any of the defendants under existing patents, or patent applications, or to trade-marks already vested at the time of the entry of this decree, or the rights of the defendants to continue to manufacture and sell under any licenses already vested at the time of the entry of this decree, but shall be applicable to future patents, future patent applications, and to future licenses and shall also be applicable to any and all restrictive provisions in connection with all patents or licenses the enforcement of which restrictive provisions is enjoined by this decree, and further shall be applicable to all penalty, forfeiture, and termination provisions, the operation of which would have the purpose or effect of carrying out any of the restrictive provisions enjoined by this decree.

V

The agreement entered into on or about January 1938

between N. V. Organon and defendant Roche-Organon and any and all amendments or supplements thereto are declared and adjudged to be unlawful under the anti-trust laws of the United States, and the defendant Roche-Organon and its successors or subsidiaries or any of them be and they hereby are enjoined and restrained from carrying out or enforcing any of the aforesaid contracts or any supplements, amendments, or modifications thereof.

Provided, however, that this Paragraph V shall not affect the title of any of the defendants under existing patents, or patent applications, or to trade-marks already vested at the time of the entry of this decree, or the rights of the defendants to continue to manufacture and sell under any licenses already vested at the time of the entry of this decree, but shall be applicable to future patents, to future patent applications, and to future licenses and shall also be applicable to any and all restrictive provisions in connection with all patents or licenses the enforcement of which restrictive provisions is enjoined by this decree, and further shall be applicable to all penalty, forfeiture, and termination provisions, the operation of which would have the purpose or effect of carrying out any of the restrictive provisions enjoined by this decree.

## VI

The provisions of any and all existing agreements, other than those enumerated in Paragraphs IV and V of this decree, between or among the defendants or with other companies which restrict the sales of the defendant companies as to the areas in which they may sell, the types of article to be sold or the packaging thereof, other terms or conditions of sale, or the price to be charged by the defendant companies in such sales, are hereby declared and adjudged to be unlawful under the antitrust laws of the United States, and the defendants and their respective successors or subsidiaries or any of them are hereby enjoined and restrained from the further performance of any of these provisions.

Provided, however, that this Paragraph VI shall not affect rights to existing patents, patent applications, trade-marks or licenses already vested at the time of the entry of this decree but shall be applicable to future patents, to future patent applications, and to future license rights and shall also be applicable to any and all restrictive provisions in connection with all patents or licenses, the enforcement of which restrictive provision is enjoined by this decree, and further shall be applicable to all penalty, forfeiture and termination provisions the operation of which would have the purpose or effect of carrying out any of the restrictive provisions enjoined by this decree.

## VII

For the purpose of securing compliance with this decree, and for no other purpose, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General or an Assistant Attorney General and on reasonable notice to the defendant corporations, made to the principle offices of the defendant corporations, be permitted (1) access, during the office hours of the defendant corporations, to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of the defendant corporations, relating to any matters contained in this decree (2) subject to the reasonable convenience of the defendant corporations and without restraint or interference from them, to interview officers or employees of the defendant corporations, who may have counsel present, regarding any such matters, and (3) the defendant corporations, on such request, shall submit such reports in respect of any such matters as may from time to time be reasonably necessary for the proper enforcement of this decree: *Provided, however,* that information obtained by the means permitted in this paragraph shall not be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Department of Justice except in the course of legal

A-16

proceedings for the purpose of securing compliance with this decree in which the United States is a party or as otherwise required by law.

## VIII

Nothing in this decree shall be construed to restrict or prohibit in any way any action taken by any defendant, its successors, subsidiaries, officers or employees in good faith and within the fair intendment of the letter of the Attorney General of the United States to the General Counsel of the Office of Production Management, dated April 29, 1941 (a copy of which is attached hereto as Exhibit "A"),[1] or with any amendment or amplification thereof by the Attorney General, or in accordance with any arrangement of similar character between the Attorney General and any National Defense Agency in effect at the time, provided such letter or arrangement has not at the time of such action been withdrawn or cancelled with respect thereto.

## IX

Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this decree to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this decree, for the modification or termination of any of the provisions thereof, for the enforcement of compliance therewith and for the punishment of violations thereof.

WILLIAM F. SMITH,

*United States District Judge.*

1. For Exhibit "A" See Page 3304.

DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

               Plaintiff,

        v.

SCHERING CORPORATION,
JULIUS WELTZIEN,
GUSTAV SCHANSSELE

ROCHE-ORGANON, INC.,                    CIVIL ACTION  1919
ELMER H. BOBST

CIBA PHARMACEUTICAL PRODUCTS, INC.
VINCENT A. GORDEN,

MACE CHEMICALS, INC.,
H. Y. VITTELMEISO,

               Defendants,

## ORDER GRANTING PETITION

       The defendants herein, Schering Corporation, Organon,
Inc. (formerly Roche-Organon, Inc.), and Ciba Pharmaceutical
Products, Inc., having filed their petition herein on the 27th
day of December, 1950, petitioning the Court to modify the
Final Judgment in this cause entered December 17, 1941, to
permit said petitioners to execute an agreement, a copy of which
is annexed to said petition as Exhibit "A"; and the plaintiff,
United States of America, and said petitioners having agreed
that said Final Judgment, under paragraph 8 of Section XI
thereof, prohibits, in terms, the execution of said agreement;
and without any determination or adjudication of the validity
of said agreement in its actual operation under the antitrust
laws and without prejudice to any rights of the plaintiff to
take action under the antitrust laws or under said Final
Judgment (except as to said paragraph 8 thereof) with respect
to said agreement in its actual operation; and upon the

A-18

subjoined consent of the plaintiff and the petitioners, it is,
on this  29th   day of January, 1951

ORDERED, ADJUDGED, and DECREED, that the Final
Judgment entered herein on December 17, 1941 be and the same
hereby is modified to permit the petitioners to execute the
said agreement.

WILLIAM F. SMITH
United States District Judge

U.S. v. SWISS BANK CORP.
Civil No.: 1920
Year Judgment Ordered: 1941

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States of America v. Swiss Bank Corporation., U.S. District Court, D. New Jersey, 1940-1943 Trade Cases ¶56,188, (Dec. 17, 1941)

Click to open document in a browser

United States of America v. Swiss Bank Corporation.

1940-1943 Trade Cases ¶56,188. U.S. District Court, D. New Jersey. Civil Action No. 1920. December 17, 1941.

**Upon consent of all parties, a decree is entered in proceedings under the Sherman Anti-Trust Act, ordering the defendant bank to divest itself of the ownership of stock of one of a group of hormone manufacturing corporations which had conspired among themselves to restrain trade in hormones; and to sell such stock to an independent company or person.**

Charles M. Phillips, U. S. Attorney, Trenton, N. J., Thurman Arnold, Assistant Attorney General, Washington, D. C., Edward P. Hodges, Herbert A. Berman and Monroe Karasik, Special Assistants to the Attorney General, for the plaintiff.

White & Case, by Samuel Waldman, New York City, for the defendant.

Before Smith, District Judge.

#### Final Judgment

The complainant, United States of America, having filed its complaint herein on Dec. 17, 1941; the defendant having appeared and filed its answers to such complaint denying the substantive allegations thereof; both parties hereto by their attorneys herein having consented to the entry of this final decree herein without trial or adjudication of any issue of fact or law herein and without admission by any party in respect of any such issue;

Now, THEREFORE, before any testimony has been taken herein and without trial or adjudication of any issue of fact or law herein, and upon consent of all parties hereto, it is hereby

ORDERED, ADJUDGED AND DECREED as follows:

I.

### [ *Jurisdiction* ]

That this Court has jurisdiction of the subject matter herein and of parties hereto; that the complaint states a cause of action against the defendant under the Act of Congress of July 2, 1890, entitled "An Act to protect Trade and Commerce Against Unlawful Restraints and Monopolies" and the acts amendatory thereof and supplemental thereto.

II.

### [ *Stock Divestiture Ordered* ]

Defendant Swiss Bank Corporation, its officers, agents, and employees, is hereby ordered to take all steps necessary to secure the divestiture of the stock of Schering Corporation of Bloomfield, New Jersey, now held directly or indirectly by the Chemical and Pharmaceutical Enterprises, Ltd., or by defendant Swiss Bank Corporation, and to secure the sale of such stock, in accordance; with all applicable Federal laws to an independent company, or person or persons whose acquisition of such stock will be in conformity with this decree and with the Anti-trust laws. If such divestiture and sale has not been consummated within 120 days from the entrance of this decree, the defendant Swiss Bank Corporation, may, upon showing to this Court that due diligence has been maintained in attempting to secure such sale, apply to this court for an order extending the period within which such sale may be consummated for a further period to be no less than 60 days nor more than 120 days. If such divestiture and sale is not consummated within 120 days from the date of this decree or

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

within the extended period so ordered, said defendant is hereby ordered to offer such stock at public auction for sale to the highest bidder meeting requirements set forth above, said sale to take place at a date not less than 30 days thereafter.

III.

[ Examination of Records]

For the purpose of securing compliance with this decree, and for no other purpose, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General or an Assistant Attorney General and on reasonable notice to the defendant made to the principal offices of the defendant, be permitted (1) access, during the office hours of the defendant to all books, ledgers, accounts correspondence, memoranda, and other records and documents in the possession or under the control of the defendant, relating to any matters contained in this decree (2) subject to the reasonable convenience of the defendant and without restraint or interference from it, to interview officers or employees of the defendant, who may have counsel present, regarding any such matters, and (3) the defendant, on such request, shall submit such reports in respect of any such matters as may from time to time be reasonably necessary for the proper enforcement of this decree; Provided, however, that information obtained by the means permitted in this paragraph shall not be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Department of Justice except in the course of legal proceedings for the purpose of securing compliance with this decree in which the United States is a party or as otherwise required by law.

IV.

[ Retention of Jurisdiction]

Jurisdiction of this cause is retained for the purpose of enabling the parties to this decree to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this decree, for the modification or termination of any of the provisions thereof, for the enforcement of compliance therewith and for the punishment of violations thereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

U.S. v. BENDIX AVIATION CORP
Civil No.: 2531
Year Judgment Entered: 1946

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States and Alien Property Custodian v. Bendix Aviation Corporation., U.S. District Court, D. New Jersey, 1946-1947 Trade Cases ¶57,444, (Feb. 13, 1946)

Click to open document in a browser

United States and Alien Property Custodian v. Bendix Aviation Corporation.

1946-1947 Trade Cases ¶57,444. U.S. District Court, D. New Jersey. Civil 2531. Dated February 13, 1946.

A consent decree entered in an action charging violations of the Sherman Anti-Trust Act contains provisions enjoining defendant aircraft instrument manufacturer from further performing or reviving restrictive cartel agreements with foreign manufacturers, instituting suits for patent infringement or collecting damages for infringement alleged to have occurred prior to the date of the judgment, or suing to recover from the Alien Property Custodian or his assigns for any claims against named foreign manufacturers. Title to some 136 patents is transferred to the Alien Property Custodian, who shall grant royalty-free licenses. Defendant is directed to issue licenses at reasonable royalties for 144 additional patents.

For plaintiffs: Tom C. Clark, Attorney General, Wendell Berge and John F. Sonnett, Assistant Attorneys General, Herbert A. Berman, Leonard J. Emmerglick, Elliot H. Moyer and Harry Le Roy Jones, Special Assistants to the Attorney General, and Raoul Berger, General Counsel to the Alien Property Custodian.

For defendant: Hughes, Hubbard & Ewing, and Stryker, Tams and Horner (formerly Lindabury, Depue & Faulks).

Meaney, United States District Judge.

### Final Judgment

The plaintiff United States of America, having filed its complaint herein on November 19, 1942, and the defendants, except Vincent Bendix, having appeared and filed their answer to such complaint denying the substantive allegations thereof; the plaintiff, Alien Property Custodian, having intervened and filed his complaint herein on February 11, 1946 and the defendant, Bendix Aviation Corporation, having filed its answer to such complaint denying the substantive allegations thereof; and all the parties hereto by their attorneys herein having severally consented to the entry of this final judgment herein without trial or adjudication of any issue of fact or law herein and without admission by the defendants in respect of any such issue;

NOW, THEREFORE, before any testimony has been taken herein, and without adjudication of any issue of fact or law herein or admission by the defendants in respect of any such issue, and upon the consent of all the parties hereto, it is hereby ordered, adjudged and decreed, as follows.

I

[ Jurisdiction and Causes of Action]

The Court has jurisdiction of the subject matter herein and of all the parties hereto. The complaint of the United States of America herein states causes of action against the defendant Bendix Aviation Corporation under Section 1 of the Act of Congress of July 2, 1890, entitled "An Act to Protect Trade and Commerce Against Unlawful Restraints and Monopolies", being commonly known as the Sherman Act, and under Section 74 of the Act of August 27, 1894 entitled "An Act to reduce taxation and to provide revenue for the Government and for other purposes", as amended by the Act of February 12, 1913, entitled "An Act to amend Sections 73 and 76 of the Act of August 27, 1894", said act being commonly known as the Wilson Tariff Act, and the complaint of the Alien Property Custodian states a cause of action under Section 24 (1) of the Judicial Code, as amended (Title 28, U. S. C. Section 41 (1)), Section 274 (d) of the Judicial Code, as amended (Title 28, U. S. C. Section 400), and Section 17 of the Trading with the Enemy Act of October 6, 1917 (40 Stat. 425; Title 50, Appendix, U. S. C. Section 17).

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

II

[ *Definitions*]

For the purpose of this judgment:

"Bendix" means Bendix Aviation Corporation, a corporation organized and existing under the laws of the State of Delaware and having its principal place of business at Detroit, Michigan.

"Siemens" means Siemens Apparate and Masohinen Gesellschaft mit beschrankter Haftpflicht, a corporation or association organized under the laws of Germany with a place of business at Berlin, Germany.

"Hakenfelde" means Luftfahrtgeratewerke Hakenfelde Gesellschaft mit beschrankter Haftpflicht, a corporation or association organized under the laws of Germany with a place of business at Berlin, Germany.

"Ottico" means Ottico Meccanica Italiana, a corporation or association organized under the laws of Italy with a place of business at Rome, Italy.

"Tokyo" means Tokyo Keiki Seisakusho, Ltd., a corporation or association organized under the laws of Japan with a place of business at Tokyo. Japan.

"Mitsui" means Mitsui Bussan Kaisha, Ltd., a corporation or association organized under the laws of Japan with a place of business at Tokyo, Japan.

"Zenith Companies" means Societe Generale des Carburateurs Zenith, a corporation or association organized under the laws of Switzerland with a place of business at Geneva, Switzerland; Zenith Carburetter Company, Limited, a corporation or association organized under the laws of Great Britain with a place of business at Stanmore, Middlesex, England; Societe du Carburateur Zenith, a corporation or association organized under the laws of France with a place of business at Lavallois-Perret, France; and Societa Anonima Carburatore Zenith, a corporation or association organized under the laws of Italy with a place of business at Turin, Italy.

"Solex Companies" means Societe Anonyme Solex, a corporation or association organized under the laws of France with a place of business at Neuilly-Sur-Seine, France; Solex Limited, a corporation or association organized under the laws of Great Britain with a place of business at London, England; and Societa Anonima Solex, a corporation or association organized under the laws of Italy with a place of business at Milan, Italy.

"Smith" means S. Smith & Sons (Motor Accessories) Limited, a corporation or association organized under the laws of Great Britain with a place of business at Cricklewood, London, England.

"Bosch" means Robert Bosch, G.m.b.H., a corporation or association organized under the laws of Germany with a place of business at Stuttgart, Germany.

"Lucas" means Joseph Lucas, Ltd., a corporation or association organized under the laws of Great Britain with a place of business at Birmingham, England.

"Rotax" means Rotax, Ltd., a corporation or association organized under the laws of Great Britain with a place of business at Willesden Junction, London, England.

"Northern" means Northern Electric Company Ltd., a corporation or association organized under the laws of Canada with a place of business at Montreal, Province of Quebec, Canada.

"Siemens Agreement" means the agreement of December 17, 1936, between Bendix and Siemens.

"Ottico Agreement" means the agreement of January 16, 1937, between Bendix and Ottico.

"Tokyo Agreement" means the agreement of August 14, 1935, between Bendix, Tokyo and Mitsui.

"Zenith Agreement" means the agreement of May 3, 1938, between Bendix, the Zenith Companies and the Solex Companies.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

"Smith Agreements" means the agreements of August 21, 1936, and June 7, 1940, between Bendix and Smith.

"Bosch Agreements" means the agreement of October 24, 1935, between Eclipse Aviation Corporation and Bosch and the agreement of July 1, 1939, between Bendix and Bosch.

"Lucas Agreements" means the license and license agreement of December 31, 1932, dated December 6, 1935, between Eclipse Aviation Corporation, Eclipse Machine Company, Bendix and Lucas, together with the supplemental agreement dated November 30, 1935.

"Rotax Agreements" means the agreements of December 31, 1938, and January 1, 1940, between Bendix and Rotax.

"Northern Agreement" means the agreement of March 21, 1940, between Bendix, Rotax and Northern.

"Agreement" as hereinafter used in this judgment in reference to any of the above-defined agreements shall include all amendments, renewals and extensions thereof.

"Patent" or "patent application" shall include continuations, renewals, reissues, divisions and extensions of any such patent or patent application.

III

[ *Performance of Agreements Enjoined; Provisos*]

Bendix, its officers, directors, agents, employees, successors, subsidiaries and assigns, and any person acting or claiming to act under, through or for them, or any of them, are severally enjoined and restrained from the further performance in whole or in part of the Siemens Agreement, the Ottico Agreement, the Tokyo Agreement, the Smith Agreements, the Bosch Agreements, the Lucas Agreements, the Rotax Agreements, the Northern Agreement and the Zenith Agreement; provided, however, that subject to the provisions of Sections V and VI of this judgment, the injunction in this Section III shall not affect or impair rights of the defendant Bendix to prosecute or maintain or to have prosecuted or maintained patent applications existing at the date of this judgment, or to manufacture, use or sell, or to grant sub-licenses, or to collect or pay royalties, under, or to maintain or have maintained, patents or patents issued upon applications, existing at the date of this judgment; and provided further that with respect to the Zenith Agreement the provisions of this Section III against further performance of such agreement shall become effective nine months from the date of the entry of this judgment.

IV

Bendix, its officers, directors, agents, employees, successors, subsidiaries and assigns, and any person acting or claiming to act under, through or for them, or any part of them, are severally enjoined and restrained from adhering to, maintaining, furthering, reviving, or entering into with any person, any agreement both similar to, and relating to any aircraft or marine instrument, device or accessory or any carburetor of the types covered by, the Siemens Agreement, the Ottico Agreement, the Tokyo Agreement, the Zenith Agreement, the Smith Agreements, the Bosch Agreements, the Lucas Agreements, the Rotax Agreements, or the Northern Agreement, the purpose or effect of which is to restrain the foreign or domestic trade or commerce of the United States, its territories or possessions, such as, for example, but without limitation, any contract, combination or conspiracy with any manufacturer to condition any assignment, license or the grant of any immunity under any patent, or the availability of any such assignment, license or immunity, or the granting, securing or availability of any manufacturing information, right or design, or right under a trademark, upon a covenant, agreement or undertaking not to sell, or not to permit the sale of, such an instrument, device or accessory or such a carburetor, for export from or import into the United States or any of its territories or possessions, or for the suppression or prevention of any such import or export.

V

[ *Patents to Be Transferred to Alien Property Custodian; Grants of Immunity; Licensing*]

---

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

Bendix, its officers, directors, agents, employees, successors, subsidiaries and as-signs, and any person acting or claiming to act under, through or for them, or any of them, are ordered and directed:

(A). To transfer, grant and assign to the Alien Property Custodian, his successors and assigns, all right, title and interest which Bendix and its subsidiaries acquired, hold or claim in, to or under the United States Letters Patent and patent applications listed in Schedule A attached hereto and made a part hereof, for the full unexpired term of said patents and any patents issued on said applications, including, without limitation, any claims to, and any right to acquire, any license, exclusive or non-exclusive, under said patents or patent applications or any patents issued on said applications, and Bendix and its subsidiaries shall forthwith execute all documents necessary to effectuate such transfer, grant and assignment to the Alien Property Custodian in a form which will satisfy the requirements of the United States Patent Office with respect to the recording thereof; provided, that the Alien Property Custodian shall not, for the purpose of this, judgment, be deemed to be a successor or assign of Bendix by reason of the grants, transfers and assignments made by Bendix to the Alien Property Custodian pursuant to this Subsection A of Section V hereof.

(B). To issue to any applicant making written request therefor, to the extent that Bendix and its subsidiaries now have or acquire the power to do so, an unrestricted and unconditional grant of immunity from suit under foreign patents or patents issued on foreign applications for patents, corresponding to the United States Letters Patent or applications for patents listed in Schedule A, to import into and to sell or use, and to have imported, sold or used in any country products made in the United States.

(C). To grant to any applicant making written request therefor, to the extent that Bendix and its subsidiaries now have or acquire the power to do so, a non-exclusive license, sub-license or immunity to manufacture, use and sell under any one or more of the United States Letters Patent and the patents issued under applications for United States Letters Patent, the patent numbers and application numbers of which are listed in Schedule B attached hereto and made a part hereof, without any condition or restriction whatsoever, except that a reasonable and non-discriminatory royalty may be charged and, where such royalty is charged, provision may be made for the inspection of the books and records of the licensee by an independent auditor who may report to Bendix only the amount of royalty due and payable and no other information.

(D). To grant to any applicant making written request therefor, to the extent that Bendix and its subsidiaries now have or acquire the power to do so, a non-exclusive grant of immunity from suit under foreign patents or patents issued on foreign applications for patents, corresponding to the United States Letters Patent or applications for patents listed in Schedule B to import into and to sell or use, and to have imported, sold or used, in any country products made in the United States, without any condition or restriction whatsoever except that a reasonable and non-discriminatory royalty may be charged and, where such royalty is charged, provision may be made for the inspection of the books and records of the licensee by an independent auditor who may report to Bendix only the amount of royalty due and payable and no other information.

VI

[ Acts Enjoined]

Bendix, its officers, directors, agents, employees, successors, subsidiaries and assigns, and any person acting or claiming to act under, through or for them, or any of them, are severally enjoined and restrained from:

(A). Instituting or threatening to institute, or maintaining, any suit or proceeding for infringement or to collect damages for infringement alleged to have occurred prior to the date of this judgment (1) of any United States Letters Patent listed in, or issued on any application listed in, Schedule A or Schedule B, or (2) of any foreign patent corresponding to a United States Letters Patent or application listed in Schedule A or Schedule B, on account of the importation, use or sale in any country of products made in the United States.

(B). Filing, prosecuting, maintaining, or threatening to file, prosecute or maintain, any suit, claim or proceeding under Section 9 of the Trading with the Enemy Act, as amended, or otherwise, to recover from the Alien Property Custodian or from any successor or assign of the Alien Property Custodian (not including Siemens, Hakenfelde, Bosch, Tokyo, Mitsui, Societa Anonima Solex, Societa Anonima Carburatore Zenith, or Ottico) or from any funds

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

4

A-27

or assets now in the United States, its territories or possessions vested by or in the custody of the Alien Property Custodian, any sums or damages, including royalties under patent licenses, on account of any claim or cause of action asserted by Bendix against Siemens or Hakenfelde under or in connection with the Siemens agreement, against Ottico under or in connection with the Ottico agreement, against Bosch under or in connection with Bosch agreements, against Tokyo or Mitsui under or in connection with the Tokyo agreement, or against Societa Anonima Carburatore Zenith or Societa Anonima Solex under or in connection with the Zenith agreement; provided, however, that this Subsection (B) of Section VI shall not affect any suit, claim or proceeding by Bendix to recover from any such funds or assets if the Alien Property Custodian or his successor is authorized, and administratively determines or is directed, to return such funds or assets to Siemens, Hakenfelde, Ottico Bosch, Tokyo, Mitsui, Societa Anonima Solex or Societa Anonima Carburatore Zenith even if such funds or assets are at the time in the possession of the Alien Property Custodian or his successors.

(C). Filing, prosecuting, maintaining, or threatening to file, prosecute or maintain, any suit, claim or proceeding under Section 9 of the Trading with the Enemy Act, as amended, or otherwise, for the purpose of claiming or recovering any right, title or interest in, to or under any patent or patent application listed in Schedule A, or to any proceeds therefrom derived from any source, and from asserting or claiming, in any suit or action at law or otherwise, any right or rights which are directly or indirectly based upon any such patent or patent application, except any rights based upon any patent license or immunity which Bendix might acquire pursuant to Section VII of this judgment; provided, however, that this Subsection (C) of Section VI shall not affect any right of Bendix in defending against any future claim by Siemens, Hakenfelde, Bosch, Tokyo, Mitsui, Societa Anonima Solex. Societa Anonima Carburatore Zenith or Ottico, or any successor or assign of any of such companies except the Alien Property Custodian, or his successors and assigns, to ownership or control of any patents or patent applications listed in Schedule A.

VII

[ *Title to Patents in Alien Property Custodian; Licensing*]

(A). It is adjudged and decreed that all right, title and interest in, to and under the patents and patent applications listed in Schedule A are in the Alien Property Custodian. Subject to the provisions of Subsection (B) of this Section VII, and Section VIII, this judgment shall not be deemed to determine, prejudice or affect the position of the Alien Property Custodian, or his successors and assigns with respect to any right or claim of the Alien Property Custodian or his successors and assigns with respect to his ownership of or right to any property including ownership of, or right to issue licenses or immunities under, any patent, patent application, process, design or invention now or hereafter vested in him, or his right or claim to vest, sell or otherwise to dispose of any property including any patent, patent application, process, design or invention, pursuant to the provisions of the Trading with the Enemy Act, as amended, and in accordance with his policy in the administration thereof, or any right or claim of the Alien Property Custodian to patent royalties or payments; or with respect to any defense by counterclaim or otherwise which the Alien Property Custodian may have to any claim filed pursuant to Section 9 of the Trading with the Enemy Act, as amended, or otherwise filed or asserted against the Alien Property Custodian or property now or hereafter vested in him or in his custody; provided, however, that, subject to the provisions of Section VI of this judgment, this judgment shall also not be deemed to determine, prejudice or affect any right of Bendix to contest the assertion by the Alien Property Custodian, or his successors and assigns, of any such right or claim.

(B). A royalty-free, non-exclusive, unconditional and unrestricted license or immunity under any one or more of the United States Letters Patent and patents issued under application for United States Letters Patent, the patent numbers and application numbers of which are listed in Schedule A, shall be granted by the Alien Property Custodian, his successors and assigns, and by the owner of any right or power to license or grant any immunity thereunder, to any applicant (including Bendix) making written request therefor; provided, that so long as ownership of said patents and patent applications or such right or power is vested in the United States, the department, agency or officer duly authorized to administer them may, upon a determination that the national interest so requires, withhold, and upon sale or other disposition of any interest in such patents or patent applications, require any subsequent owner thereof to withhold, licenses or immunity thereunder from any

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

corporation or other business organization organized under the laws of or having its principal place of business in Germany or Japan, or individuals who are subjects, citizens or residents thereof, or any corporation, business organization or individual acting for or on behalf of any such German or Japanese corporation, business organization or subject, citizen or resident of Germany or Japan, or from any person named in "The Proclaimed List of Certain Blocked Nationals" or any similar list; and provided, further, that any license issued by a duly authorized department, agency, or officer of the United States may contain the terms and conditions set forth in the form annexed hereto and marked Exhibit C.

VIII

[ *Rights, Claims Between Bendix and Alien Property Custodian; Licensing*]

Subject to the provisions of Subsection (B) of Section VI of this judgment, this judgment shall not be deemed to determine, prejudice or affect, as between Bendix and the Alien Property Custodian, his successors and assigns, any right or claim, relating to any patent or patent application listed in Schedule B, or arising out of or connected with the Zenith agreement; provided, however, that in any event Bendix shall be entitled on request to receive from the Alien Property Custodian, his successors and assigns, a royalty-free, non-exclusive, unconditional and unrestricted license or immunity, of the kind specified in Subsection (B) of Section VII, under any patent or patent application listed in Schedule B, if and to the extent that such patents, or patent applications shall have been vested by the Alien Property Custodian.

IX

[ *Access of Department of Justice to Records and Interviews; Reports*]

For the purpose of securing compliance with this judgment, and for no other purpose, and subject to any legally recognized privilege, duly authorized representatives of the Department of Justice shall, on the written request of the Attorney General, or an Assistant Attorney General, and on reasonable notice to Bendix be permitted (1) reasonable access, during the office hours of Bendix, to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession of or under the control of Bendix, relating to any of the matters contained in this judgment; (2) without restraint or interference from Bendix, to interview its officers or employees, who may have counsel present, regarding any such matters; and Bendix, on such request, shall submit such reports, on applications for licenses and licensing under Section V of this judgment, or with respect to any relationship with Siemens, Hakenfelde, Ottico, Tokyo, Mitsui, any of the Zenith companies; any of the Solex companies, Smith, Bosch, Lucas, Rotax and Northern, as may from time to time be reasonably necessary for the enforcement of this judgment; provided, however, that information obtained by means permitted in this Section IX shall not be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Department of Justice except in the course of legal proceedings in which the United States of America is a party or as otherwise required by law.

X

[ *Jurisdiction Retained*]

Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this judgment to apply to the court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this judgment, for the amendment, modification or termination of any of the provisions thereof, for the enforcement of compliance therewith and for the punishment of violations thereof.

SCHEDULE A

Siemens Patents

| Number | Inventor | Expiration Date |
| --- | --- | --- |
| 1,709,457 | Boykow | 4/16/46 |
| 1,721,653 | " | 7/22/46 |
| 1,764,714 | " | 6/17/47 |
| 1,801,947 | " | 4/21/48 |

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

6

A-29

U.S. v. U.S. PIPE AND FOUNDRY CO., ET AL.
Civil No.: 10772
Year Judgment Entered: 1948

### Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. United States Pipe and Foundry Company, James B. Clow & Sons, Glamorgan Pipe and Foundry Company, Lynchburg Foundry Company, McWane Cast Iron Pipe Company., U.S. District Court, D. New Jersey, 1948-1949 Trade Cases ¶62,285, (Jul. 21, 1948)

Click to open document in a browser

United States v. United States Pipe and Foundry Company, James B. Clow & Sons, Glamorgan Pipe and Foundry Company, Lynchburg Foundry Company, McWane Cast Iron Pipe Company.

1948-1949 Trade Cases ¶62,285. U.S. District Court, D. New Jersey. Civil Action No. 10772. July 21, 1948.

#### Sherman Antitrust Act

**Consent Judgment—Lease-License Agreements—Acts in Restraint of Trade Enjoined.**—A consent judgment entered against five manufacturers of cast iron pressure pipe and of machinery for the manufacture of such pipe terminates certain lease-license agreements, and enjoins defendants from conditioning licenses, disclosures of technical information, or sales or leases of machines for the manufacture of pipe upon the requirement that the other party to the agreement shall agree: to accept a license under any other patent owned by any defendant; to pay royalties under any unused patent; to manufacture pipe of specified kinds and sizes; not to manufacture pipe on machines not leased or sold by any defendant; to cross-license any patent owned or controlled by said other party, to any defendant; to maintain or adhere to prices or price ranges, or other terms of sale, for pipe; to maintain any restrictions as to quantity of pipe produced, or as to the exportation of pipe from the United States, or which limit the market or territories in which pipe may be sold or distributed in the United States. The defendants are enjoined from entering into any agreement to restrict, allocate or limit production of pipe; to allocate customers markets or fields; to fix, determine, maintain or adhere to prices or other terms or conditions of sale of pipe; or to attempt to limit the manufacture of pipe to any specified standards, grades or qualities. A defendant is enjoined from acquiring or holding any interest in the assets or capital stock of any other person engaged in manufacturing and selling pipe or machines for the manufacture of pipe, where such acquisition substantially lessens competition or tends to create a monopoly. That defendant is ordered to dedicate certain patents to the public, and to grant licenses of certain other patents on a reasonable royalty basis.

For plaintiff: Herbert A. Bergson, Assistant Attorney General; Sigmund Timberg, Special Assistant to the Attorney General; Isaiah A. Matlack, Acting United States Attorney; Victor H. Kramer, Morton H. Steinberg, Special Assistants to the Attorney General; Herbert Maletz, Special Attorney.

For defendants: J. W. Brennan, John A. Hartpence.

#### Final Judgment

Plaintiff, the United States of America, having filed its complaint herein the 23rd day of October, 1947; and all parties hereto by their attorneys herein having severally consented to the entry of this final judgment herein without trial or adjudication of any issue of fact or law herein, and without admission by any party in respect of any such issue:

NOW, THEREFORE, before any testimony has been taken herein, and without trial or adjudication of any issue of fact or law herein, and upon consent of all parties hereto, it is hereby

ORDERED, ADJUDGED and DECREED as follows:

[ *Jurisdiction*]

I

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

The Court has jurisdiction of the subject matter herein and of all of the parties to this judgment, and the complaint states a cause of action against the defendants, and each of them, under Sections 1 and 2 of the Act of Congress of July 2, 1890, entitled "An Act to Protect Trade and Commerce against unlawful Restraints and monopolies", as amended, commonly know as the Sherman Act (15 U. S. C. Secs. 1, 2).

[ *Terms Defined*]

II.

As used in this judgment, the following terms have the meaning assigned respectively to them below:

A) "USP" means the defendant, United States Pipe and Foundry Company;

B) "Lease-license agreements" means each, every and all agreements, letter contracts and contracts, existing and in full force and effect as of the date of this judgment, between defendant USP and other defendants, whereby licenses have been granted to manufacture, use and sell pipe under USP patents and whereby USP machines have been leased, or licenses granted for the manufacture and use thereof;

C) "Pipe" means centrifugally cast castiron pressure pipe for use in the conveyance of liquids and gases under pressure;

D) "USP machines" means machines and apparatus covered by one or more of USP patents, for the production of pipe;

E) "Patent" or "patents" means United States Letters Patent and all reissues and extensions thereof.

F) "USP patents" means the United States Letters Patent and applications therefor, listed in Exhibit A attached hereto and made a part hereof, all of which are owned by USP.

III.

The provisions of this judgment applicable to any defendant herein shall apply to each of its subsidiaries, successors, and assigns, engaged in the production of pipe, and to each of its officers, directors, agents, and employees, and to each person acting, or claiming to act, under, through or for such defendant.

[ *Agreements Terminated*]

IV.

The lease-license agreements, as defined in this judgment, are, and each of them is, hereby terminated; and the defendants are hereby jointly and severally enjoined and restrained from any further performance in whole or in part of such lease-license agreements, and from any further performance of any of the obligations assumed under or in furtherance of any such agreements. The defendants are hereby jointly and severally enjoined and restrained from directly or indirectly, maintaining, reinstating or enforcing such lease-license agreements.

[ *Acts Enjoined*]

V.

The defendants herein are individually and jointly restrained from conditioning:

1) a license or immunity granted under any patent;

2) a disclosure made of technical information or data; or

3) a sale or lease made of machines; for the manufacture of pipe, upon the requirement that the other party to such trans action shall agree:

a) to request or accept a license or immunity under any other patent owned or controlled by any defendant;

b) to pay royalties under any patent or patents which are unused by said other party;

c) not to challenge the validity of any patent or patents owned or controlled by any defendants;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

A-32

d) to manufacture only pipe of specified kinds and sizes or to manufacture only pipe covered by specified patent or patents or the production of which is covered by specified patent or patents;

e) to adopt and to use trademarks or trade names owned or controlled by any defendant;

f) to maintain standards, grades or qualities of pipe prescribed or suggested by any defendant;

g) not to manufacture pipe on machines not leased or sold by defendant;

h) to buy or lease from any defendant any other machines for the manufacture of pipe;

i) not to buy or lease machines, for the manufacture of pipe, manufactured by other than any defendant;

j) to cross-license or assign any patent, or patents, or to disclose technical information or data, owned or controlled by said other party, to any defendant;

k) to maintain or adhere to prices or price ranges, or other terms and conditions of sale, for pipe;

l) to maintain or adhere to any restrictions as to quantity of pipe produced;

m) to maintain or adhere to any restrictions which limit the exportation of pipe from the United States, its territories, or possessions, or which limit the market or territories in which pipe may be sold or distributed in the United States.

**VI.**

The defendants are severally and jointly restrained from entering into, executing, maintaining or adhering to, any contract, agreement, understanding or arrangement with any manufacturer of pipe:

a) to restrict, allocate or limit production of pipe;

b) to allocate customers, markets or fields for the manufacture, sale or distribution of pipe in the United States, its territories or possessions;

c) to fix, determine, maintain or adhere to prices or other terms or conditions of sale of pipe;

d) to prohibit or restrict the sale of pipe for export from or import into the United States, its territories or possessions;

e) to limit or attempt to limit the manufacture of pipe to any specified standards, grades or qualities;

f) to provide for the inspection of any records, files or other documents and papers of any manufacturer of pipe except that an independent public accountant may be employed for the purpose of determining amounts of royalties or rentals due.

**VII.**

Defendant USP is hereby enjoined and restrained from hereafter acquiring, or holding after such acquisition, any interest in the assets or capital stock of any other person engaged in manufacturing and in selling pipe, or machines for the manufacture of pipe, where such acquisition substantially lessens competition or tends to creat a monopoly in the manufacture and sale of pipe.

[ *Title To Be Conveyed*]

**VIII.**

Defendant USP is hereby ordered and directed to convey, within sixty (60) days from date of entry of this judgment and without further consideration, or conditions, legal title to any USP machines, now in possession of any other persons under lease-license agreements with defendant USP, to such other persons.

[ *Dedication To Public*]

**IX.**

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm
3

Defendant USP is hereby ordered and directed to dedicate to the public, within thirty (30) days from the date of entry of this judgment, all of the USP patents listed in Exhibit A.

[ *Licenses To Be Made Available*]

Upon the grant of a license or immunity under any patent, for the manufacture of pipe, acquired by any defendant within a period of three (3) years from the date of entry of this judgment, a license of immunity under such patent shall be available to any other applicant on non-discriminatory terms.

[ *Inspection for Compliance Purposes*]

XI.

For the purpose of securing compliance with this judgment and for no other purr pose, duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General or an Assistant Attorney General, and upon reasonable notice to any defendant herein made to the principal office of such defendant be permitted, subject to any legally recognized privilege, (1) access during the office hours of said defendant to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of said defendant, relating to any of the matters contained in this judgment, and (2) subject to the reasonable convenience of said defendant and without restraint or interference from it, to interview officers or employees of such defendant, who may have counsel present, regarding such matters. Upon written request of the Attorney General, or an Assistant Attorney General, on reasonable notice to any defendant herein made to its principal office, such defendant shall submit such reports as might from time to time be reasonably necessary to the enforcement of this judgment, *provided* however that no information obtained by the means provided in this Section XI shall be divulged by the Department of Justice to any person other than a duly authorized representative of the Department of Justice, except in the course of legal proceedings to which the United States is a party for the purpose of securing compliance with this judgment or as otherwise required by law.

[ *Jurisdiction Retained*]

XII.

Jurisdiction of this action is retained by this Court for the purpose of enabling any of the parties to this judgment to apply to the Court any time for, and for the Court to make, such further orders or directions as may be necessary or appropriate for the construction or carrying out of this judgment, for the modification thereof, or for the enforcement of compliance therewith, and for punishment of violations thereof.

**Exhibit A**

| Patent No. | Inventor | Title | Date |
|---|---|---|---|
| 1,833,025 | Langenberg, F. C. | Method for Hardening the Inner Surface of Cylindrical Metal Bodies | Nov. 24, 1931 |
| 1,834,128 | Langenberg, F. C. | Method and Apparatus for Improving the Texture of Hollow Metal Bodies | Dec. 1, 1931 |
| 1,845,127 | Clark, S. B. | Conveyor Mechanism | Feb. 16. 1932 |
| 1,849,072 | Clark, S. B. | Runner Trough for Centrifugal Casting Machines | Mar. 15, 1932 |
| 1,856,863 | Clark, S. B. | Pipe Annealing Furnace | May 3. 1932 |
| 1,856,874 | Langenberg, F. C. | Manufacture of Centrifugal Pipe Molds | May 3. 1932 |
| 1,856,890 | Stokes, D. B, | Pipe Joint Packing | May 3. 1932 |
| 1,890,498 | Daniel, R. E. Haughton, R. K. Clark, S. B. | Runway for Pipes | Dec. 13, 1932 |
| 1,897,631 | Clark, S. B. | Method for Casting Pipes | Feb. 14, 1933 |
| 1,899,383 | Clark, S. B. | Centrifugal Pipe Casting Apparatus | Feb. 28. 1933 |
| 1,903,220 | Lemert, L. T. | Flange Protector | Mar. 28, 1933 |

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

U.S. v. ALLEGHENY LUDLUM STEEL CORP., ET AL.
Civil No.: 4583
Year Judgment Entered: 1948

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. Allegheny Ludlum Steel Corporation, et al., U.S. District Court, D. New Jersey, 1948-1949 Trade Cases ¶62,330, (Oct. 25, 1948)

Click to open document in a browser

United States v. Allegheny Ludlum Steel Corporation, et al.

1948-1949 Trade Cases ¶62,330. U.S. District Court, D. New Jersey. Civil No. 4583. October 25, 1948.

### Sherman Antitrust Act

**Consent Judgment—Agreements in Restraint of Trade—Acts Enjoined.—A consent judgment entered in a civil suit charging 18 stainless steel companies with entering into a combination in restraint of trade in violation of the Sherman Act enjoins defendants from: entering into agreements to fix, maintain, determine or adhere to prices or other terms of sale; printing, publishing, circulating, quoting or using any prices, price lists, discounts, differentials of any other term or condition of sale to be required of others in connection with the purchase or sale of stainless steel products pursuant to or resulting from any agreement or plan among defendants; conferring as to prices or extras to be quoted or charged to others for stainless steel products; preparing, circulating, exchanging or using "advance information" or any other information concerning prices and conditions of sale; publishing, quoting or charging prices on any basis other than (1) F.O.B. at the actual place of manufacture or origin of shipment, or (2) on a basis which at destination at no time shall be higher than the F.O.B. price at the actual place of manufacture or origin of shipment, plus actual transportation and other delivery charges, with every purchaser having an option to purchase F.O.B. at the actual place of manufacture or origin of shipment. A defendant is ordered to grant to any applicant a non-exclusive license under certain patents at reasonable and non-discriminatory royalties, and a nonexclusive grant of immunity from suit under any foreign patents owned or controlled by that defendant corresponding to the domestic patents.**

For plaintiff: Herbert A. Bergson, Assistant Attorney General; Isaiah Matlack, United States Attorney; Manuel M. Gorman, Sigmund Timberg, J. Francis Hayden, Samuel Flatow, Special Assistants to the Attorney General.

For defendants: Carpenter, Gilmour & Dwyer, James S. Carpenter, Jr.; Stryker, & Homer, Stryker; John A. Hartpence; Pitney Hardin Ward & Brennan, Charles B. Hardin; C. Laud; Riker, Marsh & Scherer, Riker, Emery & Danzig; Cravath, Swaine & Moore, Hoyt A. Moore; Minton & Dinsmore, V. Lane.

### Final Judgment

The complainant, the United States of America, having filed a complaint herein on January 19, 1945; the defendants having appeared and filed their answers to such complaint, denying the substantive allegations thereof; plaintiff and the defendants, by their attorneys herein, having severally consented to the entry of this final judgment herein, without any trial or adjudication of any issue of fact or law herein, and without an admission by any party in respect of any such issue;

Now, therefore, before any testimony has been taken herein and without trial or adjudication of any issue of fact or law herein, and upon the consent of plaintiff and each of the defendants, it is hereby

*ORDERED, ADJUDGED and DECREED* as follows:

[ *Jurisdiction*]

*I*

That this Court has jurisdiction of the subject matter herein and of all the parties hereto; that the complaint states a cause of action against each of the defendants herein under Section 1 of the Act of Congress of July 2, 1890, entitled "An Act to Protect Trade and Commerce Against Unlawful Restraints and Monopolies", as amended.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

*II*

**Definitions**

As used in this judgment the term:(a) "Stainless steel" means a steel with high corrosion or heat resistant qualities, or both such qualities, which consists of an alloy of iron and chromium (known as straight chrome stainless steel), or of an alloy of iron and both chromium and nickel (known as chrome nickel stainless steel), with or without the addition of supplementary alloying agents, such as molybdenum, columbium, titanium, selenium, and others.

(b) "Stainless steel products" means bars, double bevels, single bevels, ingots, wire, structural, plates, sheets, hot rolled strip, cold rolled strip, billets and similar products made of stainless steel;

(c)"Free machining patents" means United States Letters Patent Nos. 1,835,960, 1,846.140, 1,961,777, 2,009,713, and any division, continuation, reissue or extension thereof and any additional patents or patent rights covering or pertaining to improvements upon the inventions, processes, methods or apparatus covered by the aforementioned patents, or any division, continuation, reissue or extension thereof.

*III*

Reference to any defendant herein shall be deemed in each case to include the directors, officers, employees, agents, successors and assigns of that defendant, and any wholly owned or controlled subsidiary thereof, and any person acting or claiming to act under, through, or for them or any of them.

[ *Acts Enjoined*]

*IV*

Each of the defendants is individually restrained and enjoined from:

(a) Entering into, creating, performing or giving effect to any contract, agreement, understanding, plan or program among or with any of the defendants (1) to fix, maintain, determine or adhere to prices, discounts, charges, differentials, including freight rate factors or applicators, or terms or conditions of sale to be quoted or charged to or required of others in the purchase or sale of any stainless steel products; (2) to establish, enforce, provide or use any price list, extra list, base price list or any classification of stainless steel products into base prices and extras, or activities in connection therewith; or (3) to use, enforce, or adhere to any formula or any designated means or source for determining prices, charges, discounts, classifications as base price or extras, or any other element or term, condition or differential, including freight rate factors or applicators, in connection with the sale or pricing of stainless steel products to others;

(b) Printing, publishing, circulating, quoting or using any prices, price lists, or extra lists, cash or courtesy discounts, transportation charges, differentials, including freight rate factors or applicators, or any other term or condition of sale to be quoted or charged to, or required of, others for or in connection with, the purchase or sale of stainless steel products pursuant to or resulting from any agreement or understanding, plan or program among or with any of the defendants;

(c) Conferring or consulting as to or discussing prices or extras to be quoted or charged to others for stainless steel products or any terms or conditions of sale thereof at any meeting of representatives of any of the defendants, or by any correspondence or communications among or with any of the defendants and from exchanging among or with any of the defendants any information as to prices, extras, or differentials including freight rate factors or applicators to be quoted or charged to, or required of, others for stainless steel products or any proposed terms or conditions for sale to others of such products;

(d) Preparing, circulating, exchanging or using so-called A. I. s, or Advance In formation, or any other information concerning the prices and terms or conditions of sale which any defendant proposes or intends to quote on a bid to any prospective purchaser, or has quoted or charged to any purchaser on a bid, for any sale of stainless steel products, or to disclose to any competitor bids or quotations made to others for stainless steel products;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

(e) Compiling, printing, publishing or circulating as defendant's list of prices for stainless steel products, or as defendant's list of extras, or as terms and conditions of sale, for stainless steel products any prices, extras, or terms or conditions of sale applicable to any type or grade of stain less steel or stainless steel products not now or are hereafter being manufactured, sold or ofered for sale by such defendant or any affiliated company;

(f) Publishing, printing, quoting or charging prices for stainless steel products on any basis other than (1) F. O. B. at the actual place of manufacture or origin of shipment of said products, or (2) on a basis, which at destination at no time shall be higher than the F. O. B. price at the actual place of manufacture or origin of shipment of said products plus actual transportation and other delivery charges, with every purchaser having an option to purchase F. O. B. at the actual place of manufacture or origin of the shipment of said products;

(g) Instituting or threatening to institute, or maintaining any suit, counterclaim or proceeding, judicial or administrative, for infringement of any free machining patent, alleged to have occurred prior to the date of the entry of this judgment.

[ *Patent Licensing*]

*V*

Defendant, The Carpenter Steel Company, its officers, directors, agents, employees, successors and assigns, are hereby ordered and directed:

(a) To grant to any applicant upon each written request therefore a non-exclusive license to manufacture, use and sell under any one or more free machining patents without any condition or restriction what so ever except (1) a reasonable and non-discriminatory royalty may be charged and collected, and (2) where such royalty is charged, provision may be made for inspection of the books and records of the licensee by an independent auditor who may report to the defendant licensor only the amount of royalty due and payable and no other information;

To grant to any applicant making written request therefore to the extent that the defendant, The Carpenter Steel Company has or acquires the power to do so, a nonexclusive grant of immunity from suit under any foreign patents owned or controlled by defendant, The Carpenter Steel Company, corresponding to free ma chining patents, to import into and sell or use and to have imported, sold or used in any country, products made in the United States, without any condition or restriction whatsoever, except that a reasonable and non-discriminatory royalty may be charged and collected, and where such royalty is charged, provision may be made for inspection of the books and records of the licensee by an independent auditor who may report to the defendant licensor only the amount of royalty due and payable and no other information;

(c) To include in each license issued pursuant to this Section V, a provision under which the licensee may cancel such license any time after one year from the date of issuance of such license.

[ *Webb-Pomerene Act*]

*VI*

Nothing in this judgment shall have any effect with respect to activities or operations, authorized or permitted by the Act of Congress of April 10, 1918, commonly called the Webb-Pomerene Act.

[ *Practices, Proceedings Not Affected*]

*VII*

Nothing contained herein shall be deemed to adjudicate the legality of any act or practice not prohibited herein, nor to bar or affect any proceeding under any law of the United States involving or relating to any act or practice not prohibited herein.

[ *Inspection for Compliance Purposes*]

*VIII*

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

3

For the purpose of securing compliance with this judgment authorized representatives of the Department of Justice shall, on written request of the Attorney General, or an Assistant Attorney General, be permitted, subject to any legally recognized privilege, (1) upon reasonable notice to any defendant corporation made to its principal office, reasonable access, during the office hours of such defendant, to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of such defendant, relating to any matters contained in this judgment, and (2) subject to the reasonable convenience of the defendants and without restraint or interference from the defendants, to interview officers or employees of the defendants, who may have counsel present, regarding any such matters, and (3) upon any such request said defendants shall submit such reports with respect to the licensing of stainless steel patents as may from time to time be appropriate for the purpose of enforcement of this judgment; Provided, however, that information obtained by the means permitted in this paragraph shall not be divulged by any representatives of the Department of Justice to any person other than a duly authorized representative of the Department of Justice except in the course of legal proceeding for the purpose of securing compliance with this judgment in which the United States is a party or as otherwise required by law.

[ *Jurisdiction Retained*]

IX

Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this judgment to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this judgment, for the modification of any of the provisions thereof or the enforcement of compliance therewith and for the punishment of violations thereof;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

4

A-39

U.S. v. SAND SPUN PATENTS CORP., ET AL.
Civil No.: 125-49
Year Judgment Entered: 1949

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. Sand Spun Patents Corporation, American Cast Iron Pipe Company, Florence Pipe Foundry and Machine Company, and Warren Foundry & Pipe Corporation., U.S. District Court, D. New Jersey, 1948-1949 Trade Cases ¶62,462, 462 F. Supp. 1321, (Jul. 22, 1949)

Click to open document in a browser

United States v. Sand Spun Patents Corporation, American Cast Iron Pipe Company, Florence Pipe Foundry and Machine Company, and Warren Foundry & Pipe Corporation.

1948-1949 Trade Cases ¶62,462. U.S. District Court, D. New Jersey. Civil Action No. 125-49. Filed July 22, 1949. 462 FSupp 1321

### Sherman Antitrust Act

**Pressure Pipe Industry—Consent Judgment—Patent Holding Company Ordered Dissolved. —In a civil suit charging conspiracy to monopolize and restrain trade in the cast iron pressure pipe industry, four corporations consented to a judgment which ordered a patent holding company dissolved after it had dedicated its patents to the public. The decree also terminated patent license agreements to limit the production, grades and quality of pipe. The companies were enjoined from entering any contract which would allocate customers or markets, restrict the import or export of pipe, or condition a license upon the understanding that the licensee not engage in research.**

For the plaintiff: Herbert A. Bergson, Assistant Attorney General; Alfred E. Modarelli, United States, Attorney, by John J. Barry. Morton H. Steinberg, Sigmund Timberg, Special Assistants to the Attorney General; Maurice Silverman, Special Attorney.

### Final Judgment

FORMAN, District Judge: Plaintiff, the United States of America, having filed its complaint herein on the 16th day of February, 1949; the defendants having appeared and filed their answers herein to the complaint, denying the substantive allegations thereof; and all parties hereto by their attorneys herein having severally consented to the entry of this final judgment herein without trial or adjudication of any issue of fact or law herein, and without admission by any party in respect of any such issue;

Now, therefore, before any testimony has been taken herein, and without trial or adjudication of any issue of fact or law herein, and upon consent of all parties hereto, it is hereby

Ordered, Adjudged and Decreed as follows:

I

The Court has jurisdiction of the subject matter herein and of all of the parties to this judgment, and the complaint states a cause of action against the defendants, and each of them, under Section 1 of the Act of Congress of July 2, 1890, entitled "An Act to Protect Trade and Commerce Against Unlawful Restraints and Monopolies," as amended, commonly known as the Sherman Act (15 U. S. C. Sec. 1)

[ *Terms Defined*]

II

As used in this judgment, the following terms have the meaning assigned respectively to them below:

A) "Sand Spun" means the defendant Sand Spun Patents Corporation;

---

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

B) "License agreements" means each, every and all agreements and contracts, existing and by the terms thereof in full force and effect as of the date of this judgment, between defendant Sand. Spun and other defendants, whereby licenses have been granted to manufacture, use and sell pipe under Sand Spun patents;

C) "Pipe" means centrifugally cast cast iron pressure pipe for use in the conveyance of liquids and gases under pressure;

D) "Patent" or "patents" means United States Letters Patent and all reissues and extensions thereof;

E) "Sand Spun patents" means the United States Letters Patent and applications therefor, listed in Exhibit A attached hereto and made a part hereof, all of which are owned by Sand Spun.

[ *Application of Judgment*]

III

The provisions of this judgment applicable to any defendant herein shall apply to each of its subsidiaries, successors, and assigns engaged in the production of pipe, and to each of its officers, directors, agents, and employees, and to each person acting under, through or for such defendant.

[ *Termination of License Agreements*]

IV

The license agreements, as defined in this judgment, are, and each of them is, hereby terminated; and the defendants are hereby jointly and severally enjoined and restrained from any further performance in whole or in part of such license agreements, and from any further performance of any of the obligations assumed under or in furtherance of any such agreements. The defendants are hereby jointly and severally enjoined and restrained from, directly or indirectly, maintaining, reinstating or enforcing such license agreements.

[ *Attaching Conditions to License Enjoined*]

V

The defendants herein are individually and jointly restrained from conditioning:

(1) a license or immunity granted under any patent; or

(2) a disclosure made of technical in formation or data; for the manufacture of pipe, upon the requirement, that the other party to such transaction shall agree:

(a) to manufacture only pipe of specified kinds and sizes;

(b) to maintain any standards, grades or qualities of pipe;

(c) to cross license or assign any patent or patents or any inventions, or to disclose technical information or data developed, owned or controlled by said other party in any defendant;

(d) not to dispose of any invention, patent, mechanical device or process with out first offering it to any defendant;

(e) not to engage in research or not to investigate or develop any invention, process, product, machine, mechanical device or any plan or method of manufacture, or to engage in any such research, investigation, or development only with the permission of any other person, or to forego any such research, investigation, or development if any other person agrees to undertake it;

(f) to maintain or adhere to any restrictions as to quantity of pipe produced;

(g) To pay a greater per tonnage or any other per unit royalty on any quantity of pipe produced than is provided for any smaller quantity;

(h) to maintain or adhere to any restrictions which limit the export of pipe from the United States;

(i) to pay any charge, royalty, or rental for the use of patents on pipe, based on the number of machines used in manufacturing such pipe;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

(j) to sell any machine, mechanical device or other property, the sale of which, to such other party has either been consummated, or, if not consummated, has been initiated by a person other than the granting or disclosing defendant, at the direction of, or only after first offering it to, any defendant, or only to specified persons;

(k) to assign only upon the consent of any person other than the licensor or only as an appurtenance to other property not related to the use of any such license or immunity.

[ *Restrictive Contracts Enjoined*]

VI

The defendants are severally and jointly restrained from entering into, executing, maintaining or adhering to any contract, agreement, understanding or arrangement, directly or indirectly, with any manufacturer of pipe;

(a) to control, restrict, or allocate the production or distribution of pipe;

(b) to allocate customers, markets or fields for the manufacture, sale or distribution of pipe in the United States, its territories or possessions;

(c) to prohibit or restrict the sale of pipe for export from or import into the United States, its territories or possessions;

(d) to restrict or attempt to restrict the manufacture of pipe to any specified standards, sizes, grades or qualities;

(e) to assign exclusive rights to patents, not in existence at the time of assignment, relating to the production of pipe;

(f) to provide for the inspection of any records, files or other documents and papers of any manufacturer of pipe, except that an independent public accountant may be employed for the purpose of determining amounts of royalties or rentals due.

[ *Dissolution Ordered*]

VII

Defendant Sand Spun is ordered to be dissolved within sixty (60) days from the date of entry of this judgment. There shall within ten (10) days after such dissolution be delivered to the Court, after notice to the Attorney General, adequate proof of such dissolution.

[ *Dedication of Patents Ordered*]

VIII

Defendant Sand Spun is hereby ordered and directed to dedicate to the public, withing thirty (30) days from the date of entry of this judgment, all of the Sand Spun patents listed in Exhibit A.

[ *For Purposes of Compliance*]

IX

For the purpose of securing compliance with this judgment and for no other purpose, duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General or an Assistant Attorney General, and upon reasonable notice to any defendant herein made to the principal office of such defendant be permitted, subject to any legally recognized privilege, (1) access during the office hours of said defendant to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of said defendant, relating to any of the matters contained in this judgment, and (2) subject to the reasonable convenience of said defendant and without restraint or interference from it, to interview officers or employees of such defendant, who may have counsel present, regarding such matters. Upon written request of the Attorney General, or an Assistant Attorney General, on reasonable notice to any defendant herein made to its principal office, such defendant shall submit such reports as might from time to time be reasonably necessary to the enforcement of this judgment. No information obtained by the means provided in this Section shall be divulged by the Department of Justice to any person other than a duly authorized

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

3

A-43

representative of the Department of Justice except in the course of legal proceedings to which the United States is a party for the purpose of securing compliance with this judgment or as otherwise required by law.

[ *Jurisdiction Retained*]

X

Jurisdiction of this action is retained by this Court for the purpose of enabling any of the parties to this judgment to apply to the Court at any time for, and for the Court to make, such further orders or directions as may be necessary or appropriate for the construction or carrying out of this judgment, for the modification or termination of any of the provisions thereof, or for the enforcement of compliance therewith, and for punishment of violations thereof.

**Exhibit "A"**

| Number | Date | Inventor | Title |
|---|---|---|---|
| 1,873,176 | 8/23/32 | Clarence D. Barr | Flasks |
| 1,873,227 | 8/23/32 | Murphy D. Smith | Body Pattern Extractors |
| 1,906,511 | 5/2/33 | Clarence D. Barr | Charging Machines |
| | | Stephen D. Moxley | |
| | | Frank S. Houghton | |
| 1,916,296 | 7/4/33 | Clarence D. Barr | Centrifugal Casting Machines |
| 1,927,467 | 9/19/33 | Stephen D. Moxley | Centrifugal Casting Machines |
| | | Walter Moreran | |
| 1,958,672 | 5/15/34 | W. D. Moore | Centrifugal Casting Machine |
| | | Walter Morgan | and Methods |
| 1,959,227 | 5/15/34 | Clarence D. Barr | Sand Ramming Equipment |
| | | Stephen D. Moxley | Stations for Flasks |
| 1,960,366 | 5/29/34 | Clarence D. Barr | Apparatus for Freeing and |
| | | Stephen D. Moxley | Removing Hollow Castings |
| | | Jacob L. Cooper | from Flasks |
| 1,983,431 | 12/4/34 | Clarence D. Barr | Centrifugal Casting Machines |
| | | Stephen D. Moxley | for Casting Hollow Metal |
| | | | Bodies |
| 2,015,776 | 10/1/35 | Clarence D. Barr | Charging, Weighing and |
| | | Stephen D. Moxley | Controlling Mechanism for |
| | | | Casting Machines |
| 2,043,956 | 6/9/36 | Louis A. Camerota | Improvement in Centrifugal |
| | | | Casting Machines |
| 1,897,951 | 2/14/33 | Louis A. Camerota | Methods and Apparatus for |
| | | | Blasting Pipe |
| 1,902,301 | 3/21/33 | Louis A. Camerota | Chucks for Centrifugal |
| | | | Casting Machines |
| 1,911,106 | 5/23/33 | Louis A. Camerota | Flask Handling Apparatus |
| 1,912,361 | 6/6/33 | Louis A. Camerota | Mold Disintegrating Stations |
| 1,919,199 | 7/25/33 | Louis A. Camerota | Conveyors for Cylindrical |
| | | | Objects |
| 1,925,034 | 9/12/33 | Louis A. Comerota | Stuffing Boxes for Blow |
| | | | Pipes |
| 1,936,378 | 11/21/33 | Louis A. Comerota | Centrifugal Casting |
| | | | Apparatus |
| 1,944,168 | 1/23/34 | Louis A. Comerota | Centrifugal Casting |
| | | | Machines. |

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

U.S. v. WESTINGHOUSE ELECTRIC, ET AL.
Civil No.: 5152
Year Judgment Entered: 1953

Civil Action No. 5152

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

UNITED STATES OF AMERICA,
PLAINTIFF.

v.

WESTINGHOUSE ELECTRIC & MANUFACTURING
COMPANY AND WESTINGHOUSE ELECTRIC
INTERNATIONAL COMPANY,
DEFENDANTS.

---

FINAL JUDGMENT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff.<br><br>       v.<br><br>WESTINGHOUSE ELECTRIC & MANUFACTURING<br>COMPANY AND WESTINGHOUSE ELECTRIC<br>INTERNATIONAL COMPANY,<br><br>          Defendants. | CIVIL ACTION<br>NO. 5152 |

#### FINAL JUDGMENT

Plaintiff, United States of America, having filed its Complaint herein on April 12, 1945, and the defendants herein having appeared and filed their answers to the Complaint denying the substantive allegations thereof; and the plaintiff and said defendants by their attorneys having severally consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law herein, and without admission by any party in respect of any such issues;

NOW THEREFORE, before any testimony has been taken herein, and without trial or adjudication of any issue of fact or law herein, and upon consent as aforesaid of all the parties hereto,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

I.

The Court has jurisdiction of the subject matter herein and of all the parties hereto. The Complaint of April 12, 1945, states a cause of action against the defendants under Section 1 of the Act of Congress of July 2, 1890, entitled "An Act to Protect Trade and Commerce Against Unlawful Restraints and Monopolies," commonly known as the Sherman Act, as amended, and under Section 73 of the Act of Congress of August 27, 1894, entitled "An Act to Reduce Taxation, to

A-47

Provide Revenue for the Government, and for Other Purposes," commonly known as the Wilson Tariff Act, as amended.

### II.

For the purposes of this Judgment:

(a) "Westinghouse" shall mean the defendant Westinghouse Electric & Manufacturing Company, which by change of name effective May 10, 1945, is now the Westinghouse Electric Corporation.

(b) "International" shall mean the defendant Westinghouse Electric International Company.

(c) "Electrical equipment" shall mean machines, apparatus, devices, circuits, material and processes relating to the generation, transmission, distribution or utilization of electric energy except electric lamps, radio and communications apparatus, cable, X-ray apparatus, elevators and certain other specialized apparatus. Electrical equipment includes generators, transformers and switchgear, essential for the generation and distribution of electric energy; motors of various types which serve as the sources of power for other industries; motors, magnets, switches, and heating elements for incorporation in other manufactured products; and electrical appliances such as fans and cooling or heating devices for domestic use.

(d) "Patents acquired from Siemens" shall mean any patents, patent applications, or rights to grant licenses under patents or patent applications, directed to electrical equipment and heretofore acquired by defendants from Siemens-Schuckertwerke A.G. or from Siemens & Halske A.G., named as co-conspirators in the Complaint, and shall include all reissues, divisions, continuations or extensions of said patents, and any patents which may issue upon said applications. A list of the patents acquired from Siemens and which defendants now own or control is attached hereto and marked Exhibit "A".

2

A-48

III.

The provisions of this Judgment applicable to any defendant shall apply to such defendant, its officers, directors, agents, employees, successors, assigns, subsidiaries, and all other persons acting under, through, or for such defendant.

IV.

The agreement dated November 10, 1934, between Siemens-Schuckert-werke A.G., Siemens & Halske A.G. and the defendants, Westinghouse and International, and any agreements amendatory thereof or supplemental thereto, to the extent not heretofore terminated, are hereby terminated, and the defendants are hereby enjoined and restrained from the further performance of any of the provisions of said agreement. This Article shall not be deemed to terminate any patent rights held by defendants upon the termination of said agreement.

V.

Each defendant is ordered and directed, within ninety (90) days after the date of the entry of this Judgment, to dedicate to the public any and all right, title and interest which it may have on the date of the entry of this Judgment in and to each of the patents listed in Exhibit "A" to this Judgment, such dedication to be effective as of the date of entry of this Judgment; and in order to enable anyone who desires to do so, to practice the inventions of such dedicated patents, defendants shall, to the extent necessary, continue to license upon reasonable terms any patents which they now own or control pursuant to the policy set forth in the letter attached hereto as Exhibit "B".

Each defendant is hereby enjoined and restrained from instituting or threatening to institute, or maintaining any suit, counterclaim or proceeding, judicial or administrative, for infringement, or to realize or collect damages or other compensation for infringement under or on account of any patent listed in Exhibit "A".

3

A-49

VI.

Defendant Westinghouse is hereby ordered and directed to make available for examination on reasonable terms at its plant at East Pittsburgh, Pennsylvania, to any applicant, such technical information received from Siemens-Schuckertwerke A.G. and Siemens & Halske A.G. under the agreement dated November 10, 1934, as defendant Westinghouse now has in its possession in its Foreign Engineering Department at East Pittsburgh, Pennsylvania, or may hereafter discover elsewhere in its organization. Such information shall be made available by defendant Westinghouse in the form in which it is presently maintained. Any such applicant shall be permitted by defendant Westinghouse to reproduce copies of any such information. at applicant's expense and as applicant may desire, provided that the applicant shall agree to return or replace all copies of such information taken for purposes of reproduction from the files of defendant Westinghouse.

VII.

Each defendant is hereby enjoined and restrained from entering into, adhering to, maintaining or furthering, directly or indirectly, any contract, agreement, understanding, plan or program with Siemens-Schuckertwerke A.G. or Siemens & Halske A.G. or any of their subsidiaries, successors, assigns, officers, agents or employees, to:

(a) allocate or divide territories or markets for the production, sale or other distribution of electrical equipment;

(b) exclude any person from or to restrain or limit any such person in the manufacture, use, distribution or sale of electrical equipment;

(c) limit, restrain or prevent the importation into or exportation from the United States, its territories, or possessions, of electrical equipment;

(d) refrain from competition or to leave any person free from competition in any territory, field or market in the manufacture,

4

use, distribution or sale of electrical equipment.

Nothing in the foregoing provisions of this Article VII shall be construed to prohibit, without more, licenses or conveyances of patent rights or technical information, whether on an exclusive basis or otherwise.

## VIII.

For the purpose of securing compliance with this Judgment, duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to the principal office of either defendant, be permitted (1) reasonable access during the office hours of said defendant to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of said defendant relating to any matters contained in this Judgment; and (2) subject to the reasonable convenience of said defendant and without restraint or interference from it, to interview officers or employees of said defendant, who may have counsel present, regarding such matters, and upon request said defendants shall submit such written reports as might from time to time be reasonably necessary to the enforcement of this Judgment. No information obtained by the means provided in this Article VIII shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of such Department, except in the course of legal proceedings in which the United States is a party for the purpose of securing compliance with this Judgment, or as otherwise required by law.

## IX.

Jurisdiction is retained for the purpose of enabling any of the Parties to this Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for

5

the construction or carrying out of this Judgment, or the modification
or termination of any of the provisions thereof, or the enforcement of
compliance therewith and for the punishment of violations thereof.

s/ Forman
United States District Judge

We hereby consent to the entry of the foregoing Final Judgment:

For Plaintiff:

Stanley N. Barnes                           W. D. Kilgore, Jr.
Assistant Attorney General

Edwin H. Pewett                             Donald E. Van Koughnet

                                            Grover C. Richman, Jr.

Attorneys for the United States of America.

For defendants:

Cravath, Swaine & Moore                     Stryker, Tams & Horner
by Donald C. Swatland a member             by Josiah Stryker a member
of the above firm                           of the above firm

Attorneys for the Defendants.

U.S. v. GENERAL INSTRUMENT CORP., ET AL.
Civil No.: 8586
Year Judgment Entered: 1953

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| v. | ) | NO. 8506 |
| GENERAL INSTRUMENT CORPORATION; RADIO CONDENSER COMPANY; CONDENSER DEVELOPMENT CORPORATION; VARIABLE CONDENSER CORPORATION; STANLEY S. CRAMER; RUSSELL S. CRAMER; ABRAHAM BLINEBURY, TH'S; SAMUEL COHEN; CHARLES E. RYMAN; NATHAN RYMAN and EDWARD RYMAN, | ) | |
| Defendants. | ) | |

FINAL JUDGMENT

This cause came on for hearing before the Court upon motions by the plaintiff and the defendants, counsel for the parties having been heard and the Court having determined, upon consideration of the pleadings, the admissions, stipulations and exhibits on file, that there is no genuine issue between the parties as to any material fact required for this Final Judgment, and the Court having filed its opinion herein on October 26, 1945, granting the motion by plaintiff for summary judgment against all the defendants except Nathan Ryman and Edward Ryman, and denying the motion for summary judgment on the part of the other named defendants,

NOW, THEREFORE, after hearing plaintiff and defendants by their attorneys, it is hereby

ORDERED, ADJUDGED AND DECREED as follows:

I

As used in this Final Judgment:

(A) "Development" shall mean the defendant Condenser Development Corporation;

(B) "Radio" shall mean the defendant Radio Condenser Company;

(C) "General" shall mean the defendant General Instrument Corporation;

(D) "Variable" shall mean the defendant Variable Condenser Corporation;

(E) "De Jur Amsco" shall mean De Jur Amsco Corporation;

(F) "Defendants" shall mean all the corporate parties as named in the complaint in this cause, their directors, officers and agents;

(G) "Variable condensers" shall mean a tuning device in which the capacitance is variable, and shall include the mechanical tuning devices used in conjunction therewith but shall not include inductive tuners;

(H) "Person" shall mean an individual, partnership, firm, association, corporation or other business or legal entity;

(I) "Patents" shall mean United States letters Patent and applications therefor, including all reissues, divisions, continuations or extensions thereof and patents issued upon said applications.

II

The provisions of this Final Judgment applicable to any defendant shall apply to such defendant, its officers, agents, servants, employees, and attorneys, and all other persons when acting or claiming to act on behalf of such defendant.

III

The complaint is hereby dismissed as to the individual defendants Nathan Hyman and Edward Hyman.

IV

Defendants have violated Sections 1 and 2 of the Act of Congress of July 2, 1890, 15 U.S.C. §§ 1 and 2, entitled "An Act to Protect Trade and Commerce Against Unlawful Restraints and Monopolies," commonly known as the Sherman Act. Said violations have consisted of defendants engaging in an unlawful combination and conspiracy in restraint of trade and commerce in variable condensers, entering into unlawful contracts, agreements

2

A-55

and mutual understandings in restraint of said trade and commerce and un-
lawfully attempting to monopolize and combining and conspiring to mono-
polize said trade and commerce in variable condensers.

V

(A) Each of the following agreements is hereby adjudged and decreed
to be unlawful under Sections 1 and 2 of the Sherman Act and is hereby
terminated; and defendants are jointly and severally enjoined and restrained
from the further performance or enforcement of any of the provisions of
said agreements and of any agreements amendatory thereof or supplemental
thereto:

(1) Agreement of July 30, 1934 between Radio, General
    and De Jur Amsco;

(2) Agreement of August 7, 1934 between Radio, General
    and De Jur Amsco and Development;

(3) Agreement dated May 19, 1937 between Radio, General
    and De Jur Amsco and Development;

(4) Two agreements dated June 9, 1939 between Radio and
    General and Development;

(5) Agreement of March 1, 1946 between Radio and General
    and Development;

(6) All contracts, agreements or understandi:
    any two or more of the defendants Develop.
    and General are jointly or severally parties ........ing
    the licensing of patents relating to variable con-
    densers.

(B) Defendants are hereby jointly and severally enjoined and re-
strained from entering into, performing, enforcing, adopting, adhering
to, maintaining or furthering, directly or indirectly, or claiming any
rights under any contract, agreement, arrangement, understanding, plan
or program for the purpose or with the effect of continuing, reviving
or renewing any of the agreements, contracts or understandings referred
to in Subsection (A) of this Section V.

3

VI

(A) Each defendant is hereby enjoined and restrained from entering into, performing, adopting, adhering to, maintaining or furthering, directly or indirectly, or claiming any rights under, any combination, conspiracy, contract, agreement, arrangement, understanding, or plan or program with any person engaged in the manufacture or distribution of variable condensers which has as its purpose or effect:

    (1) Limiting, restraining or preventing the sale of tools, dies, fixtures or jigs, used in the manufacture of variable condensers, to any person or for use in any specified territory;

    (2) Limiting, reducing or restricting the types, models, qualities or quantities of variable condensers which are or may be developed or manufactured;

    (3) Fixing, maintaining or adhering to prices or price ranges or other terms and conditions of sale or distribution of variable condensers; except that this provision shall not apply to valid restrictions contained in patent licenses between a defendant and a person not a party to this case;

(B) The defendants as between themselves are hereby enjoined and restrained from entering into, performing, adopting, adhering to, maintaining or furthering, directly or indirectly, or claiming any rights under any combination, conspiracy, contract, agreement, arrangement, understanding or plan or program which has as its purpose or effect:

    (1) Excluding each other from any territory or market, or interfering with or restricting each other in competing in any territory or market;

    (2) Limiting or restricting, in any manner, the exercise of independent decision in the acquisition of patents or patent rights.

4

(C)  Each defendant is hereby enjoined and restrained from entering into any contract, agreement or understanding with the purpose or effect of admitting the validity of any patent not issued at the time of such admission.

## VII

(A)  Defendants General, Radio and Development are jointly and severally ordered and directed to cause the dissolution of defendant Development within 60 days following entry of this Judgment;

(B)  Defendant Development is hereby ordered and directed within 30 days following entry of this Judgment to transfer or assign all patents or patent rights owned or controlled by it to the person (including other defendants) from whom such patents or patent rights were acquired; except that Patent No. 2,064,620 of December 15, 1936 shall be assigned by Development to Radio;

(C)  Other than the patents and patent rights required to be transferred or assigned under Subsection (B) above, all remaining assets of Development, both real and personal, shall be distributed among those defendants contributing to the administration of Development and in ratio to the amount contributed or obligated to contribute.

## VIII

(A)  Following the distribution of the assets of the defendant, Development, and its dissolution pursuant to Section VII of this Judgment:

1.  Each remaining defendant is hereby enjoined and restrained from holding, acquiring or claiming, directly or indirectly, jointly with any other defendant, any rights under any patents relating to the manufacture of variable condensers, except that this provision shall not prohibit the grant of a license in accordance with Paragraph X of this Judgment by any of the defendants to any other defendant or the taking of a non-exclusive license by any defendant relating to patents to manufacture variable condensers.

5

A-58

2.   Each remaining defendant is hereby enjoined and restrained for a period of seven (7) years from the date of the entry of this Judgment from holding, acquiring or claiming, directly or indirectly, jointly with any other person engaged in the manufacture of variable condensers, patent and patent rights relating to the manufacture of variable condensers, except that this provision shall not prohibit the grant of a license in accordance with Paragraph X of this Judgment by any of the defendants to a non-defendant or the taking of a license by any defendant from a non-defendant relating to patents to manufacture variable condensers.

3.   Each remaining defendant is hereby enjoined and restrained from holding, acquiring or claiming, directly or indirectly, any rights under any manufacturing or sale facilities, plants or other assets relating to the manufacture of variable condensers, jointly with any other defendant engaged in the manufacture of variable condensers and for a period of seven (7) years from the date of entry of this Judgment, jointly with any other person engaged in the manufacture of variable condensers.

(B)  Defendants, General and Radio, are hereby enjoined and restrained from acquiring, directly or indirectly, by purchase, merger, consolidation or otherwise, the ownership or control of the business of the other in the manufacture of variable condensers and, whether jointly or severally, for a period of seven (7) years after the date of entry of this Judgment of any other person engaged in the manufacture of variable condensers.

IX

(A)  Defendants are hereby jointly and severally enjoined and restrained from:

1.   Instituting or threatening to institute, or maintaining or continuing any action or proceeding for acts of infringement, or to collect damages, compensation or royalties alleged to have occurred or accrued, prior to the date of this Judgment, under any patent relating to the manufacture or use of variable condensers;

6

A-59

2. Instituting or threatening to institute, or maintaining or continuing any action or proceeding against any person for acts of infringement of any patent relating to the manufacture or use of variable condensers owned or controlled by any defendant and issued prior to December 31, 1956, unless such person has refused to enter into a license agreement as provided for in Section X of this Judgment after being requested so to do by such defendant.

X

(A) With the exception of defendant Development, each defendant is hereby ordered and directed, insofar as it has the power to do so, to grant to any applicant therefor a non-exclusive license under any, some or all of the patents or patent licenses relating to the manufacture or use of variable condensers owned or acquired by such defendant prior to December 31, 1956, and is hereby enjoined and restrained from making any sale or other disposition of any of said patents which deprives it of the power or authority to grant such licenses, unless it sells, transfers or assigns such patents and requires as a condition of such sale, transfer or assignment that the purchaser, transferee or assignee shall observe the requirements of Section X and XII of this Judgment with respect to the patents so acquired and the purchaser, transferee or assignee shall file with this Court, prior to consummation of said transaction, an undertaking to be bound by the provisions of said Sections with respect to the patents so acquired;

(B) Each defendant is hereby enjoined and restrained from including any restriction or condition whatsoever in any license or sub-license, as the case may be, granted by it pursuant to the provisions of this Section except that (1) the license may be made nontransferable; (2) a reasonable

7

A-60

non-discriminatory royalty may be charged; (3) reasonable provisions may be made for periodic inspection of the books and records of the licensee by an independent auditor or any person acceptable to the licensee who shall report to the licensor only the amount of the royalty due and payable; (4) reasonable provision may be made for cancellation of the license upon failure of the licensee to pay the royalty or to permit the inspection of its books and records as hereinabove provided; (5) the license shall provide that the licensee may cancel the license at any time after one year from the initial date thereof by giving 30 days notice in writing to the licensor;

(C) Upon receipt of a written request for a license or sublicense, as the case may be, under the provisions of this Section X, such defendant shall advise the applicant in writing of the royalty which it deems reasonable for the patent or patents to which the request pertains.  If the parties are unable to agree upon a reasonable royalty within 60 days from the date such request for the license was received by such defendant, the applicant therefor may forthwith apply to this Court for the determination of a reasonable royalty, and the defendant shall, upon receipt of notice of the filing of such application, promptly give notice thereof to the Attorney General.  In any such proceeding the burden of proof shall be on the defendant to establish the reasonableness of the royalty requested, and the reasonable royalty rates, if any, determined by this Court shall apply to the applicant and all other licensees under the same patent or patents.  Pending the completion of negotiations or any such proceeding, the applicant shall have the right to make, use and vend under the patents to which its application pertains without payment of royalty or other compensation as above provided, but subject to the provisions of Subsection (D) of this Section X;

8

(D) Where the applicant has the right to make, use and vend under any patents pursuant to Subsection (C) of this Section X, said applicant or the defendant may apply to this Court to fix an interim royalty rate pending final determination of what constitutes a reasonable royalty. If this Court fixes such interim royalty rate, the defendant shall then issue and the applicant shall accept a license or, as the case may be, a sublicense, providing for the periodic payment of royalties at such interim rate from the date of the filing of such application by the applicant. If the applicant fails to accept such license or fails to pay the interim royalty in accordance therewith, such action shall be ground for the dismissal of his application, and his rights under Subsection (C) shall terminate. Where an interim license or sublicense has been issued pursuant to this subsection, reasonable royalty rates, if any, as finally determined by this Court shall be retroactive for the applicant and all other licensees under the same patents to the date the applicant files his application with this Court;

(E) Nothing herein shall prevent any applicant from attacking in the aforesaid proceedings the validity or scope of any of the patents nor shall this Judgment be construed as importing any validity or value to any of said patents.

### XI

Immediately following the entry of this Judgment, each of the defendants Development, Radio, and General shall mail a copy of this Judgment to each person with whom any of them has a license agreement under patents relating to the manufacture or use of variable condensers, to each person who has applied to such defendant for such a license since August 7, 1934. Within 30 days following the entry of this Judgment, the said defendants shall file with this Court a statement setting forth the steps taken to comply with the above requirements of this Section XI,

y

XII

For the purpose of securing compliance with this Judgment and for no other purpose, duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General, or an Assistant Attorney General, and on reasonable notice to any defendant, made to its principal office, be permitted subject to any legally recognized privilege, (1) access during the office hours of said defendant to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of said defendant relating to any matters contained in this Judgment, and (2) subject to the reasonable convenience of said defendant and without restraint or interference from it to interview officers or employees of said defendant, who may have counsel present, regarding any such matters; and upon such request the defendant shall submit such reports in writing to the Department of Justice with respect to matters contained in this Judgment as may from time to time be necessary to the enforcement of this Judgment. No information obtained by the means provided in this Section shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of such Department, except in the course of legal proceedings to which the United States is a party for the purpose of securing compliance with this Judgment or as otherwise required by law.

XIII

Judgment is entered against the defendants Development, Radio, General, Variable, Stanley S. Cramer, Russell E. Cramer, Abraham Bluemenkrantz, Samuel Cohen and Charles H. Hymas, jointly and severally, for all costs to be taxed in this proceeding.

XIV

The affirmative separate defenses interposed by General, Radio and Variable together with the individual defendants are hereby denied.

10

XV

Jurisdiction is retained for the purpose of enabling any of the parties to this Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Judgment or for the modification or termination of any of the provisions thereof, and for the purpose of the enforcement of compliance therewith and the punishment of violations thereof.

XVI

Except as otherwise specifically provided in this Judgment, this Judgment shall not be construed to forbid normal business transactions of any of the corporate defendants with its selling agents or consignees, persons or corporations rendering services to it, or customers; or to prohibit transactions with citizens or corporations of foreign nations; or to prevent any defendants from availing of the benefits of the Acts of Congress of August 17, 1937, commonly known as the Miller-Tydings Act, the Act of July 14, 1952 commonly called the McGuire Act, or of the benefits of the Patent Laws.

Dated: September 30, 1953

      /s/ Forman
      United States District Judge

U.S. v. GENERAL ELECTRIC CO., ET AL.
Civil No.: 4575
Year Judgment Entered: 1953

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. General Electric Company and International General Electric Company Incorporated., U.S. District Court, D. New Jersey, 1952-1953 Trade Cases ¶67,585, (Oct. 6, 1953)

Click to open document in a browser

United States v. General Electric Company and International General Electric Company Incorporated.

1952-1953 Trade Cases ¶67,585. U.S. District Court, D. New Jersey. Civil Action No. 4575. Dated October 6, 1953. Case No. 814 in the Antitrust Division of the Department of Justice.

### Sherman Antitrust Act and Wilson Tariff Act

**Consent Decree—Practices Enjoined—Agreements with Foreign ManufacturersElectrical Equipment.—** A manufacturer of electrical equipment was enjoined by a consent decree from entering into any understanding with any foreign manufacturer to (1) allocate or divide territories or markets, (2) limit any person in the manufacture, use, distribution, or sale of electrical equipment, (3) limit the importation into or exportation from the United States, (4) leave any person free from competition, (5) refrain from competition in obtaining rights to patents, and (6) determine or prescribe the terms or conditions upon which licenses are granted to others. The use of stock or other financial interest in any foreign manufacturer to enter into understandings described above also was prohibited.

**Consent Decree—Specific Relief—Patent Licensing—Electrical Equipment.—**An electrical equipment manufacturer was ordered by a consent decree to grant to any applicant a non-exclusive license to make, use and vend electrical equipment under any patents acquired by the manufacturer from the foreign manufacturers named as co-conspirators. The granting of licenses under necessary patents (owned or controlled by the manufacturer which are needed to enable a licensee to practice the invention under the acquired patents) also was ordered. Provisions pertaining to reasonable royalties, inspection of a licensee's books and records, cancellation of the license upon failure to pay the royalties or permit inspection, and transferability of the license could be included in the license.

For the plaintiff: Stanley N. Barnes, Marcus A. Hollabaugh, Donald E. Van Koughnet, W. D. Kilgore, Jr., and William F. Tompkins, Attorneys.

For the defendant: James R. E. Ozias and Cahill, Gordon, Zachry and Reindel.

#### Final Judgment

[ *Consent to Entry of Decree*]

FORMAN, District Judge [ *In full text except for Exhibits B and C*]: The plaintiff, United States of America, having filed its complaint herein on January 18, 1945; the defendants General Electric Company and International General Electric Company, Incorporated, havings appeared and filed their answers to the complaint denying the substantive allegations thereof; the defendant International General Electric Company, Incorporated, having thereafter been merged on July 31, 1952 with the defendant General Electric Company; and the plaintiff and the defendant General Electric Company by their attorneys having severally consented to the entry of this Judgment without trial or adjudication of any issues of fact or law herein and without this Judgment constituting evidence or an admission by either of them in respect to any such issue;

Now, therefore, before any testimony has been taken and without trial or adjudication of any issue of fact or law herein, and upon consent of the parties as aforesaid, it is hereby

Ordered, adjudged and decreed as follows:

I.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

[ *Sherman Act and Wilson Tariff Act*]

This Court has jurisdiction of the subject matter herein and of the parties hereto, and the complaint states a cause of action against the defendants under Section 1 of the Act of Congress of July 2, 1890, commonly known as the Sherman Antitrust Act, as amended, and under Section 73 of the Act of Congress of August 27, 1894, commonly known as the Wilson Tariff Act, as amended.

II.

[ *Definitions*]

As used in this Judgment:

(A) "Electrical equipment" means all equipment, devices, and systems (except electric lamp and radio equipment, devices, and systems) which concern the generation, transmission, and utilization of electric energy including: generators, transformers, and switch-gear essential for the generation and distribution of electric energy; motors of various types which serve as the sources of power for other industries; motors, magnets, switches, and heating elements for incorporation in other manufactured products; and electrical appliances such as refrigerators and heating devices for household use.

(B) "Person" means an individual, partnership, firm, association or corporation. For the purpose of this Judgment a defendant and its subsidiaries shall be considered to be one person.

(C) "Subsidiary" of a corporation means a corporation more than 50% of whose stock entitled to vote upon the election of directors (other than preferred stock so entitled to vote upon the failure of the corporation to pay certain dividends) is owned or, directly or indirectly, controlled by such other corporation.

(D) "Foreign manufacturers" means Allgemeine Elektricitacts Gesellschaft, Compagnie Francaise Pour l'Exploitation des Procedes Thomson-Houston, Associated Electrical Industries Limited, Tokyo Shibaura Denki Kabushiki Kaisha, Societe d'Electricite et de Mecanique (Procedes ThomsonHouston & Carels Societe Anonyme) and Compagnia Generale di Elettricita.

(E) "Acquired patents" means any United States patents, patent applications, or rights to grant licenses under patents or patent applications, directed to electrical equipment and heretofore acquired by defendant General Electric Company from the foreign manufacturers named as co-conspirators in the complaint and listed in subparagraph (D) of this Section, and shall include all reissues, divisions, continuations or extensions of said patents, and any patents which may issue upon said applications. A list of the patents so acquired and which defendant General Electric Company now owns or controls is attached hereto and marked Exhibit "A" [not reproduced].

(F) "Necessary patents" means any United States patents, patent applications, or rights to grant licenses under patents or patent applications, directed to electrical equipment and owned or controlled by defendant General Electric Company, which must be licensed to enable a licensee to practice the inventions of the acquired patents defined in subparagraph (E) of this Section, and shall include all reissues, divisions, continuations or extensions of said patents, and any patents which may issue upon said applications.

III.

[ *Foreign Activities*]

The provisions of this Judgment applicable to defendant General Electric Company shall apply to such defendant, its officers, directors, agents, employees, representatives, subsidiaries, successors, assigns, and all other persons acting under, through or for such defendant, and to operations and activities outside the United States insofar as affecting the foreign or domestic commerce of the United States.

IV.

[ *Termination and Modification of Agreements*]

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

(A) Defendant General Electric Company is hereby ordered and directed to terminate and cancel each of the agreements listed in Exhibit "B" [not reproduced] attached to this Judgment which has not heretofore expired or terminated or been cancelled.

(B) Defendant General Electric Company is hereby ordered and directed prior to December 31, 1953, to terminate and cancel each of the agreements listed in Exhibit "C" [not reproduced] attached to this Judgment which shall not theretofore have terminated or been cancelled, or to cause the name to be modified and amended insofar as necessary so that it shall not be in conflict with any provision of this Judgment.

(C) Defendant General Electric Company is hereby enjoined and restrained from entering into, maintaining of furthering, any contract, agreement or understanding to continue or renew any provision of any of the agreements listed in (A) and (B) of this Section IV which is in conflict with any provision of this Judgment.

(D) Nothing contained in this Section shall be deemed to terminate any right of defendant General Electric Company to use on a non-exclusive and unrestrictive basis any patent under which such defendant has heretofore been licensed or to terminate any power of such defendant to issue sub-licenses or immunities under any such patent.

V.

[ *Agreements with Foreign Manufacturers*]

(A) Defendant General Electric Company is hereby enjoined and restrained from entering into, maintaining or furthering any contract, agreement or understanding with any foreign manufacturer as defined in this Judgment, or any of its subsidiaries, successors, assigns, officers, agents or employees, to:

(1) allocate or divide territories or markets for the production, sale or other distribution of electrical equipment;

(2) exclude any person from or restrain or limit any such person in the manufacture, use, distribution or sale of electrical equipment;

(3) limit, restrain or prevent the importation into or exportation from the United States, its territories, or possessions, of electrical equipment;

(4) refrain from competition or leave any person free from competition in any territory, field or market in the manufacture, use, distribution or sale of electrical equipment;

(5) refrain from competition in the manufacture, use, sale or distribution of, or in obtaining rights to, patents and technological information relating to electrical equipment;

(6) determine or prescribe the terms or conditions upon which licenses or immunities under any patent, invention, or technological information relating to electrical equipment shall be made available by the grantor to others.

Nothing in the foregoing provisions of this Section V shall be construed to prohibit, without more, licenses or conveyances of patent rights or technical information, whether on an exclusive basis or otherwise.

(B) Defendant General Electric Company is further enjoined and restrained from using its stock or other financial interest in any foreign manufacturer, as defined in this Judgment, to directly or indirectly influence or to attempt to influence such manufacturer to enter into any contract, agreement or understanding in conflict with any provision of (A) of this Section.

VI.

[ *Non-Exclusive Licenses Under Acquired Patents*]

(A) Defendant General Electric Company is hereby ordered and directed to grant, to the extent that it has the power to do so, to any applicant making written request therefor a non-exclusive license under any, some or all

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

3

A-68

of the acquired patents, as defined herein and listed in Exhibit "A" [not reproduced] attached to this Judgment, and for their full unexpired terms, to make, use and vend electrical equipment.

(B) (1) Defendant General Electric Company is enjoined and restrained from including any restriction or condition whatsoever in any license or sub-license granted by it pursuant to this Section, except that each such license or sub-license may contain any, some or all of the following provisions: (a) a provision for the payment to the licensor of a reasonable, non-discriminatory compensation in the nature of a royalty or other monetary consideration (herein referred to as a "royalty"); (b) reasonable provisions for periodic inspection of the books and records of the licenses by an independent auditor, or by any other person acceptable to the licensee and licensor, who shall report to the licensor only the amount of royalty due and payable; (c) reasonable provisions for cancellation of the license upon failure of the licensee to pay the royalties or to permit the inspection of his books or records as hereinabove provided; (d) that the license shall not be transferable; and (e) such other terms and provisions as this Court shall approve if application for such approval is made after reasonable notice to the Attorney General.

(2) Each license issued pursuant to this Section shall provide that: (a) the licensee may cancel the license at any time after one year from the initial date thereof by giving thirty (30) days' notice in writing to the licensor; and (b) the licensor shall notify each licensee of the issuance of each license granted pursuant to this Section involving the same patent or patents; and each licensee shall have the right, upon written request, to exchange its license for any other such license granted by the licensor and involving the same patent or patents, in the event such other license be upon more favorable terms.

(3) Upon receipt by the defendant of a written request for a license under the provisions of this Section, the defendant shall advise the applicant, in writing, of the royalty which it deems reasonable for the patent or patents to which the request pertains. If the parties are unable to agree upon a reasonable royalty within sixty (60) days from the date such request for a license was received by the defendant, the applicant therefor may forthwith apply to this Court for the determination of a reasonable royalty, and the defendant shall, upon receipt of notice of the filing of such application, promptly give notice thereof to the Attorney General or the Assistant Attorney General in charge of the Antitrust Division. The reasonable royalty rates, if any, determined by the Court shall apply to the applicant and to all other subsequent licensees under the same patent or patents. Pending the completion of negotiations or any such proceedings, the applicant shall have the rights requested under this Section to make, have made, use or vend the patent or patents to which its application pertains without payment of royalty or other compensation as above provided, except as provided in Paragraph B (4) hereof.

(4) Where the applicant has the right to make, have made, use or vend as provided in Paragraph B (3) hereof, said applicant or the defendant may apply to this Court to fix an interim royalty rate pending final determination of what constitutes a reasonable royalty. If the Court fixes such interim royalty rate, the defendant shall then issue, and the applicant shall accept, a license or, as the case may be, a sub-license, providing for the periodic payment of royalties at such interim rate from the date of the filing of the application for a license. If the applicant fails to accept such license, or sublicense, or fails to pay the interim royalty in accordance therewith, such action shall be ground for the dismissal of his application, and his rights under this Section shall terminate. The interim royalty rate determined by this Court shall apply to the license granted to such applicant from the date of his application for a license, and may be charged to each subsequent licensee under the same patent or patents, unless this Court shall fix a different rate of interim royalty upon application of any such subsequent licensee pursuant to this Section.

(5) Upon the written request of any licensee licensed pursuant to the provisions of this Section, the defendant shall grant such licensee, to the extent it has the power to do so, an unrestricted, unconditional and non-exclusive grant of immunity from suit by such defendant, with respect to any products made or sold under a license granted pursuant to the terms of this Judgment, under any foreign patents corresponding to the patent or patents under which such licensee is licensed.

VII.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

[ *Non-Exclusive Licenses Under Necessary Patents*]

(A) Defendant General Electric Company is hereby further ordered and directed to grant to any applicant licensed under the provisions of Section VI of this Judgment, but only to the extent necessary to enable said applicant to practice the inventions of the acquired patents licensed under such Section, a non-exclusive license under any, some or all of the necessary patents as defined herein and for their full unexpired terms, to make, use and vend electrical equipment.

(B) Licenses granted under this Section VII shall be subject to and in conformity with the provisions of Section VI (B) of this Judgment.

VIII.

[ *Inspection and Compliance*]

For the purpose of securing compliance with this Judgment, duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendant General Electric Company, to its principal office, be permitted, subject to any legally recognized privilege, (1) access during the office hours of said defendant to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of said defendant relating to any matters contained in this Judgment, and (2) subject to the reasonable convenience of said defendant and without restraint or interference from it, to interview officers or employees of said defendant, who may have counsel present, regarding any such matters, and upon request said defendant shall submit such written reports as might from time to time be reasonably necessary to the enforcement of this Judgment. No information obtained by the means provided in this Section shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of such Department, except in the course of legal proceedings to which the United States is a party for the purpose of securing compliance with this Judgment or as otherwise required by law.

IX.

[ *Jurisdiction Retained*]

Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate in relation to the construction of or carrying out of this Judgment, for the modification or termination of any of the provisions thereof, and for the purpose of the enforcement of compliance therewith and the punishment of violations thereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

U.S. v. AMERICAN LEAD PENCIL CO., ET AL.
Civil No.: 73-54
Year Judgment Entered: 1954

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. American Lead Pencil Co., Joseph Dixon Crucible Co., Eagle Pencil Co., and Eberhard Faber Pencil Co., U.S. District Court, D. New Jersey, 1954 Trade Cases ¶67,676, (Feb. 5, 1954)

United States v. American Lead Pencil Co., Joseph Dixon Crucible Co., Eagle Pencil Co., and Eberhard Faber Pencil Co.

1954 Trade Cases ¶67,676. U.S. District Court, D. New Jersey. Civil Action No. 73-54. Filed February 05, 1954. Case No. 1184 in the Antitrust Division of the Department of Justice.

### Sherman Antitrust Act

**Consent Decree—Practices Enjoined—Price Fixing—Allocation of Markets or Customers—Exportation Agreements—Secret Exchange of Notices of Proposed Changes in Prices or Sales Terms.**—Four lead pencil manufacturers consent to the entry of a decree prohibiting them from contracting among themselves or with any other manufacturer in the United States, or through any trade association of pencil manufacturers to fix prices, discounts, of other terms for the sale of pencils. They are further enjoined from agreeing to allocate markets, orders, or customers for the manufacture or distribution of pencils and from agreeing to refrain from exporting or importing pencils from or into the United States. The communication to any other manufacturer or trade association of information regarding intended changes in prices or sales terms before the proposed changes are generally announced to the trade is also forbidden.

**Consent Decree—Practices Enjoined—Price Fixing—Collusive Bidding—Interests in Foreign Corporation.**—A consent decree orders four lead pencil manufacturers to refrain from (1) fixing prices or sales terms upon which any dealer may sell pencils in the United States to a third party; (2) fixing prices, or conditions of any dealer's bid which may be submitted in response to an invitation for a bid to supply pencils in the United States; (3) appointing any dealer an agent of any defendant for the submission of invited bids for pencils; (4) refusing to sell pencils on customary trade terms to any dealer because he has submitted his own bid in competition with a defendant's bid, provided that the dealer is a regular wholesaler or retailer of the defendant's pencils. Under an additional provision of the decree, two defendants are enjoined from renewing a previously dissolved joint interest in a foreign corporation.

For the plaintiff: Stanley N. Barnes, Assistant Attorney General; Worth Rowley, and Richard B. O'Donnell, Special Assistants to the Attorney General; William D. Kilgore, Jr., John S. James, Harry N. Burgess, Alfred Karsted, Mary G. Jones, and Stanley Blecher, Attorneys.

For the defendants: Cleary, Gottlieb, Friendly & Hamilton, by R. C. Barnard, for American Lead Pencil Co.; Carey, Schenck & Jardine, by Robert Carey, for Joseph Dixon Crucible Co.; Donovan, Leisure, Newton & Irvine, by Ralstone R. Irvine, for Eagle Pencil Co.; and Crawford & Reed, by John Howley, for Eberhard Faber Pencil Co.

### Final Judgment

Smith, District Judge [ *in full text*]: Plaintiff, United States of America, having filed its complaint herein on January 26, 1954, and each of the defendants having appeared herein, and the plaintiff and the said defendants by their respective attorneys having severally consented to the making and entry of this Final Judgment without trial or adjudication of any issue of fact or law herein and without admission by any party in respect of any such issue, and the Court having considered the matter and being duly advised

Now, therefore, before the taking of any testimony and without trial or adjudication of any issue of fact or law herein, and upon the consent as aforesaid of all the parties hereto

It is hereby ordered, adjudged and decreed as follows:

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

I

[ *Sherman Act* ]

This Court has jurisdiction of the subject matter hereof and of all the parties hereto. The complaint states a cause of action against the defendants and each of them under Section 1 of the Act of Congress of July '2, 1890 entitled "An Act to protect trade and commerce against unlawful restraints and monopolies", as amended, commonly known as the Sherman Act.

II

[ *Definitions* ]

As used in this Final Judgment:

(a) "Lead pencils" means wood-cased lead pencils;

(b) "Person" means any individual, partnership, firm, corporation, association or other business or legal entity;

(c) "Manufacturer" means a person as herein defined engaged in the manufacture and sale of lead pencils;

(d) "Dealer" means any person other than a manufacturer regularly engaged in the wholesale or retail sale or distribution of lead pencils;

(e) "United States" names the continental United States, its territories and possessions.

III

[ *Applicability of Judgment* ]

The provisions of this Final Judgment applicable to a defendant shall apply to such defendant, its officers, agents, servants, employees and attorneys, and to those persons in active concert or participation with any defendant who receive actual notice of this Final Judgment by personal service or otherwise.

IV

[ *Practices Enjoined* ]

The defendants and each of them, are jointly and severally enjoined and restrained from entering into, adhering to, maintaining or furthering, or claiming any rights under, any contract, combination, agreement, understanding or arrangement among themselves or with any other manufacturer in the United States, or with or through any trade association or other central agency of manufacturers of lead pencils, directly or indirectly, to:

(a) Fix, determine, establish, maintain or adhere to prices, discounts or other terms or conditions for the sale of lead pencils to any person: or

(b) Allocate, pro-rate or divide markets, fields, contracts, orders or customers for the manufacture, distribution or sale of lead pencils; or

(c) Refrain from exporting or importing lead pencils from or into the United States.

V

[ *Dissemination of Price Information* ]

The defendants are jointly and severally enjoined and restrained from directly or indirectly circulating, exchanging or communicating to or with any other manufacturer or to or through any trade association or central organization of manufacturers, any information regarding the price or prices, terms or conditions, or intended or proposed changes in price or prices, terms or conditions, for the sale in the United States of lead pencils prior to the time that such price or prices, terms or conditions or changes in such price or prices, terms or conditions are published and generally announced to the trade.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

WK_Trade Regulation Reporter - Trade Cases 1932 - 1992 United States v American Lead Pencil Co Joseph Dixon Crucible Co Eagle Pencil Co and Eberhard .pdf

**VI**

[ *General Prohibitions—Modification*]

(A) The defendants are jointly and severally enjoined and restrained from, directly and indirectly:

(1) Fixing, determining or controlling in any manner the price or prices, terms or conditions upon which any dealer may sell lead pencils in the United States to third persons;

(2) Fixing, determining or controlling in any manner the price or prices, terms or conditions of any bid which may be submitted by any dealer, in response to any invitation for bids to supply lead pencils in the United States;

(3) Appointing or designating any dealer as an agent of or for any such defendant for the submission of any bid in response to any invitation for bids to supply lead pencils in the United States;

(4) Refusing to sell lead pencils upon normal and customary trade terms and conditions to any dealer because such dealer, in competition with a bid submitted by such defendant, has submitted its own bid on the same invitation to bid and has been awarded a contract for the sale of lead pencils, provided that such dealer is regularly engaged in the wholesale or retail sale or distribution of lead pencils of such defendant.

(B) Upon the expiration of three (3) years after the date of the entry of this Final Judgment the defendants, or any of them, may apply to this Court to be relieved from the prohibitions contained in subsections (A) (3) and (4) of this Section VI and may be so relieved upon a showing made to the satisfaction of this Court that the prohibitions therein contained work an undue burden or hardship upon such defendant or defendants.

**VII**

[ *Dissolution of Interests in Foreign Corporation*]

Defendants Eagle Pencil Company, and American Lead Pencil Company, having submitted to this court due proof of the dissolution of the joint interests heretofore held by them in Reber, S. A., a Mexican corporation, such dissolution of said joint interests is hereby made of record and said defendants Eagle Pencil Company, and American Lead Pencil Company are jointly and severally enjoined and restrained from renewing said joint interest in said corporation.

**VIII**

[ *Rights Under Other Acts Preserved*]

(a) Nothing contained in this Final Judgment shall be construed as denying to any defendant any rights which such defendant may have under the Act of Congress of August 17, 1937, commonly known as the Miller-Tydings Act, or under the Act of Congress of July 14, 1952, commonly known as the McGuire Act;

(b) Without in any manner adjudicating, determining or passing upon the legality or illegality of any of the acts or practices of the Pencil Industry Export Association and without, in any manner imputing any legality or illegality to any of the acts or practices of said Export Association, nothing contained in this Final Judgment shall be construed as denying to the defendants or any of them, any rights which they may have under the Act of Congress of April 10, 1918, commonly known as the Webb-Pomerene Act.

**IX**

[ *Inspection and Compliance*]

For the purpose of securing compliance with this Final Judgment duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to any defendant, made to its principal office, be permitted, (a) access during the office hours of said defendant to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of said defendant relating to any matters contained in this Final Judgment, and (b) subject to the reasonable convenience of said

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

WK_Trade Regulation Reporter - Trade Cases 1932 - 1992 United States v American Lead Pencil Co Joseph Dixon Crucible Co Eagle Pencil Co and Eberhard .pdf

defendant and without restraint or interference from it to interview officers or employees of said defendant, who may have counsel present, regarding any such matters, and (c) upon such request the said defendant shall submit such reports in writing to the Department of Justice with respect to matters contained in this Final Judgment as may from time to time be necessary to the enforcement of this Final Judgment. No information obtained by the means provided in this Section IX shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Department except in the course of legal proceedings to which the United States is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law.

X

[ *Effective Date*]

This Final Judgment shall become effective ninety (90) days after the date of its entry.

XI

[ *Jurisdiction Retained*]

Jurisdiction is retained for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment or for the modification of any of the provisions thereof, and for the purpose of the enforcement of compliance therewith and the punishment of violations thereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

4

U.S. v. THE EMBROIDERY CUTTERS ASS'N, ET AL.
Civil No.: 889-54
Year Judgment Entered: 1954

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. The Embroidery Cutters Association, et al., U.S. District Court, D. New Jersey, 1954 Trade Cases ¶67,891, (Nov. 12, 1954)

Click to open document in a browser

United States v. The Embroidery Cutters Association, et al.

1954 Trade Cases ¶67,891. U.S. District Court, D. New Jersey. Civil Action No. 889-54. Filed November 12, 1954. Case No. 1208 in the Antitrust Division of the Department of Justice.

### Sherman Antitrust Act

**Combinations and Conspiracies—Consent Decree—Practices Enjoined—Price Fixing and Related Practices—Association Membership.**—Embroidery cutters were enjoined by a consent decree from entering into any agreement (1) to fix prices, pricing methods, discounts, or other terms used by any cutter, (2) to fix the charges or other terms for delivery, (3) to circulate any price lists in advance of the publication of such lists to customers, or (4) to circulate any statistics representing costs of operation. The cutters and a trade association were enjoined from suggesting prices; from circulating any price lists which have been established by any two or more cutters; and from being a member of any trade association or central agency, the activities of which are inconsistent with the decree.

**Combinations and Conspiracies—Consent Decree—Specific Relief—Revision of Price Lists.**—Embroidery cutters were ordered by a consent decree to withdraw their presently in effect price lists to the extent that such price lists are identical with the prices appearing on a price list prepared by the defendant trade association. Also, they were ordered to individually review the prices withdrawn on the basis of their individual cost figures and individual judgment as to profits and to issue new price lists on the basis of such independent review.

**Department of Justice Enforcement and Procedure—Consent Decree—Specific Relief —Dissolution of Trade Association.**—Embroidery cutters were ordered by a consent decree to commence taking such action as may be necessary to accomplish the dissolution of the defendant trade association and to complete such dissolution within the minimum period of time permitted by the applicable state laws.

For the plaintiff; Stanley N. Barnes, Assistant Attorney General; Bertram C. Dedman, W. D. Kilgore, Jr., and Richard B. O'Donnell, Special Assistants to the Attorney General; and John S. James, Stanley Blecher, and Moses M. Lewis, Trial Attorneys.

For the defendants: Moses L. Kove for the Embroidery Cutters Assn.

### Final Judgment

THOMAS F. MEANEY, District Judge [ *In full text*]: The plaintiff, United States of America, having filed its complaint herein on November 12, 1954 and each of the said defendants having appeared herein and the plaintiff and the defendants, by their respective attorneys, having severally consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law herein, and without this Final Judgment constituting evidence or admission by any defendant in respect of any such issue;

Now, therefore, before any testimony or evidence has been taken herein, and without trial or adjudication of any issue of fact or law herein, and upon the consent of all the parties hereto, it is hereby

Ordered, adjudged and decreed as follows:

I

[ *Sherman Act*]

The Court has jurisdiction of the subject matter herein and all the parties hereto. The complaint states a cause of action against the defendants and each of them under Section 1 of the Act of Congress of July 2, 1890, entitled

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

"An Act to protect trade and (Commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

II

[ *Definitions*]

As used in this Final Judgment:

(A) "Person" means any individual, partnership, firm, association, corporation, or other legal entity;

(B) "Embroiderer" means an individual, partnership, firm or corporation engaged in the business of designing, ordering, and selling embroidery used in the manufacture of wearing apparel;

(C)"Embroidery cutter" means an individual, partnership, firm, or corporation engaged in the business of cutting or finishing rolls, or sheets of cloth on which embroidery has been placed;

(D) "Defendant association" means The Embroidery Cutters Association.

III

[ *Applicability*]

The provisions of this Final Judgment applicable to any defendant shall apply to each such defendant and to his or its officers, agents, servants, employees, subsidiaries, successors, and assigns and to all persons in active concert or participation with any defendant who shall have received actual notice of this Final Judgment by personal service or otherwise.

IV

[ *Dissolution of Association*]

The defendants are ordered and directed:

(A) Forthwith to commence taking such action as may be necessary to accomplish the dissolution of the defendant association under the laws of the State of New Jersey and to complete such dissolution within the minimum period of time permitted by the laws of the State of New Jersey;

(B) Upon the completion of such dissolution of the defendant association, to file an affidavit with this Court and with the Attorney General setting forth the fact of their compliance with this Section.

V

[ *Price Fixing and Related Practices*]

The defendants other than the defendant association are jointly and severally enjoined and restrained from entering into, adhering to or maintaining, or claiming any rights under any contract, combination, agreement, understanding, plan or program with any other defendant, with any other embroidery cutter, or with any association or central agency of or for embroidery cutters;

(A) To fix, determine, establish, or maintain prices, pricing methods, discounts, or other terms and conditions used or to be used by such defendant or by any other person in connection with the cutting or finishing of embroidery;

(B) To fix, determine, establish, or maintain the charges or any other terms and conditions for the delivery of embroidery, after cutting or finishing work has been performed thereon, by such defendant or by any other person;

(C) To circulate or exchange, directly or indirectly, any price lists or price quotations applicable to embroidery cutting or finishing work with any other embroidery cutter or embroidery cutters in advance of the publication, circulation, or communication of such price lists or price quotations to the customers of such defendant;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

(D) To circulate or exchange, directly or indirectly, any statistics representing costs of operation with any other embroidery cutter or embroidery cutters, for the purpose or with the effect of fixing prices, or otherwise restraining trade.

VI

[ *Price Lists — Association Membership*]

The defendants are jointly and severally enjoined and restrained from:

(A) Urging, influencing or suggesting, or attempting to urge, influence or suggest to any other embroidery cutter the price or prices, or other terms or conditions to be charged by such other embroidery cutter for the cutting or finishing of embroidery;

(B) Circulating, exchanging or using, in any manner, any price list or purported price list containing or purported to contain any prices, terms or conditions for the cut ting or finishing of embroidery, which have been agreed upon or established pursuant to agreement between two or more embroidery cutters;

(C) Being a member of, contributing anything of value, or participating in any of the activities of, any trade association or central agency or for embroidery cutters, the activities of which are inconsistent in any manner with any of the provisions of this Final Judgment.

VII

[ *Revision of Price Lists*]

Within thirty (30) days following the date of the entry of this Final Judgment, each of the defendants other than the defendant association shall:

(A) Withdraw his or its presently effective price list for embroidery cutting and finishing work (or, where no price list has been issued, withdraw his or its presently prevailing prices) to the extent that such price list or prices are identical with the prices appearing on the price list prepared by the Price Survey Committee of the defendant association and circulated by the defendant association in May 1954; and

(B) Individually review the prices with drawn in conformity with Section VII (A) herein on the basis of his or its individual cost figures and individual judgment as to profits and issue a new price list (or, where no price list has been issued, issue new prices) on the basis of such independent review.

VIII

[ *Notification of Judgment*]

The defendant association is ordered and directed, within ten (10) days after the date of its entry, to furnish to each of its present members a conformed copy of this Final Judgment and to file with this Court, and with the Attorney General or Assistant Attorney General in charge of the Antitrust Division, a report setting forth the fact and manner of its compliance with this Section VIII, together with the names and addresses of each person to whom a copy of this Final Judgment shall have been furnished in compliance herewith.

IX

[ *Inspection and Compliance*]

For the purpose of securing compliance with this Final Judgment, duly authorized representatives of the Department of Justice, shall, on written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to any defendant made to its principal office, be permitted, subject to any legally-recognized privilege, (a) reasonable access, during the office hours of such defendant, to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of such defendant, relating to any of the matters contained in this Final Judgment, and (b) subject to the reasonable convenience of such defendant, and without restraint or

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

3

interference, to interview officers and employees of such defendant who may have counsel present, regarding any such matters. For the purpose of securing compliance with this Final Judgment, the defendants, upon the written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, shall submit such written reports with respect to any of the matters contained in this Final Judgment as from time to time may be necessary for the purpose of enforcement of this Final Judgment. No information obtained by the means permitted in this Section IX shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Department except in the course of legal proceedings for the purpose of securing compliance with this Final Judgment in which the United States is a party or as otherwise required by law.

x

[ *Retention of Jurisdiction*]

Jurisdiction of this Court is retained) for the purpose of enabling any of the parties to this Final Judgment to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification or termination of any of the provisions thereof, for the enforcement of compliance therewith and punishment of violations thereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm
4

US. v. NATIONAL ELECTRICAL CONTRACTORS ASS'N, N.J. CHAPTER, INC., ET AL.
Civil No.: 575-56
Year Judgment Entered: 1956

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,     )
                           )
            Plaintiff,    )
                           )
      vs.                )    Civil Action 575-56
                           )
NATIONAL ELECTRICAL CONTRACTORS )    Filed: July 13, 1956
ASSOCIATION, N. J. CHAPTER, INC., )
P. JOSEPH QUINN. MEL DOWNS'   )
ELECTRICAL CONSTRUCTION COMPANY,  )
MELVIN M. DOWNS, GERALD ELECTRICAL )
CONSTRUCTION COMPANY, J. C. FITZ-  )
GERALD, JOHN F. MEADE, FRED FERRAMPUS, )
BARRY R. COMPTON, CALVI ELECTRIC  )
COMPANY, FRANCIS CALVI, McADAM    )
ELECTRIC COMPANY, THOMAS J. McADAM, )
WILLIAM E. SNELL, and ROLAND E.   )
McMAHON, JR.,               )
                           )
           Defendants.   )

## FINAL JUDGMENT

The plaintiff, United States of America, having filed its
complaint herein on July 13, 1956, and each of the defendants
having appeared herein and having filed its answer in which it denies
the offenses charged in such complaint, and having asserted the truth
of their answer and innocence of any violation of the law; and no
testimony having been taken, and the plaintiff and said defendants
by their respective attorneys having consented to the entry of this
Final Judgment without trial or adjudication of any issue of fact or
law herein, and without this Final Judgment constituting evidence or
admission by the defendants in respect to any such issue;

NOW, THEREFORE, upon the consent of the parties hereto, it is
hereby

ORDERED, ADJUDGED, AND DECREED as follows:

I

The Court has jurisdiction of the subject matter of this
action and of the parties hereto. The complaint states a claim

for relief against the defendants under Section 1 of the Act of Congress of July 2, 1890, entitled "An Act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

## II

As used in this Final Judgment:

(a) "Electrical contractors" means corporations, firms, and persons engaged in the sale and installation of electrical equipment;

(b) "Electrical equipment" means and includes all types and kinds of electrical equipment and materials which are customarily affixed or permanently installed by skilled labor in commercial, residential, industrial, public, and other buildings and structures, such as electrical wiring, cable and conduits, switches and switch boxes, outlets and outlet boxes and covers, fuses and fuse boxes, circuit breakers, panels and panel boards, control equipment, insulators, lighting fixtures, and other devices and material used in electrical lighting and power systems in said buildings and structures; and

(c) "Awarding authority" means all persons (including, but not limited to, general contractors, architects, engineers, government bodies, school boards, and representatives of private, public or charitable organizations) designating and selecting electrical contractors to sell or install electrical equipment in structures and buildings.

## III

The provisions of this Final Judgment applicable to any defendant shall apply to each such defendant and to his or its officers, agents, servants, employees, subsidiaries, successors

and assigns, and to all persons in active concert or participation
with any defendant who shall have received actual notice of this
Final Judgment by personal service or otherwise.

IV

The defendants are jointly and severally enjoined and re-
strained from entering into, participating in, or maintaining
any contract, combination, agreement, undertaking, plan or pro-
gram with each other or with any other electrical contractor or
anyone acting for or on behalf of any electrical contractor to:

    (a) Fix prices or terms for the sale or installation of
        electrical equipment;

    (b) Exchange future bid prices or terms for the sale or
        installation of electrical equipment;

    (c) Allocate contracts for the sale or installation of
        electrical equipment among electrical contractors;

    (d) Restrict the sale or installation of electrical equip-
        ment by electrical contractors to a prescribed area,
        territory, customer or class of customers, or to con-
        tracts above or below a prescribed valuation;

    (e) Submit fictitious, fraudulent, or complementary bids to
        awarding authorities requesting bids for the sale or
        installation of electrical equipment;

    (f) Restrict or prohibit any electrical contractor from ob-
        taining contract plans, specifications, bid proposal
        forms, or other bidding information from awarding
        authorities requesting bids for the sale or installa-
        tion of electrical equipment;

    (g) Restrict or prohibit any electrical contractor from
        obtaining supplies of electrical equipment from whole-
        sale suppliers or manufacturers of such equipment.

-3-

V

The defendants are jointly and severally enjoined and re-
strained from entering into, participating in or maintaining any
contract, combination, agreement, undertaking, plan, or program
with any labor union, association, brotherhood, or other labor
organization to:

(a)  Restrict, curtail, or prevent the supply of labor to
any electrical contractor who is willing and able to
comply with and abide by union requirements concerning
wages, hours, working conditions, and collective bar-
gaining;

(b)  Supply inadequate, incompetent, or supernumerary labor
and otherwise discriminate in furnishing labor to elec-
trical contractors who are able and willing to comply
with and abide by union requirements concerning wages,
hours, working conditions, and collective bargaining;

(c)  Induce or coerce any electrical contractor to employ
labor under terms and conditions of employment dif-
ferent than required of or imposed upon other electrical
contractors; or

(d)  Induce or bring about strikes, walk-outs, picketing,
slowdowns, or other labor difficulties between any
electrical contractor and any union labor organization
which do not arise out of efforts by such labor organi-
zation to exercise its lawful rights with respect to
such contractor or contractors.

PROVIDED, HOWEVER, that nothing in this Final Judgment shall
be deemed to enjoin any defendant from bargaining collectively
and entering into and carrying out the terms of any agreement
with duly organized labor unions which is incident and appropriate
to the exercise of any or all rights, privileges, immunities,

-4-

duties and obligations accruing to and devolving upon a duly
organized labor union and its officers, agents and members.

VI

Defendant Association is ordered and directed:

(a) To cancel and revoke any provision of its by-laws,
    rules or regulations excluding any person from being,
    or preventing any person from becoming a member, save
    for failure or refusal of any person to comply with
    said Association's reasonable and nondiscriminatory
    requirements for membership, not otherwise inconsistent
    with the provisions of this Final Judgment;

(b) To expel promptly from membership any member of the
    defendant association who shall be found guilty of
    violating the provisions of this Judgment when the
    said defendant association shall have knowledge of
    such violation.

VII

For the purpose of securing compliance with this Final Judg-
ment, duly authorized representatives of the Department of Justice
shall, on written request of the Attorney General or the Assistant
Attorney General in charge of the Antitrust Division, and on
reasonable notice to any defendant, be permitted, subject to any
legally-recognized privilege, (a) reasonable access, during the
office hours of such defendant, to all books, ledgers, accounts,
correspondence, memoranda, and other records and documents in the
possession or under the control of such defendant, relating to
any of the matters contained in this Final Judgment, and (b) sub-
ject to the reasonable convenience of any defendant, and without
restraint or interference, to interview officers and employees of

-5-

A-86

such defendant who may have counsel present, regarding any such matters. For the purpose of securing compliance with this Final Judgment, any defendant, upon the written request of the Attorney General or the Assistant Attorney General in charge of the Anti-trust Division, shall submit such written reports with respect to any of the matters contained in this Final Judgment as from time to time may be necessary for the purpose of enforcement of this Final Judgment. No information obtained by the means permitted in this Section VII shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Department except in the course of legal proceedings for the purpose of securing compliance with this Final Judgment in which the United States is a party or as otherwise required by law.

### VIII

Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this Final Judgment to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification or termination of any of the provisions thereof, for the enforcement of compliance therewith and punishment of violations thereof. It is represented to the court that all defendants appear voluntarily and waived service by filing answer. T.M.M
Dated: July 13, 1956

/s/ Thomas M. Madden
United States District Judge

We consent to the entry of the foregoing Final Judgment:

For the Plaintiff:

/s/    Edward A. Foote                   /s/ William L. Maher
    EDWARD A. FOOTE
First Assistant, Antitrust Division
                                        /s/ Donald G. Balthis
                                        Attorneys, Department of Justice

-6-

A-87

/s/ Wilford L. Whitley, Jr.
Attorney, Department of Justice

/s/ George F. Schueller
Attorney, Department of Justice

For the Defendants:

/s/ James T. Owens
Attorney for
National Electrical Contractors
Association, New Jersey Chapter, Inc.
and P. Joseph Quinn

/s/ Murray Fredericks
Attorney for
Calvi Electric Company and
Francis Calvi
McAdam Electric Company and
Thomas J. McAdam

/s/ Joshua V. Davidow
Attorney for
Mel Downs Electrical Construction Co.
and Melvin M. Downs

/s/ Raymond J. Osborn
Attorney for
Gerald Electric Construction Company, Inc.
and J. C. Fitzgerald

/s/ William T. Cahill
Attorney for
Harry R. Compton

/s/ E. Milton Hannold
Attorney for
Roland E. McMahon, Jr.

/s/ S. Thurman Lovitt
Attorney for
John F. Meade

/s/ Charles E. Gant
Attorney for
Fred Phrampus

/s/ Samuel F. Orlando
Attorney for
William E. Snell

**Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. National Electrical Contractors Association, New Jersey Chapter, Inc., P. Joseph Quinn, Mel Downs Electrical Construction Company, Melvin M. Downs, Gerald Electrical Construction Company, J. C. Fitzgerald, John F. Meade, Fred Phrampus, Harry R. Compton, Calvi Electric Company, Francis Calvi, McAdam Electric Company, Thomas J, McAdam, William E. Snell, and Roland E. McMahon, Jr., U.S. District Court, D. New Jersey, 1956 Trade Cases ¶68,534, (Oct. 26, 1956)**

Click to open document in a browser

United States v. National Electrical Contractors Association, New Jersey Chapter, Inc., P. Joseph Quinn, Mel Downs Electrical Construction Company, Melvin M. Downs, Gerald Electrical Construction Company, J. C. Fitzgerald, John F. Meade, Fred Phrampus, Harry R. Compton, Calvi Electric Company, Francis Calvi, McAdam Electric Company, Thomas J. McAdam, William E. Snell, and Roland E. McMahon, Jr.

1956 Trade Cases ¶68,534. U.S. District Court, D. New Jersey. Civil Action No. 575-56. Filed October 26, 1956. Case No. 1298 in the Antitrust Division of the Department of Justice.

### Sherman Antitrust Act

**Department of Justice Enforcement and Procedure—Consent Decrees—Permissive Provisions—Bidding Practices.**—Where a consent decree prohibited electrical contractors from entering into any agreement to fix prices or to exchange future bids, and it appeared that the decree might preclude some contractors from competing with other contractors, the decree, upon the consent of the parties, was modified so as not to prohibit any electrical contractor from entering into a joint venture agreement whereby a single bid will be submitted and the assets and facilities of each of the parties thereto will be combined for the sale and installation of electrical equipment of such monetary value or in such quantities that each party to the joint venture could not singly bid or perform the contract.

For the plaintiff: William L. Maher, Attorney, Department of Justice.

For the defendants: James T. Owens for National Electrical Contractors Association, New Jersey Chapter, Inc., and P. Joseph Quinn; Murray Fredericks for Calvi Electric Company, Francis Calvi, McAdam Electric Company, and Thomas J. McAdam; Joshua V. Davidow for Mel Downs Electrical Construction Co. and Melvin M. Downs; Raymond J. Osborn for Gerald Electric Construction Company, Inc., and J. C. Fitzgerald; William T. Cahill for Harry R. Compton; E. Milton Hannold for Roland E. McMahon, Jr.; S. Thurman Lovitt for John F. Meade; Charles E. Gant for Fred Phrampus; and Samuel P. Orlando for William E. Snell.

**Modifying a consent decree entered in the U. S. District Court, District of New Jersey, 1956 Trade Cases ¶ 68,413.**

#### Modification of Final Judgment

THOMAS M. MADDEN, District Judge [ *In full text*] : Final Judgment having been entered herein on July 13, 1956 and it having come to the attention of the attorneys for the plaintiff that the terms of such judgment might preclude some electrical contractors from competing with certain other electrical contractors in bidding and contracting for certain sales and installations of electrical equipment,

Now, therefore, upon consent of the parties hereto it is hereby

Ordered, adjudged and decreed as follows:

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

*1*

Nothing contained in the provisions of Section IV(a) and (b) of the said Final judgment shall be deemed to enjoin any defendant electrical contractor or member of the defendant Association from entering into, participating in, or maintaining with each other or with any other electrical contractor or with anyone acting for or in behalf of any electrical contractor, a joint venture agreement: whereby a single bid will be submitted and the assets and facilities of each of the parties thereto will be combined for the sale and installation of electrical equipment of such monetary value or in such quantities that each party to the joint venture could not singly bid or perform the contract. Provided, however, that such joint ventures shall not be used or permitted to circumvent or evade any of the other provisions of the judgment or to implement other activities in derogation thereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

US. v. GARDEN STATE RETAIL GASOLINE DEALERS ASS'N, INC., ET AL.
Civil No.: 482-55
Year Judgment Entered: 1956

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. Garden State Retail Gasoline Dealers Association, Inc., Anthony Vitolo, and Irving Lichtenstein., U.S. District Court, D. New Jersey, 1956 Trade Cases ¶68,493, (Sept. 19, 1956)

Click to open document in a browser

United States v. Garden State Retail Gasoline Dealers Association, Inc., Anthony Vitolo, and Irving Lichtenstein. 1956 Trade Cases ¶68,493. U.S. District Court, D. New Jersey. Civil Action No. 482-55. Filed September 19, 1956. Case No. 1239 in the Antitrust Division of the Department of Justice.

### Sherman Antitrust Act

**Combinations and Conspiracies—Consent Decree—Practices Enjoined—Price Fixing—Gasoline.**—A retail gasoline dealers' association and two individuals were prohibited by a consent decree from entering into any understanding with any retailer or any association of retailers to fix prices, pricing methods, or other terms for the sale of gasoline to consumers, and from suggesting to any other retailer the prices to be charged by such other retailer or circulating any price list containing any prices for the sale of gasoline agreed upon by two or more retailers.

**Combinations and Conspiracies—Consent Decree—Practices Enjoined—Preventing Persons from Selling.**—A retail gasoline dealers' association and two individuals were prohibited by a consent decree from entering into any understanding with any retailer or association of retailers to hinder, restrict, limit, or prevent any person from selling gasoline to customers, and from hindering, restricting, limiting, or preventing any person from selling gasoline.

**Combinations and Conspiracies—Consent Decree—Practices Enjoined—Membership in Association.**—A retail gasoline dealers' association and two individuals were each prohibited by a consent decree from being a member of, contributing anything of value to, or participating in any of the activities of, any trade association, the activities of which are inconsistent with the provisions of the decree.

**Department of Justice Enforcement and Procedure—Consent Decrees—Specific Relief—Dissolution of Association.**—A retail gasoline dealers' association and two individuals were ordered to institute such action as may be necessary to dissolve the association under the laws of the state of its incorporation, to complete such dissolution within the minimum period of time permitted by such laws, and to file an affidavit setting forth the fact of their compliance upon the completion of such dissolution.

**Department of Justice Enforcement and Procedure—Consent Decrees—Specific Relief—Notice of Judgment.**—A retail gasoline dealers' association was ordered by a consent decree to cause to be published in a specified trade magazine an advertisement setting forth a summary of the substantive provisions of the consent decree.

For the plaintiff: Victor R. Hansen, Assistant Attorney General, and Worth Rowley, John D. Swartz, Charles F. B. McAleer, W. D. Kilgore, Jr., Richard B. O'Donnell, Walter W. K. Bennett, and Bernard Wehrmann, Attorneys, Department of Justice.

For the defendants: Anthony D. Rinaldo for Garden State Retail Gasoline Dealers Association, Inc., and Anthony Vitolo; and Norman Fischbein for Irving Lichtenstein.

### Final Judgment

WORTENDYKE, District Judge[ *In full text*]:The plaintiff, United States of America, having filed its complaint herein on May 25, 1955, and each of the said defendants having appeared herein and the plaintiff and the defendants, by their respective attorneys, having severally consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law herein, and without this Final Judgment constituting evidence or admission by any defendant in respect of any such issue;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

1

Now, therefore, before any testimony or evidence has been taken herein, and without trial or adjudication of any issue of fact or law herein, and upon the consent of all the parties hereto, it is hereby

Ordered, adjudged and decreed as follows:

I

[ *Sherman Act*]

The Court has jurisdiction of the subject matter hereof and all the parties hereto. The complaint states a claim upon which relief may be granted against the defendants and each of them under Section 1 of the Act of Congress of July 2, 1890, entitled "An Act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

II

[ *Definitions*]

As used in this Final Judgment:

(A) "Person" shall mean any individual, partnership, firm, association, corporation or other legal entity;

(B) "Defendant association" shall mean the defendant Garden State Retail Gasoline Dealers Association, Inc.;

(C) "Retailer" shall mean any person who sells gasoline to consumers.

III

[ *Applicability of Judgment*]

The provisions of this Final Judgment applicable to any defendant shall apply to each such defendant and to his or its officers, agents, servants, employees, subsidiaries, successors and assigns, and to all persons in active concert or participation with any defendant who shall have received actual notice of this Final Judgment by personal service or otherwise.

IV

[ *Dissolution of Association*]

The defendants are ordered and directed:

(A) Forthwith to institute such action as may be necessary to dissolve the defendant association under the laws of the State of New Jersey and to complete such dissolution within the minimum period of time permitted by the laws of the State of New Jersey;

(B) Upon the completion of such dissolution of the defendant association, to file an affidavit with this Court and with the Attorney General setting forth the fact of their compliance with this Section.

V

[ *Price Fixing—Restrictions on Sales*]

The defendants are jointly and severally enjoined and restrained from, directly or indirectly, entering into, adhering to, enforcing, maintaining or claiming any rights under any contract, agreement, understanding, plan or program with any retailer or with any association or central agency of or for retailers:

(A) To fix, determine, establish, maintain or stabilize prices, pricing methods, discounts, mark-ups or other terms or conditions for the sale of gasoline to consumers;

(B) To hinder, restrict, limit or prevent any person from selling gasoline to consumers.

VI

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

The defendants are jointly and severally enjoined and restrained from, directly or indirectly:

(A) Suggesting, or attempting to suggest to any other retailer the price or prices, or other terms or conditions to be charged by such other retailer for the sale of gasoline to any other person;

(B) Hindering, restricting, limiting or preventing or attempting to hinder, restrict, limit or prevent any person from selling gasoline;

(C) Circulating, exchanging or using, in any manner, any price list or purported price list containing or purporting to contain any prices, terms or conditions for the sale of gasoline agreed upon or established pursuant to agreement between two or more retailers;

(D) Being a member of, contributing anything of value, or participating in any of the activities of, any trade association or other organization, the activities of which are inconsistent in any manner with any of the provisions of this Final Judgment.

VII

[ Notice of Judgment]

Defendant association is ordered and directed, at the earliest practical date, to cause to be published in the trade magazine THE GASOLINE RETAILER an advertisement, in a form first approved by plaintiff, setting forth a summary of the substantive provisions of this Final Judgment.

VIII

[ Inspection and Compliance]

For the purpose of securing compliance with this Final Judgment, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to any defendant made to its principal office, be permitted, subject to any legally-recognized privilege, (A) reasonable access, during the office hours of such defendant, to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of such defendant, relating to any of the matters contained in this Final Judgment, and (B) subject to the reasonable convenience of such defendant, and without restraint or interference, to interview officers and employees of such defendant who may have counsel present, regarding any such matters. Upon such written request said defendant shall submit such written reports with respect to any of the matters contained in this Final Judgment as from time to time may be necessary for the purpose of enforcement of this Final Judgment. No information obtained by the means permitted in this Section VIII shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Department except in the course of legal proceedings in which the United States is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law.

IX

[ Jurisdiction Retained]

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification or termination of any of the provisions thereof, for the enforcement of compliance therewith and punishment of violations thereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

3

\

A-94

US. v. AMERICAN TYPE FOUNDERS CO., INC., ET AL.
Civil No.: 698-58
Year Judgment Entered: 1958

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. American Type Founders Co., Inc., U.S. District Court, D. New Jersey, 1958 Trade Cases ¶69,065, (Jun. 20, 1958)

Click to open document in a browser

United States v. American Type Founders Co., Inc.

1958 Trade Cases ¶69,065. U.S. District Court, D. New Jersey. Civil Action No. 698-58. Dated June 20, 1958. Case No. 1396 in the Antitrust Division of the Department of Justice.

### Sherman Antitrust Act

**Combinations and Conspiracies—Consent Decree—Practices Enjoined—Price Fixing.**—A company engaged in the manufacture and distribution of printing presses and printing equipment was prohibited by a consent decree from entering into any agreement with any distributor having a place of business in the United States, or with any domestic or foreign manufacturer, to fix prices or other terms for the sale of such products in, or exported from, the United States.

**Combinations and Conspiracies—Consent Decree—Practices Enjoined—Allocation of Territories and Markets.**—A company engaged in the manufacture and distribution of printing presses and printing equipment was prohibited by a consent decree from entering into any agreement with any distributor having a place of business in the United States to limit or restrict the territories in which, or the customers to whom, any such distributor might sell such products.

**Combinations and Conspiracies—Consent Decree—Practices Enjoined—Restricting Use of Competitors' Products.**—A company engaged in the manufacture and distribution of printing presses and printing equipment was prohibited by a consent decree from entering into any agreement with any distributor having a place of business in the United States to limit or restrict the right of any such distributor to purchase, distribute, or sell products from any source other than the company. The company was further prohibited from selling or offering to sell products for use or resale in the United States on the condition or understanding that the purchaser not purchase, distribute, or sell products from any source other than the company.

**Combinations and Conspiracies—Consent Decree—Practices Enjoined—Agreements to Control Imports and Exports.**—A company engaged in the manufacture and distribution of printing presses and printing equipment was prohibited by a consent decree from entering into any agreement with any domestic or foreign manufacturer (1) restricting or preventing any foreign manufacturer from exporting to and selling products in the United States to ultimate consumers, except where the company has an exclusive distributorship for such products in the United States, or (2) restricting or preventing the company from exporting products from the United States.

**Department of Justice Enforcement and Procedure—Consent Decree—Contingent Provision.**—A consent decree entered against a company engaged in the manufacture and distribution of printing presses and printing equipment provided that, in the event the company should engage in the manufacture of a specific product or products, the company would be prohibited from entering into any understanding (1) to fix prices for the sale of such product or products in or exported from the United States, (2) to allocate customers or markets for the manufacture, distribution, or sale of such product or products, (3) to restrict or limit imports of such product or products into or exports of such product or products from the United States, (4) to refrain from selling such product or products or otherwise refrain from doing business in such product or products, or (5) to refrain from competing in or for any customer, territory, or market for the manufacture, distribution, or sale of such product or products.

**Department of Justice Enforcement and Procedure—Consent Decree—Permissive Provisions.**—A consent decree entered against a company engaged in the manufacture and distribution of printing presses and equipment provided that the company, subject to certain provisions of the decree, could choose its distributors and customers and designate geographical areas in which such distributors should be primarily responsible for selling the company's products and could terminate the franchise of any distributor who does not adequately

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

represent the company. The purchase by the company of products under a requirements contract, reasonable in time, was excluded from a prohibition of the decree. The decree further provided that nothing contained therein should be construed to (1) require the company to violate any law or decree of any court of competent jurisdiction in a foreign nation, (2) prevent the company from entering into or adhering to any fair trade contract otherwise permitted under the Miller-Tydings and McGuire acts, or (3) prohibit a covenant, reasonable in time and space, not to compete in the manufacture or sale of products if such covenant is ancillary to the lawful sale of a business or a department of a business.

For the plaintiff: Victor R. Hansen, Assistant Attorney General, and William D. Kilgore, Jr., Baddia J. Rashid, Philip L. Roache, Jr., Charles F. B. McAleer, and Stanley R. Mills, Jr., Attorneys, Department of Justice.

For the defendant: Stroock and Stroock and Lavan by Samuel Hoffman; Victor H. Kramer; and Kresteller, Zucker, Lowenstein and Cohen by Melvin B. Cohen.

#### Final Judgment

MENDIN MORRILL, District Judge [ *In full text*] : Plaintiff, United States of America, having filed its complaint herein on June 20, 1958; defendant, American Type Founders Co., Inc., having appeared and filed its answer to the complaint denying the substantive allegations thereof; and the plaintiff and the defendant, by their attorneys, having severally consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law herein and without admission by either of them in respect to any such issue;

Now, therefore, before any testimony has been taken herein, and without trial or adjudication of any issue of fact or law herein, and upon consent of the parties hereto, it is hereby

Ordered, Adjudged and Decreed as follows:

I

#### [ *Sherman Act*]

This Court has jurisdiction of the subject matter herein and of the parties hereto. The complaint states claims against the defendant, American Type Founders Co., Inc., upon which relief may be granted under Sections 1 and 3 of the Act of Congress of July 2, 1890, entitled "An Act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

II

#### [ *Definitions*]

As used in this Final Judgment:

(A) "Printing presses and printing equipment" means (1) letter presses and offset presses for making printed impressions on paper or other material from an inked surface, and the equipment and accessories used in connection therewith and as a part thereof and (2) the Solna Vertico 1400 Step and Repeat Machine and the Solna Gatherer; but type and type-setting equipment are neither "printing pressess" nor "printing equipment".

(B) "Products" means printing presses and printing equipment;

(C) "Defendant" means the defendant American Type Founders Co., Inc., a corporation organized and existing under the laws of the State of Delaware;

(D) "United States" means the United States and its territories and possessions;

(E) "Person" means an individual, partnership, firm, association, corporation or other business or legal entity;

(F) "Vickers" means Vickers-Armstrongs, Limited, a holding company organized and existing under the laws of the United Kingdom;

(G) "Engineers" means Vickers-Armstrongs (Engineers), Ltd., a company organized and existing under the laws of the United Kingdom;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

(H) "Mann" means George Mann & Co., Ltd., a company organized and existing under the laws of the United Kingdom;

(I) "A/B Printing" means A/B Printing Equipment, a company organized and existing under the laws of Sweden;

(J) "Honolulu Paper" means Honolulu Paper Company, Limited, a corporation organized and existing under the laws of the Territory of Hawaii;

(K) "Heinsohn" means A. E. Heinsohn Printing Machinery & Supplies, a partnership with its office and principal place of business in Denver, Colorado.

III

[ *Applicability of Decree*]

The provisions of this Final Judgment shall apply to the defendant and to each of its subsidiaries, successors, assigns, officers, directors, servants, employees and agents, and to those persons in active concert or participation with the defendant who receive actual notice of this Final Judgment by personal service or otherwise.

IV

[ *Agreements with Distributors*]

Defendant is enjoined and restrained from, directly or indirectly:

(A) Entering into, adhering to, maintaining or claiming any rights under any contract, agreement or understanding with Honolulu Paper, Heinsohn or any other distributor having a place of business in the United States to:

(1) Fix, establish, maintain or adhere to prices, terms or conditions for the sale of products in or exported from the United States to third persons;

(2) Limit or restrict the territories in which or the customers to whom any such distributor may sell products;

(3) Limit or restrict the right of any such distributor to purchase, distribute or sell products from any source other than defendant;

(B) Selling or offering to sell products for use or resale in the United States on the condition or understanding that the purchaser not purchase, distribute or sell products from any source other than defendant.

Subject to the terms of subsections (A) and (B) of this Section IV and of Section VI below defendant may exercise its right to choose and select its distributors and customers and to designate geographical areas in which such distributors shall respectively be primarily responsible for selling defendant's products and may terminate the franchises of distributors who do not adequately represent defendant and promote the sale of all defendant's products in areas so designated as their primary responsibility.

V

[ *Agreements with Manufacturers*]

Defendant is enjoined and restrained from, directly or indirectly, entering into, adhering to, maintaining or claiming any rights under any contract, agreement or understanding with any domestic or foreign manufacturer:

(A) Fixing, establishing, maintaining, or adhering to prices, terms or conditions for the sale of products in or exported from the United States to third persons;

(B) Restricting or preventing any foreign manufacturer from exporting to and selling products in the United States to ultimate consumers, except where defendant has an exclusive distributorship for said products in the United States from such foreign manufacturer;

(C) Restricting or preventing defendant from exporting products from the United States;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

3

A-98

(D) Under which any person refrains from engaging in the manufacture of products; provided, however, that this sub section shall not be deemed to prohibit (1) the purchase by defendant of products under a requirements contract, reasonable in time, or (2) the enforcement of any rights defendant may have under a contract with Van Vlaanderen Machine Company, dated September 7, 1956.

VI

[ Contingent Prohibitions]

In the event that defendant shall engage in the manufacture of a specific product or products, then defendant is enjoined and restrained from, directly or indirectly, entering into, adhering to, maintaining or claiming any rights under any contract, agreement or understanding with any other person to:

(A) Fix, establish, maintain or adhere to prices, terms or conditions for the sale of said specific product or products in or ex ported from the United States to any third person;

(B) Allocate or divide customers, territories or markets for the manufacturer, distribution or sale of said specific product or products;

(C) Restrict or limit imports of said specific product or products into or export of said specific product or products from the United States;

(D) Refrain from selling said specific product or products to, or otherwise refrain from doing business in said specific product or products with any person;

(E) Refrain from competing in or for any customer, territory or market for the manufacture, distribution or sale of said specific product or products.

For the purposes of this Section VI of this Final Judgment (1) the manufacture by defendant of parts of products for the purpose of servicing products in the hands of consumers shall not constitute the manufacture of any product and, (2) the occasional assembling of component parts into any product by defendant shall not constitute the manufacture of any product so long as said parts are not manufactured by, or under a running contract for, defendant.

VII

[ Notice of Judgment]

Defendant is ordered and directed within 60 days from the effective date of this Final Judgment:

(A) To cease adhering to any provision in any contract with Vickers, Engineers, Mann, A/B Printing, Honolulu Paper and Heinsohn, relating to products, which is contrary to or inconsistent with any term of this Final Judgment;

(B) To mail to each of the companies listed in (A) above, a true and complete copy of this Final Judgment, and to advise each of them in writing of the effect of this Final Judgment, and particularly VII(A) above, on any contract to which each may now be a party with defendant.

VIII

[ Permissive Provisions]

Nothing contained in this Final Judgment shall be construed

(A) To require defendant to do, or omit to do, any act in a foreign nation in violation of any law or decree of any court of competent jurisdiction of said foreign nation; provided that defendant shall have the bur den of demonstrating that any act or omission by it otherwise in violation of this Final Judgment was done or omitted be cause of the requirements of the laws or decrees of courts of competent jurisdiction of a foreign nation;

(B) To prevent the defendant from entering into or adhering to any fair trade contract, otherwise permitted by the acts of Congress commonly known as the Miller-Tydings and McGuire acts.

---

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

4

(C) To prohibit a covenant, reasonable in time and space, not to compete in the manufacture or sale of products if said covenant is ancillary to the lawful sale of a business or of a department thereof.

IX

[ *Inspection and Compliance*]

For the purpose of securing compliance with this Final Judgment duly authorized representative of the Department of Justice shall, on written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to the defendant made to its principal office, be permitted, subject to any legally recognized privilege:

(A) Access, during the office hours of the defendant, to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of the defendant relating to any matters contained in this Final Judgment.

(B) Subject to the reasonable convenience of the defendant and without restraint or interference from the defendant, to interview officers or employees of the defendant, who may have counsel present, regarding any such matters.

Upon such written request the defendant shall submit such reports in writing with respect to the matters contained in this Final Judgment as may from time to time be necessary to the enforcement of this Final Judgment. No information obtained by the means permitted in this Section IX shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Department of Justice except in the course of legal proceedings in which the United States is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law

X

[ *Jurisdiction Retained*]

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the amendment or modification of any of the provisions thereof, for the enforcement of compliance therewith, and for the punishment of violations thereof.

[ *Effective Date*]

This judgment shall become effective sixty (60) days from the date of entry hereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

US. v. THE GEMEX CORP.
Civil No.: 1350-58
Year Judgment Entered: 1959

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. The Gemex Corporation., U.S. District Court, D. New Jersey, 1959 Trade Cases ¶69,421, (Jul. 31, 1959)

Click to open document in a browser

United States v. The Gemex Corporation.

1959 Trade Cases ¶69,421. U.S. District Court, D. New Jersey. Civil Action No. 1350-58. Filed July 31, 1959. Case No. 1426 in the Antitrust Division of the Department of Justice.

### Sherman Antitrust Act

**Combinations and Conspiracies—Consent Decree—Practices Enjoined—Price Fixing —Fixing Prices for Sale of Watchbands.**—A manufacturer of watchbands was prohibited by a consent decree from entering into any agreement with any wholesaler to fix prices for the sale of watchbands to third persons. The decree also enjoined the manufacturer from requiring any wholesaler to sell watchbands at list price or at any other specific price level.

**Combinations and Conspiracies-Consent Decree—Practices Enjoined—Price Fixing —Investigations and Penalties—Policing Adherence to Price Fixing Agreements.**—A manufacturer of watchbands was prohibited from collecting, publishing, or disseminating information regarding price cutting or price deviation by wholesalers or retailers. The decree also enjoined the manufacturer from requiring any wholesaler to report to it regarding any such price deviation by retailers or other wholesalers.

**Combinations and Conspiracies—Consent Decree—Practices Enjoined—Exclusive Dealing.**—A manufacturer of watchbands was prohibited by a consent decree from selling to its wholesalers on the condition that they refrain from dealing in competitors' products.

For the plaintiff: Robert A. Bicks, W. D. Kilgore, Jr., Raymond M. Carlson, Charles L. Beckler, Charles F. B. McAleer, Charles H. McEnerney, Jr., and John L. Wilson, Department of Justice.

For the defendant; Manning, Hollinger & Shea, New York, N. Y., by Bruce A. Hecker; and Platoff, Platoff & Heftler, Union City, N. J., by Robert G. Platoff.

### Final Judgment

[ *Consent Decree*]

REYNIER J. WORTENDYKE, Jr., District judge [ *in full text*] : The plaintiff, United States of America, having filed its complaint herein ton December 16, 1958; the defendant, the Gemex Corporation, having appeared and filed its answer to the complaint denying the substantive allegations thereof; and the plaintiff and the defendant, by their attorneys, having severally consented to the entry of this Final Judgment without trial or adjudication of any issue or fact, or law herein and without admission by either of them in respect to any such issue ;

Now, Therefore, before any testimony or evidence has been taken herein, and without trial or adjudication of any issue of fact or law herein, and upon consent of the parties hereto, it is hereby

Ordered, adjudged and decreed as follows :

I

[ *Jurisdiction*]

This Court has jurisdiction of the subject matter hereof and of the parties hereto. The complaint states a claim against the defendant, under which relief may be granted under Section .1 of the Act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies" commonly known as the Sherman Act, as amended.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

**II**

[ *Definitions*]

As used in this Final Judgment:

(A) "Watchbands" means attachments, whether of precious or non-precious metals, cord, fabric, leather or other materials, or combinations thereof, which are used to hold watches to the wrist.;

(B) "Wholesaler" means a person who purchases watchbands from a manufacturer for resale to retailers;

(C) "Retailer" means a person who purchases watchbands from a wholesaler for resale to ultimate consumers;

(D) "Person" means any individual, partnership, firm, association; corporation or other business: or legal entity;

(E) "Subsidiary" means any existing or future corporation whose stock is, directly or indirectly, wholly owned by defendant.

**III**

[ *Applicability*]

The provisions of this Final Judgment shall apply to the defendant and to each of its subsidiaries, successors, assigns, officers, directors, employees and agents, and to those persons in active concert or participation with the defendant who receive actual notice of this Final Judgment by personal service or otherwise.

**IV**

[ *Price Fixing—Exclusive Dealing*]

Defendant is enjoined and restrained from directly or indirectly:

(A) Entering into, adhering to, maintaining, enforcing or claiming any rights under any contract, agreement, understanding, plan or program, with any wholesaler to fix, establish, maintain, stabilize or adhere to prices for the sale of watch bands to third persons;

(B) Collecting, publishing or disseminating information regarding, or suggesting, soliciting or requiring that any wholesaler report to defendant, any price cutting or price deviation by any wholesaler or retailer ;

(C) Requiring any wholesaler to sell any watchbands at list price or at any other specific price level;

(D) Selling or offering, or attempting to sell, any watchbands on the condition, agreement or understanding that any wholesaler shall not deal in watchbands manufactured by any person other than the defendant.

**V**

[ *Enforcement and Compliance*]

For the purpose of securing compliance with this Final Judgment and for no other purpose, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to the defendant made to its principal office, be permitted, subject to any legally recognized privilege:

(A) Access, during the office hours of the defendant, to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of the defendant which relate to any matters contained in this Final Judgment;

(B) Subject to the reasonable convenience of the defendant and without restraint or interference from the defendant, to interview officers or employees of the defendant, who may have counsel present, regarding any such matters.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

A-103

Upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, the defendant shall submit such reports in writing with respect to the matters contained in this Final judgment as may from time to time be necessary to the enforcement of this Final Judgment.

No information obtained by the means permitted in this Section V shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Executive Branch of the plaintiff except in the course of legal proceedings in which the United States is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law.

VI

[ *Jurisdiction Retained*]

Jurisdiction is retained by this Court for the purpose of enabling either of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the amendment or modification of any of the provisions thereof, for the enforcement of compliance therewith, and for the punishment of violations thereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm
3

US. v. NEW JERSEY AUTO GLASS DEALER ASS'N
Civil No.: 575-60
Year Judgment Entered: 1960

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. New Jersey Auto Glass Dealer Association., U.S. District Court, D. New Jersey, 1960 Trade Cases ¶69,764, (Jun. 29, 1960)

Click to open document in a browser

United States v. New Jersey Auto Glass Dealer Association.

1960 Trade Cases ¶69,764. U.S. District Court, D. New Jersey. Civil Action No. 575-60. Dated June 29, 1960. Case No. 1547 in the Antitrust Division of the Department of Justice.

### Sherman Antitrust Act

**Price Fixing—Group Boycott—Coercion.**—An association of auto replacement glass dealers was prohibited by a consent decree from entering into any agreement to (1) fix prices for the sale or installation of such glass, (2) investigate or report prices charged, (3) hinder the sale of replacement glass to any person, (4) restrict the free and independent selection of customers or dealers, (5) cause or bring about boycotts, (6) prevent any person from purchasing, or having installed, replacement glass, or (7) prevent any person from vertising the prices charged by him. The association also was prohibited from circulating t o any insurance company any membership list, unless such list names every member and contains a notice that prices are determined by each member, and from picketing any insurance company, purchaser, or user of such glass.

**Consent Decree—Specific Relief—Association Membership.**—An auto replacement glass dealer's association was required by a consent decree to admit to membership any qualified auto glass dealer doing business it its area.

For the plaintiff: Robert A. Bicks, Paul A. Owens, W. D. Kilgore, Jr., Richard B. O'Donnell, John D. Swartz, Walter W. K. Bennett, and Francis E. Dugan, Attorneys, Department of Justice.

For the defendant: Hyman Siegendorf.

### Final Judgment

HARTSHONNE, District Judge [ *in full text*]: The plaintiff, United States of America, having filed its complaint herein on June 29, 1960, and the parties hereto, by their respective attorneys, having consented to the entering of this Final Judgment without trial or adjudication of any issue of fact or law herein, and without admission by any party hereto with respect to any such issue:

Now, therefore, before the taking of any testimony, and without trial or adjudication of any issue of fact or law herein, and upon the consent of the parties hereto, it is hereby Ordered, adjudged and decreed as follows:

I

[ *Jurisdiction*]

This Court has jurisdiction of the subject matter hereof and of the parties hereto. The complaint states claims for relief against the defendant, under Section 1 of the Act of Congress of July 2, 1890, entitled "An Act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

II

[ *Definitions*]

As used in this Final Judgment:

(A)"Person" shall mean any individual, partnership, corporation or any other business or legal entity;

(B)"NJAGDA" shall mean the defendant New Jersey Auto Glass Dealers' Association.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

(C)"Defendant" shall mean the defendant NJAGDA and those members of NJAGDA who have received notices of this Final Judgment pursuant to Section IV(A) hereof;

(D)"Replacement glass" shall mean laminated, tempered, and other types of glass suitable for installation in automobiles, trucks, or other vehicles as windshields, back lites (i. e., rear vision windows), or side windows. The term shall include molded or bent glass, flat, and uncut, as well as precut, or preformed glass;

(E) "Installation of replacement glass" shall mean the necessary fitting, glazing, cutting or grinding, as well as the actual installing of glass in an automobile, truck or other vehicle.

(F) "Automobile glass dealer" shall mean any person engaged in the business of selling at retail and installing replacement glass.

III

[ *Applicability*]

The provisions of this Final Judgment applicable to defendant shall apply to its members, officers, directors, agents, employees, successors and assigns, and to all other persons in active concert or participation with such defendant who shall have received actual notice of this Final Judgment by personal service, or otherwise.

IV

[ *By-Laws—Incorporation of Provisions*]

(A) Defendant is ordered and directed to mail a copy of this Final Judgment to each of its members within sixty days after the dale of the entry hereof.

(B) Defendant is ordered and directed within ninety days from the date of entry of this Final Judgment to institute and complete such proceedings as may be appropriate and necessary to amend its Charter and By-Laws so as to incorporate therein Sections V, VI and VII of this Final Judgment, and to require as a condition of membership that all present and future members be bound by such sections of this Final Judgment;

(C) Promptly after compliance therewith defendant shall file with this Court and with the Assistant Attorney General an affidavit of compliance with subparagraphs (A) and (B) of this Section IV attaching copies of the documents used to effect such compliance.

V

[ *Prohibited Agreements*]

The defendant is enjoined and restrained from entering into, adhering to, maintaining, enforcing, or claiming any rights under any contract, agreement, understanding, plan or program with any other person to:

(A) Fix, suggest, establish, determine or maintain prices, terms or conditions to be charged or imposed by any other person for the sale or installation of replacement glass;

(B) Prepare, publish, circulate, or suggest prices, price lists, including discounts from prices, or other terms or conditions to be charged or imposed by any other person in connection with the sale or installation of replacement glass;

(C) Urge, suggest, coerce, require, or attempt to influence such person to boycott, threaten to boycott, or refuse or threaten to refuse to do business with any third person;

(D) Interfere or threaten or attempt to interfere with the business of any person by picketing or other similar activity;

(E) Investigate and report to others, or police, the prices or terms charged or imposed by any person in connection with the sale or installation of replacement glass. This subsection shall not be construed to prohibit an individual automobile glass dealer from independently ascertaining competitive prices;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

(F) Hinder, restrict or prevent, or attempt or threaten to hinder, restrict or prevent in any manner, the sale of replacement glass by any manufacturer, distributor or wholesaler to any person, except pursuant to the exercise of such lawful rights as an automobile glass dealer may have under a distributor ship agreement with any manufacturer;

(G) Hinder, restrict or limit or attempt or threaten to hinder, restrict or limit any other person in the free and independent selection of customers or automobile glass dealers;

(H) Hinder, restrict or prevent, or attempt or threaten to hinder, restrict or prevent any person from purchasing replacement glass from, or procuring the installation of replacement glass by, any other person;

(I) Hinder, restrict or prevent, or attempt or threaten to hinder, restrict or prevent any Person from advertising prices, terms or other conditions for the sale or installation of replacement glass to be sold or installed by such person.

Subject to the injunctive provisions here in contained, this Section B is not intended to prevent defendant from engaging in the joint or collective solicitation of business on behalf of its members as a whole.

## VI

[ *Prohibited Practices*]

Defendant is enjoined and restrained from directly or indirectly:

(A) Preparing, suggesting, publishing or circulating prices, price lists, price catalogues or discounts therefrom for the sale or installation of replacement glass; provided, however, nothing herein contained shall prevent any automobile glass dealer from preparing, negotiating, publishing or circulating his own prices and price lists or price catalogues containing his own prices for the sale or installation of replacement glass which prices have been individually determined by him, in the normal course of his business;

(B) Preparing, publishing or circulating to any insurance company or any other person any list of the membership of defendant unless such list contains the name of every member and contains a legend in a form, first approved by the Assistant Attorney General in charge of the Anti-trust Division, to the effect that NJAGDA makes no representation as to the price or prices to be charged for replacement glass sold or work performed by any such member and that such prices are determined by each individual member;

(C) Suggesting, or attempting to suggest, to any automobile glass dealer, the price or prices or terms to be charged or imposed by such automobile glass dealer for the sale or installation of replacement glass;

(D) Picketing or threatening to picket any insurance company, purchaser, or user of replacement glass;

(E) Hindering, restricting or preventing, or attempting or threatening to hinder, restrict or prevent, the sale in any manner of replacement glass by any manufacturer, distributor or wholesaler to any person; except pursuant to the exercise of such lawful rights as an automobile glass dealer may have under a distributorship agreement with any manufacturer;

(F) Suggesting or attempting to suggest, to any automobile glass dealer that he should purchase or offer to purchase from any person any materials to be used for automobile glass replacement upon the condition or understanding that such person will refrain from selling any of such materials to any other person.

## VII

[ *Opening of Membership*]

(A) Defendant is ordered and directed to admit to and continue in membership therein, upon application, any automobile glass dealer doing business within the State of New Jersey, or within any other area served by its members, who is technically qualified to engage in the business of installation of replacement glass as defined in Section 11(E) of this Final Judgment. In the event defendant rejects any application for membership, it shall (1) advise the applicant, and the Assistant Attorney General, in writing, of the specific reasons for such rejection and

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

(2) on request of the applicant, submit the question of the applicant's qualifications for membership to arbitration under the rules of the American Arbitration Association, whose decision shall be final and binding on the parties thereto, the fee of the American Arbitration Association to be borne by the losing party;

(B) Defendant is enjoined and restrained from expelling from membership or otherwise taking any punitive action against any member; provided, however, nothing herein shall prevent defendant from expelling any member for (1) failure to pay dues; (2) failure to comply with this Final Judgment or (3) for cause unconnected with such member's competitive or pricing activities. In the event of any such expulsion, defendant shall notify the expelled member in writing of the specific grounds for such expulsion and, if the expulsion is for grounds stated in (3) above, shall, upon request of the expelled member, submit the justification for such expulsion to arbitration under the rules of the American Arbitration Association, whose decision shall be final and binding upon the parties thereto, the fee of the American Arbitration Association to be borne by the losing party;

(C) Defendant is ordered and directed to send, within sixty days from the date of entry of this Final Judgment, a letter, in a form first approved by the Assistant Attorney General in charge of the Antitrust Division, to the claim supervisors of all insurance companies to whom price lists and price catalogues have heretofore been sent cancelling such price lists, and setting forth the substantive provisions of this Final Judgment.

VIII

[ Compliance]

For the purpose of securing compliance with this Final Judgment, duly authorized representatives of the Department of Justice shall, upon the written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, upon reasonable notice to defendant at its principal office, subject to any legally recognized privilege, be permitted:

(A) Reasonable access during the office hours of defendant, to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession of or under the control of the defendant, who may have counsel present, relating to any of the matters contained in this Final Judgment; and

(B) Subject to the reasonable convenience of the defendant, and without restraint or interference, to interview officers and employees of the defendant, who may have counsel present, regarding any such matters.

For the purpose of securing compliance with this Final Judgment, defendant, upon the written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, made to its principal office, shall submit such written reports with respect to any of the matters contained in this Final Judgment as from time to time may be necessary for the purpose of enforcement of this Final Judgment.

No information obtained by the means permitted in this Section VIII shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the executive branch of the plaintiff, except in the course of legal proceedings for the purpose of securing compliance with this Final Judgment in which the United States is a party or as otherwise required by law.

IX

[ Jurisdiction Retained]

Jurisdiction of this Court is retained for the purpose of enabling any of the parties to this Final Judgment to apply to the Court at any time for such further orders and directions as may be necessary or appropriate of the provisions thereof, for the enforce-for the construction or carrying out of this ment of compliance therewith, and for the Final Judgment, for the modification of any punishment of violations thereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

US. v. DRIVER-HARRIS CO., ET AL.
Civil No.: 942-56
Year Judgment Entered: 1961

**Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. Driver-Harris Co., Alloy Metal Wire Co., Inc., and its Successor, H. K. Porter Co. (Delaware), Wilbur B. Driver Co., Hoskins Manufacturing Co., C. O. Jelliff Manufacturing Corp., U.S. District Court, D. New Jersey, 1961 Trade Cases ¶70,031, (May 25, 1961)**

Click to open document in a browser

United States v. Driver-Harris Co., Alloy Metal Wire Co., Inc., and its Successor, H. K. Porter Co. (Delaware), Wilbur B. Driver Co., Hoskins Manufacturing Co., C. O. Jelliff Manufacturing Corp.

1961 Trade Cases ¶70,031. U.S. District Court, D. New Jersey. Civil Action No. 942-56. Filed May 25, 1961. Case No. 1312 in the Antitrust Division of the Department of Justice.

## Sherman Act

**Consent Decree—Relief—Patent Licensing—Technical Information and Assistance—Identical Bids —Pricing.**—Two electrical alloy resistance product manufacturers entered into a consent decree in which it was provided that (1) the companies would withdraw present price lists and issue new ones, and sell on non-discriminatory terms to all persons on the same functional industry level as other customers, with exceptions for items no longer offered; (2) make a public dedication or grant royalty-free licenses under specified patents which the government charged had been misused, and make licenses available on all other patents, including those obtained within 5 years following the effective date of the judgment; and (3) give technical information and assistance, at specified maximum charges, to actual or potential manufacturers requesting such help during the five years after the judgment becomes effective, or during the life of patents as to licensees. Practices involving price fixing, territory allocation, and avoidance of competition were prohibited, as were the exchange of information, holding stock or other interests in other manufacturers, or having common "policy" personnel with such manufacturers. The decree also provided that, in any enforcement action by the government, a showing by the plaintiff of an "appreciable number" (not otherwise defined) of identical bids in excess of $50 by a consenting defendant with any other defendant for the sale of electrical resistance materials or products would be *prima facie* evidence of price fixing.

For the plaintiff: George Reycraft and Jay Flocken, Department of Justice.

For the defendants: Pitney, Hardin & Ward, Newark, N. J., for Driver-Harris Co.; Shanley & Fisher, Newark, N. J., for Jelliff Mfg. Co.; Stickel & Stickel, Newark, N. J., for Wilbur B. Driver Co.; Milton, McNulty & Augelli, Jersey City, N. J., for Hoskins Mfg. Co.; McCarter, English & Studer, Newark, N. J., for Alloy Metal "Wire Co.

### Final Judgment

SMITH, District Judge [ *In full text*]: Plaintiff, United States of America, having filed its complaint herein on December 5, 1956; the defendants consenting hereto having appeared and filed their answers to such complaint, denying the substantive allegations thereof; and the plaintiff and the defendants consenting hereto, by their respective attorneys, having consented to the entry of this Final Judgment herein;

Now, therefore, before the taking of any testimony and without trial or adjudication of any issue of fact or law, and upon consent of the parties signatory hereto, and the Court being advised and having considered the matter, it is hereby

Ordered, adjudged and decreed as follows:

I

This Court has jurisdiction of the subject matter of this action and of the parties hereto. The complaint states claims upon which relief may be granted against the defendants consenting hereto, under Sections 1 and 2 of

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

the Act of Congress of July, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

II

[ *Definitions*]

As used in this Final Judgment:

(A) "Person" shall mean any individual, partnership, firm, association, corporation, or any other business or legal entity;

(B) "Resistance materials" shall mean (1) electrical resistance materials, and (2) materials sold by a defendant (a) having a composition substantially similar to electrical resistance materials, or (b) for thermocouple or sparkplug purposes, and (3) tubing, wire, ribbon, strip or rod sold by a defendant for heat resistant purposes in connection with the flow of electricity;

(C) "Resistance products" shall mean wire, ribbon, strip, rod or tubing made from resistance materials;

(D) "Electrical resistance materials" shall mean any alloy or any metallic or other element, or any combination of elements now or which may be

(1) produced, processed, sold or received by a defendant, which is recognized or represented by such defendant as having electrical resistance properties (including controllable and reproducible electrical resistivity or temperature coefficients of resistance) suitable for electrical resistance uses; or

(2) manufactured, sold, distributed or received by a defendant for electrical resistance purposes; or

(3) known or recognized generally in the trade as an electrical resistance material;

(E) "Electrical resistance products" shall mean tubing," wire, ribbon, strip or rod made from electrical resistance materials;

(F) "Manufacturer" shall mean any person engaged in the manufacture or drawing or processing (such as enameling, insulating, oxidizing or coiling) of electrical resistance materials or electrical resistance products;

(G) "Patents" shall mean any, some or all claims of patents relating to the manufacture, use or sale of electrical resistance materials or electrical resistance products, including any divisions, reissues or extensions of such patents, or applications there for;

(H) "Subsidiary" shall mean any corporation controlled by, or more than 50% of whose outstanding stock entitled to vote is held by one person;

(I) "Bid" shall mean a bid for furnishing electrical resistance materials or electrical resistance products pursuant to a formal written invitation for a bid made by a prospective customer who, the defendant knows or has reason to know, has also submitted the same request for a bid to another person. It shall not include the ordinary solicitation of orders by a defendant from a customer or prospective customer nor the ordinary quotation to a customer or prospective customer;

(J) "Consenting defendant" or "consenting defendants" shall mean only a defendant or defendants which shall have consented to the terms of this Final Judgment;

(K) "Effective date of this Final Judgment" shall mean the date on which a Final Judgment not subject to further appeal is entered against the remaining defendants.

III

[ *Scope of Judgment— Notice*]

(A) The provisions of this Final Judgment shall apply solely to any consenting defendant, to each of its subsidiaries, successors and assigns, and to each of its officers, directors, agents and employees, and to all other persons in active concert or participation with any consenting defendant who shall have received notice

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

of this Final Judgment by personal service or otherwise. The provisions of this Final Judgment shall not apply to acts, contracts, agreements, arrangements, understandings, plans or programs of foreign subsidiaries of any consenting defendant unless such acts, contracts, agreements, arrangements, understandings, plans or programs concern the foreign or domestic commerce of the United States. This Final Judgment shall not apply to transactions solely between a consenting defendant and its subsidiaries and the officers, directors, agents and employees of either when acting in such capacity.

(B) Each consenting defendant is ordered and directed (1) to serve a copy of this Final Judgment upon (a) each present and future member of its Board of Directors; (b) each of its present and future Vice Presidents and chief managerial officers who are not members of its Board of Directors and (c) the present and future chief executive officers of each of its subsidiaries engaged in the manufacture, processing or sale of resistance materials or resistance products, and (2) within thirty (30) days after the effective date of this Final Judgment, to file with this Court, and serve upon the plaintiff, an affidavit as to the fact and manner of its compliance, as to its present officers and directors, with this subsection (B), setting forth in said affidavit the name, position and address of each person upon whom a copy of this Final Judgment at that time shall have been served as herein ordered and directed.

(C) Each consenting defendant is ordered and directed for a period of five (5) years after the effective date of this Final Judgment to furnish, without charge, to any person requesting the same, a copy of this Final Judgment together with a copy of the affidavit required to be filed by subsection (B) of Section V hereof.

IV

### [ *Price Lists— Customer Selection*]

Each consenting defendant is ordered and directed:

(A) With respect to its domestic and Canadian operations, to cancel each of its current price lists pertaining to resistance materials or resistance products and individually to determine new prices in lieu thereof for such materials and products then being manufactured or offered for sale by the defendant; such new prices to be individually determined by each defendant on the basis of its own costs and its own judgment as to margins of profit and other lawful considerations; and after the effective date of this Final Judgment to issue new price lists containing the prices determined in accordance with this subsection (A) and to serve upon the plaintiff copies of work papers used by it in determining the prices contained in such new price lists. New price lists covering electrical resistance materials and electrical resistance products in the form of rod shall be issued and served upon plaintiff thirty (30) days after the effective date of this Final Judgment. New price lists covering resistance materials and resistance products other than rod shall be issued and served upon plaintiff ninety (90) days after the effective date of this Final Judgment. Cancellation of said current price lists shall be effective as of the date fixed for the issuance of the new price lists covering the respective materials and products.

(B) If a consenting defendant has sold to or processed for, or hereafter sells to or processes for, any person any resistance material or resistance product, either directly or through regularly designated distributors, to sell to or process for, or cause such distributors to sell to or process for, any other person on the same functional industry level as the defendant's other customers, upon request of such other person and upon uniform and non-discriminatory prices and other terms and conditions, except as otherwise permitted by way of defense under the Robinson-Patman Act; and such defendant and such distributors shall hold themselves out as ready and willing so to sell or process? provided, however, that in cases of short supply the defendant shall make a reasonable allocation among its customers, but not to the exclusion of new customers.

This subsection (B) shall not require a defendant (i) to submit any bid, (ii) to continue to sell any size or line of material or products which it discontinues making, or (hi) to sell to a person an electrical resistance material or electrical resistance product designated by such person as having been made by the defendant for a particular customer if (1) such material or product has been made by the defendant according to specification developed by the particular customer without the assistance of the defendant and (2) the defendant has not during the preceding year made an identical or substantially identical material or product for any other customer, and (3)

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

3

if such defendant after having made a request therefor has not secured the consent of such customer to make such sales*

(C) To file with the Assistant Attorney General in charge of the Antitrust Division within ten (10) days after its execution a copy of any contract or agreement relating to activities covered by this Final Judgment (other than orders, contracts or agreements relating to routine sales and purchases and which do not create any obligation upon either party thereto extending more than six months) entered into within a period of five (5) years after the effective date of this Final Judgment between (i) such defendant and any other defendant and (ii) such defendant and any other manufacturer or distributor;

(D) To retain any and all of its records relating to activities covered by this Final Judgment for a period of ten (10) years from the date of the making thereof except that this subsection (D) shall not require the retention of routine sales and purchase data longer than seven (7) years.

V

### [ Patents]

(A) To the extent that a consenting defendant has any interest in the patents listed in Appendix A [1] to this Final Judgment, such defendant shall, at its option, dedicate such interest to the public within thirty (30) days after the effective date of this Final Judgment or shall license to any applicant any right it may have under such patents, without any royalty therefor. If such defendant claims it has no interest in said patents, it shall file an affidavit to that effect at the time of the entry of this Judgment or within ten (10) days thereafter;

(B) Each consenting defendant is ordered and directed, within sixty (60) days after the effective date of this Final Judgment, to file with this Court, and serve upon the plaintiff, an affidavit showing separately, as of the effective date of this Final Judgment, the number, date of issue (or filing as to applications) and name of owner of each existing patent (other than those listed in Appendix A) required to be licensed under this Final Judgment;

(C) Each of the consenting defendants is ordered and directed to grant, to the extent of its legal right to do so, to any person making written request therefor a nonexclusive license for the life of the patent, or patents, to make, have made, use and sell electrical resistance materials or electrical resistance products under any, some, or all of the patents as the applicant may request except those covered by subsection (A) above, which on the effective date of this Final Judgment are owned or controlled by the defendant, or under which it has the right to issue sublicenses, or which within five (5) years from the effective date of this Final Judgment, are issued to, or applied for, or acquired by the defendant, or under which it obtains sublicensing rights within such period;

(D) Each consenting defendant is enjoined and restrained from including in any license issued pursuant to subsection (C) of this Section V any restriction or limitation whatsoever except that:

(1) A reasonable royalty may be charged, which royalty shall be uniform and nondiscriminatory as among licensees procuring the same rights under the same patents;

(2) Reasonable provisions may be made for periodic reports by the licensee to the defendant as to the amount of royalties due and inspection of the books and records of the licensee by an independent auditor or any other person acceptable to both defendant and the licensee, who shall report to the defendant only the amount of the royalty due and payable;

(3) Reasonable provisions may be made for cancellation of the license upon failure of the licensee to pay the royalties or permit inspection of his books and records as herein provided;

(4) The license may be made non-transferable if the licensee is unwilling to agree to notify the defendant of any contemplated transfer and must provide that the licensee may cancel the license at the end of one (1) year and thereafter at any time by giving to the defendant sixty (60) days' notice in writing;

(5) The license may require such patent markings as may be required by statute;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

4

(E) Upon receipt of a written request for a license under the provisions of subsection (C) hereof, defendant shall advise the applicant, in writing, within thirty (30) days, of the royalty it deems reasonable for the patent or patents to which the application pertains. If such applicant and defendant are unable to agree upon what constitutes a reasonable royalty within sixty (60) days from the date the written application for the license was received by the defendant, either the applicant or defendant may, upon notice to the plaintiff, apply to this Court for the determination of a reasonable royalty. In any such proceeding the burden of proof shall be upon the defendant to establish the reasonableness of any royalty requested. Pending the completion of any such negotiations or court proceeding, the applicant shall have the right to make, have made, use and vend under the patent or patents to which his application pertains without payment of royalty or other compensation, but subject to the following provisions: Defendant may, upon notice to the plaintiff, apply to this Court to fix an interim royalty rate pending final determination of what constitutes a reasonable royalty. If this Court fixes such interim royalty rate, defendant shall then issue and the applicant shall accept a license providing for the periodic payment of royalties at such interim rate from the date upon which the applicant requested the license. If the applicant fails to accept such license or fails to pay the interim royalty in accordance therewith, such action may be grounds for the rejection or dismissal of his application for a license; in the case of such rejection or dismissal, the applicant shall pay any royalties found by the Court to be due to the defendant. Whether or not an interim royalty is fixed by the Court, a final Court determination of a reasonable royalty shall be applicable to the applicant for a license from the date upon which the applicant requested such license, and, from the date of such determination, to any other licensee, at its option, then having the same rights under the same patents;

(F) Nothing herein shall prevent any applicant from attacking, in the aforesaid proceedings or in any other controversy, the validity or scope of any of the patents, nor shall this Final Judgment be construed as imputing any validity or value to any of said patents;

(G) Each consenting defendant is enjoined and restrained from (i) granting, after the effective date of this Final Judgment, any license or sublicense under any patents to which this Section V shall apply, except in accordance with, and pursuant to, the terms of this Final Judgment, and (ii) taking or accepting after the effective date of this Final Judgment, any right, patent, license or immunity, under any patent owned or controlled by any person other than such defendant, which right, license or immunity is by its terms, or in fact, exclusive to the defendant unless such defendant is also granted the right to grant sublicenses to others as required *by* this Final Judgment (for the purpose of this subparagraph (ii), any right or immunity under a patent shall be deemed to be a license subject to the provisions of this Section V);

(H) Each consenting defendant is enjoined and restrained from making any sale or other disposition of any patent or rights in or under patents which deprives it of the power or authority to grant the licenses required by this Section V unless the purchaser, transferee or assignee shall file with this Court, and serve upon the plaintiff, prior to consummation of any such transaction, its consent to be bound by the applicable provisions of this Section V with respect to such patent;

(I) Each consenting defendant is enjoined and restrained from using or attempting to use any foreign patent, or any rights under any foreign patent, to hinder, restrict, limit or prevent any person licensed pursuant to this Section V from exporting from the United States any electrical resistance materials or electrical resistance products manufactured in the United States pursuant to such license;

(J) Each consenting defendant is enjoined and restrained from maintaining, instituting or threatening to institute any action, counter-claim, set-off, suit or other proceeding against any person for use of or any act of infringement of any existing patent alleged to have occurred prior to the effective date of this Final Judgment.

VI

**[ Technical Information and Assistance]**

(A) For five (5) years after the effective date of this Final Judgment, each consenting defendant is ordered and directed, upon written request therefor from any actual or potential manufacturer within the United States or any State, territory or possession thereof, to furnish to such applicant copies of any technical manuals, books

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

of instructions, drawings, specifications, blueprints, pamphlets, diagrams or other similar documents (other than those supplied to a defendant by a customer who has developed them for its use without assistance by a defendant, and which the customer, upon request by the defendant to whom the application has been made, refuses to permit to be made available) which the applicant desires owned by or subject to the control of the defendant on the effective date of this Final Judgment, and which documents have been used, or prepared for use, by the defendant in the manufacture or processing of electrical resistance materials or electrical resistance products for the purpose of (i) melting, rolling, drawing and finishing, or (ii) drawing and finishing the same, or (iii) any of the processes enumerated in (i) or (ii) above. For this data the defend ant may charge the applicant a reasonable amount but not to exceed, if all data is furnished (a) $2,000 if the data relates to the processes of melting, rolling, drawing, and finishing or (b) $1,000 if the data relates to the processes of drawing and finishing.

(B) Each consenting defendant is ordered and directed, upon written request of any person licensed under any patent or patents pursuant to Section V of this Final Judgment, to furnish during the life of the patent or patents to such licensee such of the defendant's technical information as the licensee may request as may be necessary in order to practice the invention or inventions of any of the patents licensed by such defendant to the licensee, in such licensee's own manufacture or processing of electrical resistance materials or electrical resistance products. For this information the defendant may make a reasonable charge which shall not be more than the cost to the defendant of furnishing such information.

(C) Upon receipt within a reasonable time of a written application from any actual or potential manufacturer representing that the written technical information furnished to such applicant by the defendant pursuant to sub-sections (A) or (B) of this Section VI is inadequate or insufficient to enable such applicant satisfactorily to practice the inventions, or to perform the said manufacturing processes for which it sought information under said subsections, and specifying in reasonable detail the difficulties experienced, such defendant is ordered and directed to make available to such applicant, if feasible, such additional written information relating to such technical information or manufacturing processes as may be reasonably necessary to enable the applicant to practice the inventions or to manufacture under the specific processes, and if not feasible or sufficient, to make available at reasonable times and for reasonable periods, and without subjecting defendant to hardship, technically qualified personnel from among its own employees for consultation with such applicant at the applicant's place of manufacture regarding the said inventions or manufacturing processes for which the applicant sought information. This subsection (C) shall not require a defendant to send any person outside of the United States. For this data or service the defendant may make a reasonable charge; provided, however, that if such written data were within the control of the defendant at the time when defendant furnished the data under subsections (A) or (B) above, no charge for such written data shall be made unless agreeable to the applicant or unless defendant shows to the satisfaction of the Court that it could not reasonably have contemplated that the applicant would need such written data.

(D) Any person entitled and qualified to receive the documents under subsection (A) of this Section VI, upon written application to a defendant shall be permitted at his own expense and at and for reasonable times, to visit the principal plant of such defendant performing such operations for the purpose of observing and being advised as to the methods, processes, machines and equipment, in use at or before the effective date of this Final Judgment and then being used by such defendant in the manufacture or processing of electrical resistance materials or electrical resistance products, if (1) within five years from such effective date such person shows to the satisfaction of the defendant, or to the satisfaction of the plaintiff in the event of failure to satisfy the defendant, that he does not need or desire information or assistance otherwise provided for in this Section VI, or (2) such person represents that the information or assistance furnished to such applicant by the defendant under this Section VI is inadequate or insufficient to enable such applicant satisfactorily to carry out the manufacture or processing for which the applicant applied for such information or assistance; provided, however, that such visits may be further restricted as follows:

(1) to not more than three officers or employees of the applicant at any one time;

(2) to not more than four such visits per year within three years after such persons first application under this subsection relating to the same information.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

6

For such observations and advice the defendant may make a reasonable charge which, in the case of any person referred to in Clause (1) of this subsection shall not exceed that permitted under subsection (A) above for comparable data and, in the case of any person referred to in Clause (2) of this subsection shall be based on the services and advice given, but not to exceed a rate of $150 per day.

(E) If the applicant and the defendant are unable to agree upon what constitutes a reasonable charge, the applicant, the defendant or the plaintiff may apply to this Court for a determination of a reasonable charge. In any proceedings for a determination of a reasonable charge, the burden of proof shall be upon the defendant to establish the reasonableness of any charge requested by the defendant.

(F) In the event of an application to a consenting defendant for know-how under this Section VI, except subsection (B), by a person, other than a consenting defendant, (a) who is a substantial customer of a consenting defendant for electrical resistance materials or electrical resistance products and not a competitor of any consenting defendant with respect thereto, (b) whose resources are substantially in excess of those of the consenting defendant whose customer applies, and (c) who desires to use such know-how to manufacture such materials or products only for incorporation in products sold by it, any consenting defendant may apply to this Court within thirty (30) days after the application was made, with notice to plaintiff and the applicant, for an order permitting or requiring rejection of such application, which the Court may grant upon the defendant's establishing to the satisfaction of the Court that such rejection is necessary to prevent substantial injury due to the prospective loss of the applicant as a customer and that such rejection would not unduly restrain competition.

(G) No consenting defendant shall be deemed, in connection with the furnishing of any of the foregoing pursuant to this Final Judgment, to have given any implied warranty, representations or guaranty against infringement of patents of others by, or any warranty of success in connection with, its use.

(H) Every agreement under which technical information is furnished pursuant to this Section VI shall contain, if the party furnishing such information shall so request, reasonable provisions requiring the recipient of such information and its subsidiaries to keep such technical information confidential and use the same only for their own manufacturing and selling operations.

(I) Each consenting defendant within ten (10) days from the effective date of this Final Judgment, shall file with the Court and with the plaintiff a listing by categories of all documents it believes come under subsection (A) of this Section VI and a separate list, by customer, of all documents which it believes come under the parenthetical clause in that subsection, and, for a period of five (5) years, to furnish a copy of such lists to any person upon request.

**VII**

**[ Pricing Practices—Territories-Identical Bids]**

The consenting defendants are jointly and severally enjoined and restrained from entering into, adhering to, maintaining, furthering, renewing or claiming any rights under, any combination, conspiracy, contract, agreement, understanding, plan, program, or common course of action with any other person, directly or indirectly, to:

(A) Establish, fix, determine, maintain or adhere to prices, differentials, discounts, extras or any other term or element of prices, differentials, discounts or extras for the manufacture, processing or sale to or for third persons, including another defendant, of any resistance materials or resistance products, either through the device of establishing technical standards for such materials or such products, or otherwise; provided, however, that this subsection (A) shall not be construed to prohibit the consenting defendants or any of them from participating in a program for the sole purpose of establishing voluntary, uniform technical standards for resistance materials or resistance products. In any proceedings brought by the plaintiff to enforce this Final Judgment against any consenting defendant, a showing by plaintiff, to the satisfaction of the Court of an appreciable number of identical bids in excess of $50.00 by a consenting defendant with any other defendant (except where the bids

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

are minimum charges) for the sale of electrical resistance materials or electrical resistance products, shall be *prima facie* evidence of price fixing;

(B) Divide, allocate or apportion territories, markets or customers for the manufacture, processing or sale of any electrical resistance materials or electrical resistance products;

(C) Refrain from the manufacture, processing or sale of electrical resistance materials or electrical resistance products or refrain from competition with any other person in any territory or market in the manufacture, processing or sale of any such materials or such products;

(D) Hinder, restrict, limit or prevent any other person from manufacturing, processing or selling any electrical resistance materials or electrical resistance products;

(E) Limit the purchase or sale of electrical resistance materials or electrical resistance products to any particular person or group of persons; provided that this shall not prevent lawful contracts for purchases over reasonable periods to secure supplies for such materials or products.

Nothing in this Section VII shall be deemed to prevent a defendant from (i) giving a distributor an exclusive territory provided the distributor is free to sell in any area and to handle electrical resistance materials and electrical resistance products manufactured by others; (ii) selling its business with a one year covenant not to compete or (iii) making lawful contracts with any person other than an actual or potential competitor of a defendant, that they will not reveal trade secrets of the defendant.

### VIII

#### [ *Exchange of Information— Interlocking Interests*]

Each consenting defendant is enjoined and restrained from, directly or indirectly:

(A) Circulating outside its own organization and its own distributors any price list or price information relating to the manufacture, processing or sale of any electrical resistance materials or electrical resistance products in advance of the circulation or dissemination of such price list or price information to its own customers and to the trade generally;

(B) Permitting any of its officers, directors, agents or employees to serve simultaneously as an officer, director, agent or employee of any other manufacturer not a subsidiary of the defendant;

(C) Except for the purchase and sale of products bought and sold in the normal course of business,

(1) acquiring or holding, directly or indirectly, any of the assets or capital stock of, or any financial interest in any other defendant or any other person which becomes a manufacturer other than a wholly owned subsidiary of the consenting defendant, or acquiring, directly or indirectly, any of the assets or capital stock of, or any financial interest in any other manufacturer;

(2) Knowingly permitting any of its officers, directors, or managerial or policy-making agents or employees to acquire or hold, directly or indirectly, any of the assets or capital stock of, or any financial interest in, any other defendant or any person which becomes a manufacturer, or to acquire, directly or indirectly, any of the assets or capital stock of, or any financial interest in, any manufacturer;

(D) Hindering, restricting, limiting or preventing, or attempting to hinder, restrict, limit or prevent any person from serving as a dealer or distributor of or for electrical resistance materials or electrical resistance products manufactured, processed or sold by any other person;

(E) Hindering, restricting, limiting or preventing, or attempting to hinder, restrict, limit or prevent except for lawful action to prevent patent infringement or to protect property rights in trade secrets, any other person from engaging in the manufacture, processing or sale of any electrical resistance materials or electrical resistance products;

(F) Entering into, adhering to, maintaining, furthering, renewing or claiming any rights under, any contract, agreement, understanding, plan or program with any other person, the purpose or effect of which is to hinder,

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

8

A-118

restrict, limit or prevent either (i) such defendant or (ii) any other person, from granting a license or sublicense under any patent or patents whether owned or controlled by such defendant or such other person. This subsection shall not be deemed to prohibit the mere assignment of any patent or the grant of any exclusive license under any patent if such license grants sub licensing rights.

IX

(A) Each consenting defendant is ordered and directed:

(1) to cancel within thirty (30) days after the effective date of this Final Judgment each provision of each contract to which it may be a party which is contrary to any of the provisions of this Final Judgment;

(2) to file with this Court and serve upon the plaintiff an affidavit setting forth the fact and manner of its compliance with the foregoing subsection (1).

(B) The consenting defendants, and each of them, are jointly and severally enjoined and restrained from entering into, adhering to, maintaining, furthering or claiming any rights under any contract, agreement, plan or program which is or shall be contrary to or inconsistent with any of the provisions of this Final Judgment.

X

[ *Supervision*]

(A) For the purpose of securing compliance with this Final Judgment and for no other purpose, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to any consenting defendant made to its principal office, be permitted, subject to any legally recognized privilege:

(1) access, during the office hours of said defendant, to those books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of said defendant which relate to any matter contained in this Final Judgment;

(2) subject to the reasonable convenience of said defendant and without restraint or interference from it, to interview officers or employees of any defendant, who may have counsel present, regarding any such matters.

(B) Upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, said defendant shall submit such reports in writing, and under oath or affirmation if so requested, with respect to the matters contained in this Final Judgment as may from time to time be necessary to the enforcement of this Final Judgment.

(C) No information obtained by the means provided in this Section X shall be divulged by any representatives of the Department of Justice to any person other than a duly authorized representative of the Executive Branch of the plaintiff except in the course of legal proceedings to which the United States is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law.

XI

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the amendment or modification of any of the provisions thereof, for the enforcement of compliance therewith, and for the punishment of violations thereof.

| Footnotes | | | |
|---|---|---|---|
| | **Appendix A** | | |
| **Patent No.** | **Patent Date** | **Inventor** | **Filing Date** |
| 2,581,420 | 1/8/52 | James M. Lohr .... | 9/23/49 |
| 2,687,954 | 8/31/54 | James M. Lohr .... | 10/19/51 |

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm
9

| | | |
|---|---|---|
| 2,687,956 | 8/31/54 James M. Lohr .... | 12/28/51 |
| Reissue No. 24,243 | 12/ 4/56 James M. Lohr .... | 6/29/56 |
| Reissue No. 24,242 | 12/ 4/56 James M. Lohr .... | 6/29/56 |
| Reissue No. 24,244 | 12/ 4/56 James M. Lohr .... | 6/29/56 |
| 2,587,275 | 2/26/52 Francis E. Bash .. | 9/23/49 |

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

Cheetah™                                                           Wolters Kluwer

**Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. Driver-Harris Co., Alloy Metal Wire Co., Inc., and its successor H. K. Porter Co. (Delaware), Wilbur B. Driver Co., Hoskins Manufacturing Co., CO. Jelliff Manufacturing Corp., U.S. District Court, D. New Jersey, 1966 Trade Cases ¶71,658, (Dec. 7, 1965)**

Federal Antitrust Cases

Trade Regulation Reporter - Trade Cases (1932 - 1992) ¶71,658

Click to open document in a browser

United States v. Driver-Harris Co., Alloy Metal Wire Co., Inc., and its successor H. K. Porter Co. (Delaware), Wilbur B. Driver Co., CO. Hoskins Manufacturing Co., CO. Jelliff Manufacturing Corp.

1966 Trade Cases ¶71,658. U.S. District Court, D. New Jersey. Civil Action No. 942-56. Entered December 7, 1965. Case No. 1312 in the Antitrust Division of the Department of Justice.

---

Headnote

---

### Sherman Act

**Price Fixing—Electrical Resistance Products—Consent Judgment.**—Two manufacturers of electrical resistance products were required by a consent decree to cancel their current price lists and individually determine new prices and were prohibited from fixing prices, dividing markets, limiting sales to particular customers, or acquiring (for a period of five years) any interest in a manufacturer of electrical resistance products.

**Department of Justice—Compulsory Licensing of Patents—Electrical Resistance Products—Consent Judgment.**—Two manufacturers were required by a consent decree to grant non-exclusive patent licenses for electrical resistance products, at reasonable, nondiscriminatory royalties, under presently owned patents or under patents obtained within a period of five years and to furnish technical information to such licensees at a reasonable charge.

**Superseding** 1961 Trade Cases ¶ 70,031.

For the plaintiff: W. D. Kilgore, Jr., Donald F. Melchior, and Herbert G. Schoepke, Attorneys, Department of Justice.

For the consenting defendants: Fred G. Stickel, Jr., Stickel & Stickel, for Wilbur B. Driver Co.; Harold L. Smith, Hughes, Hubbard, Blair & Reed, and Donald A. Robinson, Shanley & Fisher, for C. O. Jelliff Mfg. Corp.

#### Final Judgment

SHAWN, Judge: Plaintiff, United States of America, having filed its complaint herein on December 5, 1956; the defendants consenting hereto having appeared and filed their answers to such complaint, denying the substantive allegations thereof; and the plaintiff and the defendants consenting hereto, by their respective attorneys, having consented to the entry of this Final Judgment herein;

Now, therefore, before the taking of any testimony and without trial or adjudication of any issue of fact or law, and upon consent of the parties signatory hereto, and the Court being advised and having considered the matter, it is hereby

Ordered, adjudged and decreed as follows:

© 2018 CCH Incorporated and its affiliates and licensors.                    1                    Aug 29, 2018 from Cheetah™
All rights reserved.


I

[ *Jurisdiction*]

This Court has jurisdiction of the subject matter of this action and of the parties hereto. The complaint states claims upon which relief may be granted against the defendants consenting hereto, under Sections 1 and 2 of the Act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

II

[ *Definitions*]

As used in this Final Judgment:

(A) "Person" shall mean any individual, partnership, firm, association, corporation, or any other business or legal entity;

(B) "Resistance materials" shall mean (1) electrical resistance materials, and (2) materials sold by a defendant (a) having a composition substantially similar to electrical resistance materials, or (b) for thermocouple or sparkplug purposes, and (3) tubing, wire, ribbon, strip or rod sold by a defendant for heat resistance purposes in connection with the flow of electricity;

(C) "Resistance products" shall mean wire, ribbon, strip, rod or tubing made from resistance materials;

(D) "Electrical resistance materials" shall mean any alloy or any metallic or other element, or any combination of elements now or which may be

(1) produced, processed, sold or received by a defendant, which is recognized or represented by such defendant as having electrical resistance properties (including controllable and reproducible electrical resistivity or temperature co-efficients of resistance) suitable for electrical resistance uses; or

(2) manufactured, sold, distributed or received by a defendant for electrical resistance purposes; or

(3) known or recognized generally in the trade as an electrical resistance material;

(E) "Electrical resistance products" shall mean tubing, wire, ribbon, strip or rod made from electrical resistance materials;

(F) "Manufacturer" shall mean any person engaged in the manufacture or drawing or processing (such as enameling, insulating, oxidizing or coiling) of electrical resistance materials or electrical resistance products;

(G) "Patents" shall mean any, some or all claims of patents relating to the manufacture, use or sale of electrical resistance materials or electrical resistance products, including any divisions, reissues or extensions of such patents, or applications therefor;

(H) "Subsidiary" shall mean any corporation controlled by, or more than 50% of whose outstanding stock entitled to vote is held by one person;

(I) "Bid" shall mean a bid for furnishing electrical resistance materials or electrical resistance products pursuant to a formal written invitation for a bid made by a prospective customer who, the defendants knows or has reason to know, has also submitted the same request for a bid to another person. It shall not include the ordinary solicitations of orders by a defendant from a customer or prospective customer nor the ordinary quotation to a customer or prospective customer;

(J) "Consenting defendant" or "consenting defendants" shall mean only a defendant or defendants which shall have consented to the terms of this Final Judgment;

(K) "Effective date of this Final Judgment" shall be December 2, 1964.

© 2018 CCH Incorporated and its affiliates and licensors.     2      Aug 29, 2018 from Cheetah™
All rights reserved.


III

### [Applicability]

(A) The provisions of this Final Judgment shall apply solely to any consenting defendant, to each of its subsidiaries, successors and assigns, and to each of its officers, directors, agents and employees, and to all other persons in active concert or participation with any consenting defendant who shall have received notice of this Final Judgment by personal service or otherwise. The provisions of this Final Judgment shall not apply to acts, contracts, agreements, arrangements, understandings, plans or programs of foreign subsidiaries of any consenting defendant unless such acts, contracts, agreements, arrangements, understandings, plans or programs concern the foreign or domestic commerce of the United States. This Final Judgment shall not apply to transactions solely between a consenting defendant and its subsidiaries and the officers, directors, agents and employees of either when acting in such capacity.

(B) Each consenting defendant is ordered and directed: (1) to serve a copy of this Final Judgment upon (a) each present and future member of its Board of Directors; (b) each of its present and future Vice Presidents and chief managerial officers who are not members of its Board of Directors; and (c) the present and future chief executive officers of each of its subsidiaries engaged in the manufacture, processing or sale of resistance materials or resistance products; and (2) within thirty (30) days after the effective date of this Final Judgment, to file with this Court, and serve upon the plaintiff, an affidavit as to the fact and manner of its compliance, as to its present officers and directors, with this subsection (B), setting forth in said affidavit the name, position and address of each person upon whom a copy of this Final Judgment at that time shall have been served as herein ordered and directed.

(C) Each consenting defendant is ordered and directed for a period of five (5) years after the effective date of this Final Judgment to furnish, without charge, to any person requesting the same, a copy of this Final Judgment together with a copy of the affidavit required to be filed by subsection (B) of Section V hereof.

IV

### [Price Lists—Customer Selection]

Each consenting defendant is ordered and directed:

(A) With respect to its domestic and Canadian operations, to cancel each of its current price lists pertaining to resistance materials or resistance products and individually to determine new prices in lieu thereof for such materials and products then being manufactured or offered for sale by the defendant; such new prices to be individually determined by each defendant on the basis of its own costs and its own judgment as to margins of profit and other lawful considerations; and after the effective date of this Final Judgment to issue new price lists containing the prices determined in accordance with this subsection (A) and to serve upon the plaintiff copies of work papers used by it in determining the prices contained in such new price lists. New price lists covering electrical resistance materials and electrical resistance products in the form of rod shall be issued and served upon plaintiff thirty (30) days after the effective date of this Final Judgment. New price lists covering resistance materials and resistance products other than rod shall be issued and served upon plaintiff ninety (90) days after the effective date of this Final Judgment. Cancellation of said current price lists shall be effective as of the date fixed for the issuance of the new price lists covering the respective materials and products;

(B) If a consenting defendant has sold to or processed for, or hereafter sells to or processes for, any person any resistance material or resistance products, either directly or through regularly designated distributors, to sell to or process for, or cause such distributors to sell to or process for, any other person on the same functional industry level as the defendant's other customer, upon request of such other person and upon uniform and non-discriminatory prices and other terms and conditions, except as otherwise permitted by way of defense under the Robinson-Patman Act; and such defendant and such distributors shall hold themselves out as ready and willing so to sell or process; provided, however, that in cases of short supply the defendant shall make a reasonable allocation among its customers, but not to the exclusion of new customers.

© 2018 CCH Incorporated and its affiliates and licensors. All rights reserved.



This subsection (B) shall not require a defendant (i) to submit any bid, (ii) to continue to sell any size or line of material or products which it discontinues making, or (iii) to sell to a person an electrical resistance material or electrical resistance product designated by such person as having been made by the defendant for a particular customer if (1) such material or product has been made by the defendant according to specification developed by the particular customer without the assistance of the defendant and (2) the defendant has not during the preceding year made an identical or substantially identical material or product for any other customer, and (3) if such defendant after having made a request therefor has not secured the consent of such customer to make such sales;

(C) To file with the Assistant Attorney General in charge of the Antitrust Division within ten (10) days after its execution a copy of any contract or agreement relating to activities covered by this Final Judgment (other than orders, contracts or agreements relating to routine sales and purchases and which do not create any obligation upon either party thereto extending more than six months) entered into within a period of five (5) years after the effective date of this Final Judgment between (i) such defendant and any other defendant and (ii) such defendant and any other manufacturer or distributor;

(D) To retain any and all of its records relating to activities covered by this Final Judgment for a period of ten (10) years from the date of the making thereof except that this subsection (D) shall not require the retention of routine sales and purchase data longer than seven (7) years.

V

[ *Patents*]

(A) Each of the consenting defendants is ordered and directed to grant, to the extent of its legal right to do so, to any person making written request therefor, a non-exclusive license for the life of a patent, or patents, to make, have made, use and sell electrical resistance materials or electrical resistance products under any, some, or all of the patents as the applicant may request which on the effective date of this Final Judgment are owned or controlled by the defendant, including the patents listed in Appendix A hereto, or under which it has a right to issue sublicenses, or which within five (5) years from the effective date of this Final Judgment, are issued to or acquired by the defendant, or under which it obtains sublicensing rights within such period.

(B) Each consenting defendant is ordered and directed, within sixty (60) days after the effective date of this Final Judgment, to file with this Court, and serve upon the plaintiff, an affidavit showing separately, as of the effective date of this Final Judgment, the number, date of issue (or filing as to applications) and name of owner of each existing patent (other than those listed in Appendix A) required to be licensed under this Final Judgment.

(C) Each consenting defendant is enjoined and restrained from including in any license issued pursuant to subsection (A) of this Section V any restriction or limitation whatsoever except that:

(1) A reasonable royalty may be charged, which royalty shall be uniform and nondiscriminatory as among licensees procuring the same rights under the same patents;

(2) Reasonable provisions may be made for periodic reports by the licensee to the defendant as to the amount of royalties due and inspection of the books and records of the licensee by an independent auditor or any other person acceptable to both defendant and the licensee, who shall report to the defendant only the amount of the royalty due and payable;

(3) Reasonable provisions may be made for cancellation of the license upon failure of the licensee to pay the royalties or permit inspection of his books and records as herein provided;

(4) The license may be made nontransferable if the licensee is unwilling to agree to notify the defendant of any contemplated transfer and must provide that the licensee may cancel the license at the end of one (1) year and thereafter at any time by giving to the defendant sixty (60) days' notice in writing;

© 2018 CCH Incorporated and its affiliates and licensors. All rights reserved. 4



(5) The licensee may require such patent markings as may be required by statute.

(D) Upon receipt of a written request for a license under the provisions of subsection (A) hereof, defendant shall advise the applicant, in writing, within thirty (30) days, of the royalty it deems reasonable for the patent or patents to which the application pertains. If such applicant and defendant are unable to agree upon what constitutes a reasonable royalty within sixty (60) days from the date the written application for the license was received by the defendant, either the applicant or defendant may, upon notice to the plaintiff, apply to this Court for the determination of a reasonable royalty. In any such proceeding the burden of proof shall be upon the defendant to establish the reasonableness of any royalty requested. Pending the completion of any such negotiations or court proceeding, the applicant shall have the right to make, have made, use and vend under the patent or patents to which his application pertains without payment of royalty or other compensation, but subject to the following provisions: Defendant may, upon notice to the plaintiff, apply to this Court to fix an interim royalty rate pending final determination of what constitutes a reasonable royalty. If this Court fixes such interim royalty rate, defendant shall then issue and the applicant shall accept a license providing for the periodic payment of royalties at such interim rate, from the date upon which the applicant requested the license. If the applicant fails to accept such license or fails to pay the interim royalty in accordance therewith, such action may be grounds for the rejection or dismissal of his application for a license; in the case of such rejection or dismissal, the applicant shall pay any royalties found by the Court to be due to the defendant. Whether or not an interim royalty is fixed by the Court, a final Court determination of a reasonable royalty shall be applicable to the applicant for a license from the date upon which the applicant requested such license, and, from the date of such determination, to any other licensee, at its option, then having the same rights under the same patents.

(E) Nothing herein shall prevent any applicant from attacking, in the aforesaid proceedings or in any other controversy, the validity or scope of any of the patents, nor shall this Final Judgment be construed as imputing any validity or value to any of said patents.

(F) Each consenting defendant is enjoined and restrained from (i) granting, after the effective date of this Final Judgment, any license or sublicense under any patents to which this Section V shall apply, except in accordance with, and pursuant to, the terms of this Final Judgment, and (ii) taking or accepting for a period of five (5) years after the effective date of this Final Judgment, any right, license or immunity, under any patent owned or controlled by any person other than such defendant, which right, license or immunity is by its terms, or in fact, exclusive to the defendant unless such defendant is also granted the right to grant sublicenses to others as required by this Final Judgment (for the purpose of this subparagraph (ii), any right or immunity under a patent shall be deemed to be a license subject to the provisions of this Section V).

(G) Each consenting defendant is enjoined and restrained from making any sale or other disposition of any patent or rights in or under patents which deprives it of the power or authority to grant the licenses required by this Section V unless the purchaser, transferee or assignee shall file with this Court, and serve upon the plaintiff, prior to consummation of any such transaction, its consent to be bound by the applicable provisions of this Section V with respect to such patent.

(H) Each consenting defendant is enjoined and restrained from using or attempting to use any foreign patent, or any rights under any foreign patent, to hinder, restrict, limit or prevent any person licensed pursuant to this Section V from exporting from the United States any electrical resistance materials or electrical resistance products manufactured in the United States pursuant to such license.

(I) Each consenting defendant is enjoined and restrained from maintaining, instituting or threatening to institute any action, counter-claim, set-off, suit or other proceeding against any person for use of or any act of infringement of any existing patent alleged to have occurred prior to the effective date of this Final Judgment.

VI

[ *Technical Information*]

© 2018 CCH Incorporated and its affiliates and licensors.
All rights reserved.     5



(A) For five (5) years after the effective date of this Final Judgment, each consenting defendant is ordered and directed upon written request therefor from any actual or potential manufacturer within the United States or any State, territory or possession thereof, to furnish to such applicant copies of any technical manuals, books of instructions, drawings, specifications, blueprints, pamphlets, diagrams or other similar documents (other than those supplied to a defendant by a customer who has developed them for its use without assistance by a defendant, and which the customer, upon request by the defendant to whom the application has been made, refuses to permit to be made available) which the applicant desires owned by or subject to the control of the defendant on the effective date of this Final Judgment, and which documents have been used, or prepared for use, by the defendant in the commercial manufacture of electrical resistance materials or electrical resistance products for the purpose of melting only. For this data the defendant may charge the applicant a reasonable amount not to exceed $1000.

(B) Each consenting defendant is ordered and directed, upon written request of any person licensed under any patent or patents pursuant to Section V of this Final Judgment, to furnish during the life of the patent or patents to such licensee such of the defendant's technical information as the licensee may request as may be necessary for a person skilled in the art of metal melting technology to practice the invention or inventions of any of the patents licensed by such defendant to the licensee, in such licensee's own melting of electrical resistance materials or electrical resistance products. For this information the defendant may make a reasonable charge which shall not be more than the cost to the defendant of furnishing such information, but in no event more than $1000.

(C) Upon receipt within a reasonable time of a written application from any actual or potential manufacturer representing that the written technical information furnished to such applicant by the defendant pursuant to subsections (A) or (B) of this Section VI is inadequate or insufficient to enable such applicant satisfactorily to practice the inventions, or to perform the said manufacturing processes for which it sought information under said subsections, and specifying in reasonable detail the difficulties experienced, such defendant is ordered and directed to make available to such applicant, if feasible, such additional written information relating to such technical information relating to melting as may be reasonably necessary to enable the personnel of the applicant skilled in the art of metal melting technology to practice the inventions or to manufacture under the specific processes, and if not feasible or sufficient, to make available at reasonable times and for reasonable periods, and without subjecting defendant to hardship, technically qualified personnel from among its own employees for consultation with such applicant at the applicant's place of manufacture regarding the said inventions or manufacturing processes for which the applicant sought information. This subsection (C) shall not require a defendant to send any person outside of the United States. For this data or service the defendant may make a reasonable charge; provided, however, that if such written data were within the control of the defendant at the time when defendant furnished the data under subsections (A) or (B) above, no charge for such written data shall be made unless agreeable to the applicant or unless defendant shows to the satisfaction of the Court that it could not reasonably have contemplated that the applicant would need such written data.

(D) Any person entitled and qualified to receive the documents under subsection (A) of this Section VI, upon written application to a defendant shall be permitted at his own expense and at and for reasonable times, to visit the principal plant of such defendant performing such operations for the purpose of observing and being advised as to the methods, processes, machines and equipment, in use at or before the effective date of this Final Judgment and then being used by such defendant in the melting of electrical resistance materials or electrical resistance products, if (1) within five years from such effective date such person shows to the satisfaction of the defendants, or to the satisfaction of the plaintiff in the event of failure to satisfy the defendant, that he does not need or desire information or assistance otherwise provided for in this Section VI, or (2) such person represents that the information or assistance furnished to such applicant by the defendant under this Section VI is inadequate or insufficient to enable such applicant satisfactorily to carry out the manufacture or processing for which the applicant applied for such information or assistance; provided, however, that such visits may be further restricted as follows:

© 2018 CCH Incorporated and its affiliates and licensors.
All rights reserved.   6



(1) to not more than three officers or employees of the applicant at any one time;

(2) to not more than four such visits per year within three years after such persons first application under this subsection relating to the same information.

For such observations and advice the defendant may make a reasonable charge which, in the case of any person referred to in Clause (1) of this subsection shall not exceed that permitted under subsection (A) above for comparable data and, in the case of any person referred to in Clause (2) of this subsection shall be based on the services and advice given, but not to exceed a rate of $150 per day.

(E) If the applicant and the defendant are unable to agree upon what constitutes a reasonable charge, the applicant, the defendant or the plaintiff may apply to this Court for a determination of a reasonable charge. In any proceedings for a determination of a reasonable charge, the burden of proof shall be upon the defendant to establish the reasonableness of any charge requested by the defendant.

(F) In the event of an application to a consenting defendant for know-how under this Section VI, by a person, other than a consenting defendant, (a) who is a substantial customer of a consenting defendant for electrical resistance materials or electrical resistance products, (b) whose resources are substantially in excess of those of the consenting defendant whose customer applies and (c) who desires to use such know-how to manufacture such materials or products only for incorporation in products sold by it, any consenting defendant may apply to this Court within thirty (30) days after the application was made, with notice to plaintiff and the applicant, for an order permitting or requiring rejection of such application, which the Court may grant upon the defendant's establishing to the satisfaction of the Court that such rejection is necessary to prevent substantial injury due to the prospective loss of the applicant as a customer and that such rejection would not unduly restrain competition.

(G) No consenting defendant shall be deemed, in connection with the furnishing of any of the foregoing pursuant to this Final Judgment, to have given any implied warranty, representations or guaranty against infringement of patents of others by, or any warranty of success in connection with, its use.

(H) Every agreement under which technical information is furnished pursuant to this Section VI shall contain, if the party furnishing such information shall so request, reasonable provisions requiring the recipient of such information and its subsidiaries to keep such technical information confidential and use the same only for their own manufacturing and selling operations.

(I) Each consenting defendant within ten (10) days from the effective date of this Final Judgment, shall file with the Court and with the plaintiff a listing by categories of all documents it believes come under subsection (A) of this Section VI and a separate list, by customer, of all documents which it believes come under the parenthetical clause in that subsection, and, for a period of five (5) years, to furnish a copy of such lists to any person upon request.

VII

[ *Pricing—Territories* ]

The consenting defendants are jointly and severally enjoined and restrained from entering into, adhering to, maintaining, furthering, renewing or claiming any rights under, any combination, conspiracy, contract, agreement, understanding, plan, program, or common course of action with any other person, directly or indirectly, to:

(A) Establish, fix, determine, maintain or adhere to prices, differentials, discounts, extras or any other term or element of prices, differentials, discounts or extras for the manufacture, processing or sale to or for third persons, of any resistance materials or resistance products;

(B) Divide, allocate or apportion territories, markets or customers for the manufacture, processing or sale of any electrical resistance materials or electrical resistance products;

© 2018 CCH Incorporated and its affiliates and licensors. All rights reserved.

7



(C) Refrain from the manufacture, processing or sale of electrical resistance materials or electrical resistance products or refrain from competition with any other person in any territory or market in the manufacture, processing or sale of any such materials or such products;

(D) Hinder, restrict, limit or prevent any other person from manufacturing, processing or selling any electrical resistance materials or electrical resistance products;

(E) Limit the purchase or sale of electrical resistance materials or electrical resistance products to any particular person or group of persons; provided that this shall not prevent lawful contracts for purchases over reasonable periods to secure supplies for such materials or products.

Nothing in this Section VII shall be deemed to prevent a defendant from (i) giving a distributor an exclusive territory provided the distributor is free to sell in any area and to handle electrical resistance materials and electrical resistance products manufactured by others; (ii) selling its business with a one year covenant not to compete or (iii) making lawful contracts with any person other than an actual or potential competitor of a defendant, that they will not reveal trade secrets of the defendant.

VIII

[ *Directors—Acquisitions*]

Each consenting defendant is enjoined and restrained from, directly or indirectly:

(A) Circulating outside its own organization and its own distributors any price list or price information relating to the manufacture, processing or sale of any electrical resistance materials or electrical resistance products in advance of the circulation or dissemination of such price list or price information to its own customers and to the trade generally;

(B) Permitting any of its officers, directors, agents or employees to serve simultaneously as an officer, director, agent or employee of any other manufacturer not a subsidiary of the defendant;

(C) Except for the purchase and sale of products bought and sold in the normal course of business, for a period of five (5) years from the effective date of this Final Judgment,

(1) acquiring or holding, directly or indirectly, any of the assets or capital stock of, or any financial interest in any other defendant or any other person which becomes a manufacturer other than a wholly owned subsidiary of the consenting defendant, or acquiring, directly or indirectly, any of the assets or capital stock of, or any financial interest in any other manufacturer; (provided, this limitation shall not apply to a defendant acquiring or holding, directly or indirectly, any of the assets or capital stock of, any financial interest in a manufacturer located outside of the United States of America, its territories or possessions);

(2) knowingly permitting any of its officers, directors, or managerial or policymaking agents or employees to acquire or hold, directly or indirectly, any of the assets or capital stock of, or any financial interest in, any other defendant or any person which becomes a manufacturer, or to acquire, directly or indirectly, any of the assets or capital stock of, or any financial interest in, any manufacturer;

(D) Hindering, restricting, limiting or preventing, or attempting to hinder, restrict, limit or prevent any person from serving as a dealer or distributor of or for electrical resistance materials or electrical resistance products manufactured, processed or sold by any other person;

(E) Hindering, restricting, limiting or preventing, or attempting to hinder, restrict, limit or prevent except for lawful action to prevent patent infringement or to protect property rights in trade secrets, any other person from engaging in the manufacture, processing or sale of any electrical resistance material or electrical resistance products;

© 2018 CCH Incorporated and its affiliates and licensors. All rights reserved.                5



(F) Entering into, adhering to, maintaining, furthering, renewing or claiming any rights under, any contract, agreement, understanding, plan or program with any other person, the purpose or effect of which is to hinder, restrict, limit or prevent either (i) such defendant or (ii) any other person, from granting a license or sublicense under any patent or patents whether owned or controlled by such defendant or such other person. This subsection shall not be deemed to prohibit the mere assignment of any patent or the grant of any exclusive license under any patent if such license grants sublicensing rights.

IX

[ *Cancellation of Contracts*]

(A) Each consenting defendant is ordered and directed:

(1) to cancel within thirty (30) days after the effective date of this Final Judgment each provision of each contract to which it may be a party which is contrary to any of the provisions of this Final Judgment;

(2) to file with this Court and serve upon the plaintiff an affidavit setting forth the fact and manner of its compliance with the foregoing subsection (1).

(B) The consenting defendants,, and each of them, are jointly and severally enjoined and restrained from entering into, adhering to, maintaining, furthering or claiming any rights under any contract, agreement, plan or program which is or shall be contrary to or inconsistent with any of the provisions of this Final Judgment.

X

[ *Compliance*]

(A) For the purpose of securing compliance with this Final Judgment and for no other purpose, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to any consenting defendant made to its principal office, be permitted, subject to any legally recognized privilege:

(1) access, during the office hours of said defendant, to those books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of said defendant which relate to any matter contained in this Final Judgment;

(2) subject to the reasonable convenience of said defendant and without restraint or interference from it, to interview officers or employees of any defendant, who may have counsel present, regarding any such matters.

(B) Upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, said defendant shall submit such reports in writing, and under oath or affirmation if so requested, with respect to the matters contained in this Final Judgment as may from time to time be necessary to the enforcement of this Final Judgment.

(C) No information obtained by the means provided in this Section X shall be divulged by any representatives of the Department of Justice to any person other than a duly authorized representative of the Executive Branch of the plaintiff except in the course of legal proceedings to which the United States is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law.

XI

© 2018 CCH Incorporated and its affiliates and licensors. All rights reserved.

Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. Driver-Harris Co., Alloy…  Wolters Kluwer

[ *Jurisdiction Retained*]

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the amendment or modification of any of the provisions thereof, for the enforcement of compliance therewith, and for the punishment of violations thereof.

XII

[ *Prior Judgment Superceded*]

This Final Judgment shall supersede and replace the Final Judgment entered herein against the consenting defendants on May 25, 1961, and shall be *nunc pro tunc* to the effective date of this Final Judgment. Action taken by the consenting defendants to comply with said May 25, 1961 Final Judgment shall be deemed compliance with the same requirements of this Final Judgment.

**Appendix A**

| Patent No. | Patent Date | Inventor | Filing Date |
|---|---|---|---|
| 2,581,420 | 1/8/52 | James M. Lohr | 9/23/49 |
| 2,687,954 | 8/31/54 | James M. Lohr | 10/19/51 |
| 2,687,956 | 8/31/54 | James M. Lohr | 12/28/51 |
| Reissue No | | | |
| 24,243 | 12/4/56 | James M. Lohr | 6/29/56 |
| Reissue No | | | |
| 24,242 | 12/4/56 | James M. Lohr | 6/29/56 |
| Reissue No | | | |
| 24,244 | 12/4/56 | James M. Lohr | 6/29/56 |
| 2,587,275 | 2/26/52 | Francis E. Bash | 9/23/49 |

© 2018 CCH Incorporated and its affiliates and licensors. All rights reserved.

US. v. HUNTERDON COUNTY TRUST CO., ET AL.
Civil No.: 1100-61
Year Judgment Entered: 1962

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. Hunterdon County Trust Co., First National Bank of Clinton, and Clinton National Bank., U.S. District Court, D. New Jersey, 1962 Trade Cases ¶70,263, (Apr. 16, 1962)

Click to open document in a browser

United States v. Hunterdon County Trust Co., First National Bank of Clinton, and Clinton National Bank.

1962 Trade Cases ¶70,263. U.S. District Court, D. New Jersey. Civil No. 1100-61. Entered April 16, 1962. Case No. 1639 in the Antitrust Division of the Department of Justice.

### Sherman Act

**Price Fixing—Bank Service Charges—Schedules.**—Banks were prohibited by a consent decree from combining to fix uniform charges for checks, checking accounts, collection of checks and drafts, and other services and from compiling or distributing among themselves or other banks any schedule or charts containing information regarding their service charges.

#### Final Judgment

LANE, District Judge [ *In full text*]: The plaintiff, U. S. of America, having filed its complaint herein on December 26, 1961, and the defendants, by their respective attorneys, having severally consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law herein, and without admission by any party with respect to any such issue, and the Court having considered the matter and being duly advised,

Now, therefore, before the taking of any testimony and upon consent of the parties hereto, it is hereby

Ordered, adjudged and decreed as follows:

I.

#### [ *Jurisdiction*]

This Court has jurisdiction of the subject matter hereof and of the parties hereto. The complaint states claims upon which relief may be granted against the defendants under Section 1 of the Act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

II.

#### [ *Definitions*]

As used in this Final Judgment:

(A)"Commercial banking institution" shall mean any bank that is a member of the Federal Reserve System or that has been chartered under any State law applicable to commercial banks though not a member of the Federal Reserve System;

(B)"Customer" shall mean any person who maintains a demand deposit account with one or more of the defendant banks;

(C)"Service charges" shall mean the fees and charges of a commercial bank asserted against the checking account of a customer, including those asserted when the minimum balance in the account is below a fixed amount, charges for deposits made to the checking account of a customer, charges for checks issued by the customer, for collections made by the bank for a customer, for the certification of checks by the bank, for

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

honoring "stop payment" orders of a customer, for the furnishing of blank checks or check forms with or without the imprint of the customer's name and for "late charges" of any kind charged to a customer.

### III.

#### [ Applicability]

The provisions of this Final Judgment applicable to any defendant shall apply also to its successors (including the banking institution resulting from the merger of the defendant, First National Bank of Clinton and the defendant, Clinton National Bank), to its assigns, officers, directors, agents and employees, and to all other persons in active concert or participation with such defendant who receive actual notice of this Final Judgment by personal service or otherwise.

### IV.

#### [ Service Charges]

The defendants are each enjoined and restrained from entering into, adhering to, participating in, maintaining or furthering any contract, combination, agreement, undertaking, by-law, rule, regulation, plan or program with each other or any other commercial banking institution maintaining an office in Hunterdon, Somerset, Morris or Warren County, New Jersey to fix, determine, maintain, establish, stabilize or make uniform any service charges; provided, however, that the foregoing shall not be deemed to prohibit any defendant acting individually from adopting or using any schedule of service charges which such defendant considers appropriate to its own operations.

### V.

#### [ Information]

The defendants are each enjoined and restrained from compiling, publishing or distributing in concert or collaboration with any other defendant or any other commercial banking institution maintaining an office in Hunterdon, Somerset, Morris or Warren County, New Jersey any schedules, lists, bulletins or charts containing or graphically portraying information regarding the service charges of the defendants.

### VI.

#### [ Schedules]

The defendants are each ordered and directed to discontinue the use of the "Revised Schedule of Allowances and Costs for Bank Services" effective March 1, (1957, heretofore published in the names of all of the defendants.

### VII.

#### [ Inspection and Compliance]

For the purpose of securing compliance with this Final Judgment, duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to any defendant, made to its principal office, be permitted, subject to any legally recognized privilege:

(A) Access during the office hours of said defendant, to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of such defendant, relating to any matters contained in this Final Judgment; and

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

A-133

(B) Subject to the reasonable convenience of such defendant and without restraint or interference from it, to interview officers and employees of such defendant, who may have counsel present, regarding any such matters.

Upon such written request, the defendant shall submit reports in writing in respect to any such matters as may from time to time be reasonably necessary to the enforcement of this Final Judgment. No information obtained by the means provided in this Section VII shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Executive Branch of the plaintiff, except for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

**VIII.**

**[ Jurisdiction Retained]**

Jurisdiction is retained for the purpose of enabling any of the parties to this Final Judgment to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any provision thereof, for the enforcement of compliance therewith, and for punishment of violation thereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

3

A-134

US. v. BECTON, DICKINSON AND CO.
Civil No.: 567-60
Year Judgment Entered: 1964

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. Becton, Dickinson and Company., U.S. District Court, D. New Jersey, 1964 Trade Cases ¶71,144, (Jul. 20, 1964)

Click to open document in a browser

United States v. Becton, Dickinson and Company.

1964 Trade Cases ¶71,144. U.S. District Court, D. New Jersey. Civil Action No. 567-60. Entered July 20, 1964. Case No. 1546 in the Antitrust Division of the Department of Justice.

### Sherman Act

**Patents—Compulsory Licensing—Consent Judgment.**—A manufacturer of reusable hypodermic syringes which was charged with violating Section 2 of the Sherman Act by restrictive use of its patents agreed to a consent judgment which required it to grant any domestic applicant nonexclusive, unconditional and unrestricted licenses at a reasonable and nondiscriminatory royalty, together with technical information and drawings at cost, and not to dispose of its patents in any manner which would prevent it from granting licenses.

**Price Fixing—Reusable Hypodermic Syringes—Consent Judgment.**—A manufacturer of reusable hypodermic syringes was prohibited under the terms of a consent judgment from entering into, enforcing or claiming any rights under contracts or agreements fixing, restricting or limiting the price or prices, or terms or conditions of sale, upon which its customers could resell the products, except as authorized by the Miller-Tydings or McGuire Acts.

For the plaintiff: William H. Orrick, Jr.

For the defendant: Toner, Crowley, Woelper & Vanderbilt, by Willard G. Woelper, Newark, New Jersey, H. Allen Lochner, Royall, Koegel, Harris & Caskey, David S. Kane, Kane, Dalsimer & Kane, New York, N. Y.

### Final Judgment

WORTENDYKE, District Judge: Plaintiff, United States of America, having filed its complaint herein on June 28, 1960, and defendant, Becton, Dickinson and Company, having filed its answer thereto denying the substantive allegations thereof; and the parties hereto, by their respective attorneys, having consented to the making and entry of this Final Judgment without trial or adjudication of any issue of fact or law herein, and without admission by any party in respect to any such issue;

Now, therefore, before the taking of any testimony and upon said consent of the parties hereto, it is hereby

Ordered, adjudged and decreed as follows:

I

[ *Sherman Act*]

This Court has jurisdiction of the subject matter hereof and the parties hereto. The complaint states claims against defendant upon which relief may be granted under Sections 1 and 2 of the Act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies commonly known as the Sherman Act, as amended.

II

[ *Definitions*]

As used herein:

(A) "Defendant" means Becton, Dickinson and Company, a corporation organized and existing under the laws of the State of New Jersey, and any subsidiary thereof;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

(B) "Hypodermic syringe" means any instrument (other than those designed for injection without a needle) used to inject various medicaments, serums, antibiotics, vitamins, palliatives and other liquids under the skin of humans or animals; "reusable hypodermic syringe" means any such instrument which is primarily designed for more than one use; "disposable hypodermic syringe" means any such instrument which is primarily designed for one use only and which is sold prior to being filled with any medicament, serum, antibiotic, vitamin, palliative or other liquid;

(C) "Hospital-surgical product" means any hypodermic syringe or any other product (excluding pharmaceuticals and hypodermic syringes pre-filled therewith) used by physicians, surgeons, veterinarians, hospitals, clinics and others, in connection with the prevention, treatment or study of illneses or diseases of humans or animals;

(D) "B-D product" means any hospital-surgical product manufactured or sold by defendant:

(E) "Existing patent" means any United States letters patent or patent application, and any division, continuation, reissue or extension thereof, relating to reusable hypodermic syringes (and excluding hypodermic syringes designed for injection without a needle) or processes or machinery for the manufacture thereof, owned or controlled, directly or indirectly, by the defendant on the date of the entry of this Final Judgment, or under which the defendant, on such date, has power or authority to grant licenses or sublicenses to others;

(F) "Future patent" means any United States letters patent or patent application (exclusive of existing patents), and any division, continuation, reissue or extension thereof, relating to reusable hypodermic syringes (and excluding hypodermic syringes designed for injection without a needle) or processes or machinery for the manufacture thereof, owned or controlled, directly or indirectly, by the defendant at any time during the period of five (5) years following the date of the entry of this Final Judgment, or under which the defendant, during such period, has power or authority to grant licenses or sublicenses to others;

(G) "Person" means any individual, corporation, partnership, association, firm or other legal entity and includes, wherever applicable, any federal, state or local government or instrumentality thereof;

(H) "Subsidiary" means a corporation controlled, or more than 50% of whose stock entitled to vote upon election of directors (other than preferred stock entitled to vote upon failure of the corporation to pay certain dividends) is, directly or indirectly, owned or controlled by the defendant;

(I) "Distributor" means any person engaged in the business of purchasing hospital-surgical products from the manufacturers thereof and selling and distributing such products to hospitals and others;

(J) "Distribution agreement" means any agreement between the defendant and any other person (other than an agent of defendant) relating to the distribution by such other person of any B-D product;

(K) "Commercial manufacture" means the manufacture and production by defendant B-D, in its normal and regular course of business, of hypodermic syringes which it regularly sells or offers for sale. The term "commercial manufacture" as used herein does not include exclusively experimental manufacture;

(L) "Domestic applicant" as used in Section X of this Final Judgment means any person resident in, or incorporated under the laws of, the United States or any one of the States thereof.

III

### [ Applicability]

(A) The provisions of this Final Judgment applicable to the defendant shall also be applicable to each of its subsidiaries, directors, officers, employees and agents, and to its successors and assigns with respect to the business and products acquired from defendant, and to all persons in active concert or participation with it who receive actual notice of this Final Judgment by personal service or otherwise; provided that they shall not be applicable to a person who ceases to be a subsidiary of the defendant and who is not engaged in the manufacture or sale of hypodermic syringes on the date of the entry of this Final Judgment, if defendant in good faith has divested itself completely of all interest, ownership and control, directly and indirectly, in said person.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

(B) Defendant is ordered and directed forthwith to take all such steps as may be necessary to secure compliance by its officers, directors, employees, agents and subsidiaries, with the terms of this Final Judgment.

(C) The provisions of this Final Judgment shall not be applicable to activities of the defendant, its successors or assigns, conducted exclusively outside the United States and not in unreasonable restraint of the domestic or foreign commerce of the United States. Any sale of, or offer to sell, any hospital-surgical product to, or for the use of the plaintiff or any instrumentality or agency thereof shall be deemed to be a sale, or offer to sell, within the United States.

IV

[ *Notice Required*]

Defendant is ordered and directed:

(A)(1) Forthwith to serve a copy of this Final Judgment upon (a) each member of its Board of Directors? (b) each of its principal managerial officers who are not members of its Board of Directors; (c) each of its sales employees who has sales responsibility over a regional geographical area; (d) each of the principal managerial officers of each of its subsidiaries;

(2) Within ninety (90) days after the date of the entry of this Final Judgment, to file with this Court, and serve upon the plaintiff, an affidavit setting forth the fact and manner of its compliance with the foregoing paragraph (1);

(B) Forthwith to mail a copy of this Final Judgment to each distributor in the United States with whom defendant, on the date of this Final Judgment, has a distribution agreement, and to each distributor outside of the United States with whom defendant, on the date of this Final Judgment, has a distribution agreement, and who, to the knowledge of the defendant, has been selling, or is planning to sell, B-D products in the United States, and thereafter, for a period of five (5) years after the date of entry of this Final Judgment, to each such distributor at the time he first enters into a distribution agreement with defendant;

(C) Within ninety (90) days after the date of the entry of this Final Judgment, to file with this Court and serve upon the plaintiff a full and complete list of all existing patents to which this Final Judgment may be applicable:

(D) For a period of five (5) years after the date of the entry of this Final Judgment, to furnish, without cost, to any person so requesting, a copy of this Final Judgment, and also, to any person so requesting a copy of the list, kept up to date, referred to in the foregoing subsection (C).

V

[ *Price Fixing*]

(A) Defendant is ordered and directed, not later than ninety (90) days after the entry of this Final Judgment, to cancel each distribution agreement to which, on the date of entry of this Final Judgment, it is a party, where the other party thereto is a distributor in the United States, or is a distributor outside of the United States who, to the knowledge of the defendant, has been selling, or is planning to sell, B-D products in the United States.

(B) Subject to Section VI of this Final Judgment, defendant is enjoined and restrained from entering into, adhering to, maintaining or claiming any rights under, any contract, agreement or understanding, with any other person, any term or provision of which is, or may be, inconsistent with an)r of the provisions of this Final Judgment, including specifically, but without limitation, any contract, agreement or understanding with any person which (except to the limited extent specifically permitted by Section VI of this Final Judgment) fixes, restricts or limits the price or prices, or the terms or conditions relating thereto, at or upon which such other person may or shall sell any hospital-surgical product purchased from the defendant.

(C) Defendant is enjoined and restrained from entering into, adhering to, maintaining or claiming any rights under, any contract, agreement or understanding, with any other person in the United States, which fixes, restricts, or limits the persons to whom such other person may or shall sell reusable hypodermic syringes purchased from the defendant.

---

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm
3

(D) Defendant is enjoined and restrained from, directly or indirectly, entering into, adhering to, maintaining, enforcing, or claiming any rights (except for the recovery of sums of money already due and payable prior to the date of entry of this Final Judgment) under any contract, agreement or understanding with any other person which requires or obligates such other person to purchase all, or any stated percentage or proportion of such persons' requirements for, reusable hypodermic syringes from defendant Becton, Dickinson, or any source designated by defendant Becton, Dickinson, provided that nothing herein contained shall apply to reusable syringes sold by defendant pursuant to an award received by defendant on invitation for competitive bids, or, if the purchaser has the right to cancel on no more than two (2) weeks' written notice, to reusable syringes sold by defendant which are to be resold under the brand name or private label of a distributor.

(E) Defendant is ordered and directed to cancel within ninety (90) days after the date of the entry of this Final Judgmet any contract, agreement or understanding, to which it may be a party on the date of the entry of this Final Judgment and which is or may be in any manner inconsistent with the foregoing subsection (D) of this Section V.

VI

[ *Fair Trade*]

(A) Nothing contained in Section V of this Final Judgment shall be deemed to prohibit defendant from lawfully exercising such legal rights, if any, as it may have under the Act of Congress of August 17, 1937, commonly known as the Miller-Tydings Act, and of the Act of Congress of July 14, 1952, commonly known as the McGuire Act.

(B) Nothing contained in Section V of this Final Judgment shall be deemed to prevent defendant from issuing and circulating its suggested resale prices for B-D products; provided that (i) each and every paper (for example, price lists, order blanks, packages or advertisements) containing any reference to defendant's suggested resale prices contains on its face, and in bold and conspicuous letters, a clear statement, except where fair trade may be applicable, that the resale prices therein contained are suggested prices; and (ii) defendant takes no action, directly or indirectly (except as specifically authorized by the preceding subsection (A) of this Section VI), to enforce or attempt to enforce, such suggested resale prices against any distributor or other seller of B-D products or any other person.

VII

[ *Refusal to Deal*]

For a period of five (5) years following the entry of this Final Judgment, defendant is ordered and directed to sell upon request and upon its usual and customary terms including credit, and availability in periods of short supply, to any person *in* the United States who, at the time of such request, is a distributor of hospital-surgical products, any reusable hypodermic syringe which it regularly manufactures and sells, or offers for sale, in the normal course of its business in the United States.

VIII

[ *Coercive Practices*]

Defendant is enjoined and restrained from directly or indirectly,

(A) Unreasonably restricting, limiting or preventing or attempting unreasonably to restrict, limit or prevent any person in the United States, including specifically, but without limitation, any distributor of B-D products

(1) from purchasing, distributing, selling (except to a purchaser who specifies at the time of each order that only a B-D product or B-D products be supplied in response to each such order), handling or otherwise dealing in, any reusable hypodermic syringes manufactured, or sold, by persons other than the defendant;

(2) from engaging in the manufacture of reusable hypodermic syringes;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

(3) from selling reusable hypodermic syringes purchased from defendant to any person.

(B) Conditioning the sale of any reusable hypodermic syringe upon the purchase of any other hospital-surgical product or conditioning the sale of any hospital-surgical product upon the purchase of any reusable hypodermic syringe; provided, however, that this subsection (B) shall not be deemed to prohibit defendant from requiring, as a term of its distribution agreements, that its distributors maintain such reasonable stock of B-D products as may be necessary in order to service, from stock, the normal and reasonable demand upon such distributor for such B-D products, and from requiring such distributors to stock new B-D products of a type normally marketed by defendant through distributors and to devote a reasonable amount of promotional and selling effort to such new B-D products.

IX

[ *Acquisitions*]

Defendant is enjoined and restrained:

(A) For the period of five (5) years after the date of the entry of this Final Judgment from, directly or indirectly, acquiring any of the shares of stock, business or assets (other than a nonexclusive license under the United States or foreign Letters Patent or applications therefor) of, or other financial interest in, any other person engaged in the manufacture of reusable hypodermic syringes;

(B) After the expiration of five (5) years after the date of the entry of this Final Judgment, and for an additional period of five (5) years thereafter, from, directly or indirectly, acquiring any of the shares of stock, business or assets (other than a nonexclusive license under the United States or foreign Letters Patent or applications therefor) of, or other financial interest in any other person engaged in the manufacture of reusable hypodermic syringes, except (1) with the prior approval of the plaintiff, or (2) after an affirmative showing to the satisfaction of this Court, upon sixty (60) days' notice to the plaintiff, that the effect of such acquisition will not be substantially to lessen competition or tend to create a monopoly in the manufacture, sale or distribution of reusable hypodermic syringes.

[ *Terms of Sale*]

(C) For a period of ten (10) years after the date of entry of this Final Judgment, by its officers, employees, agents and salesmen, from soliciting, taking or accepting, or requesting its distributors to solicit, take or accept from any purchaser or potential purchaser in the United States, any order to be filled either by defendant or a distributor for reusable hypodermic syringes manufactured or sold by defendant (whether such reusable hypodermic syringes so ordered are to be supplied by direct shipment from the defendant or through a distributor) except to the extent, and only to the extent, that (i) the entire quantity of such reusable hypodermic syringes so ordered are to be, and actually are, shipped to such purchaser as a single shipment, and (ii) the entire amount due from, and payable by, the purchaser for the entire quantity of such reusable hypodermic syringes so ordered and shipped is billed to such purchaser by defendant or its distributor as a single charge and is payable by the purchaser in accordance with the normal and usual trade terms and conditions including credit terms of defendant or its distributor; provided that this subsection shall not apply to (a) any order with respect to which the purchaser or potential purchaser is specifically notified in writing by defendant with respect to each order that any unshipped balance of such order for reusable syringes may be cancelled by the purchaser or potential purchaser upon notice to defendant and without any penalty; (b) orders submitted pursuant to awards received on invitation for competitive bids; and (c) orders for non-catalogued reusable hypodermic syringes manufactured specially for the purchaser. For the purpose of this subsection shipments to more than one destination requested in an order and shipments made to fill an order from more than one shipping point shall be deemed a single shipment;

(D) From including the volume of reusable hypodermic syringes purchased or to be purchased by any person as a factor in determining the extent to which such person shall be given or offered any discount, allowance or rebate from defendant's established prices for hospital-surgical products, where the basis for such discount, allowance or rebate is the total volume of hospital-surgical products purchased or to be purchased by such person from defendant or any source designated by defendant.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

x

[ *Licenses* ]

(A) Subject to subsection (C) of this Section X, defendant is ordered and directed to grant to any domestic applicant making written request therefor, a nonexclusive, unconditional and unrestricted license to make, have made, use and sell in the United States reusable hypodermic syringes or processes or machinery for the manufacture thereof under any, some or all, as the applicant may choose, existing or future patent or patents.

(B) Any license granted by defendant pursuant to the foregoing subsection (A) shall include, as to reusable syringes so manufactured, without specific request therefor from the applicant, a non-exclusive, unconditional, unrestricted and royalty-free grant of immunity from suit under foreign letters patent owned or controlled by defendant and corresponding to the United States letters patent under which the licensee is licensed.

(C)(1) Any license granted by the defendant under subsection (A) of this Section X may provide that:

(a) a reasonable and non-discriminatory royalty may be charged and collected;

(b) reasonable provision may be made for periodic reports to defendant by the licensee as to the amount of the royalty due and payable and no other information;

(c) reasonable provision may be made for periodic inspection of the books and records of the licensee by an independent auditor who may report to defendant only the amount of royalty due and payable and no other information;

(d) the license may be nontransferable;

(e) reasonable provision may be made for cancellation of the license upon failure of the licensee to make the reports which may be required by (b) above, pay the royalties due or permit the inspection of its books and records as herein provided;

(f) the license must provide that the licensee may cancel the license at any time by giving thirty (30) days notice in writing to the licensor.

(2) Upon any application to it for a license pursuant to subsection (A) of this Section X, defendant is ordered and directed to advise the applicant of the royalty it deems reasonable for the patent or patents to which the application pertains. If defendant and the applicant are unable to agree upon what constitutes a reasonable royalty, defendant or the applicant may apply to this Court for a determination of a reasonable royalty, giving notice thereof to the other person and the plaintiff, and defendant shall make such application forthwith upon request of the applicant. In any such proceeding the burden of proof shall be upon defendant to establish the reasonableness of the royalty requested by it. Pending completion of any such court proceeding, the applicant shall have the right to make, have made use and sell in the United States reusable hypodermic syringes or processes or machinery for the manufacture thereof, under the patents to which the application pertains, without the payment of royalty or other compensation, subject, however, to the following: Defendant may, with notice to the applicant and plaintiff, apply to this Court to fix an interim royalty rate pending final determination of what constitutes a reasonable royalty. If this Court fixes such interim royalty rate, a license shall then issue to the applicant providing for the periodic payment of royalties at such interim rate from the date of the making of such application by the applicant; and whether or not such interim rate is fixed, any final order may provide for such readjustments, including retroactive royalties, as this Court may order after final determination of a reasonable and nondiscriminatory royalty; if the applicant fails to accept the license under this paragraph (2) of subsection (C) of this Section X, or fails to pay the royalties agreed upon or established by this Court, such action shall be ground for the dismissal of his application, and his rights under subsection (A) of this Section X shall terminate.

(D) Nothing herein shall prevent any applicant from attacking in the aforesaid proceedings or in any other controversy the validity or scope of any of the patents nor shall this Judgment be construed as importing any validity or value to any of said patents.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

6

(E) Nothing contained in this Section X shall be deemed to prohibit defendant from prosecuting to final judgment any suit or proceeding against any person instituted prior to, and pending on the date of, entry of this Final Judgment.

(F) After the date of the entry of this Final Judgment defendant is enjoined and restrained from issuing or granting any license under any existing or future patent or patents except in accordance with and pursuant to this Section X.

(G) Defendant is enjoined and restrained from instituting or threatening to institute any suit or other proceeding against any person, or claiming or recovering any damages or other compensation, based upon any infringement, prior to the date of entry of this Final Judgment, of any patent to which Section X(A) of this Final Judgment may be applicable.

XI

[ *Disposition of Patents*]

(A) Defendant is enjoined and restrained from making any disposition of any existing or future United States or foreign patent or patents or rights thereunder which deprives it of the power or authority to grant the licenses or immunities required by subsections (A) and (B) of Section X of this Final Judgment, unless, when selling, transferring or assigning said patent or patents, or rights thereunder, it requires, as a condition of such sale, transfer or assignment that the purchaser, transferee or assignee shall observe the provisions of said Section X with respect to the patent or patents, or rights thereunder, so acquired, and the purchaser, transferee or assignee files with this Court, prior to consummation of said transaction, an undertaking to be bound by the provisions of said Section X with respect to the patent or patents, or rights thereunder, so acquired.

(B) Nothing contained in this Section XI shall be deemed to prevent the defendant from abandoning or withdrawing a patent application at any time before the patent issues thereon, or from compromising or settling interference proceedings upon such terms as may be lawful.

XII

[ *Technical Information*]

(A) For a period of five (5) years from the date of entry of this Final Judgment, defendant is ordered and directed, upon written request, to furnish, to any person licensed, pursuant to this Final Judgment, under any existing or future patent or patents, the following:

(1) A description, in writing, of the commercial practices and technical information used by defendant at the time of such request relating to the commercial manufacture by defendant of reusable hypodermic syringes, or processes or machinery for the manufacture thereof, under the patent or patents under which the licensee is licensed;

(2) A copy of all then current blueprints, drawings and specifications, owned or controlled by defendant, relating to any machine, device or process manufactured, or used, by defendant at the time of such request in its commercial manufacture of reusable hypodermic syringes under the patent or patents under which the licensee is licensed;

(3) The name and address of each person who, within two (2) years preceding such request, has manufactured for or sold to defendant any machine or machines used by defendant at the time of such request in its commercial manufacture of reusable hypodermic syringes under the patent or patents under which the licensee is licensed.

(B) In furnishing any of the information required by subsection (A) of this Section XII, defendant is enjoined and restrained from making any charge to such licensee other than a nominal charge to reimburse defendant for its costs in reproducing and furnishing the same;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

(C) Nothing contained in Sections X, XI and this Section XII of this Final Judgment shall be construed to impose upon defendant any responsibility or liability to others except the responsibility thereby imposed to furnish licenses, information or other matters therein specifically described, and defendant shall not be deemed, by having furnished the same, to have made any representation other than that such licenses, information and other matters conform to those used by defendant in its commercial manufacture of reusable hypodermic syringes, nor shall said sections be construed to create in anyone other than the plaintiff herein any rights, claims or rights of action against defendant that do not otherwise exist.

XIII

[ Publication Required]

Defendant is ordered and directed to insert, in a trade journal of general circulation, three (3) times, in the second, fourth and sixth months following the date of the entry of this Final Judgment, a notice that, pursuant to this Final Judgment, it is required to grant licenses under, and technological information concerning, existing and future patents relating to reusable hypodermic syringes, and processes or machinery for the manufacture thereof, and that a list of such patents and a copy of this Final Judgment will be furnished, upon written request, by the defendant

XIV

[ Inspection and Compliance]

For the purpose of securing compliance with this Final Judgment, and subject to any legally recognized privilege, duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendant, made to its principal office, be permitted (1) access during reasonable office hours to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of the defendant relating to any of the subject matters contained in this Final Judgment, and (2), subject to the reasonable convenience of defendant, and without restraint or interference from, it, to interview officers or employees of the defendant, who may have counsel present, regarding any such matters; and, upon such request, defendant shall submit such reports in writing to the Department of Justice with respect to matters contained in this Final Judgment as may from time to time be necessary to the enforcement of this Final Judgment. No information obtained by the means provided in this Section XIV shall be divulged by any representative of the Department of Justice to any person, other than a duly authorized representative of the Executive Branch of plaintiff, except in the course of legal proceedings to which the United States of America is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law.

XV

[ Jurisdiction Retained]

Jurisdiction is retained for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment or for the modification or termination of any of the provisions thereof, and for the enforcement of compliance therewith and punishment of violations thereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm
8

US. v. DRIVER-HARRIS CO., ET AL.
Civil No.: 942-56
Year Judgment Entered: 1964

**Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. (Driver-Harris Co.), Alloy Metal Wire Company, Inc., and its successor H. K. Porter Company (Delaware), Wilbur B. Driver Company, (Hoskins Manufacturing Company), and C. O. Jelliff Manufacturing Corporation., U.S. District Court, D. New Jersey, 1964 Trade Cases ¶71,170, (Aug. 13, 1964)**

Click to open document in a browser

United States v. (Driver-Harris Co.), Alloy Metal Wire Company, Inc., and its successor H. K. Porter Company (Delaware), Wilbur B. Driver Company, (Hoskins Manufacturing Company), and C. O. Jelliff Manufacturing Corporation.

1964 Trade Cases ¶71,170. U.S. District Court, D. New Jersey. Civil No. 942-56. Entered August 13, 1964. Case No. 1312 in the Antitrust Division of the Department of Justice.

### Sherman Act

**Price Fixing—Electrical Resistance Products—Consent Judgment.**—Manufacturers of electrical resistance products were required under the terms of a consent judgment to cancel current price lists for electrical resistance products and to determine individually new prices, and would be prohibited from fixing prices, dividing markets, limiting sales to particular customers, or acquiring any interest in a manufacturer of electrical resistance products for a period of five years.

**Patents—Compulsory Licensing and Assistance to Licensees—Electrical Resistance Products— Consent Judgment.**—Manufacturers of electrical resistance products were required under the terms of a consent judgment to grant non-exclusive licenses at reasonable royalties under presently owned patents or under patents obtained within a period of five years, and to grant technical information to licensees.

For the plaintiff: William H. Orrick, Jr., Assistant Attorney General, William D. Kilgore, Jr., and Donald F. Melchior, Attorneys, Department of Justice.

For the defendants: Milton, Keane & Debona, by John Milton, Jr., and Fred J. Schumann, for Hoskins Mfg. Co., and Pitney, Hardin, & Kipp, by William H. Osborne, Jr., for Driver-Harris Co.

### Final Judgment

SHAW, Judge: Plaintiff, United States of America, having filed its complaint herein on December 5, 1956; the defendants consenting hereto having appeared and filed their answers to such complaint, denying the substantive allegations thereof; and the plaintiff and the defendants consenting hereto, by their respective attorneys, having consented to the entry of this Final Judgment herein;

Now, therefore, before the taking of any testimony and without trial or adjudication of any issue of fact or law, and upon consent of the parties signatory hereto, and the Court being advised and having considered the matter, it is hereby

Ordered, adjudged and decreed as follows:

I

[ *Sherman Act*]

This Court has jurisdiction of the subject matter of this action and of the parties hereto. The complaint states claims upon which relief may be granted against the defendants consenting hereto, under Sections 1 and 2 of the Act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

II

[ *Definitions*]

As used in this Final Judgment:

(A) "Person" shall mean any individual, partnership, firm, association, corporation, or any other business or legal entity;

(B) "Resistance materials" shall mean (1) electrical resistance materials, and (2) materials sold by a defendant (a) having a composition substantially similar to electrical resistance materials, or (b) for thermocouple or spark plug purposes, and (3) tubing, wire, ribbon, strip or rod sold by a defendant for heat resistant purposes in connection with the flow of electricity;

(C) "Resistance products" shall mean wire, ribbon, strip, rod or tubing made from resistance materials;

(D) "Electrical resistance materials" shall mean any alloy or any metallic or other element, or any combination of elements now or which may be

(1) produced, processed, sold or received by a defendant, which is recognized or represented by such defendant as having electrical resistance properties (including controllable and reproducible electrical resistivity or temperature coefficients of resistance) suitable for electrical resistance uses; or

(2) manufactured, sold, distributed or received by a defendant for electrical resistance purposes; or

(3) known or recognized, generally in the trade as an electrical resistance material;

(E) "Electrical resistance products" shall mean tubing, wire, ribbon, strip or rod made from electrical resistance materials;

(F) "Manufacturer" shall mean any person engaged in the manufacture or drawing or processing (such as enameling, insulating, oxidizing or coiling) of electrical resistance materials or electrical resistance products;

(G) "Patents" shall mean any, some or all claims of patents covering the manufacture, use or sale of electrical resistance materials or electrical resistance products, including any divisions, reissues or extensions of such patents, or applications therefor;

(H) "Subsidiary" shall mean any corporation controlled by, or more than 50% of whose outstanding stock entitled to vote is held by one person;

(I) "Bid" shall mean a bid for furnishing electrical resistance materials or electrical resistance products pursuant to a formal written invitation for a bid made by a prospective customer who the defendant knows or has reason to know has also submitted the same request for a bid to another person. It shall not include the ordinary solicitation of orders by a defendant from a customer or prospective customer nor the ordinary quotation to a customer or prospective customer;

(J) "Consenting defendant" or "consenting defendants" shall mean only a defendant or defendants which shall have consented to the terms of this Final Judgment;

(K) "Effective date of this Final Judgment" shall mean the date on which a Final Judgment not subject to further appeal is entered against the last remaining defendant

III

[ *Applicability*]

(A) The provisions of this Final Judgment shall apply solely to any consenting defendant, to each of its subsidiaries, successors and assigns, and to each of its officers, directors, agents and employees, and to all other persons in active concert or participation with any consenting defendant who shall have received notice of this Final Judgment by personal service or otherwise. The provisions of this Final Judgment shall not apply to acts, contracts, agreements, arrangements, understandings, plans or programs of foreign subsidiaries of any consenting defendant unless such acts, contracts, agreements, arrangements, understandings, plans or

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

programs concern the foreign or domestic commerce of the United States. This Final Judgment shall not apply to transactions solely between a consenting defendant and its subsidiaries and the officers, directors, agents and employees of either when acting in such capacity.

(B) Each consenting defendant is ordered and directed:

(1) To serve a copy of this Final Judgment upon,

(a) each present and future member of its Board of Directors;

(b) each of its present and future vice presidents and chief managerial officers who are not members of its Board of Directors;

(c) the present and future chief executive officers of each of its subsidiaries engaged in the manufacture, processing or sale of resistance materials or resistance products; and

(2) Within thirty (30) days after the effective date of this Final Judgment, to file with this Court, and serve upon the plaintiff, an affidavit as to the fact and manner of its compliance, as to its present officers and directors, with this subsection (B), setting forth in said affidavit the name, position and address of each person upon whom a copy of this Final Judgment at that time shall have been served as herein ordered and directed.

(C) Each consenting defendant is ordered and directed for a period of five (5) years after the effective date of this Final Judgment to furnish, without charge, to any person requesting the same, a copy of this Final Judgment together with a copy of the affidavit required to be filed by subsection (B) of Section V hereof.

IV

[ *Former Price Lists, Future Sales*]

Each consenting defendant is ordered and directed:

(A) With respect to its domestic and Canadian operations, to cancel each of its current price lists pertaining to resistance materials or resistance products and individually to determine new prices in lieu thereof for such materials and products then being manufactured or offered for sale by the defendant; such new prices to be individually determined by each defendant on the basis of its own costs and its own judgment as to margins of profit and other lawful considerations; and after the effective date of this Final Judgment to issue new price lists containing the prices determined in accordance with this subsection (A) and to serve upon the plaintiff copies of work papers used by it in determining the prices contained in such new price lists. New price lists covering electrical resistance materials and electrical resistance products in the form of rod shall be issued and served upon plaintiff thirty (30) days after the effective date of this Final Judgment. New price lists covering resistance materials and resistance products other than rod shall be issued and served upon plaintiff ninety (90) days after the effective date of this Final Judgment. Cancellation of said current price lists shall be effective as of the date fixed for the issuance of the new price lists covering the respective materials and products;

(B) If a consenting defendant has sold to or processed for, or hereafter sells to or processes for, any person any resistance material or resistance product, either directly or through regularly designated distributors, to sell to or process for, or cause such distributors to sell to or process for, any other person on the same functional industry level as the defendant's other customers, upon request of such other person and upon uniform and nondiscriminatory prices and other terms and conditions, except as otherwise permitted by way of defense under the Robinson-Patman Act; and such defendant and such distributors shall hold themselves out as ready and willing so to sell or process; provided, however, that in cases of short supply the defendant shall make a reasonable allocation among its customers, but not to the exclusion of new customers.

This subsection (B) shall not require a defendant (i) to submit any bid, (ii) to continue to sell any size or line of material or products which it discontinues making, or (iii) to sell to a person a resistance material or resistance product designated by such person as having been made by the defendant for a particular customer if (1) such material or product has been made by the defendant according to specification developed by the particular customer without the assistance of the defendant and (2) the defendant has not during the preceding year made

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

an identical or substantially identical material or product for any other customer, and (3) if such defendant after having made a request therefor has not secured the consent of such customer to make such sales;

(C) To file with the Assistant Attorney General in charge of the Antitrust Division within ten (10) days after its execution a copy of any contract or agreement relating to activities covered by this Final Judgment (other than orders, contracts or agreements relating to routine sales and purchases and which do not create any obligation upon either party thereto extending more than six months) entered into within a period of five (5) years after the effective date of this Final Judgment between (i) such defendant and any other defendant and (ii) such defendant and any other manufacturer or distributor;

(D) To retain any and all of its records relating to activities covered by this Final Judgment for a period of ten (10) years from the date of the making thereof except that this subsection. (D) shall not require the retention of routine sales and purchase data longer than seven (7) years.

V

[ *Compulsory Licensing*]

(A) Each of the consenting defendants is ordered and directed to grant, to the extent of its legal right to do so, to any person making written request therefor, a nonexclusive license for the life of a patent, or patents, to make, have made, use and sell electrical resistance materials or electrical resistance products under any, some, or all of the patents as the applicant may request which on the date of entry of this Final Judgment are owned or controlled by the defendant, including the patents listed in Appendix A hereto, or under which it has a right to issue sublicenses, or which within five (5) years from the date of entry of this Final Judgment, are issued to or acquired by the defendant, or under which it obtains sublicensing rights within such period.

(B) Each consenting defendant is ordered and directed, within sixty (60) days after the effective date of this Final Judgment, to file with this Court, and serve upon the plaintiff, an, affidavit showing separately as of that date, the number, date of issue (or filing as to applications) and name of owner of each existing patent (other than those listed in Appendix A) required to be licensed under this Final Judgment.

(C) Each consenting defendant is enjoined and restrained from including in any license issued pursuant to subsection (A) of this Section V any restriction or limitation whatsoever except that:

(1) A reasonable royalty may be charged, which royalty shall be uniform, and nondiscriminatory as among licensees procuring the same rights under the same patents;

(2) Reasonable provisions may be made for periodic reports by the licensee to the defendant as to the amount [of] royalties due and inspection of the books and records of the licensee by an independent auditor or any other person acceptable to both defendant and the licensee, who shall report to the defendant only the amount of the royalty due and payable;

(3) Reasonable provisions may be made for cancellation of the license upon failure of the licensee to pay the royalties or permit inspection of his books and records as herein provided;

(4) The license may be made nontransferable and must provide that the licensee may cancel the license at the end of one (1) year and thereafter at any time by giving to the defendant sixty (60) days' notice in writing;

(5) The license may require such patent markings as may be required by statute.

(D) Upon receipt of a written, request for a license under the provisions of subsection (A) hereof, defendant shall advise the applicant, in writing, within thirty (30) days, of the royalty it deems reasonable for the patent or patents to which the application pertains. If such, applicant and defendant are unable to agree upon what constitutes a reasonable royalty within sixty (60) days from the date the written application for the license was received by the defendant, either the applicant or defendant may, upon notice to the plaintiff, apply to this Court for the determination of a reasonable royalty. In any such proceeding the burden of proof shall be upon, the defendant to establish the reasonableness of any royalty requested. Pending the completion of any such negotiations or court proceeding, the applicant shall have the right to make, have made, use and vend under the patent or

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm
4

patents to which his application pertains without payment of royalty or other compensation, but subject to the following provisions: Defendant may, upon notice to the plaintiff, apply to this Court to fix an interim royalty rate pending final determination of what constitutes a reasonable royalty. If this Court fixes such interim royalty rate, defendant shall then issue and the applicant shall accept a license providing for the periodic payment of royalties at such interim rate from the date upon which the applicant requested the license. If the applicant fails to accept such license or fails to pay the interim royalty in accordance therewith, such action may be grounds for the rejection or dismissal of his application for a license; in the case of such rejection or dismissal, the applicant shall pay any royalties found by the Court to be due to the defendant Whether or not an interim royalty is fixed by the Court, a final Court determination of a reasonable royalty shall be applicable to the applicant for a license from the date upon which the applicant requested such license, and, from the date of such determination, to any other licensee, at its option, then having the same rights under the same patents.

(E) Nothing herein shall prevent any applicant from attacking, in the aforesaid proceedings or in any other controversy, the validity or scope of any of the patents, nor shall this Final Judgment be construed as imputing any validity or value to any of said patents.

(F) Each consenting defendant is enjoined and restrained from (i) granting, after the date of entry of this Final Judgment, any license or sublicense under any patents to which this Section V shall apply, except in accordance with, and pursuant to, the terms of this Final Judgment, and (ii) taking or accepting [for a period of five (5) years] after the date of entry of this Final Judgment, any right, license or immunity, under any patent owned or controlled by any person other than such defendant, which right, license or immunity is by its terms, or in fact, exclusive to the defendant unless such defendant is also granted the right to grant sublicenses to others as required by this Final Judgment (for the purpose of this subparagraph (ii), any right or immunity under a patent shall be deemed to be a license subject to the provisions of this Section V).

(G) Each consenting defendant is enjoined and restrained from making any sale or other disposition of any patent or rights in or under patents which deprives it of the power or authority to grant the licenses required by this Section V unless the purchaser, transferee or assignee shall file with this Court, and serve upon the plaintiff, prior to consummation of any such transaction, its consent to be bound by the applicable provisions of this Section V with respect to such patent.

(H) Each consenting defendant is enjoined and restrained from using or attempting to use any foreign patent, or any rights under any foreign patent, to hinder, restrict, limit or prevent any person licensed pursuant to this Section, V from exporting from the United States any electrical resistance materials or electrical resistance products manufactured in the United States pursuant to such license.

(I) Each consenting defendant is enjoined and restrained from maintaining, instituting or threatening to institute any action, counterclaim, set-off, suit or other proceeding against any person for use of or any act of infringement of any existing patent alleged to have occurred prior to the effective date of this Final Judgment.

VI

[ *Technical Information*]

(A) For five (5) years after the effective date of this Final Judgment, each consenting defendant is ordered and directed, upon written request therefor from any actual or potential manufacturer within the United States or any State, territory or possession thereof, to furnish to such applicant copies of any technical manuals. books of instructions, drawings, specifications, blueprints, pamphlets, diagrams or other similar documents (other than those supplied to a defendant by a customer who has developed them, for its use without assistance by a defendant, and which the customer, upon request by the defendant to whom the application has been made, refuses to permit to be made available) which the applicant desires owned by or subject to the control of the defendant on the effective date of this Final Judgment, and which documents have been used, or prepared for use, by the defendant in the commercial manufacture of electrical resistance materials or electrical resistance products for the purpose of melting only. For this data the defendant may charge the applicant a reasonable amount not to exceed one thousand and no/100 ($1,000.00) Dollars.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

5

(B) Each consenting defendant is ordered and directed, upon written request of any person licensed under any patent or patents pursuant to Section V of this Final Judgment, to furnish during the life of the patent or patents to such licensee such of the defendant's technical information as the licensee may request as may be necessary for a person skilled in the art of metal melting technology to practice the invention or inventions of any of the patents licensed by such defendant to the licensee; in such licensee's own melting of electrical resistance materials or electrical resistance products. For this information the defendant may make a reasonable charge which shall not be more than the cost to the defendant of furnishing such information, but in no event more than one thousand and no/100 ($1,000.00) Dollars.

(C) Upon receipt within a reasonable time of a written application from any actual or potential manufacturer representing that the written technical information furnished to such applicant by the defendant pursuant to sub-sections (A) or (B) of this Section VI is inadequate or insufficient to enable such applicant satisfactorily to practice the inventions, or to perform the said manufacturing processes for which it sought information under said subsections, and specifying in reasonable detail the difficulties experienced, such defendant is ordered and directed to make available to such applicant, if feasible, such additional written information to such applicant, if feasible, such additional written information relating to such technical information relating to melting as may be reasonably necessary to enable the personnel of the applicant skilled in the art of metal melting technology to practice the inventions or to manufacture under the specific processes, and if not feasible or sufficient, to make available at reasonable times and for reasonable periods, and without subjecting defendant to hardship, technically qualified personnel from among its own employees for consultation with such applicant at the applicant's place of manufacture regarding the said inventions or manufacturing processes for which the applicant sought information. This subsection (C) shall not require a defendant to send any person outside of the United States. For this data or service the defendant may make a reasonable charge; provided, however, that if such written data were within the control of the defendant at the time when defendant furnished the data under subsections (A) or (B) above, no charge for such written data shall be made unless agreeable to the applicant or unless defendant shows to the satisfaction of the Court that it could not reasonably have contemplated that the applicant would need such written data.

(D) Any person entitled and qualified to receive the documents under subsection (A) of this Section VI, upon written application to a defendant shall be permitted at his own expense and at and for reasonable times, to visit the principal plant of such defendant performing such operations for the purpose of observing and being advised as to the methods, processes, machines and equipment, in use at or before the effective date of this Final Judgment and then being used by such defendant in the melting of electrical resistance materials or electrical resistance products, if (1) within five years from such effective date such person shows to the satisfaction of the defendant, or to the satisfaction, of the plaintiff in the event of failure to satisfy the defendant, that he does not need or desire information or assistance otherwise provided for in this Section VI, or (2) such person represents that the information or assistance furnished to such applicant by the defendant under this Section VI is inadequate or insufficient to enable such applicant satisfactorily to carry out the manufacture or processing for which the applicant applied for such information or assistance; provided, however, that such visits may be further restricted as follows:

(1) to not more than three officers or employees of the applicant at any one time;

(2) to not more than four such visits per year within three years after such person's first application under this subsection relating to the same information.

For such observations and advice the defendant may make a reasonable charge which, in the case of any person referred to in Clause (1) of this subsection shall not exceed that permitted under subsection (A) above for comparable data and, in the case of any person referred to in Clause (2) of this subsection shall be based on the services and advice given, but not to exceed a rate of $150 per day.

(E) If the applicant and the defendant are unable to agree upon what constitutes a reasonable charge, the applicant, the defendant or the plaintiff may apply to this Court for a determination of a reasonable charge. In

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

6

any proceedings for a determination of a reasonable charge, the burden of proof shall be upon the defendant to establish the reasonableness of any charge requested by the defendant.

(F) In the event of an application to a consenting defendant for know-how under this Section VI, by a person, other than a consenting defendant, (a) who is a substantial customer of a consenting defendant for electrical resistance materials or electrical resistance products, (b) who uses electrical resistance products or materials for incorporation as heating elements or heat or corrosive resistant elements in electrical appliances or furnaces sold by said customer, or for resistor purposes in devices sold by said customer, and (c) whose resources are substantially in excess of those of the consenting defendant whose customer applies, any consenting defendant may apply to this Court within thirty (30) days after the application was made, with notice to plaintiff and the applicant, for an order permitting or requiring rejection of such application, which the Court may grant upon the defendant's establishing to the satisfaction of the Court that such rejection is necessary to prevent substantial injury due to the prospective loss of the applicant as a customer and that such rejection would not unduly restrain competition.

(G) No consenting defendant shall be deemed, in connection with the furnishing of any of the foregoing pursuant to this Final Judgment, to have given any implied warranty, representations or guaranty against infringement of patents of others by, or any warranty of success in connection with, its use.

(H) Every agreement under which technical information is furnished pursuant to this Section VI shall contain, if the party furnishing such information shall so request, reasonable provisions requiring the recipient of such information and its subsidiaries to keep such technical information confidential and use the same only for their own manufacturing and selling operations.

(I) Each consenting defendant within ten (10) days from the effective date of this Final Judgment, shall file with the Court and with the plaintiff a listing by categories of all documents it believes come under subsection (A) of this Section VI and a separate list, by customer, of all documents which it believes come under the parenthetical clause in that subsection, and, for a period of five (5) years, to furnish a copy of such lists to any person upon request.

VII

[ *Price Fixing, Division of Markets*]

The consenting defendants are jointly and severally enjoined and restrained from entering into, adhering to, maintaining, furthering, renewing or claiming any rights under, any combination, conspiracy, contract, agreement, understanding, plan, program, or common course of action with any other person, directly or indirectly, to:

(A) Establish, fix, determine, maintain or adhere to prices, differentials, discounts, extras or any other term or element of prices, differentials, discounts or extras for the manufacture, processing or sale to or for third persons of any resistance materials or resistance products;

(B) Divide, allocate or apportion territories, markets or customers for the manufacture, processing or sale of any electrical resistance materials or electrical resistance products;

(C) Refrain from the manufacture, processing or sale of electrical resistance materials or electrical resistance products or refrain from competition with any other person in any territory or market in the manufacture, processing or sale of any such materials or such products;

(D) Hinder, restrict, limit or prevent any other person from manufacturing, processing or selling any electrical resistance materials or electrical resistance products;

(E) Limit the purchase or sale of electrical resistance materials or electrical resistance products to any particular person or group of persons; provided that this shall not prevent lawful contracts for purchases over reasonable periods to secure supplies for such materials or products.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm
7

Nothing in this Section VII shall be deemed to prevent a defendant from (i) giving a distributor an exclusive territory provided the distributor is free to sell in any area and to handle electrical resistance materials and electrical resistance products manufactured by others; (H) selling its business with a one-year covenant not to compete or (iii) making lawful contracts with any person other than an actual or potential competitor of a defendant, that they will not reveal trade secrets of the defendant.

VIII

[ *Future Acquisitions*]

Each consenting defendant is enjoined and restrained from, directly or indirectly:

(A) Circulating outside its own organization and its own distributors any price list or price information relating to the manufacture, processing or sale of any electrical resistance materials or electrical resistance products in advance of the circulation or dissemination of such price list or price information to its own customers and to the trade generally;

(B) Permitting any of its officers, directors, agents or employees to serve simultaneously as an officer, director, agent or employee of any other manufacturer not a subsidiary of the defendant;

(C) Except for the purchase and sale of products bought and sold in the normal course of business, for a period of five (5) years, from the date of entry of this Final Judgment,

(1) acquiring or holding, directly or indirectly, any of the assets or capital stock of, or any financial interest in any other defendant or any other person which becomes a manufacturer other than a wholly-owned subsidiary of the consenting defendant, or acquiring, directly or indirectly, any of the assets or capital stock of, or any financial interest in any other manufacturer, (provided, this limitation shall not apply to a defendant acquiring or holding, directly or indirectly, any of the assets or capital stock of, any financial interest in a manufacturer located outside of the United States of America, its territories or possessions);

(2) knowingly permitting any of its officers, directors, or managerial or policy-making agents or employees to acquire or hold, directly or indirectly, any of the assets or capital stock of, or any financial interest in, any other defendant or any person which becomes a manufacturer, or to acquire, directly or indirectly, any of the assets or capital stock of, or any financial interest in, any manufacturer.

(D) Hindering, restricting, limiting or preventing, or attempting to hinder, restrict, limit or prevent any person from serving as a dealer or distributor of or for electrical resistance materials or electrical resistance products manufactured, processed or sold by any other person;

(E) Hindering, restricting, limiting or preventing, or attempting to hinder, restrict, limit or prevent except for lawful action to prevent patent infringement or to protect property rights in trade secrets, any other person from engaging in the manufacture, processing or sale of any electrical resistance materials or electrical resistance products;

(F) Entering into, adhering to, maintaining, furthering, renewing or claiming any rights under, any contract, agreement, understanding, plan or program with any other person, the purpose or effect of which is to hinder, restrict, limit or prevent either (i) such defendant or (ii) any other person, from granting a license or sublicense under any patent or patents whether owned or controlled by such defendant or such other person. This subsection shall not be deemed to prohibit the mere assignment of any patent or the grant of any exclusive license under any patent if such license grants sublicensing rights.

IX

[ *Illegal Contract Provisions*]

(A) Each consenting defendant is ordered and directed:

(1) to cancel within thirty (30) days after the effective date of this Final Judgment each provision of each contract to which it may be a party which is contrary to any of the provisions of this Final Judgment;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm
8

(2) to file with this Court and serve upon the plaintiff an affidavit setting forth the fact and manner of its compliance with the foregoing subsection (1).

(B) The consenting defendants, and each of them, are jointly and severally enjoined and restrained from entering into, adhering to, maintaining, furthering or claiming any rights under any contract, agreement, plan or program which is or shall be contrary to or inconsistent with any of the provisions of this Final Judgment.

X

[ *Compliance*]

(A) For the purpose of securing compliance with this Final Judgment and for no other purpose, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to any consenting defendant made to its principal office, be permitted, subject to any legally recognized privilege:

(1) access, during the office hours of said defendant, to those books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of said defendant which relate to any matter contained in this Final Judgment;

(2) subject to the reasonable convenience of said defendant and without restraint or interference from it, to interview officers or employees of any defendant, who may have counsel present, regarding any such matters.

(B) Upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, said defendant shall submit such reports in writing, and under oath or affirmation if so requested, with respect to the matters contained in this Final Judgment as may from time to time be necessary to the enforcement of this Final Judgment.

(C) No information obtained by the means provided in this Section X shall be divulged by any representatives of the Department of Justice to any person other than a duly authorized representative of the Executive Branch of the plaintiff except in the course of legal proceedings to which the United States is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law.

XI

[ *Jurisdiction Retained*]

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the amendment or modification of any of the provisions thereof, for the enforcement of compliance therewith, and for the punishment of violations thereof.

**Appendix A**

| Patent No. | Patent Date | Inventor | Filing Date |
|---|---|---|---|
| 2,581,420 | 1/8/52 | James M. Lohr | 9/23/49 |
| 2,687,954 | 8/31/54 | James M. Lohr | 10/19/51 |
| 2,687,956 | 8/31/54 | James M. Lohr | 12/28/51 |
| Reissue No.24,243 | 12/4/56 | James M. Lohr | 6/29/56 |
| Reissue No.24,242 | 12/4/56 | James M. Lohr | 6/29/56 |
| Reissue No. 24,244 | 12/4/56 | James M. Lohr | 6/29/56 |
| 2,587,275 | 2/26/52 | Francis E. Bash | 9/23/49 |

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm
3

US. v. DRIVER-HARRIS CO., ET AL.
Civil No.: 942-56
Year Judgment Entered: 1964

**Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. Driver-Harris Company, Alloy Metal Wire Company, Inc., and its successor (H. K. Porter Company (Delaware)), Wilbur B. Driver Company, Hoskins Manufacturing Company, and C. O. Jelliff Manufacturing Corporation., U.S. District Court, D. New Jersey, 1964 Trade Cases ¶71,234, (Dec. 2, 1964)**

Click to open document in a browser

United States v. Driver-Harris Company, Alloy Metal Wire Company, Inc., and its successor (H. K. Porter Company (Delaware)), Wilbur B. Driver Company, Hoskins Manufacturing Company, and C. O. Jelliff Manufacturing Corporation.

1964 Trade Cases ¶71,234. U.S. District Court, D. New Jersey. Civil No. 942-56. Entered December 2, 1964. Case No. 1312 in the Antitrust Division of the Department of Justice.

### Sherman Act

**Price Fixing—Electrical Resistance Products and Materials—Consent Judgment.**—An electrical resistance products and materials manufacturer was required by a consent judgment to develop new, independently arrived at price lists and was prohibited from fixing prices.

**Department of Justice Enforcement—Compulsory Licensing of Electrical Resistance Products Patents—Consent Judgment.**—An electrical resistance products and materials manufacturer was required by a consent judgment to grant reasonable and non-exclusive patent licenses and to provide actual or potential manufacturers with know how.

**Refusal to Deal—Electrical Resistance Products and Materials—Consent Judgment.**—An electrical resistance products and materials manufacturer was prohibited by a consent judgment from refusing to deal.

For the plaintiff: William H. Orrick, Jr., Assistant Attorney General, William D. Kilgore, Jr., Donald F. Melchior, and Herbert G. Schoepke, Attorneys, Department of Justice.

For the defendant: McCarter & English, by Eugene M. Haring, for H. K. Porter Company, Inc.

### Final Judgment

SHAW, *District Judge:* Plaintiff, United States of America, having filed its complaint herein on December 5, 1956; the defendant, H. K. Porter Company, Inc., having appeared and filed its answer to such complaint, denying the substantive allegations thereof, and the plaintiff and said defendant, by their respective attorneys, having consented to the entry of this Final Judgment herein;

Now, therefore, before the taking of any testimony and without trial or adjudication of any issue of fact or law, and upon consent of the parties hereto, and the Court being advised and having considered the matter, it is hereby

Ordered, adjudged and decreed as follows:

**I**

This Court has jurisdiction of the subject matter of this action and of the parties hereto. The complaint states claims upon which relief may be granted against the defendant consenting hereto, under Sections 1 and 2 of the Act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

**II**

As used in this Final Judgment:

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

(A) "Person" shall mean any individual, partnership, firm, association, corporation, or any other business or legal entity;

(B) "Resistance materials" shall mean (1) electrical resistance materials, and (2) materials sold by a defendant (a) having a composition substantially similar to electrical resistance materials or (b) for thermocouple or spark plug purposes, and (3) tubing, wire, ribbon, strip or rod sold by a defendant for heat resistant purposes in connection with the flow of electricity;

(C) "Resistance products" shall mean wire, ribbon, strip, rod or tubing made from resistance materials;

(D) "Electrical resistance materials" shall mean any alloy or any metallic or other element, or any combination of elements now or which may be

(1) produced, processed, sold or received by a defendant, which is recognized or represented by such defendant as having electrical resistance properties (including controllable and reproducible electrical resistivity or temperature coefficients of resistance) suitable for electrical resistance uses; or

(2) manufactured, sold, distributed, or received by a defendant for electrical resistance purposes, or

(3) known or recognized generally in the trade as an electrical resistance material;

(E) "Electrical resistance products" shall mean tubing, wire, ribbon, strip or rod made from electrical resistance materials;

(F) "Manufacturer" shall mean any person engaged in the manufacture or drawing or processing (such as enameling, insulating, oxidizing or coiling) of electrical resistance materials or electrical resistance products.

(G) "Patents" shall mean any, some or all claims of patents covering the manufacture, use or sale of electrical resistance materials or electrical resistance products, including any divisions, reissues or extensions of such patents, or applications therefor.

(H) "Subsidiary" shall mean any corporation controlled by, or more than 50% of whose, outstanding stock entitled to vote is held by one person;

(I) "Bid" shall mean a bid for furnishing electrical resistance materials or electrical resistance products pursuant to a formal written invitation for a bid made by a prospective customer who the defendant knows or has reason to know has also submitted the same request for a bid to another person. It shall not include the ordinary solicitation of orders by a defendant from a customer or prospective customer nor the ordinary quotation to a customer or prospective customer.

(J) "Consenting defendant" or "consenting defendants" shall mean only a defendant or defendants which shall have consented to the terms of this Final Judgment.

III

(A) Except as hereinafter qualified and limited by the terms of subparagraph (B) immediately following, the provisions of this Final Judgment shall apply solely to the consenting defendant, to each of its subsidiaries, successors and assigns, and to each of its officers, directors, agents and employees, and to all other persons in active concert or participation with the consenting defendant who shall have received notice of this Final Judgment by personal service or otherwise.

(B) The provisions of this Final Judgment shall not apply to (1) acts, contracts, agreements, arrangements, understandings, plans or programs of foreign subsidiaries of the consenting defendant unless such acts, contracts, agreements, arrangements, understandings, plans or programs concern the foreign or domestic commerce of the United States; (2) transactions solely between the consenting defendant and its subsidiaries and the officers, directors, agents and employees of either when acting in such capacity; (3) any officers, manegerial or policy making employees of H. K. Porter Company, Inc., except those whose duties relate to the operations of the Riverside-Alloy Metal Division of H. K. Porter Company, Inc., (4) the operations of any division or subsidiary of H. K. Porter Company, Inc., except the Alloy Works of Riverside-Alloy Metal Division; provided,

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

however, that this Final Judgment shall be applicable to any division or subsidiary of H. K. Porter Company, Inc., and any officers, managerial or policy making employees thereof, which has been or may hereafter become a manufacturer or seller of resistance materials, resistance products, electrical resistance materials, of electrical resistance products.

(C) The consenting defendant is ordered and directed:

(1) To serve a copy of this Final Judgment upon,

(a) each present member of its Board of Directors;

(b) each of its present and future vice presidents and chief managerial officers who are not members of its Board of Directors and whose duties relate to the operations of its Riverside-Alloy Metal Division or the Alloy Works of said division, or to the operations of any of its divisions or subsidiaries which have been or may hereafter become a manufacturer or seller of resistance materials, resistance products, electrical resistance materials, or electrical resistance products.

(c) the present and future chief executive officers of each of its subsidiaries engaged in the manufacture, processing or sale of resistance materials or resistance products; and

(2) Within thirty (30) days after the effective date of this Final Judgment, to file with this Court, and serve upon, the plaintiff, an affidavit as to the fact and manner of its compliance, as to its present officers and directors, with this subsection (C), setting forth in said affidavit the name, position and address of each person upon whom a copy of this Final Judgment at the time shall have been served as herein ordered and directed.

(D) The consenting defendant is ordered and directed for a period of five (5) years after the effective date of this Final Judgment to furnish, without charge, to any person requesting the same, a copy of this Final Judgment together with a copy of the affidavit required to be filed by subsection (B) of Section V hereof.

IV

The consenting defendant is ordered and directed:

(A) With respect to its domestic and Canadian operations, to cancel each of its current price lists pertaining to resistance materials or resistance products and individually to determine new prices in lieu thereof for such materials and products then '-being manufactured or offered for sale by the defendant; such new prices to be individually determined by the defendant on the basis; of its own costs and its own judgment as to margins of profit and other lawful considerations; and after the effective date of this Final Judgment to issue new price lists containing the prices determined in accordance with this subsection (A) and to serve upon the plaintiff copies of work papers used by it in determining the prices contained in such new price lists. New price lists covering electrical resistance materials and electrical resistance products in the form of rod shall be issued and served upon plaintiff thirty (30) days after the effective date of this Final Judgment. New price lists covering resistance materials and resistance products other than rod shall be issued and served upon plaintiff ninety (90) days after the effective date of this Final Judgment. Cancellation of said current lists shall be effective as of the date fixed for the issuance of the new price lists covering the respective materials and products;

(B) If the consenting defendant has sold to or processed for, or hereafter sells to or processes for, any person any resistance material or resistance product, either directly or through regularly designated distributors, to sell to or process for, or cause such distributors to sell to or process for, any other person on the same functional industry level as the defendant's other customers, upon request of such other persons and upon uniform and nondiscriminatory prices and other terms and conditions, except as otherwise permitted by way of defense under the Robinson-Patman Act; and such defendant and such distributors shall hold themselves out as ready and willing so to sell or process; provided, however, that in cases of short supply the defendant shall make a reasonable allocation among its customers, but not to the exclusion of new customers;

This subsection (B) shall not require the defendant (i) to submit any bid, (ii) to continue to sell any size or line of material or products which it discontinues making, or (iii) to sell to a person a resistance material or resistance

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm
3

product designated by such person as having been made by the defendant for a particular customer if (1) such material or product has been made by the defendant according to specification developed by the particular customer without the assistance of the defendant and (2) the defendant has not during the preceding year made an identical or substantially identical material or product for any other customer, and (3) if such defendant after having made a request therefor has not secured the consent of such customer to make such sales;

(C) To file with the Assistant Attorney General in charge of the Antitrust Division within ten (10) days after its execution a copy of any contract or agreement relating to activities covered by this Final Judgment (other than orders, contracts or agreements relating to routine sales and purchases and which do not create any obligation upon either party thereto extending more than six months) entered into within a period of five (5) years after the effective date of this Final Judgment between (i) such defendant and any other defendant and (ii) such defendant and any other manufacturer or distributor;

(D) To retain any and all of its records relating to activities covered by this Final Judgment for a period of ten (10) years from the date of the making thereof except that this subsection (D) shall not require the retention of routine sales and purchase data longer than seven (7) years.

V

(A) The consenting defendant is ordered and directed to grant, to the extent of its legal right to do so, to any person making written request therefor, a nonexclusive license for the life of a patent, or patents, to make, have made, use and sell electrical resistance materials or electrical resistance products under any, some or all of the patents as the applicant may request which on the date of entry of this Final Judgment are owned or controlled by the defendant, including the patents listed in Appendix A hereto, or under which it has a right to issue sublicenses, or which within five (5) years from the date of entry of this Final Judgment, are issued to or acquired by the defendant, or under which it obtains sublicensing rights within such period.

(B) The consenting defendant is ordered and directed, within sixty (60) days after the effective date of this Final Judgment, to file with this Court, and serve upon the plaintiff, an affidavit showing separately, as of that date, the number, date of issue (or filing as to applications) and name of owner of each existing patent (other than those listed in Appendix A) required to be licensed under this Final Judgment.

(C) The consenting defendant is enjoined and restrained from including in any license issued pursuant to subsection (A) of this Section V any restriction or limitation whatsoever except that:

(1) A reasonable royalty may be charged, which royalty shall be uniform and nondiscriminatory as among licensees procuring the same rights under the same patents;

(2) Reasonable provisions may be made for periodic reports by the licensee to the defendant as to the amount of royalties due and inspection of the books and records of the licensee by an independent auditor or any other person acceptable to both defendant and the licensee, who shall report to the defendant only the amount of the royalty due and payable;

(3) Reasonable provisions may be made for cancellation of the license upon failure of the licensee to pay the royalties or permit inspection of his books and records as herein provided;

(4) The license may be made nontransferable and must provide that the licensee may cancel the license at the end of one (1) year and thereafter at any time by giving to the defendant sixty (60) days' notice in writing;

(5) The license may require such patent markings as may be required by statute.

(D) Upon receipt of a written request for a license under the provisions of subsection (A) hereof, defendant shall advise the applicant, in writing, within thirty (30) days, of the royalty it deems reasonable for the patent or patents to which the application pertains. If such applicant and defendant are unable to agree upon what constitutes a reasonable royalty within sixty (60) days from the date the written application for the license was received by the defendant, either the applicant or defendant may, upon notice to the plaintiff, apply to this Court for the determination of a reasonable royalty. In any such proceeding the burden of proof shall be upon the defendant to establish the reasonableness of any royalty requested. Pending the completion of any such negotiations or court

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

4

proceeding, the applicant shall have the right to make, have made, use and vend under the patent or patents to which his application pertains without payment of royalty or other compensation, but subject to the following provisions: Defendant may, upon notice to the plaintiff, apply to this Court to fix an interim royalty rate pending final determination of what constitutes a reasonable royalty. If this Court fixes such interim royalty rate, defendant shall then issue and the applicant shall accept a license providing for the periodic payment of royalties at such interim rate from the date upon which the applicant requested the license. If the applicant fails to accept such license or fails to pay the interim royalty in accordance therewith, such action may be grounds for the rejection or dismissal of his application for a license; in the case of such rejection or dismissal, the applicant shall pay any royalties found by the Court to be due to the defendant. Whether or not an interim royalty is fixed by the Court, a final Court determination of a reasonable royalty shall be applicable to the applicant for a license from the date upon which the applicant requested such license, and, from the date of such determination, to any other licensee, at its option, then having the same rights under the same patents.

(E) Nothing herein shall prevent any applicant from attacking, in the aforesaid proceedings or in any other controversy, the validity or scope of any of the patents, nor shall this Final Judgment be construed as imputing any validity or value to any of said patents.

(F) The consenting defendant is enjoined and restrained from (i) granting, after the date of entry of this Final Judgment, any license or sublicense under any patents to which this Section V shall apply, except in accordance with, and pursuant to, the terms of this Final Judgment, and (ii) taking or accepting [for a period of five (5) years] after the date of entry of this Final Judgment, any right, license or immunity, under any patent owned or controlled by any person other than such defendant, which right, license or immunity is by its terms, or in fact, exclusive to the defendant unless such defendant is also granted the right to grant sublicenses to others as required by this Final Judgment (for the purpose of this subparagraph (ii), any right or immunity under a patent shall be deemed to be a license subject to the provisions of this Section V).

(G) The consenting defendant is enjoined and restrained from making any sale or other disposition of any patent or rights in or under patents which deprives it of the power or authority to grant the licensees required by this Section V unless the purchaser, transferee or assignee shall file with this Court, and serve upon the plaintiff, prior to consummation of any such transaction, its consent to be bound by the applicable provisions of this Section V with respect to such patent.

(H) The consenting defendant is enjoined and restrained from using or attempting to use any foreign patent, or any rights under any foreign patent, to hinder, restrict, limit or prevent any person licensed pursuant to this Section V from exporting from the United States any electrical resistance materials or electrical resistance products manufactured in the United States pursuant to such license.

(I) The consenting defendant is enjoined and restrained from maintaining, instituting or threatening to institute any action, counterclaim, set-off, suit or other proceeding against any person for use of or any act of infringement of any existing patent alleged to have occurred prior to the effective date of this Final Judgment.

## VI

(A) For five (5) years after the effective date of this Final Judgment, the consenting defendant is ordered and directed, upon written request therefor from any actual or potential manufacturer within the United States or any State, territory or possession thereof, to furnish to such applicant copies of any technical manuals, books of instructions, drawings, specifications, blueprints, pamphlets, diagrams or other similar documents (other than those supplied to the defendant by a customer who has developed them for its use without assistance by the defendant, and which the customer, upon request by the defendant, refuses to permit to be made available) which the applicant desires owned by or subject to the control of the defendant on the effective date of this Final Judgment, and which documents have been used, or prepared for use, by the defendant in the commercial manufacture of electrical resistance materials or electrical resistance products for the purpose of melting only. For this data the defendant may charge the applicant a reasonable amount not to exceed one thousand and no/100 ($1,000.00) Dollars.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

5

A-159

(B) The consenting defendant is ordered and directed, upon written request of any person, licensed under any patent or patents pursuant to Section V of this Final Judgment, to furnish during the life of the patent or patents to such licensee such of the defendant's technical information as the licensee may request as may be necessary for a person skilled in the art of metal melting technology to practice the invention or inventions of any of the patents licensed by such defendant to the licensee, in such licensee's own melting of electrical resistance materials or electrical resistance products. For this information the defendant may make a reasonable charge which shall be more than the cost to the defendant of furnishing such information, but in no event more than one thousand and no/100 ($1,000.00) Dollars.

(C) Upon receipt within a reasonable time of a written application from any actual or potential manufacturer representing that the written technical information furnished to such applicant by the defendant pursuant to subsections (A) or (B) of this Section VI is inadequate or insufficient to enable such applicant satisfactorily to practice the inventions, or to perform the said manufacturing processes for which it sought information under said subsections, and specifying in reasonable detail the difficulties experienced, such defendant is ordered and directed to make available to such applicant, if feasible, such additional written information relating to such technical information relating to melting as may be reasonably necessary to enable the personnel of the applicant skilled in the art of metal melting technology to practice the inventions or to manufacture under the specific processes, and if not feasible or sufficient, to make available at reasonable times and for reasonable periods, and without subjecting defendant to hardship, technically qualified personnel from among its own employees for consultation with such applicant at the applicant's place of manufacture regarding the said inventions or manufacturing processes for which the applicant sought information. This subsection (C) shall not require the defendant to send any person outside of the United States. For this data or service the defendant may make a reasonable charge, provided, however, that if such written data were within the control of the defendant at the time when defendant furnished the data under subsections (A) or (B) above, no charge for such written data shall be made unless agreeable to the applicant or unless defendant shows to the satisfaction of the Court that it could not reasonably have contemplated that the applicant would need such written data.

(D) Any person entitled and qualified to receive the documents under subsection (A) of this Section VI, upon written application to the defendant shall be permitted at his own expense and at and for reasonable times, to visit the principal plant of such defendant performing such operations for the purpose of observing and being advised as to the methods, processes, machines and equipment, in use at or before the effective date of this Final Judgment and then being used by such defendant in the melting of electrical resistance materials or electrical resistance products, if (1) within five years from such effective date such person shows to the satisfaction of the defendant, or to the satisfaction of the plaintiff in the event of failure to satisfy the defendant, that he does not need or desire information or assistance otherwise provided for in this Section VI, or (2) such person represents that the information or assistance furnished to such applicant by the defendant under this Section VI is inadequate or insufficient to enable such applicant satisfactorily to carry out the manufacture or processing for which the applicant applied for such information or assistance; provided, however, that such visits may be further restricted as follows:

(1) to not more than three officers or employees of the applicant at any one time;

(2) to not more than four such visits per year within three years after such person's first application under this subsection relating to the same information.

For such observations and advice the defendant may make a reasonable charge which, in the case of any person referred to in Clause (1) of this subsection shall not exceed that permitted under subsection (A) above for comparable data and, in the case of any person referred to in Clause (2) of this subsection shall be based on the services and advice given, but not to exceed a rate of $150 per day.

(E) If the applicant and the defendant are unable to agree upon what constitutes a reasonable charge, the applicant, the defendant or the plaintiff may apply to this Court for a determination of a reasonable charge. In any proceedings for a determination of a reasonable charge, the burden of proof shall be upon the defendant to establish the reasonableness of any charge requested by the defendant.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

6

(F) In the event of an application to the consenting defendant for know-how under this Section VI, by a person, other than a consenting defendant, (a) who is a substantial customer of a consenting defendant for electrical resistance materials or electrical resistance products, (b) who uses electrical resistance products or materials for incorporation as heating elements or heat or corrosive resistant elements in electrical appliances or furnaces sold by said customer, or for resistor purposes in devices sold by said customer, and (c) whose resources are substantially in excess of those of the consenting defendant whose customer applies, the consenting defendant may apply to this Court within thirty (30) days after the application was made, with notice to plaintiff and the applicant, for an order permitting or requiring rejection of such application, which the Court may grant upon the defendant's establishing to the satisfaction of the Court that such rejection is necessary to prevent substantial injury due to the prospective loss of the applicant as a customer and that such rejection would not unduly restrain competition.

(G) The consenting defendant shall not be deemed, in connection with the furnishing of any of the foregoing pursuant to this Final Judgment, to have given any implied warranty, representations or guaranty against infringement of patents of others by, or any warranty of success in connection with, its use.

(H) Every agreement under which technical information is furnished pursuant to this Section VI shall contain, if the party furnishing such information shall so request, reasonable provisions requiring the recipient of such information and its subsidiaries to keep such technical information confidential and use the same only for their own manufacturing and selling operations.

(I) The consenting defendant within ten (10) days from the effective date of this Final Judgment, shall file with the Court and with the plaintiff a listing by categories of all documents it believes come under subsection (A) of this Section VI and a separate list, by customer, of all documents which it believes come under the parenthetical clause in that subsection, and, for a period of five (5) years, to furnish a copy of such lists to any person upon request.

VII

The consenting defendant is enjoined and restrained from entering into, adhering to, maintaining, furthering, renewing or claiming any rights under, any combination, conspiracy, contract, agreement, understanding, plan, program, or common course of action with any other person, directly or indirectly, to:

(A) Establish, fix, determine, maintain or adhere to prices, differentials, discounts, extras or any other term or element of prices, differentials, discounts or extras for the manufacture, processing or sale to or for third persons of any resistance materials or resistance products;

(B) Divide, allocate or apportion territories, markets or customers for the manufacture, processing or sale of any electrical resistance materials or electrical resistance products;

(C) Refrain from the manufacture, processing or sale of electrical resistance materials or electrical resistance products or refrain from competition with any other person in any territory or market in the manufacture, processing or sale of any such materials or such products;

(D) Hinder, restrict, limit or prevent any other person from manufacturing, processing or selling any electrical resistance materials or electrical resistance products;

(E) Limit the purchase or sale of electrical resistance materials or electrical resistance products to any particular person or group of persons; provided that this shall not prevent lawful contracts for purchases over reasonable periods to secure supplies for such materials or products.

Nothing in this Section VII shall be deemed to prevent the defendant from (i) giving a distributor an exclusive territory provided the distributor is free to sell in any area and to handle electrical resistance materials and electrical resistance products manufactured by others; (ii) selling its business with a one-year covenant not to compete or (iii) making lawful contracts with any person other than an actual or potential competitor of a defendant, that they will not reveal trade secrets of the defendant.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

7

A-161

**VIII**

The consenting defendant is enjoined and restrained from, directly or indirectly:

(A) Circulating outside its own organization and ns own distributors any price list or price information relating to manufacture, processing or sale of any electrical resistance materials or electrical resistance products in advance of the circulation or dissemination of such price list or price information to its own customers and to the trade generally;

(B) Permitting any of its officers, directors, agents or employees to serve simultaneously as an officer, director, agent or employee of any other manufacturer not a subsidiary of the defendant;

(C) Except for the purchase and sale of products bought and sold in the normal course of business, for a period of five (5) years, from the date of entry of this Final Judgment,

(I) acquiring or holding, directly or indirectly, any of the assets or capital stock of, or any financial interest in any other defendant or any other person which becomes a manufacturer other than a wholly owned subsidiary of the consenting defendant, or acquiring, directly or indirectly, any of the assets or capital stock of, or any financial interest in any other manufacturer, (provided, this limitation shall not apply to the defendant acquiring or holding, directly or indirectly, any of the assets or capital stock of, or any financial interest in a manufacturer located outside of the United States of America, its territories or possessions);

(2) knowingly permitting any of its officers, directors, or managenal or policy-making agents or employees to acquire or hold, directly or indirectly, any of the assets or capital stock of, or any financial interest in, any other defendant or any person which hereafter becomes a manufacturer, or to acquire, directly or indirectly, any of the assets or capital stock of, or any financial interest in, any such manufacturer.

(D) Hindering, restricting, limiting or preventing, or attempting to hinder, restrict, limit or prevent any person from serving as a dealer or distributor of or for electrical resistance materials or electrical resistance products manufactured, processed or sold by any other person;

(E) Hindering, restricting, limiting or preventing, or attempting to hinder, restrict, limit or prevent except for lawful action to prevent patent infringement or to protect property rights in trade secrets, any other person from engaging in the manufacture, processing or sale of any electrical resistance materials or electrical resistance products;

(F) Entering into, adhering to, maintaining, furthering, renewing or claiming any rights under, any contract, agreement, understanding, plan or program with any other person, the purpose or effect of which is to hinder, restrict, limit or prevent either (i) such defendant or (ii) any other person, from granting a license or sublicense under any patent or patents whether owned or controlled by such defendant or such other person. This subsection shall not be deemed to prohibit the mere assignment of any patent or the grant of any exclusive license under any patent if such license grants sublicensing rights.

**IX**

(A) The consenting defendant is ordered and directed:

(1) to cancel within thirty (30) days after the effective date of this Final Judgment each provision of each contract to which it may be a party which is contrary to any of the provisions of this Final Judgment;

(2) to file with this Court and serve upon the plaintiff an affidavit setting forth the fact and manner of its compliance with the foregoing subsection (1).

(B) The consenting defendant is enjoined and restrained from entering into, adhering to, maintaining, furthering or claiming any rights under any contract, agreement, plan or program which is or shall be contrary to or inconsistent with any of the provisions of this Final Judgment.

**X**

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm
8

A-162

(A) For the purpose of securing compliance with this Final Judgment and for no other purpose, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to the consenting defendant made to its principal office, be permitted, subject to any legally recognized privilege:

(1) access, during the office hours of said defendant, to those books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of said defendant which relate to any matter contained in this Final Judgment;

(2) subject to the reasonable convenience of said defendant and without restraint or interference from it, to interview officers, or employees of the defendant, who may have counsel present, regarding any such matters.

(B) Upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, said defendant shall submit such reports in writing, and under oath or affirmation if so requested, with respect to the matters contained in this Final Judgment as may from time to time be necessary to the enforcement of this Final Judgment.

(C) No information obtained by the means provided in this Section X shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Executive Branch of the plaintiff except in the course of legal proceedings to which the United States is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law.

XI

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the amendment or modification of any of the provisions thereof, for the enforcement of compliance therewith, and for the punishment of violations thereof.

**Appendix A**

| Patent No. | Patent Date | Inventor | Filing Date |
|---|---|---|---|
| 2,581,420 | 1/8/52 | James M. Lohr | 9/23/49 |
| 2,687,954 | 8/31/54 | James M. Lohr | 10/19/51 |
| 2,687,956 | 8/31/54 | James M. Lohr | 12/28/51 |
| Reissue No. 24,243 | 12/4/56 | James M. Lohr | 6/29/56 |
| Reissue No. 24,242 | 12/4/56 | James M. Lohr | 6/29/56 |
| Reissue No. 24,244 | 12/4/56 | James M. Lohr | 6/29/56 |
| 2,587,275 | 2/26/52 | Francis E. Bash | 9/23/49 |

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

9

US. v. JOHNSON & JOHNSON
Civil No.: 840-64
Year Judgment Entered: 1966

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. Johnson & Johnson., U.S. District Court, D. New Jersey, 1966 Trade Cases ¶71,712, (Apr. 18, 1966)

Click to open document in a browser

United States v. Johnson & Johnson.

1966 Trade Cases ¶71,712. U.S. District Court, D. New Jersey. Civil Action No. 840-64. Entered April 18, 1966. Case No. 1820 in the Antitrust Division of the Department of Justice.

### Sherman and Clayton Acts

**Exclusive Dealing—Preferential Treatment—First Aid and Baby Products—Consent Judgment—**A manufacturer of first aid and baby toiletry products was prohibited by a consent judgment from entering into or enforcing any contract or program requiring a distributor to refrain from or restrict the purchase or display of competitive products ; from refusing to enter into any franchise on the ground that the distributor has failed to refrain from or restrict the purchase or display of competitive products; and from selling to distributors on the condition that the distributor buy other products or his total Requirements from the manufacturer, give preferential rack space to the manufacturer's products, discriminate against products not produced by the manufacturer, or agree to devote any specific amount of rack or display space to the manufacturer's products. **Department of Justice Enforcement—Consent Judgment—Notice of Judgment—**A manufacturer of first aid and baby toiletry products was required by a consent judgment to serve a copy of the judgment upon each member of its board of directors and each of its sales executives or officers, to mail a copy to its distributors, and to publish a statement concerning the judgment in a trade publication.

For the plaintiff: Donald F. Turner, Gordon B. Spivack, William D. Kilgore, Jr., Harry G. Sklarsky, John D. Swartz, William J. Elkins, Edward F. Corcoran, Ronald E. Sommer, Charles F. B. McAleer and Robert J. Ludwig, Attorneys, Department of Justice.

For the defendant: Royall, Koegel & Rogers, Wylis S. Newcomb, George S. Frazza and Harry Heher, Jr.

### Final Judgment

ARTHUR S. LANE, District Judge: Plaintiff, United States of America, having filed its complaint herein on September 17, 1964, and defendant, Johnson & Johnson, having filed its answer thereto denying the substantive allegations thereof; and the parties hereto, by their respective attorneys, having consented to the making and entry of this Final Judgment without trial or adjudication of any issue of fact or law herein, and without admission by any party in respect to any such issue;

Now therefore, before the taking of any testimony and upon said consent of the parties hereto, it is hereby

Ordered, adjudged and decreed as follows:

I

[ *Sherman and Clayton Acts*]

This Court has jurisdiction of the subject matter hereof and the parties hereto. The complaint states claims against defendant upon which relief may be granted under Sections 1 and 2 of the Act of Congress of July 2, 1890, entitled "An Act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act as amended, and under Section 3 of the Act of Congress of October 14, 1914, entitled "An Act to supplement existing laws against unlawful restraints and monopolies and for other purposes," commonly known as the Clayton Act, as amended.

II

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

[ *Definitions*]

As used in this Final Judgment:

(A) "Person" means any individual, corporation, partnership, association, firm or other legal or business entity;

(B) "Defendant" means Johnson & Johnson,, a corporation organized and existing under the laws of the State of New Jersey;

(C) "Food store" means any retail outlet in the United States (such as a grocery store or self-service supermarket) which is substantially engaged in the retail sale of food;

(D) "Products" means any, some or all of the following first aid or baby toiletry articles when sold in food stores: adhesive bandages, adhesive tape, gauze bandages, gauze pads, sterile cotton and sterile cotton balls, first aid kits, baby powder and baby oil;

(E) "J & J Products" means Products manufactured or sold by defendant;

(F) "Distributor" means any person regularly engaged in the business of purchasing Products from the manufacturers thereof for resale in food stores.

(G) "Racks" means self-service shelving located in food stores on which Products are displayed for sale.

III

[ *Applicability*]

The provisions of this Final Judgment applicable to the defendant shall also apply to each of its subsidiaries doing business in the United States; to each of its directors, officers, employees and agents, and to all persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or otherwise.

IV

[ *Notice of Judgment*]

Defendant is ordered and directed: (A)(1) Forthwith to serve a copy of this Final Judgment upon (a) each member of its Board of Directors, and (b) each of its executives and principal officers having responsibility for the sale of J & J Products on a national, regional or divisional basis;

(2) Within ninety (90) days after the date of the entry of this Final Judgment, to file with this Court, and serve upon the plaintiff, an affidavit setting forth the fact and manner of its compliance with the foregoing sub-paragraph (1) including the names, titles and addresses of the persons so served;

(B)(1) Forthwith to mail a copy of this Final Judgment to each distributor to whom defendant, on the date of this Final Judgment and for a period of one year prior thereto, is selling or has sold, J & J Products; and thereafter, for a period of five (5) years after the date of entry of this Final Judgment to any other distributor who purchases J & J Products from defendant;

(2) To publish, within sixty (60) days from the date of entry hereof, a statement in a prominent section of *Super Market News*, setting forth the fact of entry, and the provisions of Section V and VI of this Final Judgment, and to furnish to plaintiff a copy of such edition of *Super Market News*.

(C) For a period of five (5) years after the date of the entry of this Final Judgment, to furnish, without cost, to any person so requesting a copy of this Final Judgment.

V

[ *Distributor Agreements*]

Defendant is enjoined and restrained from directly or indirectly:

---

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

A-166

(A) Entering into, adhering to, maintaining, enforcing or claiming any rights under, or seeking to create or obtain, any contract, agreement, understanding, combination, plan or program with any distributor wherein or whereby such distributor agrees or promises to refrain from, limit or restrict the purchase, promotion, display or sale of Products not manufactured by defendant.

(B) Refusing to enter into, cancelling or threatening to cancel any franchise, contract, agreement or understanding with any distributor for the purchase, distribution, promotion, display or sale of J & J Products on the ground that such distributor has failed or refused to enter into or adhere to any franchise, contract, agreement, understanding, combination, plan or program as described in paragraph V(A) herein.

(C) Selling or offering to sell any J & J Product or Products, or granting or offering to grant any discount, promotion or other allowance or other term or condition relating to the sale of any J & J Product or Products, on or accompanied by any condition or requirement that

(1) the distributor buy any other J & J Product or Products or combination thereof, or any, some or all of his requirements from defendant;

(2) the distributor give preferential treatment or rack space to J & J Products;

(3) the distributor discriminate against Products not manufactured or sold by defendant;

(4) the distributor agree to devote any specific amount or percentage of rack or display space to any J & J Product or Products.

(D) Interfering with, controlling, restricting or attempting to interfere with, control or restrict the right of any distributor to allocate his rack space in accordance with his own independent judgment.

(E) Refusing to sell J & J Products to any distributor because of his failure or refusal to display, or to agree to display J & J Products, on racks owned or controlled by him or because of his failure or refusal to purchase any one or more J & J Products.

Provided, however, that nothing contained in this Final Judgment shall prohibit defendant from offering to distributors for limited periods of time, special promotions relating to the purchase or display of any of its Products, or any combination thereof, at prices or terms of sale more favorable than those otherwise offered by defendant in the ordinary course of its business, provided that:

(1) defendant shall not condition any such special promotion upon the purchaser's agreement not to purchase Products manufactured by persons other than defendant and such special promotion is not offered for the purpose of inducing distributors to curtail their purchases of Products other than J & J Products;

(2) the purchase or refusal to purchase any such special promotional Products by any distributor shall not affect the prices or terms of sale at which such distributor purchases J & J Products in the ordinary course of business and shall not affect or alter in any way the business relationship between said distributor and the defendant; and

(3) nothing in this proviso shall be deemed to permit any act or conduct otherwise unlawful under the Sherman Act or Section 3 of the Clayton Act.

VI

[ *Business Policies*]

Defendant is enjoined and restrained from refusing to sell J & J Products to any distributor, or altering its business relations with any distributor because of such distributor's complaints or criticism with respect to any business policy or practice followed by defendant which is referred to or dealt with in this Final Judgment.

VII

[ *Inspection and Compliance*]

For the purpose of securing compliance with this Final Judgment, and subject to any legally recognized privilege, duly authorized representatives of the Department of Justice shall, upon written request of the

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

Attorney General or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendant, made to its principal office, be permitted: (1) access during regular office hours to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of the defendant relating to any of the subject matters contained in this Final Judgment, and (2) subject to the reasonable convenience of defendant, and without restraint or interference from it, to interview officers or employees of the defendant, who may have counsel present, regarding any such matters; and, upon such request, defendant shall submit such reports in writing to the Department of Justice with respect to matters contained in this Final Judgment as may from time to time be necessary to the enforcement of this Final Judgment. No information obtained by the means provided in this Section VII shall be divulged by any representative of the Department of Justice to any person, other than a duly authorized representative of the Executive Branch of plaintiff, except in the course of legal proceedings to which the United States of America is a party for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

VIII

[ Jurisdiction Retained]

Jurisdiction is retained for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment or for the modification of any of the provisions thereof, and for the enforcement of compliance therewith and punishment of violations thereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

4

US. v. ALUMINIUM LIMITED, ET AL.
Civil No.: 1174-64
Year Judgment Entered: 1966

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. Aluminium Limited, Alcan Aluminum Corporation and National Distillers and Chemical Corporation., U.S. District Court, D. New Jersey, 1966 Trade Cases ¶71,895, (Nov. 4, 1966)

Click to open document in a browser

United States v. Aluminium Limited, Alcan Aluminum Corporation and National Distillers and Chemical Corporation.

1966 Trade Cases ¶71,895. U.S. District Court, D. New Jersey. Civ. No. 1174-64. Entered November 4, 1966. Case No. 1841 in the Antitrust Division of the Department of Justice.

### Clayton Act

**Acquisitions—Aluminum Company—Consent Judgment.**—An aluminum company was required under the terms of a consent judgment to offer for sale the assets of one of two divisions within a nine-month period. If the company is unable to sell one of the divisions within the nine-month period, it may apply to the court for a determination that it has made a good faith effort to find a purchaser and has been unable to do so and, on such determination by the court, it will no longer be required by the judgment to divest itself of either unit.

For the plaintiff: Donald F. Turner, Assistant Attorney General, William D. Kilgore, Jr., Charles D. Mahaffie, Jr., J. E. Waters, Gerald A. Connell, and Robert N. Kaplan, Attorneys, Department of Justice.

For the defendants: Pitney, Hardin & Kipp, for Aluminum Ltd. and Alcan Aluminum Corp. William E. Jackson, of Counsel, for Aluminium Ltd. and Alcan Aluminum Corp.

### Final Judgment

COOLAHAN, District Judge: Plaintiff, United States of America, having filed its complaint herein on December 30, 1964, and defendants having filed their answers to such complaint, denying the substantive allegations thereof; and plaintiff and defendants Aluminium Limited and Alcan Aluminum Corporation, by their respective attorneys, having each consented to the making and entry of this Final Judgment without trial or adjudication of any issue of fact or law herein, and without this Final Judgment constituting any evidence or admission by any party hereto with respect to any such issue;

Now, therefore, before the taking of any testimony, without trial or adjudication of any issue of fact or law herein, and upon consent of the parties hereto, it is hereby

Ordered, adjudged and decreed as follows:

I

This Court has jurisdiction of the subject matter of this action and of the parties hereto. The complaint states a claim upon which relief may be granted against the defendants under Section 7 of the Act of Congress of October 15, 1914, as amended (15 U. S. C. § 18), commonly known as the Clayton Act.

II

As used in this Final Judgment:

(A)"Alcancorp" means defendant Alcan Aluminum Corporation, a corporation organized and existing under the laws of the State of New York with its principal office at Cleveland, Ohio;

(B)"Eligible purchaser" means any person approved by plaintiff, but shall not include defendant Alcan Aluminum Limited (formerly known and sued herein as Aluminium Limited), or any of the subsidiaries, successors, assigns, directors, officers or agents of Alcancorp or of Alcan Aluminium Limited, or any person engaged or which prior

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

to the date of entry of this Final Judgment has announced plans to engage in producing, directly or indirectly, primary aluminum ingot or which has primary aluminum ingot produced for it under a tolling agreement;

(C)"Person" means any individual, partnership, firm, corporation, association, trustee or other business or legal entity;

(D)"Flexalum Division Assets" means those assets acquired by Alcancorp from defendant National Distillers and Chemical Corporation ("National") pursuant to an agreement dated October 8, 1964 (including any changes, additions or improvements thereto made by Alcancorp prior to any disposition thereof pursuant hereto) relating to the manufacture at the Riverside Plant and the sale under the Flexalum trademarks of components for aluminum Venetian blinds, components for aluminum awnings, and aluminum residential siding, including all buildings, machinery, equipment, vehicles, tools and other tangible personal property located at the Riverside Plant and used exclusively in connection with the manufacture of the above-mentioned products, inventories of end-products and related raw materials wherever located, accounts receivable relating to the sale of such products, the Flexalum trademarks, patents and copyrights, machinery in the possession of franchised Flexalum dealers, the franchise agreements, warehouses used in the distribution of the above-mentioned products, and the so called Design Center (except records relating to products other than those mentioned above); said assets to be such as will permit a purchaser to operate with them as a going business concern.

(E)"Riverside Plant" means the Flexalum Division Assets and the plant in Riverside, California acquired by Alcancorp from National pursuant to the aforesaid agreement dated October 8, 1964, and all interests therein, and all real property and fixtures, machinery, equipment, vehicles, tools, furniture, leasehold improvements and other tangible personal property incident to the use and operation of the Plant, inventories of raw materials, work in progress, finished goods, containers, supplies and fuel, and all improvements or additions thereto made from the date of filing of the complaint herein until the date of any disposition of the Plant pursuant hereto;

(F)"Revere Building" means the land and building which are part of the Riverside Plant and were acquired from Revere Copper and Brass, Inc. by National on December 21, 1962; and

(G)"Flexalum trademarks, patents and copyrights" means all trademarks, patents and copyrights relating to Flexalum Division Assets in existence at the time of divestiture pursuant to this decree.

III

The provisions of this Final Judgment applicable to any defendant shall apply to such defendant and its parents, subsidiaries, successors and assigns and to each of their respective agents, officers and directors; and to all persons in active concert or participation with each such defendant who receives actual notice of this Final Judgment by personal service or otherwise. None of the provisions of this Final Judgment shall apply to any person or persons who acquire any of the assets which may be disposed of pursuant to this Final Judgment.

IV

(A) Alcancorp is ordered and directed, within nine months from the date of entry of this Final Judgment, to sell either the Flexalum Division Assets or the Riverside Plant to an eligible purchaser; provided, however, that during the initial six months of such period Alcancorp may condition its acceptance of any offer for the purchase of the Riverside Plant on its inability, within the said six month period, to sell the Flexalum Division Assets pursuant to and in accordance with this paragraph IV; and provided further, that any sale of the Riverside Plant shall be made only to an eligible purchaser which represents that it intends to operate the Plant as an operating business in competition with other firms engaged in the manufacture, production and sale of components for aluminum Venetian blinds, components for aluminum awnings, and aluminum residential siding. Any sale pursuant to this paragraph IV shall be on terms and conditions which are reasonable under the circumstances of this suit. Any sale of the Riverside Plant pursuant to the terms of this Judgment shall be subject to the approval of the Department of Defense.

(B) Alcancorp shall make known the availability of the Flexalum Division Assets and the Riverside Plant for sale by ordinary and usual means for a sale of a business. Alcancorp shall furnish to bona fide prospective eligible

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

A-171

purchasers all necessary information, including *pro forma* statements, regarding the Flexalum Division Assets and the Riverside Plant and the operation thereof, and shall permit them to make such inspections as may be reasonably necessary for the above purpose.

(C) Any purchaser of the Flexalum Division Assets or the Riverside Plant, as the case may be, shall agree to continue all applicable employee benefit plans, collective bargaining agreements, and other conditions of employment, upon terms not substantially less favorable than those provided by Alcancorp.

(D) Alcancorp shall agree as a condition of the sale of the Flexalum Division Assets to segregate the Flexalum Division Assets from its other aluminum fabricating facilities and to relocate the physical assets located at the Riverside Plant relating exclusively to the manufacture of components for aluminum Venetian blinds and awnings to the Revere Building at its expense, or, at the purchaser's expense, to relocate any or all of the Flexalum Division Assets to any other location specified by the purchaser. In the event that any such purchaser elects to have such assets relocated to the Revere Building, Alcancorp shall agree to include the Revere Building among the assets sold to such purchaser. At the option of any such purchaser, Alcancorp shall agree to exclude from the assets sold to the purchaser those which relate exclusively to the manufacture and sale of aluminum residential siding.

(E) As a part of the offer to sell the Flexalum Division Assets or the Riverside Plant pursuant to subparagraph (A) of this paragraph IV, Alcancorp shall agree, at the option of the purchaser:

(i) For a period of six months following the date of sale not to compete with the purchaser in the manufacture or sale of components for aluminum Venetian blinds and aluminum awnings;

(ii) For a period of twelve months following the date of sale not to knowingly solicit the patronage of any customers of the purchaser of the Flexalum Division Assets insofar as such patronage relates to the purchase of components for aluminum Venetian blinds and aluminum awnings; and

(iii) To enter into a contract, for not more than five years, to supply, on standard terms and conditions, the purchaser's requirements for aluminum used in the operation of the acquired assets; provided, that said contract need not obligate Alcancorp to furnish aluminum in an aggregate annual amount exceeding that consumed in the operation of the divested assets during the twelve calendar months immediately preceding sale.

(F) Pending any sale pursuant to the terms of this Final Judgment Alcancorp shall continue the normal operations of the Flexalum Division Assets and of the Riverside Plant and shall take no affirmative action with respect to personnel employed in the operation of those assets which could impair the sale thereof as a going business.

(G) The sale by Alcancorp within the nine-month period provided in subparagraph (A) of this paragraph IV of either the Flexalum Division Assets or the Riverside Plant shall constitute the divestiture ordered and directed by this Final Judgment. If Alcancorp is unable to sell the Flexalum Division Assets or the Riverside Plant in accordance herewith within such nine-month period, it shall have the right to apply to the Court, on notice to plaintiff, for a determination that it has made a bona fide effort to find a purchaser for either the Flexalum Division Assets or the Riverside Plant and has been unable so to do and is not then engaged in negotiations with any prospective purchaser, and on such determination by the Court, Alcancorp shall no longer be required by any provision of this Final Judgment to divest itself of any of the Flexalum Division Assets or the Riverside Plant.

(H) The divestiture ordered and directed by this Final Judgment, when made, shall be made in good faith and shall be absolute and unqualified; provided, however, that Alcancorp may accept and enforce any bona fide lien, mortgage, deed of trust or other form of security on all or any portion of the divested assets given for the purpose of securing to Alcancorp payment of any unpaid portion of the purchase price thereof or performance of the sale transaction and may also enforce any other terms and conditions of the sale transaction as therein provided or as provided by law. In the event that Alcancorp, as a result of the enforcement of any bona fide lien, mortgage, deed of trust or other form of security reacquires possession of the divested assets, then it shall be obliged to offer such assets for sale in accordance with the terms of this Final Judgment.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

3

A-172

(I) Following the entry of this Final Judgment and continuing until the divestiture of the Flexalum Division Assets or the Riverside Plant, or failing such divestiture, until the end of the nine-month period provided in subparagraph (A) of this paragraph IV Alcancorp shall

(i) Render monthly reports to the Assistant Attorney General in charge of the Antitrust Division outlining in detail the efforts made by it to dispose of the Flexalum Division Assets or the Riverside Plant. The first such report shall be rendered within thirty (30) days after the date of entry of this Final Judgment; and

(ii) Report promptly to plaintiff the name of any person making inquiry whom Alcancorp does not believe to be a bona fide prospective eligible purchaser as contemplated by subparagraph (B) above.

V

(A)For the purpose of determining or securing compliance with this Final Judgment and for no other purpose, and subject to any legally recognized privilege, duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General, or of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to Alcancorp at its principal office, be permitted:

(1) Reasonable access, during office hours of Alcancorp, to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of Alcancorp relating to any matters contained in this Final Judgment; and

(2) Subject to the reasonable convenience of Alcancorp and without restraint or interference from it, to interview officers or employees of Alcancorp, who may have counsel present, regarding any such matters.

(B)For the purpose of securing compliance with this Final Judgment, Alcancorp, upon the written request of the Attorney General or of the Assistant Attorney General in charge of the Antitrust Division, shall submit such reasonable reports in writing to the Department of Justice with respect to matters contained in this Final Judgment as may, from time to time, be requested. No information obtained by the means provided in this paragraph V shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Executive Branch of the plaintiff except in the course of court proceedings to which plaintiff is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law.

VI

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification or termination of any of the provisions hereof, for the enforcement of compliance herewith, and for the punishment of violations hereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

4

A-173

**Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. Aluminium Limited, Alcan Aluminum Corp., and National Distillers and Chemical Corp., U.S. District Court, D. New Jersey, 1968 Trade Cases ¶72,631, (Apr. 30, 1968)**

Click to open document in a browser

United States v. Aluminium Limited, Alcan Aluminum Corp., and National Distillers and Chemical Corp.

1968 Trade Cases ¶72,631. U.S. District Court, D. New Jersey. Civil Action No. 1174-64. Filed April 30, 1968. Case No. 1841 in the Antitrust Division of the Department of Justice.

## Clayton Act

**Consent Decree—Compliance—Divestiture—Relief—Deficient Offers.**—A company was granted its application for relief from any further obligation to divest itself of particular assets as a going concern under the terms of a consent decree, since it properly rejected the only two offers made during the nine months alloted by the decree. One offeror had declined to take particular warehouse leases that were essential to creating a viable competitor within the terms of the decree. (Another reason for rejection, the buyer's refusal to assure continued employment of particular personnel, was not considered by the court.) The other was not an "eligible purchaser" under the decree because it had not demonstrated its ability to meet the financial terms set out by the decree.

For the plaintiff: J. E. Waters and Gerald Connell, Dept of Justice.

For the defendants: Pitney, Hardin & Kipp, by Donald B. Kipp (Milbank, Tweed, Hadley & McCloy, by William E. Jackson and Isaac Shapiro, of counsel).

### Opinion

COOLAHAN, District Judge: On December 30, 1964, the United States of America (hereinafter referred to as the plaintiff) filed suit against the above named defendants and moved for a preliminary injunction under Section 7 of the Clayton Act, 15 U. S. C. § 25, for the purpose of enjoining the proposed acquisition of the Aluminum Division of National Distillers and Chemical Corporation (hereinafter referred to as National) by the Alcan Aluminum Corporation (hereinafter referred to as Alcan). Plaintiff prayed that if the proposed merger were not preliminarily enjoined, Alcan, nevertheless, be required to divest itself of the assets acquired from National. This court denied the motion for a preliminary injunction and entered an order permitting the acquisition; the court further ordered that the assets of the acquired company be segregated pending the final determination of the case on the merits.

Prior to the agreed trial date, both counsel for the plaintiff and Alcan entered into negotiations in order to seek to reach a mutually acceptable pre-trial settlement, and at the same time, avoid a long and protracted trial. As a result of these negotiations, a final consent judgment [ 1966 TRADE CASES ¶ 71,895], was agreed upon by the parties and signed by this court on November 4, 1966. Under the terms of this judgment, Alcan was required to offer for sale a portion of the assets acquired from National, namely, either the Flexalum Division assets, located at the Riverside Plant at Riverside, California, or the Riverside Plant itself, to an eligible purchaser. The obligation to sell was to last for duration of nine months; if, at the end of this period an eligible purchaser could not be found, Alcan would then have the right to make application to this court for an order relieving it of its obligation to offer the above assets for sale.

The manufacturing facilities located at the Riverside Plant are utilized in the final processing of aluminum strip into Venetian blinds, awnings, and siding. These three product lines, according to the allegations of the plaintiff's complaint, were the lines of commerce most seriously affected by the proposed merger between Alcan and National. The objective to be achieved, therefore, from the sale of the Flexalum Division assets was the restoration of competition among individual competitors of all three products. Stated differently, the sale of the Flexalum Division assets as a going business concern to an eligible purchaser would create a viable competitor

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

1

capable of carrying on the production of Venetian blinds, awnings, and siding. Unfortunately for those concerned, however, at the expiration of the nine-month period referred to above, Alcan was unable to consummate a sale of these assets; on September 11, 1967, Alcan moved in this court for an order relieving it of its obligation to offer for sale the assets located at the Riverside Plant. The plaintiff presented a memorandum in opposition to the motion and requested a hearing, which was held on December 22, 1967. At the conclusion of testimony and final arguments by both parties, the court took the matter under advisement for further disposition.

At the outset, it would be helpful to briefly outline the events which occurred subsequent to the court's signing of the final consent judgment [ 1966 TRADE CASES ¶ 71,895], on November 4, 1966. Immediately following this date, Alcan commenced preparation to sell the Flexalum Division assets. The financial services of Hammond, Kennedy & Company, a firm specializing in investment and commercial banking, were retained in order to find a purchaser of these assets. At the same time, 1250 preliminary inquiries were mailed to persons who were regarded as possible prospective purchasers. Detailed brochures were then sent to those persons who expressed an interest in purchasing the assets located at Riverside. Persons receiving these brochures numbered approximately 100.

During the nine-month period in which Alcan was obligated to divest itself of the Flexalum Division assets, two proposals were received from prospective purchasers. Both of these, however, were rejected. The first proposal to purchase the above assets was received from a company called Hunter Douglas International Limited. This proposal encompassed only a portion of the assets required to be sold under paragraph 2(d) of the final consent judgment, and was rejected by Alcan on the ground that the proposal did not constitute an offer to purchase the Flexalum Division assets as a going business concern. The second proposal was received from the General Aluminum Corporation one day before the expiration of the nine month period mentioned above. Alcan, however, rejected this proposal and refused to negotiate further, on the ground that the General Aluminum Corporation, an insolvent and inactive corporation, did not qualify as an eligible purchaser under the terms of the final consent judgment.

Thereafter, Alcan brought its present motion for a release of its obligation to sell the Flexalum Division assets, claiming that it had made a bona fide effort to find a purchaser for these assets, that it had been unable to do so, and that it was not engaged in negotiations with any prospective purchaser. In deciding whether to grant or deny Alcan's motion, it is of course necessary for the court to determine whether Alcan's rejection of both the Hunter Douglas and General Aluminum proposals were justifiable under the terms of the final consent judgment. For this reason, a more detailed inquiry into the nature of the proposals and the reasons for their rejection is necessary.

### I. The Hunter Douglas Proposal

Hunter Douglas International Limited is a Canadian subsidiary which is owned by Hunter Douglas Limited, a company which makes and sells aluminum fabricated products everywhere except in the United States. Hunter Douglas Limited sells many of its products under the Flexalum trademark, but because Alcan owns the exclusive rights to the Flexalum trademark for the domestic sale of aluminum fabricated products in the United States, Hunter Douglas Limited never regarded it as feasible to sell its products in this country absent an effective sales organization. Upon learning that the Flexalum Division assets were available for purchase, Hunter Douglas International Limited, which supplies Hunter Douglas Limited and other subsidiaries of Hunter Douglas Limited with raw materials, immediately entered into negotiations with Alcan. These negotiations culminated in a proposal transmitted by Hunter Douglas International Limited (hereinafter referred to as Hunter Douglas) to Alcan on July 7, 1967, the import of which was that Hunter Douglas offered to purchase substantially all of the Flexalum Division assets as defined by paragraph 2(d) of the final consent judgment. Specifically, this offer included inventory, finished goods, accounts receivable, and physical assets consisting mainly of aluminum processing equipment situated at the Riverside Plant. Hunter Douglas, however, was not prepared to include in its offer the assumption of leasehold obligations on five field warehouses operated by Alcan, despite the fact that these warehouse leases were included in paragraph 2(d) of the consent judgment as assets which Alcan was obligated to offer for sale. In addition, Hunter Douglas was unwilling to make a firm commitment with respect to continued employment of certain key warehouse and sales personnel employed by Alcan. Since Alcan regarded

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

A-175

the position taken by Hunter Douglas with respect to both of these matters as untenable, the parties were unable to consummate a final agreement whereby the Flexalum Division assets could be sold. On July 10, 1967, Alcan rejected the Hunter Douglas proposal.

Plaintiff argues that Alcan's rejection was unjustified, and that therefore Alcan's motion for relief should be denied. Alcan of course takes the position that under the terms of the consent judgment, it was not obligated to accept Hunter Douglas' offer to purchase only a portion of the Flexalum Division assets. In addition, Alcan contends that the purposes which motivated the attempted divestiture of these assets could not be realized in the absence of Hunter Douglas' willingness to continue to employ the personnel referred to above. For the reasons stated hereafter, the court is of the opinion that Alcan was justified in rejecting the Hunter Douglas proposal.

Attention shall first be given to the problem raised by Hunter Douglas' refusal to assume the above warehouse leases. The crucial problem present throughout the negotiations between the parties and which underlay their disagreement with respect to the warehouse leases was basically how the Flexalum Division assets could be sold so as to permit the purchaser of these assets to operate them as a going business concern in the United States, thus enabling it to compete effectively in the domestic production and sale of Venetian blinds, awnings, and siding. As was adverted to earlier, the sale of these assets in this matter would help to restore competition in the aluminum byproduct industry. The question arises, however, as to what standard the court must adopt in deciding whether a given proposal to purchase the Flexalum Division assets is one which, if accepted, would result in this type of sale. Alcan's position is that the provisions of the final consent judgment, which were carefully scrutinized by the attorneys for the plaintiff, should be adopted in deciding whether to approve any proposal to purchase these assets, and that since, under paragraph 2(d) of the consent judgment, Alcan was required to offer for sale all warehouses used in the distribution of the three product lines referred to above, the Hunter Douglas proposal, which did not include the assumption of Alcan's leases on the warehouses, was not an offer requiring acceptance. While it need not be decided whether the fact that a given proposal to purchase the Flexalum Division assets departs in any manner from the provisions of the consent judgment would justify a refusal by either Alcan or the plaintiff to approve such proposal, the court, for the reasons which follow, is satisfied that a proposal to purchase the Flexalum Division assets which did not include the assumption of the warehouse leases would not further the objectives of increased competition in the aluminum byproduct industry.

In reaching the above conclusion, the court attaches great importance to the fact that both of the parties to the present proceeding regarded paragraph 2(d) of the final consent judgment, defining the assets which were to be made available by Alcan for sale, as the final determination of those specific assets which would have to be sold in order for a prospective purchaser to operate the Flexalum Division assets as a going business concern. This is evident from the following: When the tentative draft of the consent judgment was submitted by Alcan to attorneys for the plaintiff, the warehouse leases were not included in paragraph 2(d) as part of the definition of the Flexalum assets. The attorneys for the plaintiff, however, refused to approve this draft for the stated reason that the definition of the Flexalum assets had to be phrased in a manner which would make clear that what was being sold was a going business concern and not merely physical assets. According to the plaintiff, this would not be possible unless the warehouse leases were included in paragraph 2(d). Thereafter, the consent judgment was modified to include "warehouses presently used in the distribution of end products" as part of the definition of the Flexalum Division assets. The above clearly indicates to the court that it was considered undesirable for a prospective purchaser of the Flexalum Division assets to carve out for himself those assets defined in paragraph 2(d) which would be profitable for him to purchase and on the other hand, exclude from his offer those assets which he could not utilize effectively in his own operation. In this connection, it should be pointed out that under paragraph 4(d) of the consent judgment, Alcan was required to exclude from the sale of the Flexalum Division assets, at the election of the purchaser, those facilities used in the manufacture and sale of siding. The consent judgment is quite clear, however, that the remaining assets listed under paragraph 2(d) were to be sold in one package.

The plaintiff argues, however, that the rejection by Alcan of the Hunter Douglas proposal was not justified. The thrust of its argument is that Hunter Douglas, having discovered that it would not be financially expedient to

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

assume the warehouse leases, could not be expected to purchase an asset which it could not utilize profitably. Stated differently, Hunter Douglas had the right under the terms of the final consent judgment to purchase only those assets which would enable it to continue to operate its own business as a going business concern. From what has already been said, it is clear that this argument is totally without merit. To again reiterate, the objective to be achieved from the sale by Alcan of the Flexalum Division assets was not to enable Hunter Douglas to purchase those assets which it thought could be utilized profitably in its own operation, but rather to create a successor to Alcan which would be capable of competing effectively in the domestic production and sale of Venetian blinds, awnings, and siding. The suggestion by the Government that these two alternatives can be equated is, in the opinion of the court, plain error.

One final word is in order with respect to the function of the warehouses in connection with Alcan's operation of the Riverside Plant. The market for Venetian blinds, awnings, and siding is a national one, but at the same time, however, orders for these products must be filled promptly. To meet this demand for prompt service, the present warehouse distribution system used by Alcan was put into operation more than twenty years ago. Such a system has made it possible for Alcan and its predecessors to serve effectively the needs of their customers without incurring excessive shipping costs which would be otherwise necessary to distribute its products on a national level. One consequence of operating the Riverside Plant without the benefit of the present distribution system would be the possible loss of distant geographical markets assuming that it continues to be necessary to provide immediate delivery to customers of products ordered. In the court's view, this fact is strong support for the position taken by Alcan with regard to the Hunter Douglas offer, keeping in mind the purposes incident to the sale of the Flexalum Division assets.

In view of the court's disposition of the dispute concerning the warehouse leases, it is unnecessary to consider the refusal by Hunter Douglas to make a commitment for the continued employment of various personnel presently employed by Alcan.

### II. General Aluminum Proposal

Disposition of the problem raised by Alcan's action with respect to the General Aluminum proposal is less difficult. General Aluminum was formerly a corporation engaged in roughly the same business as Alcan. The company is presently insolvent, has no principal place of business, and is totally inactive. In 1966, acute financial problems were encountered which required General Aluminum to sell its assets to satisfy the obligations to secured creditors. When it learned in the spring of 1967 that the Flexalum Division assets had been offered for sale, General Aluminum became interested in acquiring these assets for the purpose of resuming its business operations. On August 3, 1967, the day before the termination of the nine-month period which Alcan had to sell the Flexalum Division assets, General Aluminum submitted a proposal to Alcan in which it offered to purchase all of the assets defined in paragraph 2(d) of the final consent judgment, with the exception of the warehouse leases previously referred to above. Alcan summarily rejected this offer and refused to participate in any further negotiations with General Aluminum. Plaintiff contends that both the rejection and the refusal to negotiate were not made in good faith and were thus a violation of the requirements imposed on Alcan in the court's decree of November 4, 1966. For the reasons stated hereafter, the court finds that the course of action taken by Alcan with respect to the General Aluminum proposal was justifiable under the circumstances.

The pivotal question involved with respect to Alcan's rejection of the General Aluminum proposal and its refusal to negotiate is whether General Aluminum was an "eligible purchaser" as that term is defined in paragraph 2(b) of the final consent judgment in its proposal submitted to Alcan, General Aluminum offered to make a down payment of approximately five per cent of the total purchase price of the Flexalum Division assets, the balance to be paid over a twelve-year period. From the facts recited above, it is quite obvious that General Aluminum could not by itself finance the purchase of these assets, whatever the terms might have been. At the hearing held before the court on December 22, 1967, however, a former officer of the company testified that both Walston & Company and National acceptance Corporation (it is interesting to note that the latter had instituted foreclosure proceedings which led to the sale of General Aluminum's assets) had communicated to him informally that they would furnish adequate funds to finance the purchase of the Flexalum Division assets and also provide sufficient

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

working capital which would permit General Aluminum to resume its operations as an aluminum processor. According to the testimony, Walston's loan was conditional upon its obtaining a security interest in the assets acquired by General Aluminum from Alcan. National Acceptance Corporation required that its loan be secured by receivables and inventory. In Alcan's opinion, however, there were two significant problems with such an arrangement. First, neither Walston & Company nor National Acceptance Corporation ever presented written formal commitments of financial backing to General Aluminum. Any commitment made by either was no more than an oral one. Second, General Aluminum never presented a satisfactory arrangement whereby it could assure Alcan of security to cover the unpaid portion of the purchase price of the Flexalum Division assets. The failure of General Aluminum to alleviate these two problems, in the opinion of the court, gave Alcan sufficient reason to conclude that no useful purpose could be served by continuing to negotiate with General Aluminum.

In conclusion, the court finds that Alcan made a bona fide effort to comply with this court's decree requiring it to offer for sale the assets defined in paragraph 2(d) of the final consent judgment, but despite such efforts, such a sale was never realized. The Hunter Douglas proposal was not one which Alcan could legally accept within the requirements set forth in the final decree of this court because this proposal did not include the assumption of the warehouse leases, an asset required for sale by paragraph 2(d) of the consent judgment. It being firmly established that General Aluminum was not an eligible purchaser within the meaning of paragraph 2(b), Alcan was under no obligation to entertain a proposal by the former to purchase the Flexalum Division assets.

Therefore, the court is of the opinion that Alcan's motion to be relieved of any further obligation to sell the Flexalum Division assets should be granted.

Let an appropriate order be submitted.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

US. v. R.J. REYNOLDS TOBACCO CO.
Civil No.: 345-65
Year Judgment Entered: 1969

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. R. J. Reynolds Tobacco Co., U.S. District Court, D. New Jersey, 1969 Trade cases ¶72,886, (Sept. 22, 1969)

Click to open document in a browser

United States v. R. J. Reynolds Tobacco Co.

1969 Trade cases ¶72,886. U.S. District Court, D. New Jersey. Civil No. 345-65. Entered September 22, 1969. Case No. 1848 in the Antitrust Division of the Department of Justice.

### Clayton and Sherman Acts

**Acquisitions—Corn and Potato Starch Firm by Tobacco Company—Divestiture as Going Concern—Consent Decree.**—A tobacco company that is a substantial purchaser of paper and packaging products was required by a consent decree to divest itself of a subsidiary corn starch producing company that it acquired, divestiture to be as a going, viable concern engaged in the development, research, production, distribution and sale of products produced by the corn wet milling process, including specified products, and the potato starch business that involves the extraction from potatoes and the sale of specified potato products and derivatives. Assets must include substantially the same functional organization as before the acquisition, together with improvements, betterments, replacements and all other assets added by the acquirer or by the acquired and utilized by the latter after the acquisition until divestiture. Divestiture must be made by: (a) sale of assets, either totally or—with government consent—as separate corn starch and potato starch concerns, (b) distribution of stock to the acquirer's shareholders, subject to limitations, (c) sale of stock to the public through an underwriter, or (4) a combination of one or more of such methods. Reacquisition is barred for five years, as is acquisition or holding interests in competitors of the divested firm or engaging in its business.

For the plaintiff: Richard W. McLaren, Asst. Atty. Gen., Charles D. Mahaffie, Jr., W. D. Kilgore, Samuel Karp, Robert N. Kaplan, and Joseph A. Tate, Attys., Dept. of Justice, Washington, D. C.

For the defendant: James D. Carpenter, of Carpenter, Bennett & Morrissey, Taggart Whipple, Davis Polk & Wardwell, Daniel F. Kolb, Guy M. Struve, and Jeffrey Small.

### Final Judgment

COOLAHAN, D. J.: Plaintiff, the United States of America, having filed its amended complaint herein on August 9, 1965; a motion by plaintiff for preliminary injunction having been denied after a hearing thereon; defendant R. J. Reynolds Tobacco Company having filed its answer denying the substantive allegations of such amended complaint, and the parties by their respective attorneys having consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law herein and without this Final Judgment constituting any evidence against or any admission by any party in respect to any such issue.

Now, Therefore, without trial or the taking of testimony or adjudication of any issue of fact or law herein, and upon consent of the parties hereto, it is hereby

Ordered, Adjudged and Decreed as follows:

I

#### [ *Jurisdiction* ]

This Court has jurisdiction of the subject matter hereof and of the parties hereto. The complaint states claims upon which relief may be granted against defendant under Section 1 of the Act of Congress of July 2, 1890, entitled "An Act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended, and under Section 7 of the Act of Congress of October 15, 1914, entitled "An

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

Act to supplement existing laws against unlawful restraints and monopolies and for other purposes," commonly known as the Clayton Act, as amended.

## II

### [ Definitions]

As used in this Final Judgment:

(A) "Person" means any individual, partnership, firm, corporation, association or other business or legal entity;

(B) "Penick & Ford" means Penick & Ford, Limited, a Delaware corporation and a wholly owned subsidiary of defendant;

(C) "Subsidiary" means any person controlled by, or more than fifty percent of whose voting stock is directly or indirectly controlled by, defendant.

## III

### [ Applicability]

The provisions of this Final Judgment shall apply to defendant and to each of its United States subsidiaries, successors and assigns, and to each of their respective officers, directors, agents, employees, successors and assigns, and to those persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise. A purchaser of the assets or stock pursuant to this Final Judgment shall not be considered a successor bound by this Final Judgment.

## IV

### [ Divestiture]

Defendant is ordered and directed, within two years from the date of entry of this Final Judgment, to divest itself of all its interest in Penick & Ford as a going, viable concern engaged in (a) the development, research, production, distribution and sale of products produced by the corn wet milling process, including starch, dextrin, gums, syrup, gluten feed, gluten meal, grits and crude corn oil, and related corn derivatives, and (b) the potato starch business which involves the extraction from potatoes and the sale of potato starch, potato flake, potato flour, and related potato derivatives.

There shall be included in the said going, viable concern divested, substantially those assets, with substantially the same functional organization, as were held and utilized in whole or in part in the conduct of the businesses referred to in (a) and (b) above by the former company known as Penick & Ford, Ltd., Incorporated at the time of its acquisition by defendant in 1965, coupled with such improvements, betterments, replacements and all other assets which have been added by defendant or Penick & Ford and utilized by Penick & Ford since such acquisition up to the date of the divestiture. In any instance where, at the time of entry of the Final Judgment, any such facility or asset is used by Penick & Ford in conjunction with any other phase of defendant's business, such as the grocery business, preference shall be given to transfer of such facility or asset to Penick & Ford, or a suitable alternative facility or asset shall be substituted therefor.

## V

### [ Method of Divestiture]

The divestiture ordered in Section IV above may be made by:

(A) A negotiated sale of all the assets of Penick & Ford, provided that if plaintiff consents divestiture of Penick & Ford as separate corn starch and potato starch concerns may be accomplished;

(B) A negotiated sale of some or all of the stock of Penick & Ford;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

A-181

(C) Distribution of the stock of Penick & Ford (i) to holders of defendant's common stock on a pro rata basis or (ii) to holders of defendant's common and/or preferred stock who shall elect to exchange shares of such stock for shares in Penick & Ford or (iii) to holders of transferable rights distributed to the holders of defendant's common stock on a pro rata basis to purchase the stock of Penick & Ford;

(D) Sale or sales of the stock of Penick & Ford to the public through an underwriter or underwriters; or

(E) A combination of (B), (C) and (D) above or any two of them.

## VI

### [ Pre-divestiture Obligation]

Defendant shall use its best efforts to maintain Penick & Ford, until the time of divestiture thereof, as a going, viable concern, at standards of operating performance, including personnel, applicable to Penick & Ford at the time of entry of this Final Judgment.

## VII

### [ Ineligible Purchasers]

Neither sale of the assets, nor sale of stock under Section V(A) or (B) of Penick & Ford shall be made knowingly, directly or indirectly, to any person who is at the time of divestiture (a) an officer, director, employee, or agent of defendent, or (b) who beneficially owns, or has power to vote, or controls, or has rights to own or control, more than one (1) percent of the outstanding shares of common stock of defendant, or (c) in whom defendant has a financial interest whether by any equity interest or otherwise.

## VIII

### [ Information for Government]

(A) If defendant proceeds with divestiture under Section V(A) or in whole or in part under V(B) of this Final Judgment, not less than forty-five (45) days prior to the closing date designated in any contract for the sale of the assets or stock of Penick & Ford, defendant shall advise plaintiff in writing of the name and address of the proposed purchaser together with the terms and conditions of the proposed sale, and such other information concerning the transaction as plaintiff may request within fifteen (15) days from the receipt of the aforesaid advice. At the same time, defendant shall also make known to plaintiff in writing the names and addresses of any other person or persons who have made an offer in writing, or expressed in writing a desire, to purchase such assets or stock together with the terms and conditions thereof.

(B) Not more than twenty-one (21) days after the receipt of the information required by this Section VIII, plaintiff shall advise defendant in writing whether it objects to the proposed sale. If plaintiff does not object to the proposed sale, it may be consummated, but if objection is made, then the proposed sale shall not be consummated until defendant obtains approval by the Court or unless plaintiff's objection is withdrawn.

(C) The time period set forth in Section IV shall be tolled during the pendency of any proceeding in this Court under this Final Judgment relating to approval of a proposed sale which delays the consummation of the divestiture transaction proposed by defendant.

## IX

### [ Individuals' Sale of Stock]

If divestiture is accomplished in whole or in part by distribution of stock under Section V(C) of this Final Judgment, defendant shall arrange that any officer or director of defendant, or any stockholder of defendant, beneficially owning or controlling, or having rights, in excess of an aggregate of one percent (1%) of defendant's

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

3

A-182

outstanding shares entitled to vote and stock convertible to such shares, shall within six (6) months of receipt of the Penick & Ford stock dispose of said stock to a person not an officer or director of defendant.

### X

#### [ *Limitation on Stock Sale*]

If divestiture is accomplished in whole or in part under Section V (D) of this Final Judgment, defendant shall prohibit any officer or director of it from acquiring any stock of Penick & Ford, so long as he remains in any such position.

### XI

#### [ *Limitation on Stock Acquisition*]

In the event that defendant receives, as consideration for the divestiture ordered in Section IV above, securities of any person engaged in the corn wet milling business or potato starch business, or of any person acquiring the divested assets, defendant shall transfer such securities to a trustee, approved by plaintiff, who shall not exercise any voting rights except with the consent of plaintiff, and said trustee shall dispose of such securities within three (3) years from the date such securities are transferred to said trustee to a person or persons who at the time of such disposal are not under the direction or control of defendant or a person described in subparagraphs (a), (b) or (c) of Section VII above.

### XII

#### [ *Reacquisition*]

Defendant is enjoined from reacquiring Penick & Ford, and, subject to the provisions of Section XI above, for a period of five (5) years after the divestiture required in Section IV above, from (a) acquiring or holding after such acquisition any assets of or stock or other beneficial interest in any person engaged in the manufacture for sale, or in the sale, of (i) starch, dextrin or gums produced by the corn wet milling process, or (ii) potato starch, and (b) engaging in such manufacture for sale or in such sale.

### XIII

#### [ *Inspection & Compliance*]

For the purpose of securing or determining compliance with this Final Judgment, and not for any other purpose:

(A) Any duly authorized representative or representatives of the Department of Justice shall, upon written request by the Attorney General or the Assistant Attorney General in charge of the Antitrust Division and on reasonable notice to defendant made to its principal office, be permitted, subject to any legally recognized privilege:

(1) Access during the office hours of defendant, which may have counsel present, to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of defendant which relate to any matters contained in this Final Judgment;

(2) Subject to the reasonable convenience of defendant and without restraint or interference from it, to interview officers or employees of defendant, who may have counsel present, regarding any such matters.

(B) Upon such written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, defendant shall submit such reports in writing with respect to any matters contained in this Final Judgment as from time to time may be requested.

(C) No information obtained by the means provided for in this Section XIII shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

Executive Branch of the United States, except in the course of legal proceedings to which plaintiff is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law.

XIV

[ *Jurisdiction Retained*]

Jurisdiction of this cause is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of the provisions thereof, for the enforcement of compliance therewith and for the punishment of violations thereof.

*©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*

US. v. THE AMERICAN OIL CO., ET AL.
Civil No.: 370-65
Year Judgment Entered: 1971

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. The American Oil Co., Atlantic Richfield Co., Cities Service Oil Co., Cities Service Co., Gulf Oil Corp., Humble Oil & Refining Co., Sinclair Refining Co., and Mobil Oil Corp., U.S. District Court, D. New Jersey, 1971 Trade Cases ¶73,616, (Aug. 12, 1971)

Click to open document in a browser

United States v. The American Oil Co., Atlantic Richfield Co., Cities Service Oil Co., Cities Service Co., Gulf Oil Corp., Humble Oil & Refining Co., Sinclair Refining Co., and Mobil Oil Corp.

1971 Trade Cases ¶73,616. U.S. District Court, D. New Jersey. Civil No. 370-65. Entered August 12, 1971. Case No. 1850, Antitrust Division, Department of Justice.

### Sherman Act

**Resale Price Fixing—Gasoline—Consent Decree.**—Each of eight oil companies was prohibited by a consent decree from entering into or adhering to any agreement with any other refiner to: (A) fix, maintain, or stabilize prices at which gasoline shall be sold to any third person; (B) suggest to any refiner or distributor or dealer the selling price of gasoline or policies under which gasoline prices should be set; (C) furnish to any competitor information concerning the prices at which it intends to sell gasoline; (D) refuse to sell or limit the sale of, or make any conditions for the sale of gasoline to third persons. In addition, each of the companies was prohibited from entering into or adhering to any agreement with any distributor or dealer to fix, maintain, or stabilize prices at which any distributor or dealer shall sell gasoline. Nothing in the decree, however, prevented any of the companies from exercising any legal rights they might have under the fair trade laws of any state under the Miller-Tydings Act, except in the states of New Jersey, Pennsylvania and Delaware for a period of five years from the date of entry of the final judgment.

**For plaintiff:** Richard W. McLaren, Asst. Atty. Gen., Baddia J. Rashid, Bernard M. Hollander, Harry N. Burgess, Robert J. Ludwig, and William F. Costigan, Attys., Dept. of Justice.

**For defendants:** M. J. Keating, Chicago, Ill., for American Oil Co.; Hughes, Hubbard & Reed, by Robert J. Sisk, New York, N. Y., for Atlantic Richfield Co. and Sinclair Refining Co.; Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, by Jay Greenfield, New York, N. Y., for Gties Service Oil Co. and Cities. Service Co.; Charles F. Rice, New York, N. Y., for Mobil Oil Co.; Kissam & Halpin, by Leo T. Kissam, New York, N. Y., for Gulf Oil Corp.; and William Simon, for Humble Oil & Refining Co.

### Final Judgment

AUGELLI, D. J.: Plaintiff, United States of America, having filed its Complain herein on the 8th day of April, 1965, and the parties hereto, by their respective attorneys, having consented to the making and entry of this Final Judgment, without trial or adjudication of any issue of fact or law herein, and without this :Final Judgment constituting evidence or an admission by any party in respect to any such issue:

Now, Therefore, before the taking of any testimony and upon consent of the parties hereto, it is hereby Ordered, Adjudged and Decreed as follows:

I

[ *Jurisdiction*]

This Court has jurisdiction of the subject matter of this action and of the parties hereto. The Complaint states claims upon which relief may be granted against the defendants under Section 1, and against defendants Atlantic Richfield Company Service Oil Company, Cities Service Company and Gulf Oil Corporation under

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

Section 2, of the Act of Congress of July 2, 1890, as amended, entitled "An Act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act.

II

[ Definitions]

For the purpose of this Final Judgment:

(A) Person shall mean any individual, partnership, firm, corporation, association, or other business or legal entity;

(B) "Gasoline" shall mean a product refined from crude offered for sale as gasoline, and suitable for use as a fuel in propelling automobiles;

(C) "Refiner" shall mean any person, other than a refiner, who purchases gasoline for resale to dealers;

(D) "Distributor" shall mean any person other than a refiner, who purchases gasoline and resells such gasoline to the public at retail service stations.

III

[ Applicability]

The provisions of this Final Judgment applicable to any defendant shall also apply to each of its directors, officers, employees, agents, affiliates, subsidiaries, successors and assigns and to all other persons in active concert or participation with such defendant who have received actual notice of this Final Judgment by personal service or otherwise.

(B) This Final Judgment shall not apply to communications or the conduct of business between or among a defendant, its parent, corporations controlled by defendant, its subsidiaries or its parent by reason of ownership of stock, and officers, directors and employees of any of them, or to transactions which occur outside the United States and which do not affect the commerce of the United States.

IV

[ Agreements with Refiners]

Each of the defendants is enjoined and restrained from entering into or adhering to any agreement, arrangement or understanding with any other refiner, to:

(A) fix, maintain or stabilize prices at which gasoline shall be sold to any third person;

(B) suggest to any refiner or any distributor or dealer the prices at or pricing policies under which any of them shall sell gasoline to any third person;

(C) furnish to any competitor information concerning the prices at which it intends to sell gasoline to any third person;

(D) refuse to sell, or limit the sale of, or make any conditions for the sale of gasoline to any third person.

V

[ Agreement with Dealers]

Each of the defendants is enjoined and restrained from entering into or adhering to any agreement, arrangement or understanding with any distributor or dealer to fix, maintain, or stabilize prices at which any distributor or dealer shall sell gasoline; provided, however, that nothing in this Decree shall prevent any defendant from exercising any legal rights which it may have under the fair trade laws of any state or under the Miller-Tydings Act, 50 Stat. 693 or under the McGuire Act, 66 Stat. 632; except that no defendant shall exercise such rights, if any, in the States of New Jersey, Pennsylvania and Delaware for a period of five (5) years from, the date of entry of this Final Judgment.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

VI

[ *Suggesting Prices*]

Each of the defendants is enjoined and restrained from:

(A) suggesting to any refiner the prices, at or pricing policies under which such refiner or any distributor or dealer of such refiner shall sell gasoline to any third person;

(B) coercing any of its distributors or dealers to adhere to such defendant's suggested retail price for gasoline provided, however, that subject to this Section VI (B), such defendant may suggest a price to its distributors or dealers for the sale of gasoline to third persons;

(C) requesting or urging any refiner to refuse to sell, or limit the sale, or make any conditions for the sale of, gasoline to any third person;

VII

[ *Informing Dealers*]

Each of the defendants is ordered to:

(A) Within thirty (30) days from the date of entry of this Final Judgment, furnish a copy of said Final Judgment to each of its distributors and dealers located in the States of New Jersey, Pennsylvania and Delaware;

(B) Within fifty (50) days from the date of entry of this Final Judgment, file with the plaintiff and this Court an affidavit setting forth the fact and manner of its compliance with this Section.

VIII

[ *Informing Officers*]

Each of the defendants is ordered to file with the plaintiff, on the anniversary date of this Final Judgment for a period of ten years, a report setting forth the steps which it has taken during the prior year to advise the defendant's appropriate officers, directors and employees of its and their obligations under this Final Judgment.

IX

[ *Inspection & Compliance*]

For the purpose of securing or determining compliance with this Final Judgment, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendant made to its principal office, be permitted, subject to any legally recognized privilege:

(A) Access, during office hours of defendant, to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession, custody, or under the control of defendant relating to any matters contained in this Final Judgment;

(B) Subject to the reasonable convenience of defendant, and without restraint or interference from it, to interview officers, directors, agents or employees of defendant, who may have counsel present, regarding any such matters.

Upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, made to such principal office defendant shall submit such reports in writing with respect to the matters contained in this Final Judgment as may from time to time be requested.

No information obtained by the means permitted in this Section IX shall be divulged by any representative of the Department of Justice to any person other than duly authorized representative of the Executive Branch of the plaintiff, except in the course of legal proceedings in which the United States is a party for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

3

A-188

x

[ *Jurisdiction Retained*]

Jurisdiction is retained for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the enforcement of compliance therewith, and the punishment of any violation thereof.

*©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*
4

US. v. E.I. DU PONT DE NEMOURS AND CO., ET AL.
Civil No.: 74-1086
Year Judgment Entered: 1977

**Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. E. I. du Pont de Nemours and Co., Verona Corp., Allied Chemical Corp., American Color & Chemical Corp., American Cyanamid Co., BASF-Wyandotte Corp., Ciba-Geigy Corp., Crompton & Knowles Corp. and GAF Corp., U.S. District Court, D. New Jersey, 1977-1 Trade Cases ¶61,447, (Apr. 18, 1977)**

Click to open document in a browser

United States v. E. I. du Pont de Nemours and Co., Verona Corp., Allied Chemical Corp., American Color & Chemical Corp., American Cyanamid Co., BASF-Wyandotte Corp., Ciba-Geigy Corp., Crompton & Knowles Corp. and GAF Corp.

1977-1 Trade Cases ¶61,447. U.S. District Court, D. New Jersey, Civil Action No. 74-1086, Entered April 18, 1977.

(Competitive impact statement and other matters filed with settlement: 41 *Federal Register* 52548, 42 *Federal Register* 9726). Case No. 2399, Antitrust Division, Department of Justice.

## Sherman Act

**Price Fixing: Exchanges of Information: Dye Manufacturers: Consent Decree.—** Dye manufacturers were barred by a consent decree from agreeing on prices or other terms and conditions for the sale of dyes and on allocation of territories, markets or customers for the production, sale or distribution of any such dyes. They also were enjoined for a period of ten years from communicating or requesting any information concerning present or future prices or changes or revisions in prices. The manufacturers were not barred from communicating information related to a *bona fide* transaction or from exchanging price information that had already been released and circulated.

**For plaintiff:** Donald I. Baker, Asst. Atty. Gen., William E. Swope, Charles F. B. McAleer, Elliott H. Moyer, Bernard Wehrmann, Donald Ferguson, Philip F. Cody, and Melvin Lublinski, Attys., Dept. of Justice. **For defendants:** Herbert Dym, of Covington & Burling, Washington, D. C., for E. I. du Pont de Nemours & Co.; Miles W. Kirkpatrick, of Morgan, Lewis & Bockius, Washington, D. C., for Verona Corp.; Briscoe R. Smith, of Milbank, Tweed, Hadley & McCloy, New York, N. Y., for Allied Chemical Corp.; Crummy, Del Deo, Dolan & Purcell, Newark, N. J., for American Color & Chemical Corp.; Donovan Leisure Newton & Irvine, New York, N. Y., for American Cyanamid Co.; Thomas A. Dieterich, of Shearman & Sterling, New York, N. Y., for BASF-Wyandotte Corp.; Ralph L. McAffe, of Cravath, Swaine & Moore, New York, N. Y., for Ciba-Geigy Corp.; Arnold Manthorne, of Warner & Stackpole, Boston, Mass., for Crompton & Knowles Corp.; Stephen M. Axinn, of Skadden, Arps, Slate, Meagher & Flom, New York, N. Y., for GAF Corp.

## Final Judgment

Meanor, D. J.: Plaintiff, United States of America, having filed its complaint herein on July 18, 1974, and plaintiff and defendants, by their respective attorneys, having each consented to the making and entering of this Final Judgment without trial or adjudication of any issue of fact or law herein and without this Final Judgment constituting any evidence or admission by any party with respect to any such issue;

Now, Therefore, before the taking of any testimony and without trial or adjudication of any issue of fact or law herein and upon consent of the parties as aforesaid, it is hereby

Ordered, Adjudged and Decreed, as follows:

I

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

[ *Jurisdiction* ]

This Court has jurisdiction of the subject matter of the action and of each of the parties hereto. The complaint states claims upon which relief may be granted against each of the defendants under Section 1 of the Act of Congress of July 2, 1890, as amended, entitled "An Act to protect trade and commerce against unlawful restraints and monopolies" (15 U. S. C. §1), commonly known as the Sherman Act.

II

[ *Definitions* ]

As used in this Final Judgment:

(A) "Person" means any individual, corporation, partnership, association, firm, or other business or legal entity.

(B) "Dye" means a soluble colored compound used for coloring textiles, leather, paper or other products, except for color additives refined, made and handled for certification pursuant to 21 U. S. C. 371 and 376; and 21 C. F. R. 8.1 *et seq.* and 9.1 *et seq.*, for use in or on foods, drugs and cosmetics.

(C) "Manufacturer" means a person who produces and regularly solicits customers for the sale of a dye or dyes and includes each defendant.

(D) "United States" means the United States of America, its territories, possessions, and other places under the jurisdiction of the United States.

III

[ *Applicability* ]

The provisions of this Final Judgment applicable to any defendant shall also apply to its subsidiaries, affiliates, successors, assigns, officers, directors, employees, and agents, and to all other persons in active concert or participation with any of them who shall have received actual notice of this Final Judgment by personal service or otherwise. For the purpose of this Final Judgment, each defendant, together with its parent company, its controlled subsidiaries, and commonly controlled affiliates along with each of its officers, directors and employees when acting solely in such capacity shall be deemed to be one person. Except for sales to the plaintiff or any agency or instrumentality thereof, this Final Judgment shall not apply to activities outside the United States which do not directly affect the foreign or domestic commerce of the United States.

IV

[ *Pricing; Allocation* ]

Each defendant is enjoined and restrained from entering into, adhering to, maintaining, furthering, enforcing, or claiming any rights under any contract, agreement, arrangement, understanding, plan or program with any other Manufacturer or Manufacturers, directly or indirectly to:

(A) Fix, maintain, determine or stabilize the price or other terms or conditions for the sale of any dye or dyes to any third person; or

(B) Allocate, limit, apportion, or divide territories, markets or customers for the production, sale or distribution of any dye or dyes.

V

[ *Information; Prices* ]

Each defendant is enjoined and restrained from:

(A) For the period of ten (10) years from the date of entry of this Final Judgment, communicating to any other Manufacturer information concerning:

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

(1) Prices at which, or terms or conditions upon which, dyes would then be or are then being sold or offered for sale by said defendant;

(2) Prices at which, or terms and conditions upon which, other than prices or terms or conditions described in subsection (1) of this paragraph (A), dyes have been sold or offered for sale by said defendant within the one (1) year period ending on the date of the communication;

(B) Communicating to any other Manufacturer information concerning:

(1) Future prices at which, or terms or conditions upon which, dyes will be sold or offered for sale by said defendant;

(2) Consideration by said defendant of changes or revisions in the prices at which, or the terms or conditions upon which, said defendant sells or offers to sell dyes;

(C) Requesting from any other Manufacturer any information of a type which said defendant could not communicate to such other Manufacturer without violating paragraph (A) or (B) of this Section V.

**VI**

**[ Communication of Information]**

Without limiting the provisions of Section IV hereof, nothing in Section V hereof shall prohibit (1) the communication of information by a defendant to another Manufacturer in the course of, and related to, negotiating for, entering into, or carrying out a bona fide purchase or sale transaction between such defendant and such other Manufacturer; or (2) the transmission, without additional comment or explanation, to another Manufacturer, upon request of said Manufacturer, of such defendant's dyes price list or dyes price book (or any change therein) regularly issued in the course of business, which price book or price list (or said change) had been previously released and circulated to the trade generally, if such transmission is made on or after the effective date of the prices included in such price list or price book (or said change).

**VII**

**[ Copies; Affidavits]**

(A) Within sixty (60) days after the date of entry of this Final Judgment, each defendant herein shall furnish a conformed copy hereof to: (1) each of its own officers and directors; (2) each of its own employees who has managerial or supervisory authority in the pricing of dyes or for the establishment or modification of general terms and conditions of sale of dyes; (3) each officer, director and aforementioned employee of a domestic subsidiary of said defendant engaged in the manufacture or sale of dyes; and (4) its parent corporation, if any; and shall advise and inform each such person that violation of this Final Judgment could result in a conviction for contempt of court and imprisonment and/or fine.

(B) Within ninety (90) days after the date of entry of this Final Judgment, each defendant shall file with the plaintiff an affidavit concerning the fact and manner of compliance with Paragraph (A) of this Section.

(C) For a period of ten (10) years after the date of entry of this Final Judgment, each defendant shall furnish a copy thereof to each person who becomes an officer, director, or employee described in Paragraph (A) of this Section, together with the advice specified by said subsection, within thirty (30) days after each such person becomes an officer, director, or employee described in said Paragraph (A) of this Section.

(D) For a period of ten (10) years from the date of entry of this Final Judgment, each defendant is ordered to file with the plaintiff, within thirty (30) days of each anniversary date of such entry, an affidavit concerning the fact and manner of compliance with Paragraph (C) of this Section.

**VIII**

**[ Compliance]**

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm
3

A-193

Case 1:19-cv-13252-RBK-AMD  Document 1-2  Filed 05/31/19  Page 195 of 303 PageID: 223

For the purpose of determining or securing compliance with this Final Judgment and for no other purpose, and subject to any legally recognized privilege, from time to time:

(A) Duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General or of the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to a defendant made to its principal office, be permitted:

(1) Access during office hours of such defendant to inspect and copy all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of such defendant, who may have counsel present, relating to any matters contained in this Final Judgment; and

(2) Subject to the reasonable convenience of such defendant and without restraint or interference from it, to interview officers, employees and agents of such defendant, who may have counsel present, regarding any such matters.

(B) Upon the written request of the Attorney General or of the Assistant Attorney General in charge of the Antitrust Division made to a defendant's principal office, such defendant shall submit such written reports, under oath if requested, with respect to any of the matters contained in this Final Judgment as may be requested.

No information or documents obtained by the means provided in this Section VIII shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Executive Branch of the United States, except in the course of legal proceedings to which the United States is a party, or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law. If at the time information or documents are furnished by a defendant to plaintiff, such defendant represents and identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and said defendant marks each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then 10 days notice shall be given by plaintiff to such defendant prior to divulging such material in any legal proceeding (other than a Grand Jury proceeding) to which that defendant is not a party.

IX

[ *Retention of Jurisdiction*]

Jurisdiction is retained for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment or for the modification of any of the provisions thereof and for the enforcement of compliance therewith and for the punishment of any violation thereof.

X

Entry of this Final Judgment is in the public interest.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

US. v. AMERICAN BUILDING MAINTENANCE CORP., ET AL.
Civil No.: 74-719
Year Judgment Entered: 1977

**Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. American Building Maintenance Corp., Atlantic Window Cleaning Co., Inc., Bloomfield Window Cleaning Co., Inc., Building Services Corp. of New Jersey, Eastern Maintenance Co., International Services, Inc., MacClean Service Co., Inc. of New Jersey, Metropolitan Maintenance Co., Middlesex Building Services, Pioneer Maintenance Corp., Trenton Window Cleaning Co., Yankee Building Maintenance Co., and Samuel S. Usdin., U.S. District Court, D. New Jersey, 1977-2 Trade Cases ¶61,713, (Oct. 25, 1977)**

Click to open document in a browser

United States v. American Building Maintenance Corp., Atlantic Window Cleaning Co., Inc., Bloomfield Window Cleaning Co., Inc., Building Services Corp. of New Jersey, Eastern Maintenance Co., International Services, Inc., MacClean Service Co., Inc. of New Jersey, Metropolitan Maintenance Co., Middlesex Building Services, Pioneer Maintenance Corp., Trenton Window Cleaning Co., Yankee Building Maintenance Co., and Samuel S. Usdin.

1977-2 Trade Cases ¶61,713. U.S. District Court, D. New Jersey, Civil No. 74-719, Entered October 25, 1977. (Competitive impact statement and other matters filed with settlement: 42 *Federal Register* 37258).

Case No. 2385, Antitrust Division, Department of Justice.

### Sherman Act

**Price Fixing: Allocation of Customers: Building Maintenance Services: Consent Decree.--** Building maintenance service firms were prohibited by a consent decree from agreeing with other such firms to allocate customers; to refrain from soliciting or competing for any customer for building maintenance services, except in connection with bona fide transactions for the purchase and sale of businesses or customer accounts; to submit noncompetitive, collusive or rigged bids; and to fix, stabilize, or maintain prices.

**For plaintiff:** John H. Shenefield, Acting Asst. Atty. Gen., William E. Swope, Charles F. B. McAleer, John J. Hughes, Raymond D. Cauley, John L. Wilson, Roger L. Currier, and Norma B. Carter, Attys., Department of Justice, Antitrust Div., Philadelphia, Pa. **For defendants:** Mortimer Katz, for American Building Maintenance Corp.; Shanley & Fisher, by Frank L. Bate, for Bloomfield Window Cleaning Co., Inc.; Lum, Biunno & Tompkis, by John P. Croake, for Eastern Maintenance Co.; Shea Gould Climinko Kasey, by Ira Postel, for MacClean Service Co., Inc. of New Jersey; A. Kenneth Weiner, for Middlesex Building Services; Brown, Vogelman & Brown, by Irving I. Vogelman, for Trenton Window Cleaning Co.; Amster & Levin, P. A., by Richard A. Levin, for Samuel S. Usdin; Walder, Steiner & Sonak, by Justin P. Walder, for Atlantic Window Cleaning Co. Inc.; Kay, Schaler, Fierman, Hays & Handler, by Mark C. Zauderer, Counsel for Building Services Corp. of New Jersey; Nulby and Hayden, by Joseph A. Hayden, Jr., for International Services, Inc.; McCarter & English, by John R. Ford, for Metropolitan Maintenance Co.; S. M. Chris Franzblau, by Steven F. Kaplan, for Pioneer Maintenance Corp.; McCarter & English, by John R. Ford, for Yankee Building Maintenance Co.

### Final Judgment

Barlow, D. J.: Plaintiff, United States of America, having filed its complaint herein, on May 16, 1974; and all parties by their attorneys, having severally consented to the making and entry of this Final Judgment, without admission by any party in respect to any issue and without this Final Judgment constituting evidence or an admission by any party with respect to any such issue;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

*1*

Now, Therefore, before any testimony has been taken herein, without trial or adjudication of any issue of fact or law herein, and upon consent of the parties hereto, it is hereby

Ordered, Adjudged and Decreed as follows:

I

#### [ *Jurisdiction*]

This Court has jurisdiction of the subject matter hereof and the parties consenting hereto. The complaint states claims upon which relief may be granted against the defendants under Section 1 of the Act of Congress of July 2, 1890 as amended (15 U. S. C. §1), commonly known as the Sherman Act.

II

#### [ *Definitions*]

As used in this Final Judgment:

(A) "Person" shall mean any individual, partnership, corporation, association or any other business or legal entity.

(B) "Building Maintenance Services" shall mean the providing to owners, tenants, landlords, and managing agents of residential, commercial, industrial and institutional buildings one or more services of the following kind: general cleaning; sweeping and dusting; stripping, waxing, and polishing floors; carpet vacuuming and shampooing; venetian blind cleaning and repairing; washing of windows, floors and walls; furniture cleaning and polishing; and other janitorial and cleaning services.

III

#### [ *Applicability*]

(A) Except as otherwise specifically stated herein, the provisions of this Final Judgment shall apply to the defendants, their affiliates, subsidiaries, successors and assigns and to their respective officers, directors, partners, agents and employees, and to all other persons in active concert or participation with any of them who shall have received actual notice of this Final Judgment by personal service or otherwise.

(B) The provisions of this Final Judgment shall not apply (1) to activities between a defendant, its officers, directors, agents, or employees and its parent or subsidiary companies, or the affiliate corporations in which 50 percent or more of the voting stock is owned by a defendant, its parent or subsidiary company, or which is in fact controlled by any defendant, or such defendant's parent or subsidiary companies; or (2) to Prudential Building Maintenance Corp. and MacClean Service Company, Inc., other corporations affiliated with defendants Building Services Corporation of New Jersey and MacClean Service Co., Inc. of New Jersey, respectively, or to persons acting in their capacity as officers, directors, agents or employees of such corporations unless such corporations, their officers, directors, agents or employees join or participate with one or more non-affiliated defendants, their respective officers, directors, partners, agents and employees in any activities which violate any of the provisions of this Final Judgment.

IV

#### [ *Prohibited Agreements*]

Each defendant is hereby enjoined and restrained from directly or indirectly entering into, adhering to, maintaining or engaging in any combination, agreement, understanding, plan or program with any other supplier of building maintenance services:

(A) To divide allocate or apportion customers for building maintenance services.

(B) To refrain from soliciting or competing for any customer for building maintenance services, except in connection with bona fide transactions for the purchase and sale of businesses or customer accounts.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

(C) To submit noncompetitive, collusive or rigged bids for building maintenance services to customers or potential customers.

(D) To fix, stabilize, or maintain prices for building maintenance services.

V

### [ *Inspections*]

(A) For the purpose of determining or securing compliance with this Final Judgment, and for no other purpose, any duly authorized representative of the Department of Justice shall, upon written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to any defendant made to its principal office, be permitted, subject to any legally recognized privilege:

(1) Access during the office hours of such defendant, which may have counsel present, to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of such defendant relating to any matters contained in this Final Judgment; and

(2) Subject to the reasonable convenience of such defendant and without restraint or interference from it, to interview officers, directors, agents, partners or employees of such defendant, who may have counsel present, regarding any such matters.

(B) A defendant, upon the written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, shall submit such reports in writing with respect to any of the matters contained in this Final Judgment as may from time to time be requested.

No information obtained by the means provided in this Section V shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Executive Branch of the United States, except in the course of legal proceedings to which the United States is a party, or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law. If at the time information or documents are furnished by a defendant to plaintiff, such defendant represents and identifies in writing the material in any such information or documents to which a claim of protection may be asserted under Rule 26(c) (7) of the Federal Rules of Civil Procedure, and said defendant marks each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then 10 days notice shall be given by plaintiff to such defendant prior to divulging such material in any legal proceeding (other than a Grand Jury proceeding) to which that defendant is not a party.

VI

### [ *Retention of Jurisdiction*]

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or modification of any of the provisions thereof, for the enforcement of compliance therewith, and the punishment of violations thereof.

VII

### [ *Public Interest*]

Entry of this Final Judgment is in the public interest.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm
3

US. v. CURTIS CIRCULATION CO., INC., ET AL.
Civil No.: 611-65
Year Judgment Entered: 1977

IWL_Trade Regulation Reporter - Trade Cases 1932 - 1992 United States v Curtis Circulation Co Inc Select Magazines Inc and National Magazine Service Last'

**Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. Curtis Circulation Co., Inc., Select Magazines, Inc., and National Magazine Service, Inc., U.S. District Court, D. New Jersey, 1967 Trade Cases ¶72,279, (Dec. 15, 1967)**

United States v. Curtis Circulation Co., Inc., Select Magazines, Inc., and National Magazine Service, Inc.

1967 Trade Cases ¶72,279. U.S. District Court, D. New Jersey. Civil Action No. 611-65. Entered December 15, 1967. Case No. 1855 in the Antitrust Division of the Department of Justice.

### Clayton and Sherman Acts

**Joint Venture—Book Distribution Subsidiary—Prohibition—Consent Decree.**—Two national distributors of magazines, paperback books and children's books were barred by a consent decree from simultaneously having an interest in a jointly owned susidiary, and, if the three firms do not comply within two years, liquidation of the subsidiary would be required. Additionally, the two distributors were barred from acquiring interests in each other or in other national distributors or wholesalers, and from having common personnel with each other or with other distributors or wholesalers.

**Exclusive Dealing—Book Distribution—Restrictions on Wholesalers and Dealers—Consent Decree.** —Two national distributors of magazines, paperback books and children's books were barred by a consent decree from combining with each other or with other national distributors to restrict wholesalers or dealers, to refuse to sell or to impose conditions on discounts or promotional allowances resulting in treatment preferential to the two or discriminatory against publications not distributed by the two, and from contributing to the costs of wholesalers' or dealers' racks unless the contributions are without restrictions, limitations or conditions. Additionally, the firms are individually barred from restraining wholesalers or dealers from allocating space on any rack except where the rack has been provided without cost or entirely paid for by the distributor, from threatening to refuse or refusing to sell because of wholesalers' refusals to adhere to> space or display requirements, from influencing or attempting to influence wholesalers to refuse to sell any publications to any dealers, and from providing or maintaining dealers' racks for the firms' books unless, at the same time, there remain in the dealers' premises racks for other national distributors' books as specified by the dealers.

**Refusal to Deal—Book Distributors Acting as Wholesalers—Availability of Wholesale Facilities to Other Distributors—Consent Decree.**—Two national distributors of magazines, paperback books and children's books, when acting as wholesalers for other national distributors, were barred by a consent decree from denying wholesaling facilities to other distributors' publications except for policies applied without discrimination to national distributors generally, from discriminating against the publications of any national distributor, and from hindering or restricting dealers in their handling of other distributors' publications.

For the plaintiff: Donald F. Turner, Asst. Atty. Gen.; Baddia J. Rashid, William D. Kilgore, Norman H. Seidler, John D. Swartz, Bernard A, L. Friedman and Harry N. Burgess, Attorneys, Dept. of Justice.

For the defendants: Wilbur H. Haines, Jr., of Pepper, Hamilton & Scheetz and Frank C. O'Brien of Pitney, Hardin, & Scheetz for Curtis Circulation Co. and National Magazine Service, Inc.; J. Bay Robinson of Whitman, Ransom & Kipp and Frederick B. Lacey of Shanley & Fisher for Select Magazines, Inc.

### Final Judgment

SHAW. J.: The plaintiff, United States of America, having filed its complaint herein on June 9, 1965, and each of the defendants having appeared and filed their several answers denying the substantive allegations thereof, and the parties hereto, by their respective attorneys, having consented to the making and entry of this Final Judgment without trial or adjudication of any issue of fact or law herein, and without admission by any party with respect to any such issue:

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

¶¶5, Trade Regulation Reporter - Trade Cases 1932 - 1992 United States v. Curtis Circulation Co Inc Select Magazines Inc and National Magazine Service Inc9

Now, Therefore, before the taking of any testimony and without trial or adjudication of any issue of fact or law herein, and upon the consent of the parties hereto, it is hereby:

Ordered, Adjudged and Decreed, as follows:

I

[ Jurisdiction]

This Court has jurisdiction of the subject matter hereof and of the parties hereto. The complaint states claims against the defendants upon which relief may be granted under Section 1 of the Act of Congress of July 2, 1890 entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended, and under Section 7 of the Act of Congress of October 15, 1914, entitled "An Act to supplement existing laws against unlawful restraints and monopolies and for other purposes," commonly known as the Clayton Act, as amended.

II

[ Definitions]

As used in this Final Judgment:

(a) "Person" means any individual, corporation, partnership, association, firm or other business or legal entity;

(b) "Curtis" means the defendant Curtis Circulation Company;

(c) "Select" means the defendant Select Magazines, Inc.;

(d) "NMS" means the defendant National Magazine Service, Inc.;

(e) "Publications" means magazines, paperback books and children's books but shall not include magazines sold by subscription;

(f) "National distributor" means any person to whom any publisher sells or consigns publications for sale or delivery to wholesalers, or any person otherwise engaged by any publisher to distribute, sell or consign publications to wholesalers throughout the United States;

(g) "Wholesaler" means any person who purchases, or takes on consignment, publications from any national distributor for resale and distribution to dealers, or any person who otherwise receives publications for sale and distribution to dealers within a particular area or areas;

(h) "Dealer" means any person who sells publications to consumers from places of business such as newsstands, drug stores, food stores, stationery stores and transportation stations;

(i) "Racks" means any self-service shelving, bins, stands, pockets or other fixtures located at any dealer's premises on which publications are displayed for sale;

(j) "Space" means the area on racks occupied by a publication or publications;

(k) "Display" means the placement of a publication on racks in relation to particular other publications and the proportion of its cover visible as a result of such placement. as well as the location within the premises of dealer of the racks;

(l) "Space or display requirement" means a request, made by a national distributor or publisher, to a /wholesaler or dealer, for particular percentages of space or particular displays for any of their publications.

III

[ Applicability]

The provisions of this Final Judgment applicable to any defendant shall also apply to each of its subsidiaries, successors and assigns; to each of its directors, officers, employees, agents and all other persons in active concert or participation with them who receive actual notice of this Final Judgment by personal service or

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

otherwise. The provisions of this Final Judgment shall be applicable only to the United States, its territories and possessions.

IV

[ Notification]

The defendants are each ordered and directed:

(A)(1) Forthwith to serve a copy of this Final Judgment upon (a) each member of its Board of Directors, and (b) each of its executives and principal officers having responsibility for the sale or distribution of publications on a national, regional or other basis;

(2) Within ninety (90) days after the date of entry of this Final Judgment, to file with this Court, and serve upon the plaintiff, an affidavit setting forth the fact and manner of its compliance with the foregoing subparagraph (1) including the names, titles and addresses of the persons so served;

(B) Forthwith to mail a copy of this Final Judgment to each wholesaler to whom such defendant, on the date of entry of this Final Judgment is selling publications; and thereafter, for a period of five (5) years after the date of entry of this Final Judgment to any other wholesaler who purchases publications from such defendant;

(C) For a period of five (5) years after the date of entry of this Final Judgment, to furnish, without cost, to any other person requesting one, a copy of this Final Judgment.

V

[ Mutual Interests]

(A) Two (2) years after the date of entry of this Final Judgment, defendants Curtis and Select are each enjoined and restricted from, simultaneously, owning or controlling, directly or indirectly, in any manner whatsoever, any financial, or other interest in defendant NMS or any successor thereof;

(B) Defendants Curtis and Select are ordered and directed to file with this Court and serve upon the plaintiff, within one (1) year after the date of entry of this Final Judgment, a report setting forth (1) the manner in which such defendants propose to comply with subsection (A) above, and (2) the actions then taken, if any, by such defendants to bring about compliance with subsection (A) above;

(C) In the event compliance with subsection (A) above cannot otherwise be accomplished by defendants Curtis and Select within the two (2) year period therein provided for, then and in that event, defendants Curtis, Select and NMS are jointly, and severally, ordered and directed, within said two (2) year period, to take all necessary and appropriate actions to dissolve and liquidate defendant NMS.

VI

[ Acquisitions Between Defendants]

Except as permitted by Section V of this Final Judgment,

(A)(1) Defendant Curtis is enjoined and restrained from:

(a) Acquiring or holding, directly or indirectly, any control of, or any financial or other interest in defendant Select; and

(b) Knowingly permitting any of its officers, directors, agents or employees to serve, at the same time, as an officer, director, agent or employee of defendant Select.

(2) Defendant Select is enjoined and restrained from:

(a) Acquiring or holding, directly or indirectly, any control of, or any financial or other interest in defendant Curtis; and

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm
3

(b) Knowingly permitting any of its officers, directors, agents or employees to serve, at the same time, as an officer, director, agent or employee of defendant Curtis.

(3) The provisions of subsections (A)(1)(a) and (2) (a) of this Section VI shall apply for a period of ten (10) years after the date of entry of this Final Judgment; and thereafter for an additional period of ten (10) years, except that defendants Curtis or Select may be relieved from the restrictions of subsections (A)(1)(a) and (2) (a) at any time during such additional period with the consent of the plaintiff or upon approval of this Court after notice to the plaintiff and upon establishing to the satisfaction of this Court that the effect thereof will not substantially lessen competition or tend to create a monopoly in the distribution and sale of publications in the United States.

(B) Defendants Curtis and Select are jointly and severally enjoined and restrained for a period of ten (10) years from acquiring or holding, directly or indirectly, any control of, or any financial or other interest in any other national distributor or in any wholesaler in which any other national distributor has any like or similar control or financial or other interest; and

(C) Each of the defendants Curtis and Select is enjoined and restrained for a period of ten (10) years from knowingly permitting any of its officers, directors, agents or employees to serve, at the same time, as an officer, director, agent or employee of any other national distributor, or of any wholesaler in which any other national distributor has any control or any financial or other interest.

## VII

[ *Joint Acts*]

(A) Each of the defendants Curtis and Select is enjoined and restrained, as a national distributor, from directly or indirectly acting jointly or in concert with the other defendant or any other national distributor by entering into, adhering to, maintaining, enforcing or claiming any rights under, or seeking to create or obtain, any contract, agreement, understanding, combination, plan or program the purpose or effect of which is to:

(1) Hinder, restrict, or limit any wholesaler or dealer in the purchase, promotion, space, display or sale of any publication purchased from any source;

(2) Refuse to sell any publication to any wholesaler or dealer;

(3) Sell, or offer to sell, any publication to any wholesaler or dealer or grant or offer to grant any discount, promotion or other allowance, term or condition relating to the sale of any publication on or accompanied by any condition or requirement that

(a) The wholesaler or dealer give preferential treatment or space on racks to any particular publication or publications;

(b) The wholesaler or dealer discriminate against publications not distributed or sold by any defendant;

(c) The wholesaler or dealer agree to devote or allocate any specific amount or percentage of space on racks or display to any particular publication or publications;

(4) Provide or contribute to the cost of racks for use by a wholesaler or dealer unless such racks are provided or contributed to without any restriction, limitation, or condition whatsoever upon such wholesaler or dealer.

(B) Nothing contained in this Section VII shall be construed to prohibit defendants Curtis and Select jointly or in concert with each other or with any other national distributor or distributors from providing or contributing to the cost of racks for use by wholesalers or dealers providing such racks are provided or contributed to without any restriction, limitation or condition whatsoever upon any such wholesaler or dealer.

## VIII

[ *Wholesalers and Dealers*]

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

WPL Trade Regulation Reporter - Trade Cases 1932 - 1992 United States v Curtis Circulation Co the Select Magazines Inc and National Magazine Service Leaf

Each of the defendants Curtis and Select is enjoined and restrained, as a national distributor, from directly or indirectly:

(A) Hindering, controlling or restricting, or attempting to hinder, control or restrict, the exercise by any wholesaler or dealer of his right to allocate space on any rack except where such rack has been provided, without cost, to such wholesaler or dealer by such defendant or where the cost thereof has been paid entirely by such defendant;

(B) Except as provided in subsection (A) above, refusing or threatening to refuse to sell to any wholesaler any publication which such wholesaler is willing to purchase and distribute as a wholesaler because of the failure or refusal of such wholesaler to adhere to or observe any space or display requirement;

(C) Influencing or attempting to influence any wholesaler to refuse or threaten to refuse to sell any publication to any dealer;

(D) Providing or contributing to the cost of, or maintaining in the premises of any dealer, any rack to be used for publications distributed by such defendant unless, at the same time, there remains such area in the premises of the dealer as he may specify for racks for publications of other national distributors.

IX

[ *Acting as Wholesalers*]

In any area where any defendant shall distribute publications for any national distributor, as a wholesaler, or through a wholesaler in which such defendant has an interest or control, each such defendant is enjoined and restrained as a wholesaler or through such wholesaler from:

(A) Denying wholesaling facilities to the publications of any national distributor except for policies applied without discrimination to national distributors generally;

(B) Discriminating against the publications of any national distributor;

(C) Hindering, controlling or restricting or attempting to hinder, control or restrict the exercise by any dealer of his right to allocate space on any rack except where such rack has been provided, without cost, to such dealer by a national distributor or by such defendant or where the cost thereof has been paid entirely by a national distributor or by such defendant acting for a national distributor, provided that, at the same time, there remains such area in the premises of the dealer as he may specify for racks for publications of other national distributors.

(D) Except as provided in subsection (C) above, refusing or threatening to refuse to sell to any dealer any publication which such dealer is willing to purchase and sell because of the failure or refusal of such dealer to adhere to or observe any space or display requirement;

(E) Distributing the publication of any other defendant until either (1) the expiration of a period of one year from the entry of such wholesaling defendant into wholesaling in said area, or (2) three national distributors, not defendants herein, have transferred wholesale distribution of their publications in said area to such wholesaling defendant.

X

[ *Compliance*]

For the purpose of securing compliance with this Final Judgment and subject to any legally recognized privilege, duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division and on reasonable notice to any Defendant, made to its principal office, be permitted: (1)reasonable access during regular office hours to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of the Defendant, who may have counsel present, regarding any such matters contained in this Final Judgment, and (2)subject to the reasonable convenience of Defendant, and without restraint or interference

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

5

CCH Trade Regulation Reporter - Trade Cases 1932 - 1992 United States v. Curtis Circulation Co Inc Select Magazines Inc and National Magazine Service Ltd

from it, to interview officers or employees of the Defendant, who may have counsel present, regarding any such matters; and, upon such request, Defendant shall submit such written reports under oath, if so requested, to the Department of Justice with respect to matters contained in this Final Judgment as may from time to time be necessary to the enforcement of this Final Judgment. No information obtained by the means provided in this Section X shall be divulged by any representative of the Department of Justice to any person, other than a duly authorized representative of the Executive Branch of plaintiff, except in the course of legal proceedings to which the United States of America is a party for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

XI

[ Jurisdiction Retained]

Jurisdiction is retained for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment or for the modification or termination of any of the provisions thereof, and for the enforcement of compliance therewith and punishment of violations thereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm
6

representative of the Department of Justice except in the course of legal proceedings to which the United States is a party for the purpose of securing compliance with this judgment or as otherwise required by law.

[ *Jurisdiction Retained*]

X

Jurisdiction of this action is retained by this Court for the purpose of enabling any of the parties to this judgment to apply to the Court at any time for, and for the Court to make, such further orders or directions as may be necessary or appropriate for the construction or carrying out of this judgment, for the modification or termination of any of the provisions thereof, or for the enforcement of compliance therewith, and for punishment of violations thereof.

## Exhibit "A"

| Number | Date | Inventor | Title |
|---|---|---|---|
| 1,873,176 | 8/23/32 | Clarence D. Barr | Flasks |
| 1,873,227 | 8/23/32 | Murphy D. Smith | Body Pattern Extractors |
| 1,906,511 | 5/2/33 | Clarence D. Barr<br>Stephen D. Moxley<br>Frank S. Houghton | Charging Machines |
| 1,916,296 | 7/4/33 | Clarence D. Barr | Centrifugal Casting Machines |
| 1,927,467 | 9/19/33 | Stephen D. Moxley<br>Walter Moreran | Centrifugal Casting Machines |
| 1,958,672 | 5/15/34 | W. D. Moore<br>Walter Morgan | Centrifugal Casting Machine and Methods |
| 1,959,227 | 5/15/34 | Clarence D. Barr<br>Stephen D. Moxley | Sand Ramming Equipment Stations for Flasks |
| 1,960,366 | 5/29/34 | Clarence D. Barr<br>Stephen D. Moxley<br>Jacob L. Cooper | Apparatus for Freeing and Removing Hollow Castings from Flasks |
| 1,983,431 | 12/4/34 | Clarence D. Barr<br>Stephen D. Moxley | Centrifugal Casting Machines for Casting Hollow Metal Bodies |
| 2,015,776 | 10/1/35 | Clarence D. Barr<br>Stephen D. Moxley | Charging, Weighing and Controlling Mechanism for Casting Machines |
| 2,043,956 | 6/9/36 | Louis A. Camerota | Improvement in Centrifugal Casting Machines |
| 1,897,951 | 2/14/33 | Louis A. Camerota | Methods and Apparatus for Blasting Pipe |
| 1,902,301 | 3/21/33 | Louis A. Camerota | Chucks for Centrifugal Casting Machines |
| 1,911,106 | 5/23/33 | Louis A. Camerota | Flask Handling Apparatus |
| 1,912,361 | 6/6/33 | Louis A. Camerota | Mold Disintegrating Stations |
| 1,919,199 | 7/25/33 | Louis A. Camerota | Conveyors for Cylindrical Objects |
| 1,926,034 | 9/12/33 | Louis A. Comerota | Stuffing Boxes for Blow Pipes |
| 1,936,376 | 11/21/33 | Louis A. Comerota | Centrifugal Casting Apparatus |
| 1,944,168 | 1/23/34 | Louis A. Comerota | Centrifugal Casting Machines. |

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

U.S. v. WESTINGHOUSE ELECTRIC, ET AL.
Civil No.: 5152
Year Judgment Entered: 1953

Civil Action No. 5152

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

—————————————————

UNITED STATES OF AMERICA,
PLAINTIFF.

v.

WESTINGHOUSE ELECTRIC & MANUFACTURING
COMPANY AND WESTINGHOUSE ELECTRIC
INTERNATIONAL COMPANY,
DEFENDANTS.

—————————————————

FINAL JUDGMENT

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff. | |
| v. | CIVIL ACTION NO. 5152 |
| WESTINGHOUSE ELECTRIC & MANUFACTURING COMPANY AND WESTINGHOUSE ELECTRIC INTERNATIONAL COMPANY, | |
| Defendants. | |

### FINAL JUDGMENT

Plaintiff, United States of America, having filed its Complaint herein on April 12, 1945, and the defendants herein having appeared and filed their answers to the Complaint denying the substantive allegations thereof; and the plaintiff and said defendants by their attorneys having severally consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law herein, and without admission by any party in respect of any such issues;

NOW THEREFORE, before any testimony has been taken herein, and without trial or adjudication of any issue of fact or law herein, and upon consent as aforesaid of all the parties hereto,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

### I.

The Court has jurisdiction of the subject matter herein and of all the parties hereto. The Complaint of April 12, 1945, states a cause of action against the defendants under Section 1 of the Act of Congress of July 2, 1890, entitled "An Act to Protect Trade and Commerce Against Unlawful Restraints and Monopolies," commonly known as the Sherman Act, as amended, and under Section 73 of the Act of Congress of August 27, 1894, entitled "An Act to Reduce Taxation, to

A-47

Provide Revenue for the Government, and for Other Purposes," commonly known as the Wilson Tariff Act, as amended.

## II.

For the purposes of this Judgment:

(a) "Westinghouse" shall mean the defendant Westinghouse Electric & Manufacturing Company, which by change of name effective May 10, 1945, is now the Westinghouse Electric Corporation.

(b) "International" shall mean the defendant Westinghouse Electric International Company.

(c) "Electrical equipment" shall mean machines, apparatus, devices, circuits, material and processes relating to the generation, transmission, distribution or utilization of electric energy except electric lamps, radio and communications apparatus, cable, X-ray apparatus, elevators and certain other specialized apparatus. Electrical equipment includes generators, transformers and switchgear, essential for the generation and distribution of electric energy; motors of various types which serve as the sources of power for other industries; motors, magnets, switches, and heating elements for incorporation in other manufactured products; and electrical appliances such as fans and cooling or heating devices for domestic use.

(d) "Patents acquired from Siemens" shall mean any patents, patent applications, or rights to grant licenses under patents or patent applications, directed to electrical equipment and heretofore acquired by defendants from Siemens-Schuckertwerke A.G. or from Siemens & Halske A.G., named as co-conspirators in the Complaint, and shall include all reissues, divisions, continuations or extensions of said patents, and any patents which may issue upon said applications. A list of the patents acquired from Siemens and which defendants now own or control is attached hereto and marked Exhibit "A".

2

### III.

The provisions of this Judgment applicable to any defendant shall apply to such defendant, its officers, directors, agents, employees, successors, assigns, subsidiaries, and all other persons acting under, through, or for such defendant.

### IV.

The agreement dated November 10, 1934, between Siemens-Schuckertwerke A.G., Siemens & Halske A.G. and the defendants, Westinghouse and International, and any agreements amendatory thereof or supplemental thereto, to the extent not heretofore terminated, are hereby terminated, and the defendants are hereby enjoined and restrained from the further performance of any of the provisions of said agreement. This Article shall not be deemed to terminate any patent rights held by defendants upon the termination of said agreement.

### V.

Each defendant is ordered and directed, within ninety (90) days after the date of the entry of this Judgment, to dedicate to the public any and all right, title and interest which it may have on the date of the entry of this Judgment in and to each of the patents listed in Exhibit "A" to this Judgment, such dedication to be effective as of the date of entry of this Judgment; and in order to enable anyone who desires to do so, to practice the inventions of such dedicated patents, defendants shall, to the extent necessary, continue to license upon reasonable terms any patents which they now own or control pursuant to the policy set forth in the letter attached hereto as Exhibit "B".

Each defendant is hereby enjoined and restrained from instituting or threatening to institute, or maintaining any suit, counterclaim or proceeding, judicial or administrative, for infringement, or to realize or collect damages or other compensation for infringement under or on account of any patent listed in Exhibit "A".

3

## VI.

Defendant Westinghouse is hereby ordered and directed to make available for examination on reasonable terms at its plant at East Pittsburgh, Pennsylvania, to any applicant, such technical information received from Siemens-Schuckertwerke A.G. and Siemens & Halske A.G. under the agreement dated November 10, 1934, as defendant Westinghouse now has in its possession in its Foreign Engineering Department at East Pittsburgh, Pennsylvania, or may hereafter discover elsewhere in its organization. Such information shall be made available by defendant Westinghouse in the form in which it is presently maintained. Any such applicant shall be permitted by defendant Westinghouse to reproduce copies of any such information, at applicant's expense and as applicant may desire, provided that the applicant shall agree to return or replace all copies of such information taken for purposes of reproduction from the files of defendant Westinghouse.

## VII.

Each defendant is hereby enjoined and restrained from entering into, adhering to, maintaining or furthering, directly or indirectly, any contract, agreement, understanding, plan or program with Siemens-Schuckerwerke A.G. or Siemens & Halske A.G. or any of their subsidiaries, successors, assigns, officers, agents or employees, to:

(a) allocate or divide territories or markets for the production, sale or other distribution of electrical equipment;

(b) exclude any person from or to restrain or limit any such person in the manufacture, use, distribution or sale of electrical equipment;

(c) limit, restrain or prevent the importation into or exportation from the United States, its territories, or possessions, of electrical equipment;

(d) refrain from competition or to leave any person free from competition in any territory, field or market in the manufacture,

4

use, distribution or sale of electrical equipment.

Nothing in the foregoing provisions of this Article VII shall be construed to prohibit, without more, licenses or conveyances of patent rights or technical information, whether on an exclusive basis or otherwise.

### VIII.

For the purpose of securing compliance with this Judgment, duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to the principal office of either defendant, be permitted (1) reasonable access during the office hours of said defendant to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of said defendant relating to any matters contained in this Judgment; and (2) subject to the reasonable convenience of said defendant and without restraint or interference from it, to interview officers or employees of said defendant, who may have counsel present, regarding such matters, and upon request said defendants shall submit such written reports as might from time to time be reasonably necessary to the enforcement of this Judgment. No information obtained by the means provided in this Article VIII shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of such Department, except in the course of legal proceedings in which the United States is a party for the purpose of securing compliance with this Judgment, or as otherwise required by law.

### IX.

Jurisdiction is retained for the purpose of enabling any of the parties to this Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for

5

the construction or carrying out of this Judgment, or the modification or termination of any of its provisions thereof, or the enforcement of compliance therewith and for the punishment of violations thereof.

s/ Forman
United States District Judge

We hereby consent to the entry of the foregoing Final Judgment:

For Plaintiff:

Stanley N. Barnes                          W. D. Kilgore, Jr.
Assistant Attorney General

Edwin H. Pewett                            Donald E. Van Koughnet

                                           Grover C. Richman, Jr.

Attorneys for the United States of America.

For defendants:

Cravath, Swaine & Moore                    Stryker, Tams & Horner
by Donald C. Swatland a member            by Josiah Stryker a member
of the above firm                          of the above firm

Attorneys for the Defendants.

A-52

U.S. v. GENERAL INSTRUMENT CORP., ET AL.
Civil No.: 8586
Year Judgment Entered: 1953

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

                Plaintiff,

     v.

GENERAL INSTRUMENT CORPORATION;
RADIO CONDENSER COMPANY;
CONDENSER DEVELOPMENT CORPORATION;
VARIABLE CONDENSER CORPORATION;
STANLEY S. CRAMER; RUSSELL S.
CRAMER; ABRAHAM BLUMBERG, THE;
SAMUEL CUMIN; CHARLES B. HYMAN;
NATHAN HYMAN and EDWARD HYMAN,

                Defendants.

CIVIL ACTION

NO. 8506

## FINAL JUDGMENT

This cause came on for hearing before the Court upon motions by the
plaintiff and the defendants, counsel for the parties having been heard
and the Court having determined, upon consideration of the pleadings, the
admissions, stipulations and exhibits on file, that there is no genuine
issue between the parties as to any material fact required for this Final
Judgment, and the Court having filed its opinion herein on October 26,
1949, granting the motion by plaintiff for summary judgment against all
the defendants except Nathan Hyman and Edward Hyman, and denying the
motion for summary judgment on the part of the other named defendants,

NOW, THEREFORE, after hearing plaintiff and defendants by their at-
torneys, it is hereby

ORDERED, ADJUDGED AND DECREED as follows:

I

As used in this Final Judgment:

(A) "Development" shall mean the defendant Condenser Development
Corporation;

(B) "Radio" shall mean the defendant Radio Condenser Company;

A-54

(C) "General" shall mean the defendant General Instrument Corporation;

(D) "Variable" shall mean the defendant Variable Condenser Corporation;

(E) "De Jur Amsco" shall mean De Jur Amsco Corporation;

(F) "Defendants" shall mean all the corporate parties so named in the complaint in this cause, their directors, officers and agents;

(G) "Variable condensers" shall mean a tuning device in which the capacitance is variable, and shall include the mechanical tuning devices used in conjunction therewith but shall not include inductive tuners;

(H) "Person" shall mean an individual, partnership, firm, association, corporation or other business or legal entity;

(I) "Patents" shall mean United States letters Patent and applications therefor, including all reissues, divisions, continuations or extensions thereof and patents issued upon said applications.

II

The provisions of this Final Judgment applicable to any defendant shall apply to such defendant, its officers, agents, servants, employees, and attorneys, and all other persons when acting or claiming to act on behalf of such defendant.

III

The complaint is hereby dismissed as to the individual defendants Nathan Hyman and Edward Hyman.

IV

Defendants have violated Sections 1 and 2 of the Act of Congress of July 2, 1890, 15 U.S.C. §§ 1 and 2, entitled "An Act to Protect Trade and Commerce Against Unlawful Restraints and Monopolies," commonly known as the Sherman Act. Said violations have consisted of defendants engaging in an unlawful combination and conspiracy in restraint of trade and commerce in variable condensers, entering into unlawful contracts, agreements

2

A-55

and mutual understandings in restraint of said trade and commerce and un-
lawfully attempting to monopolize and combining and conspiring to mono-
polize said trade and commerce in variable condensers.

V

(A) Each of the following agreements is hereby adjudged and decreed
to be unlawful under Sections 1 and 2 of the Sherman Act and is hereby
terminated; and defendants are jointly and severally enjoined and restrained
from the further performance or enforcement of any of the provisions of
said agreements and of any agreements amendatory thereof or supplemental
thereto:

(1) Agreement of July 30, 1934 between Radio, General
and De Jur Amsco;

(2) Agreement of August 7, 1934 between Radio, General
and De Jur Amsco and Development;

(3) Agreement dated May 19, 1937 between Radio, General
and De Jur Amsco and Development;

(4) Two agreements dated June 9, 1939 between Radio and
General and Development;

(5) Agreement of March 1, 1946 between Radio and General
and Development;

(6) All contracts, agreements or understandings
any two or more of the defendants Develop,
and General are jointly or severally parties concerning
the licensing of patents relating to variable con-
densers.

(B) Defendants are hereby jointly and severally enjoined and re-
strained from entering into, performing, enforcing, adopting, adhering
to, maintaining or furthering, directly or indirectly, or claiming any
rights under any contract, agreement, arrangement, understanding, plan
or program for the purpose or with the effect of continuing, reviving
or renewing any of the agreements, contracts or understandings referred
to in Subsection (A) of this Section V.

3

VI

(A) Each defendant is hereby enjoined and restrained from entering
into, performing, adopting, adhering to, maintaining or furthering, di-
rectly or indirectly, or claiming any rights under, any combination, con-
spiracy, contract, agreement, arrangement, understanding, or plan or pro-
gram with any person engaged in the manufacture or distribution of variable
condensers which has as its purpose or effect:

    (1) Limiting, restraining or preventing the sale of
        tools, dies, fixtures or jigs, used in the manu-
        facture of variable condensers, to any person or
        for use in any specified territory;

    (2) Limiting, reducing or restricting the types, models,
        qualities or quantities of variable condensers which
        are or may be developed or manufactured;

    (3) Fixing, maintaining or adhering to prices or price
        ranges or other terms and conditions of sale or distri-
        bution of variable condensers; except that this pro-
        vision shall not apply to valid restrictions contained
        in patent licenses between a defendant and a person
        not a party to this case;

(B) The defendants as between themselves are hereby enjoined and re-
strained from entering into, performing, adopting, adhering to, maintaining
or furthering, directly or indirectly, or claiming any rights under any
combination, conspiracy, contract, agreement, arrangement, understanding
or plan or program which has as its purpose or effect:

    (1) Excluding each other from any territory or market,
        or interfering with or restricting each other in
        competing in any territory or market;

    (2) Limiting or restricting, in any manner, the exercise
        of independent decision in the acquisition of patents
        or patent rights.

4

(C) Each defendant is hereby enjoined and restrained from entering into any contract, agreement or understanding with the purpose or effect of admitting the validity of any patent not issued at the time of such admission.

## VII

(A) Defendants General, Radio and Development are jointly and severally ordered and directed to cause the dissolution of defendant Development within 60 days following entry of this Judgment;

(B) Defendant Development is hereby ordered and directed within 30 days following entry of this Judgment to transfer or assign all patents or patent rights owned or controlled by it to the person (including other defendants) from whom such patents or patent rights were acquired; except that Patent No. 2,064,630 of December 15, 1936 shall be assigned by Development to Radio;

(C) Other than the patents and patent rights required to be transferred or assigned under Subsection (B) above, all remaining assets of Development, both real and personal, shall be distributed among those defendants contributing to the administration of Development and in ratio to the amount contributed or obligated to contribute.

## VIII

(A) Following the distribution of the assets of the defendant, Development, and its dissolution pursuant to Section VII of this Judgment:

1. Each remaining defendant is hereby enjoined and restrained from holding, acquiring or claiming, directly or indirectly, jointly with any other defendant, any rights under any patents relating to the manufacture of variable condensers, except that this provision shall not prohibit the grant of a license in accordance with Paragraph X of this Judgment by any of the defendants to any other defendant or the taking of a non-exclusive license by any defendant relating to patents to manufacture variable condensers.

5

2. Each remaining defendant is hereby enjoined and restrained for a period of seven (7) years from the date of the entry of this Judgment from holding, acquiring or claiming, directly or indirectly, jointly with any other person engaged in the manufacture of variable condensers, patent and patent rights relating to the manufacture of variable condensers, except that this provision shall not prohibit the grant of a license in accordance with Paragraph X of this Judgment by any of the defendants to a non-defendant or the taking of a license by any defendant from a non-defendant relating to patents to manufacture variable condensers.

3. Each remaining defendant is hereby enjoined and restrained from holding, acquiring or claiming, directly or indirectly, any rights under any manufacturing or sale facilities, plants or other assets relating to the manufacture of variable condensers, jointly with any other defendant engaged in the manufacture of variable condensers and for a period of seven (7) years from the date of entry of this Judgment, jointly with any other person engaged in the manufacture of variable condensers.

(B) Defendants, General and Radio, are hereby enjoined and restrained from acquiring, directly or indirectly, by purchase, merger, consolidation or otherwise, the ownership or control of the business of the other in the manufacture of variable condensers and, whether jointly or severally, for a period of seven (7) years after the date of entry of this Judgment of any other person engaged in the manufacture of variable condensers.

IX

(A) Defendants are hereby jointly and severally enjoined and restrained from:

1. Instituting or threatening to institute, or maintaining or continuing any action or proceeding for acts of infringement, or to collect damages, compensation or royalties alleged to have occurred or accrued, prior to the date of this Judgment, under any patent relating to the manufacture or use of variable condensers;

6

A-59

2.  Instituting or threatening to institute, or maintaining or continuing any action or proceeding against any person for acts of infringement of any patent relating to the manufacture or use of variable condensers owned or controlled by any defendant and issued prior to December 31, 1956, unless such person has refused to enter into a license agreement as provided for in Section X of this Judgment after being requested so to do by such defendant.

X

(A)  With the exception of defendant Development, each defendant is hereby ordered and directed, insofar as it has the power to do so, to grant to any applicant therefor a non-exclusive license under any, some or all of the patents or patent licenses relating to the manufacture or use of variable condensers owned or acquired by such defendant prior to December 31, 1956, and is hereby enjoined and restrained from making any sale or other disposition of any of said patents which deprives it of the power or authority to grant such licenses, unless it sells, transfers or assigns such patents and requires as a condition of such sale, transfer or assignment that the purchaser, transferee or assignee shall observe the requirements of Section X and XII of this Judgment with respect to the patents so acquired and the purchaser, transferee or assignee shall file with this Court, prior to consummation of said transaction, an undertaking to be bound by the provisions of said Sections with respect to the patents so acquired;

(B)  Each defendant is hereby enjoined and restrained from including any restriction or condition whatsoever in any license or sub-license, as the case may be, granted by it pursuant to the provisions of this Section except that (1) the license may be made nontransferable; (2) a reasonable

7

non-discriminatory royalty may be charged; (3) reasonable provisions may be made for periodic inspection of the books and records of the licensee by an independent auditor or any person acceptable to the licensee who shall report to the licensor only the amount of the royalty due and payable; (4) reasonable provision may be made for cancellation of the license upon failure of the licensee to pay the royalty or to permit the inspection of its books and records as hereinabove provided; (5) the license shall provide that the licensee may cancel the license at any time after one year from the initial date thereof by giving 30 days notice in writing to the licensor;

(C) Upon receipt of a written request for a license or sublicense, as the case may be, under the provisions of this Section X, such defendant shall advise the applicant in writing of the royalty which it deems reasonable for the patent or patents to which the request pertains. If the parties are unable to agree upon a reasonable royalty within 60 days from the date such request for the license was received by such defendant, the applicant therefor may forthwith apply to this Court for the determination of a reasonable royalty, and the defendant shall, upon receipt of notice of the filing of such application, promptly give notice thereof to the Attorney General. In any such proceeding the burden of proof shall be on the defendant to establish the reasonableness of the royalty requested, and the reasonable royalty rates, if any, determined by this Court shall apply to the applicant and all other licensees under the same patent or patents. Pending the completion of negotiations or any such proceeding, the applicant shall have the right to make, use and vend under the patents to which its application pertains without payment of royalty or other compensation as above provided, but subject to the provisions of Subsection (D) of this Section X;

8

A-61

(D) Where the applicant has the right to make, use and vend under any patents pursuant to Subsection (C) of this Section X, said applicant or the defendant may apply to this Court to fix an interim royalty rate pending final determination of what constitutes a reasonable royalty. If this Court fixes such interim royalty rate, the defendant shall then issue and the applicant shall accept a license or, as the case may be, a sublicense, providing for the periodic payment of royalties at such interim rate from the date of the filing of such application by the applicant. If the applicant fails to accept such license or fails to pay the interim royalty in accordance therewith, such action shall be ground for the dismissal of his application, and his rights under Subsection (C) shall terminate. Where an interim license or sublicense has been issued pursuant to this subsection, reasonable royalty rates, if any, as finally determined by this Court shall be retroactive for the applicant and all other licensees under the same patents to the date the applicant files his application with this Court;

(E) Nothing herein shall prevent any applicant from attacking in the aforesaid proceedings the validity or scope of any of the patents nor shall this Judgment be construed as importing any validity or value to any of said patents.

XI

Immediately following the entry of this Judgment, each of the defendants Development, Radio, and General shall mail a copy of this Judgment to each person with whom any of them has a license agreement under patents relating to the manufacture or use of variable condensers, to each person who has applied to such defendant for such a license since August 7, 1934. Within 30 days following the entry of this Judgment, the said defendants shall file with this Court a statement setting forth the steps taken to comply with the above requirements of this Section XI,

9

XII

For the purpose of securing compliance with this Judgment and for no other purpose, duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General, or an Assistant Attorney General, and on reasonable notice to any defendant, made to its principal office, be permitted subject to any legally recognized privilege, (1) access during the office hours of said defendant to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of said defendant relating to any matters contained in this Judgment, and (2) subject to the reasonable convenience of said defendant and without restraint or interference from it to interview officers or employees of said defendant, who may have counsel present, regarding any such matters; and upon such request the defendant shall submit such reports in writing to the Department of Justice with respect to matters contained in this Judgment as may from time to time be necessary to the enforcement of this Judgment. No information obtained by the means provided in this Section shall be divulged by any representative of the Department of Justice to any person other than a duly authorized reprentative of such Department, except in the course of legal proceedings to which the United States is a party for the purpose of securing compliance with this Judgment or as otherwise required by law.

XIII

Judgment is entered against the defendants Development, Radio, General, Variable, Stanley S. Cramer, Russell E. Cramer, Abraham Stammkrantz, Samuel Cohen and Charles H. Hyman, jointly and severally, for all costs to be taxed in this proceeding.

XIV

The affirmative separate defenses interposed by General, Radio and Variable together with the individual defendants are hereby denied.

10

A-63

XV

Jurisdiction is retained for the purpose of enabling any of the parties to this Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Judgment or for the modification or termination of any of the provisions thereof, and for the purpose of the enforcement of compliance therewith and the punishment of violations thereof.

XVI

Except as otherwise specifically provided in this Judgment, this Judgment shall not be construed to forbid normal business transactions of any of the corporate defendants with its selling agents or consignees, persons or corporations rendering services to it, or customers; or to prohibit transactions with citizens or corporations of foreign nations; or to prevent any defendants from availing of the benefits of the Acts of Congress of August 17, 1937, commonly known as the Miller-Tydings Act, the Act of July 14, 1952 commonly called the McGuire Act, or of the benefits of the Patent Laws.

Dated: September 30, 1953

/s/ Forman
United States District Judge

A-64

U.S. v. GENERAL ELECTRIC CO., ET AL.
Civil No.: 4575
Year Judgment Entered: 1953

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. General Electric Company and International General Electric Company Incorporated., U.S. District Court, D. New Jersey, 1952-1953 Trade Cases ¶67,585, (Oct. 6, 1953)

Click to open document in a browser

United States v. General Electric Company and International General Electric Company Incorporated.

1952-1953 Trade Cases ¶67,585. U.S. District Court, D. New Jersey. Civil Action No. 4575. Dated October 6, 1953. Case No. 814 in the Antitrust Division of the Department of Justice.

### Sherman Antitrust Act and Wilson Tariff Act

**Consent Decree—Practices Enjoined—Agreements with Foreign Manufacturers Electrical Equipment.—** A manufacturer of electrical equipment was enjoined by a consent decree from entering into any understanding with any foreign manufacturer to (1) allocate or divide territories or markets, (2) limit any person in the manufacture, use, distribution, or sale of electrical equipment, (3) limit the importation into or exportation from the United States, (4) leave any person free from competition, (5) refrain from competition in obtaining rights to patents, and (6) determine or prescribe the terms or conditions upon which licenses are granted to others. The use of stock or other financial interest in any foreign manufacturer to enter into understandings described above also was prohibited.

**Consent Decree—Specific Relief—Patent Licensing—Electrical Equipment.—** An electrical equipment manufacturer was ordered by a consent decree to grant to any applicant a non-exclusive license to make, use and vend electrical equipment under any patents acquired by the manufacturer from the foreign manufacturers named as co-conspirators. The granting of licenses under necessary patents (owned or controlled by the manufacturer which are needed to enable a licensee to practice the invention under the acquired patents) also was ordered. Provisions pertaining to reasonable royalties, inspection of a licensee's books and records, cancellation of the license upon failure to pay the royalties or permit inspection, and transferability of the license could be included in the license.

For the plaintiff: Stanley N. Barnes, Marcus A. Hollabaugh, Donald E. Van Koughnet, W. D. Kilgore, Jr., and William F. Tompkins, Attorneys.

For the defendant: James R. E. Ozias and Cahill, Gordon, Zachry and Reindel.

### Final Judgment

[ *Consent to Entry of Decree*]

FORMAN, District Judge [ *In full text except for Exhibits B and C*]: The plaintiff, United States of America, having filed its complaint herein on January 18, 1945; the defendants General Electric Company and International General Electric Company, Incorporated, havings appeared and filed their answers to the complaint denying the substantive allegations thereof; the defendant International General Electric Company, Incorporated, having thereafter been merged on July 31, 1952 with the defendant General Electric Company; and the plaintiff and the defendant General Electric Company by their attorneys having severally consented to the entry of this Judgment without trial or adjudication of any issues of fact or law herein and without this Judgment constituting evidence or an admission by either of them in respect to any such issue;

Now, therefore, before any testimony has been taken and without trial or adjudication of any issue of fact or law herein, and upon consent of the parties as aforesaid, it is hereby

Ordered, adjudged and decreed as follows:

I.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

[ *Sherman Act and Wilson Tariff Act*]

This Court has jurisdiction of the subject matter herein and of the parties hereto, and the complaint states a cause of action against the defendants under Section 1 of the Act of Congress of July 2, 1890, commonly known as the Sherman Antitrust Act, as amended, and under Section 73 of the Act of Congress of August 27, 1894, commonly known as the Wilson Tariff Act, as amended.

II.

[ *Definitions*]

As used in this Judgment:

(A) "Electrical equipment" means all equipment, devices, and systems (except electric lamp and radio equipment, devices, and systems) which concern the generation, transmission, and utilization of electric energy including: generators, transformers, and switch-gear essential for the generation and distribution of electric energy; motors of various types which serve as the sources of power for other industries; motors, magnets, switches, and heating elements for incorporation in other manufactured products; and electrical appliances such as refrigerators and heating devices for household use.

(B) "Person" means an individual, partnership, firm, association or corporation. For the purpose of this Judgment a defendant and its subsidiaries shall be considered to be one person.

(C) "Subsidiary" of a corporation means a corporation more than 50% of whose stock entitled to vote upon the election of directors (other than preferred stock so entitled to vote upon the failure of the corporation to pay certain dividends) is owned or, directly or indirectly, controlled by such other corporation.

(D) "Foreign manufacturers" means Allgemeine Elektricitacts Gesellschaft, Compagnie Francaise Pour l'Exploitation des Procedes Thomson-Houston, Associated Electrical Industries Limited, Tokyo Shibaura Denki Kabushiki Kaisha, Societe d'Electricite et de Mecanique (Procedes ThomsonHouston & Carels Societe Anonyme) and Compagnia Generale di Elettricita.

(E) "Acquired patents" means any United States patents, patent applications, or rights to grant licenses under patents or patent applications, directed to electrical equipment and heretofore acquired by defendant General Electric Company from the foreign manufacturers named as co-conspirators in the complaint and listed in subparagraph (D) of this Section, and shall include all reissues, divisions, continuations or extensions of said patents, and any patents which may issue upon said applications. A list of the patents so acquired and which defendant General Electric Company now owns or controls is attached hereto and marked Exhibit "A" [not reproduced].

(F) "Necessary patents" means any United States patents, patent applications, or rights to grant licenses under patents or patent applications, directed to electrical equipment and owned or controlled by defendant General Electric Company, which must be licensed to enable a licensee to practice the inventions of the acquired patents defined in subparagraph (E) of this Section, and shall include all reissues, divisions, continuations or extensions of said patents, and any patents which may issue upon said applications.

III.

[ *Foreign Activities*]

The provisions of this Judgment applicable to defendant General Electric Company shall apply to such defendant, its officers, directors, agents, employees, representatives, subsidiaries, successors, assigns, and all other persons acting under, through or for such defendant, and to operations and activities outside the United States insofar as affecting the foreign or domestic commerce of the United States.

IV.

[ *Termination and Modification of Agreements*]

---

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

(A) Defendant General Electric Company is hereby ordered and directed to terminate and cancel each of the agreements listed in Exhibit "B" [not reproduced] attached to this Judgment which has not heretofore expired or terminated or been cancelled.

(B) Defendant General Electric Company is hereby ordered and directed prior to December 31, 1953, to terminate and cancel each of the agreements listed in Exhibit "C" [not reproduced] attached to this Judgment which shall not theretofore have terminated or been cancelled, or to cause the name to be modified and amended insofar as necessary so that it shall not be in conflict with any provision of this Judgment.

(C) Defendant General Electric Company is hereby enjoined and restrained from entering into, maintaining of furthering, any contract, agreement or understanding to continue or renew any provision of any of the agreements listed in (A) and (B) of this Section IV which is in conflict with any provision of this Judgment.

(D) Nothing contained in this Section shall be deemed to terminate any right of defendant General Electric Company to use on a non-exclusive and unrestrictive basis any patent under which such defendant has heretofore been licensed or to terminate any power of such defendant to issue sub-licenses or immunities under any such patent.

V.

[ *Agreements with Foreign Manufacturers*]

(A) Defendant General Electric Company is hereby enjoined and restrained from entering into, maintaining or furthering any contract, agreement or understanding with any foreign manufacturer as defined in this Judgment, or any of its subsidiaries, successors, assigns, officers, agents or employees, to:

(1) allocate or divide territories or markets for the production, sale or other distribution of electrical equipment;

(2) exclude any person from or restrain or limit any such person in the manufacture, use, distribution or sale of electrical equipment;

(3) limit, restrain or prevent the importation into or exportation from the United States, its territories, or possessions, of electrical equipment;

(4) refrain from competition or leave any person free from competition in any territory, field or market in the manufacture, use, distribution or sale of electrical equipment;

(5) refrain from competition in the manufacture, use, sale or distribution of, or in obtaining rights to, patents and technological information relating to electrical equipment;

(6) determine or prescribe the terms or conditions upon which licenses or immunities under any patent, invention, or technological information relating to electrical equipment shall be made available by the grantor to others.

Nothing in the foregoing provisions of this Section V shall be construed to prohibit, without more, licenses or conveyances of patent rights or technical information, whether on an exclusive basis or otherwise.

(B) Defendant General Electric Company is further enjoined and restrained from using its stock or other financial interest in any foreign manufacturer, as defined in this Judgment, to directly or indirectly influence or to attempt to influence such manufacturer to enter into any contract, agreement or understanding in conflict with any provision of (A) of this Section.

VI.

[ *Non-Exclusive Licenses Under Acquired Patents*]

(A) Defendant General Electric Company is hereby ordered and directed to grant, to the extent that it has the power to do so, to any applicant making written request therefor a non-exclusive license under any, some or all

---

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

3

of the acquired patents, as defined herein and listed in Exhibit "A" [not reproduced] attached to this Judgment, and for their full unexpired terms, to make, use and vend electrical equipment.

(B) (1) Defendant General Electric Company is enjoined and restrained from including any restriction or condition whatsoever in any license or sub-license granted by it pursuant to this Section, except that each such license or sub-license may contain any, some or all of the following provisions: (a) a provision for the payment to the licensor of a reasonable, non-discriminatory compensation in the nature of a royalty or other monetary consideration (herein referred to as a "royalty"); (b) reasonable provisions for periodic inspection of the books and records of the licenses by an independent auditor, or by any other person acceptable to the licensee and licensor, who shall report to the licensor only the amount of royalty due and payable; (c) reasonable provisions for cancellation of the license upon failure of the licensee to pay the royalties or to permit the inspection of his books or records as hereinabove provided; (d) that the license shall not be transferable; and (e) such other terms and provisions as this Court shall approve if application for such approval is made after reasonable notice to the Attorney General.

(2) Each license issued pursuant to this Section shall provide that: (a) the licensee may cancel the license at any time after one year from the initial date thereof by giving thirty (30) days' notice in writing to the licensor; and (b) the licensor shall notify each licensee of the issuance of each license granted pursuant to this Section involving the same patent or patents; and each licensee shall have the right, upon written request, to exchange its license for any other such license granted by the licensor and involving the same patent or patents, in the event such other license be upon more favorable terms.

(3) Upon receipt by the defendant of a written request for a license under the provisions of this Section, the defendant shall advise the applicant, in writing, of the royalty which it deems reasonable for the patent or patents to which the request pertains. If the parties are unable to agree upon a reasonable royalty within sixty (60) days from the date such request for a license was received by the defendant, the applicant therefor may forthwith apply to this Court for the determination of a reasonable royalty, and the defendant shall, upon receipt of notice of the filing of such application, promptly give notice thereof to the Attorney General or the Assistant Attorney General in charge of the Antitrust Division. The reasonable royalty rates, if any, determined by the Court shall apply to the applicant and to all other subsequent licensees under the same patent or patents. Pending the completion of negotiations or any such proceedings, the applicant shall have the rights requested under this Section to make, have made, use or vend the patent or patents to which its application pertains without payment of royalty or other compensation as above provided, except as provided in Paragraph B (4) hereof.

(4) Where the applicant has the right to make, have made, use or vend as provided in Paragraph B (3) hereof, said applicant or the defendant may apply to this Court to fix an interim royalty rate pending final determination of what constitutes a reasonable royalty. If the Court fixes such interim royalty rate, the defendant shall then issue, and the applicant shall accept, a license or, as the case may be, a sub-license, providing for the periodic payment of royalties at such interim rate from the date of the filing of the application for a license. If the applicant fails to accept such license, or sublicense, or fails to pay the interim royalty in accordance therewith, such action shall be ground for the dismissal of his application, and his rights under this Section shall terminate. The interim royalty rate determined by this Court shall apply to the license granted to such applicant from the date of his application for a license, and may be charged to each subsequent licensee under the same patent or patents, unless this Court shall fix a different rate of interim royalty upon application of any such subsequent licensee pursuant to this Section.

(5) Upon the written request of any licensee licensed pursuant to the provisions of this Section, the defendant shall grant such licensee, to the extent it has the power to do so, an unrestricted, unconditional and non-exclusive grant of immunity from suit by such defendant, with respect to any products made or sold under a license granted pursuant to the terms of this Judgment, under any foreign patents corresponding to the patent or patents under which such licensee is licensed.

VII.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

[ *Non-Exclusive Licenses Under Necessary Patents*]

(A) Defendant General Electric Company is hereby further ordered and directed to grant to any applicant licensed under the provisions of Section VI of this Judgment, but only to the extent necessary to enable said applicant to practice the inventions of the acquired patents licensed under such Section, a non-exclusive license under any, some or all of the necessary patents as defined herein and for their full unexpired terms, to make, use and vend electrical equipment.

(B) Licenses granted under this Section VII shall be subject to and in conformity with the provisions of Section VI (B) of this Judgment.

VIII.

[ *Inspection and Compliance*]

For the purpose of securing compliance with this Judgment, duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendant General Electric Company, to its principal office, be permitted, subject to any legally recognized privilege, (1) access during the office hours of said defendant to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of said defendant relating to any matters contained in this Judgment, and (2) subject to the reasonable convenience of said defendant and without restraint or interference from it, to interview officers or employees of said defendant, who may have counsel present, regarding any such matters, and upon request said defendant shall submit such written reports as might from time to time be reasonably necessary to the enforcement of this Judgment. No information obtained by the means provided in this Section shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of such Department, except in the course of legal proceedings to which the United States is a party for the purpose of securing compliance with this Judgment or as otherwise required by law.

IX.

[ *Jurisdiction Retained*]

Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate in relation to the construction of or carrying out of this Judgment, for the modification or termination of any of the provisions thereof, and for the purpose of the enforcement of compliance therewith and the punishment of violations thereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm
5

U.S. v. AMERICAN LEAD PENCIL CO., ET AL.
Civil No.: 73-54
Year Judgment Entered: 1954

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. American Lead Pencil Co., Joseph Dixon Crucible Co., Eagle Pencil Co., and Eberhard Faber Pencil Co., U.S. District Court, D. New Jersey, 1954 Trade Cases ¶67,676, (Feb. 5, 1954)

United States v. American Lead Pencil Co., Joseph Dixon Crucible Co., Eagle Pencil Co., and Eberhard Faber Pencil Co.

1954 Trade Cases ¶67,676. U.S. District Court, D. New Jersey. Civil Action No. 73-54. Filed February 05, 1954. Case No. 1184 in the Antitrust Division of the Department of Justice.

### Sherman Antitrust Act

**Consent Decree—Practices Enjoined—Price Fixing—Allocation of Markets or Customers—Exportation Agreements—Secret Exchange of Notices of Proposed Changes in Prices or Sales Terms.**—Four lead pencil manufacturers consent to the entry of a decree prohibiting them from contracting among themselves or with any other manufacturer in the United States, or through any trade association of pencil manufacturers to fix prices, discounts, of other terms for the sale of pencils. They are further enjoined from agreeing to allocate markets, orders, or customers for the manufacture or distribution of pencils and from agreeing to refrain from exporting or importing pencils from or into the United States. The communication to any other manufacturer or trade association of information regarding intended changes in prices or sales terms before the proposed changes are generally announced to the trade is also forbidden.

**Consent Decree—Practices Enjoined—Price Fixing—Collusive Bidding—Interests in Foreign Corporation.**—A consent decree orders four lead pencil manufacturers to refrain from (1) fixing prices or sales terms upon which any dealer may sell pencils in the United States to a third party; (2) fixing prices, or conditions of any dealer's bid which may be submitted in response to an invitation for a bid to supply pencils in the United States; (3) appointing any dealer an agent of any defendant for the submission of invited bids for pencils; (4) refusing to sell pencils on customary trade terms to any dealer because he has submitted his own bid in competition with a defendant's bid, provided that the dealer is a regular wholesaler or retailer of the defendant's pencils. Under an additional provision of the decree, two defendants are enjoined from renewing a previously dissolved joint interest in a foreign corporation.

For the plaintiff: Stanley N. Barnes, Assistant Attorney General; Worth Rowley, and Richard B. O'Donnell, Special Assistants to the Attorney General; William D. Kilgore, Jr., John S. James, Harry N. Burgess, Alfred Karsted, Mary G. Jones, and Stanley Blecher, Attorneys.

For the defendants: Cleary, Gottlieb, Friendly & Hamilton, by R. C. Barnard, for American Lead Pencil Co.; Carey, Schenck & Jardine, by Robert Carey, for Joseph Dixon Crucible Co.; Donovan, Leisure, Newton & Irvine, by Ralstone R. Irvine, for Eagle Pencil Co.; and Crawford & Reed, by John Howley, for Eberhard Faber Pencil Co.

### Final Judgment

SMITH, District Judge [ *In full text*]: Plaintiff, United States of America, having filed its complaint herein on January 26, 1954, and each of the defendants having appeared herein, and the plaintiff and the said defendants by their respective attorneys having severally consented to the making and entry of this Final Judgment without trial or adjudication of any issue of fact or law herein and without admission by any party in respect of any such issue, and the Court having considered the matter and being duly advised

Now, therefore, before the taking of any testimony and without trial or adjudication of any issue of fact or law herein, and upon the consent as aforesaid of all the parties hereto

It is hereby ordered, adjudged and decreed as follows:

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

I

### [ Sherman Act]

This Court has jurisdiction of the subject matter hereof and of all the parties hereto. The complaint states a cause of action against the defendants and each of them under Section 1 of the Act of Congress of July '2, 1890 entitled "An Act to protect trade and commerce against unlawful restraints and monopolies", as amended, commonly known as the Sherman Act.

II

### [ Definitions]

As used in this Final Judgment:

(a) "Lead pencils" means wood-cased lead pencils;

(b) "Person" means any individual, partnership, firm, corporation, association or other business or legal entity;

(c) "Manufacturer" means a person as herein defined engaged in the manufacture and sale of lead pencils;

(d) "Dealer" means any person other than a manufacturer regularly engaged in the wholesale or retail sale or distribution of lead pencils;

(e) "United States" names the continental United States, its territories and possessions.

III

### [ Applicability of Judgment]

The provisions of this Final Judgment applicable to a defendant shall apply to such defendant, its officers, agents, servants, employees and attorneys, and to those persons in active concert or participation with any defendant who receive actual notice of this Final Judgment by personal service or otherwise.

IV

### [ Practices Enjoined]

The defendants and each of them, are jointly and severally enjoined and restrained from entering into, adhering to, maintaining or furthering, or claiming any rights under, any contract, combination, agreement, understanding or arrangement among themselves or with any other manufacturer in the United States, or with or through any trade association or other central agency of manufacturers of lead pencils, directly or indirectly, to:

(a) Fix, determine, establish, maintain or adhere to prices, discounts or other terms or conditions for the sale of lead pencils to any person; or

(b) Allocate, pro-rate or divide markets, fields, contracts, orders or customers for the manufacture, distribution or sale of lead pencils: or

(c) Refrain from exporting or importing lead pencils from or into the United States.

V

### [ Dissemination of Price Information]

The defendants are jointly and severally enjoined and restrained from directly or indirectly circulating, exchanging or communicating to or with any other manufacturer or to or through any trade association or central organization of manufacturers, any information regarding the price or prices, terms or conditions, or intended or proposed changes in price or prices, terms or conditions, for the sale in the United States of lead pencils prior to the time that such price or prices, terms or conditions or changes in such price or prices, terms or conditions are published and generally announced to the trade.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

A-73

VI

[ General Prohibitions—Modification]

(A) The defendants are jointly and severally enjoined and restrained from, directly and indirectly:

(1) Fixing, determining or controlling in any manner the price or prices, terms or conditions upon which any dealer may sell lead pencils in the United States to third persons;

(2) Fixing, determining or controlling in any manner the price or prices, terms or conditions of any bid which may be submitted by any dealer, in response to any invitation for bids to supply lead pencils in the United States;

(3) Appointing or designating any dealer as an agent of or for any such defendant for the submission of any bid in response to any invitation for bids to supply lead pencils in the United States;

(4) Refusing to sell lead pencils upon normal and customary trade terms and conditions to any dealer because such dealer, in competition with a bid submitted by such defendant, has submitted its own bid on the same invitation to bid and has been awarded a contract for the sale of lead pencils, provided that such dealer is regularly engaged in the wholesale or retail sale or distribution of lead pencils of such defendant.

(B) Upon the expiration of three (3) years after the date of the entry of this Final Judgment the defendants, or any of them, may apply to this Court to be relieved from the prohibitions contained in subsections (A) (3) and (4) of this Section VI and may be so relieved upon a showing made to the satisfaction of this Court that the prohibitions therein contained work an undue burden or hardship upon such defendant or defendants.

VII

[ Dissolution of Interests in Foreign Corporation]

Defendants Eagle Pencil Company, and American Lead Pencil Company, having submitted to this court due proof of the dissolution of the joint interests heretofore held by them in Reber, S. A., a Mexican corporation, such dissolution of said joint interests is hereby made of record and said defendants Eagle Pencil Company, and American Lead Pencil Company are jointly and severally enjoined and restrained from renewing said joint interest in said corporation.

VIII

[ Rights Under Other Acts Preserved]

(a) Nothing contained in this Final Judgment shall be construed as denying to any defendant any rights which such defendant may have under the Act of Congress of August 17, 1937, commonly known as the Miller-Tydings Act, or under the Act of Congress of July 14, 1952, commonly known as the McGuire Act;

(b) Without in any manner adjudicating, determining or passing upon the legality or illegality of any of the acts or practices of the Pencil Industry Export Association and without, in any manner imputing any legality or illegality to any of the acts or practices of said Export Association, nothing contained in this Final Judgment shall be construed as denying to the defendants or any of them, any rights which they may have under the Act of Congress of April 10, 1918, commonly known as the Webb-Pomerene Act.

IX

[ Inspection and Compliance]

For the purpose of securing compliance with this Final Judgment duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to any defendant, made to its principal office, be permitted, (a) access during the office hours of said defendant to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of said defendant relating to any matters contained in this Final Judgment, and (b) subject to the reasonable convenience of said

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

3

defendant and without restraint or interference from it to interview officers or employees of said defendant, who may have counsel present, regarding any such matters, and (c) upon such request the said defendant shall submit such reports in writing to the Department of Justice with respect to matters contained in this Final Judgment as may from time to time be necessary to the enforcement of this Final Judgment. No information obtained by the means provided in this Section IX shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Department except in the course of legal proceedings to which the United States is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law.

X

[ *Effective Date*]

This Final Judgment shall become effective ninety (90) days after the date of its entry.

XI

[ *Jurisdiction Retained*]

Jurisdiction is retained for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment or for the modification of any of the provisions thereof, and for the purpose of the enforcement of compliance therewith and the punishment of violations thereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

U.S. v. THE EMBROIDERY CUTTERS ASS'N, ET AL.
Civil No.: 889-54
Year Judgment Entered: 1954

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. The Embroidery Cutters Association, et al., U.S. District Court, D. New Jersey, 1954 Trade Cases ¶67,891, (Nov. 12, 1954)

Click to open document in a browser

United States v. The Embroidery Cutters Association, et al.

1954 Trade Cases ¶67,891. U.S. District Court, D. New Jersey. Civil Action No. 889-54. Filed November 12, 1954. Case No. 1208 in the Antitrust Division of the Department of Justice.

### Sherman Antitrust Act

**Combinations and Conspiracies—Consent Decree—Practices Enjoined—Price Fixing and Related Practices—Association Membership.**—Embroidery cutters were enjoined by a consent decree from entering into any agreement (1) to fix prices, pricing methods, discounts, or other terms used by any cutter, (2) to fix the charges or other terms for delivery, (3) to circulate any price lists in advance of the publication of such lists to customers, or (4) to circulate any statistics representing costs of operation. The cutters and a trade association were enjoined from suggesting prices; from circulating any price lists which have been established by any two or more cutters; and from being a member of any trade association or central agency, the activities of which are inconsistent with the decree.

**Combinations and Conspiracies—Consent Decree—Specific Relief—Revision of Price Lists.**—Embroidery cutters were ordered by a consent decree to withdraw their presently in effect price lists to the extent that such price lists are identical with the prices appearing on a price list prepared by the defendant trade association. Also, they were ordered to individually review the prices withdrawn on the basis of their individual cost figures and individual judgment as to profits and to issue new price lists on the basis of such independent review.

**Department of Justice Enforcement and Procedure—Consent Decree—Specific Relief —Dissolution of Trade Association.**—Embroidery cutters were ordered by a consent decree to commence taking such action as may be necessary to accomplish the dissolution of the defendant trade association and to complete such dissolution within the minimum period of time permitted by the applicable state laws.

For the plaintiff; Stanley N. Barnes, Assistant Attorney General; Bertram C. Dedman, W. D. Kilgore, Jr., and Richard B. O'Donnell, Special Assistants to the Attorney General; and John S. James, Stanley Blecher, and Moses M. Lewis, Trial Attorneys.

For the defendants: Moses L. Kove for the Embroidery Cutters Assn.

### Final Judgment

THOMAS F. MEANEY, District Judge [ *In full text*]: The plaintiff, United States of America, having filed its complaint herein on November 12, 1954 and each of the said defendants having appeared herein and the plaintiff and the defendants, by their respective attorneys, having severally consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law herein, and without this Final Judgment constituting evidence or admission by any defendant in respect of any such issue;

Now, therefore, before any testimony or evidence has been taken herein, and without trial or adjudication of any issue of fact or law herein, and upon the consent of all the parties hereto, it is hereby

Ordered, adjudged and decreed as follows:

I

[ *Sherman Act*]

The Court has jurisdiction of the subject matter herein and all the parties hereto. The complaint states a cause of action against the defendants and each of them under Section 1 of the Act of Congress of July 2, 1890, entitled

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

"An Act to protect trade and (Commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

II

[ *Definitions*]

As used in this Final Judgment:

(A) "Person" means any individual, partnership, firm, association, corporation, or other legal entity;

(B) "Embroiderer" means an individual, partnership, firm or corporation engaged in the business of designing, ordering, and selling embroidery used in the manufacture of wearing apparel;

(C)"Embroidery cutter" means an individual, partnership, firm, or corporation engaged in the business of cutting or finishing rolls, or sheets of cloth on which embroidery has been placed;

(D) "Defendant association" means The Embroidery Cutters Association.

III

[ *Applicability*]

The provisions of this Final Judgment applicable to any defendant shall apply to each such defendant and to his or its officers, agents, servants, employees, subsidiaries, successors, and assigns and to all persons in active concert or participation with any defendant who shall have received actual notice of this Final Judgment by personal service or otherwise.

IV

[ *Dissolution of Association*]

The defendants are ordered and directed:

(A) Forthwith to commence taking such action as may be necessary to accomplish the dissolution of the defendant association under the laws of the State of New Jersey and to complete such dissolution within the minimum period of time permitted by the laws of the State of New Jersey;

(B) Upon the completion of such dissolution of the defendant association, to file an affidavit with this Court and with the Attorney General setting forth the fact of their compliance with this Section.

V

[ *Price Fixing and Related Practices*]

The defendants other than the defendant association are jointly and severally enjoined and restrained from entering into, adhering to or maintaining, or claiming any rights under any contract, combination, agreement, understanding, plan or program with any other defendant, with any other embroidery cutter, or with any association or central agency of or for embroidery cutters;

(A) To fix, determine, establish, or maintain prices, pricing methods, discounts, or other terms and conditions used or to be used by such defendant or by any other person in connection with the cutting or finishing of embroidery;

(B) To fix, determine, establish, or maintain the charges or any other terms and conditions for the delivery of embroidery, after cutting or finishing work has been performed thereon, by such defendant or by any other person;

(C) To circulate or exchange, directly or indirectly, any price lists or price quotations applicable to embroidery cutting or finishing work with any other embroidery cutter or embroidery cutters in advance of the publication, circulation, or communication of such price lists or price quotations to the customers of such defendant;

---

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

A-78

(D) To circulate or exchange, directly or indirectly, any statistics representing costs of operation with any other embroidery cutter or embroidery cutters, for the purpose or with the effect of fixing prices, or otherwise restraining trade.

VI

[ *Price Lists — Association Membership*]

The defendants are jointly and severally enjoined and restrained from:

(A) Urging, influencing or suggesting, or attempting to urge, influence or suggest to any other embroidery cutter the price or prices, or other terms or conditions to be charged by such other embroidery cutter for the cutting or finishing of embroidery;

(B) Circulating, exchanging or using, in any manner, any price list or purported price list containing or purported to contain any prices, terms or conditions for the cut ting or finishing of embroidery, which have been agreed upon or established pursuant to agreement between two or more embroidery cutters;

(C) Being a member of, contributing anything of value, or participating in any of the activities of, any trade association or central agency or for embroidery cutters, the activities of which are inconsistent in any manner with any of the provisions of this Final Judgment.

VII

[ *Revision of Price Lists*]

Within thirty (30) days following the date of the entry of this Final Judgment, each of the defendants other than the defendant association shall:

(A) Withdraw his or its presently effective price list for embroidery cutting and finishing work (or, where no price list has been issued, withdraw his or its presently prevailing prices) to the extent that such price list or prices are identical with the prices appearing on the price list prepared by the Price Survey Committee of the defendant association and circulated by the defendant association in May 1954; and

(B) Individually review the prices with drawn in conformity with Section VII (A) herein on the basis of his or its individual cost figures and individual judgment as to profits and issue a new price list (or, where no price list has been issued, issue new prices) on the basis of such independent review.

VIII

[ *Notification of Judgment*]

The defendant association is ordered and directed, within ten (10) days after the date of its entry, to furnish to each of its present members a conformed copy of this Final Judgment and to file with this Court, and with the Attorney General or Assistant Attorney General in charge of the Antitrust Division, a report setting forth the fact and manner of its compliance with this Section VIII, together with the names and addresses of each person to whom a copy of this Final Judgment shall have been furnished in compliance herewith.

IX

[ *Inspection and Compliance*]

For the purpose of securing compliance with this Final Judgment, duly authorized representatives of the Department of Justice, shall, on written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to any defendant made to its principal office, be permitted, subject to any legally-recognized privilege, (a) reasonable access, during the office hours of such defendant, to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of such defendant, relating to any of the matters contained in this Final Judgment, and (b) subject to the reasonable convenience of such defendant, and without restraint or

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

3

interference, to interview officers and employees of such defendant who may have counsel present, regarding any such matters. For the purpose of securing compliance with this Final Judgment, the defendants, upon the written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, shall submit such written reports with respect to any of the matters contained in this Final Judgment as from time to time may be necessary for the purpose of enforcement of this Final Judgment. No information obtained by the means permitted in this Section IX shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Department except in the course of legal proceedings for the purpose of securing compliance with this Final Judgment in which the United States is a party or as otherwise required by law.

X

[ Retention of Jurisdiction]

Jurisdiction of this Court is retained) for the purpose of enabling any of the parties to this Final Judgment to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification or termination of any of the provisions thereof, for the enforcement of compliance therewith and punishment of violations thereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

4

A-80

US. v. NATIONAL ELECTRICAL CONTRACTORS ASS'N, N.J. CHAPTER, INC., ET AL.
Civil No.: 575-56
Year Judgment Entered: 1956

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,

            Plaintiff,

     vs.

NATIONAL ELECTRICAL CONTRACTORS
ASSOCIATION, N. J. CHAPTER, INC.,
P. JOSEPH QUINN. MEL DOWNS
ELECTRICAL CONSTRUCTION COMPANY,
MELVIN M. DOWNS, GERALD ELECTRICAL
CONSTRUCTION COMPANY, J. C. FITZ-
GERALD, JOHN F. MEADE, FRED PERAMPUS,
HARRY R. COMPTON, CALVI ELECTRIC
COMPANY. FRANCIS CALVI. McADAM
ELECTRIC COMPANY. THOMAS J. McADAM,
WILLIAM E. SHELL, and ROLAND E.
McMAHON, JR.,

            Defendants.

Civil Action  575-56

Filed:  July 13, 1956

### FINAL JUDGMENT

The plaintiff, United States of America, having filed its complaint herein on July 13, 1956, and each of the defendants having appeared herein and having filed its answer in which it denies the offenses charged in such complaint, and having asserted the truth of their answer and innocence of any violation of the law; and no testimony having been taken, and the plaintiff and said defendants by their respective attorneys having consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law herein, and without this Final Judgment constituting evidence or admission by the defendants in respect to any such issue;

NOW, THEREFORE, upon the consent of the parties hereto, it is hereby

ORDERED, ADJUDGED, AND DECREED as follows:

I

The Court has jurisdiction of the subject matter of this action and of the parties hereto. The complaint states a claim

for relief against the defendants under Section 1 of the Act
of Congress of July 2, 1890, entitled "An Act to protect trade
and commerce against unlawful restraints and monopolies,"
commonly known as the Sherman Act, as amended.

II

As used in this Final Judgment:

(a) "Electrical contractors" means corporations, firms, and
persons engaged in the sale and installation of elec-
trical equipment;

(b) "Electrical equipment" means and includes all types and
kinds of electrical equipment and materials which are
customarily affixed or permanently installed by skilled
labor in commercial, residential, industrial, public,
and other buildings and structures, such as electrical
wiring, cable and conduits, switches and switch boxes,
outlets and outlet boxes and covers, fuses and fuse
boxes, circuit breakers, panels and panel boards, con-
trol equipment, insulators, lighting fixtures, and other
devices and material used in electrical lighting and
power systems in said buildings and structures; and

(c) "Awarding authority" means all persons (including, but
not limited to, general contractors, architects, en-
gineers, government bodies, school boards, and repre-
sentatives of private, public or charitable organiza-
tions) designating and selecting electrical contractors
to sell or install electrical equipment in structures
and buildings.

III

The provisions of this Final Judgment applicable to any de-
fendant shall apply to each such defendant and to his or its
officers, agents, servants, employees, subsidiaries, successors

-2-

A-83

and assigns, and to all persons in active concert or participation
with any defendant who shall have received actual notice of this
Final Judgment by personal service or otherwise.

IV

The defendants are jointly and severally enjoined and re-
strained from entering into, participating in, or maintaining
any contract, combination, agreement, undertaking, plan or pro-
gram with each other or with any other electrical contractor or
anyone acting for or on behalf of any electrical contractor to:

(a) Fix prices or terms for the sale or installation of
electrical equipment;

(b) Exchange future bid prices or terms for the sale or
installation of electrical equipment;

(c) Allocate contracts for the sale or installation of
electrical equipment among electrical contractors;

(d) Restrict the sale or installation of electrical equip-
ment by electrical contractors to a prescribed area,
territory, customer or class of customers, or to con-
tracts above or below a prescribed valuation;

(e) Submit fictitious, fraudulent, or complementary bids to
awarding authorities requesting bids for the sale or
installation of electrical equipment;

(f) Restrict or prohibit any electrical contractor from ob-
taining contract plans, specifications, bid proposal
forms, or other bidding information from awarding
authorities requesting bids for the sale or installa-
tion of electrical equipment;

(g) Restrict or prohibit any electrical contractor from
obtaining supplies of electrical equipment from whole-
sale suppliers or manufacturers of such equipment.

-3-

V

The defendants are jointly and severally enjoined and re-
strained from entering into, participating in or maintaining any
contract, combination, agreement, undertaking, plan, or program
with any labor union, association, brotherhood, or other labor
organization to:

(a) Restrict, curtail, or prevent the supply of labor to
any electrical contractor who is willing and able to
comply with and abide by union requirements concerning
wages, hours, working conditions, and collective bar-
gaining;

(b) Supply inadequate, incompetent, or supernumerary labor
and otherwise discriminate in furnishing labor to elec-
trical contractors who are able and willing to comply
with and abide by union requirements concerning wages,
hours, working conditions, and collective bargaining;

(c) Induce or coerce any electrical contractor to employ
labor under terms and conditions of employment dif-
ferent than required of or imposed upon other electrical
contractors; or

(d) Induce or bring about strikes, walk-outs, picketing,
slowdowns, or other labor difficulties between any
electrical contractor and any union labor organization
which do not arise out of efforts by such labor organi-
zation to exercise its lawful rights with respect to
such contractor or contractors.

PROVIDED, HOWEVER, that nothing in this Final Judgment shall
be deemed to enjoin any defendant from bargaining collectively
and entering into and carrying out the terms of any agreement
with duly organized labor unions which is incident and appropriate
to the exercise of any or all rights, privileges, immunities,

-4-

A-85

duties and obligations accruing to and devolving upon a duly
organized labor union and its officers, agents and members.

VI

Defendant Association is ordered and directed:

(a) To cancel and revoke any provision of its by-laws,
rules or regulations excluding any person from being,
or preventing any person from becoming a member, save
for failure or refusal of any person to comply with
said Association's reasonable and nondiscriminatory
requirements for membership, not otherwise inconsistent
with the provisions of this Final Judgment;

(b) To expel promptly from membership any member of the
defendant association who shall be found guilty of
violating the provisions of this Judgment when the
said defendant association shall have knowledge of
such violation.

VII

For the purpose of securing compliance with this Final Judg-
ment, duly authorized representatives of the Department of Justice
shall, on written request of the Attorney General or the Assistant
Attorney General in charge of the Antitrust Division, and on
reasonable notice to any defendant, be permitted, subject to any
legally-recognized privilege, (a) reasonable access, during the
office hours of such defendant, to all books, ledgers, accounts,
correspondence, memoranda, and other records and documents in the
possession or under the control of such defendant, relating to
any of the matters contained in this Final Judgment, and (b) sub-
ject to the reasonable convenience of any defendant, and without
restraint or interference, to interview officers and employees of

-5-

such defendant who may have counsel present, regarding any such matters. For the purpose of securing compliance with this Final Judgment, any defendant, upon the written request of the Attorney General or the Assistant Attorney General in charge of the Anti-trust Division, shall submit such written reports with respect to any of the matters contained in this Final Judgment as from time to time may be necessary for the purpose of enforcement of this Final Judgment. No information obtained by the means permitted in this Section VII shall be divulged by any representa-tive of the Department of Justice to any person other than a duly authorized representative of the Department except in the course of legal proceedings for the purpose of securing compliance with this Final Judgment in which the United States is a party or as otherwise required by law.

### VIII

Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this Final Judgment to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification or termination of any of the provisions thereof, for the enforcement of com-pliance therewith and punishment of violations thereof. It is represented to the court that all defendants appear voluntarily and waived service by filing answer. T.M.M
Dated: July 13, 1956

/s/ Thomas M. Madden
United States District Judge

We consent to the entry of the foregoing Final Judgment:

For the Plaintiff:

/s/   Edward A. Foote
EDWARD A. FOOTE
First Assistant, Antitrust Division

/s/ William L. Maher

/s/ Donald G. Balthis
Attorneys, Department of Justice

/s/ Wilford L. Whitley, Jr.
Attorney, Department of Justice

/s/ George F. Schueller
Attorney, Department of Justice

For the Defendants:

/s/ James T. Owens
Attorney for
National Electrical Contractors
Association, New Jersey Chapter, Inc.
and P. Joseph Quinn

/s/ Murray Fredericks
Attorney for
Calvi Electric Company and
Francis Calvi
McAdam Electric Company and
Thomas J. McAdam

/s/ Joshua V. Davidow
Attorney for
Mel Downs Electrical Construction Co.
and Melvin M. Downs

/s/ Raymond J. Osborn
Attorney for
Gerald Electric Construction Company, Inc.
and J. C. Fitzgerald

/s/ William T. Cahill
Attorney for
Harry R. Compton

/s/ E. Milton Hannold
Attorney for
Roland E. McMahon, Jr.

/s/ S. Thurman Lovitt
Attorney for
John F. Meade

/s/ Charles E. Gant
Attorney for
Fred Phrampus

/s/ Samuel P. Orlando
Attorney for
William E. Snell

**Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. National Electrical Contractors Association, New Jersey Chapter, Inc., P. Joseph Quinn, Mel Downs Electrical Construction Company, Melvin M. Downs, Gerald Electrical Construction Company, J. C. Fitzgerald, John F. Meade, Fred Phrampus, Harry R. Compton, Calvi Electric Company, Francis Calvi, McAdam Electric Company, Thomas J, McAdam, William E. Snell, and Roland E. McMahon, Jr., U.S. District Court, D. New Jersey, 1956 Trade Cases ¶68,534, (Oct. 26, 1956)**

Click to open document in a browser

United States v. National Electrical Contractors Association, New Jersey Chapter, Inc., P. Joseph Quinn, Mel Downs Electrical Construction Company, Melvin M. Downs, Gerald Electrical Construction Company, J. C. Fitzgerald, John F. Meade, Fred Phrampus, Harry R. Compton, Calvi Electric Company, Francis Calvi, McAdam Electric Company, Thomas J. McAdam, William E. Snell, and Roland E. McMahon, Jr.

1956 Trade Cases ¶68,534. U.S. District Court, D. New Jersey. Civil Action No. 575-56. Filed October 26, 1956. Case No. 1298 in the Antitrust Division of the Department of Justice.

### Sherman Antitrust Act

**Department of Justice Enforcement and Procedure—Consent Decrees—Permissive Provisions—Bidding Practices.**—Where a consent decree prohibited electrical contractors from entering into any agreement to fix prices or to exchange future bids, and it appeared that the decree might preclude some contractors from competing with other contractors, the decree, upon the consent of the parties, was modified so as not to prohibit any electrical contractor from entering into a joint venture agreement whereby a single bid will be submitted and the assets and facilities of each of the parties thereto will be combined for the sale and installation of electrical equipment of such monetary value or in such quantities that each party to the joint venture could not singly bid or perform the contract.

For the plaintiff: William L. Maher, Attorney, Department of Justice.

For the defendants: James T. Owens for National Electrical Contractors Association, New Jersey Chapter, Inc., and P. Joseph Quinn; Murray Fredericks for Calvi Electric Company, Francis Calvi, McAdam Electric Company, and Thomas J. McAdam; Joshua V. Davidow for Mel Downs Electrical Construction Co. and Melvin M. Downs; Raymond J. Osborn for Gerald Electric Construction Company, Inc., and J. C. Fitzgerald; William T. Cahill for Harry R. Compton; E. Milton Hannold for Roland E. McMahon, Jr.; S. Thurman Lovitt for John F. Meade; Charles E. Gant for Fred Phrampus; and Samuel P. Orlando for William E. Snell.

**Modifying a consent decree entered in the U. S. District Court, District of New Jersey, 1956 Trade Cases ¶ 68,413.**

#### Modification of Final Judgment

THOMAS M. MADDEN, District Judge [ *In full text*] : Final Judgment having been entered herein on July 13, 1956 and it having come to the attention of the attorneys for the plaintiff that the terms of such judgment might preclude some electrical contractors from competing with certain other electrical contractors in bidding and contracting for certain sales and installations of electrical equipment,

Now, therefore, upon consent of the parties hereto it is hereby

Ordered, adjudged and decreed as follows:

---

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

Nothing contained in the provisions of Section IV(a) and (b) of the said Final judgment shall be deemed to enjoin any defendant electrical contractor or member of the defendant Association from entering into, participating in, or maintaining with each other or with any other electrical contractor or with anyone acting for or in behalf of any electrical contractor, a joint venture agreement: whereby a single bid will be submitted and the assets and facilities of each of the parties thereto will be combined for the sale and installation of electrical equipment of such monetary value or in such quantities that each party to the joint venture could not singly bid or perform the contract. Provided, however, that such joint ventures shall not be used or permitted to circumvent or evade any of the other provisions of the judgment or to implement other activities in derogation thereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm
2

A-90

US. v. GARDEN STATE RETAIL GASOLINE DEALERS ASS'N, INC., ET AL.
Civil No.: 482-55
Year Judgment Entered: 1956

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. Garden State Retail Gasoline Dealers Association, Inc., Anthony Vitolo, and Irving Lichtenstein., U.S. District Court, D. New Jersey, 1956 Trade Cases ¶68,493, (Sept. 19, 1956)

Click to open document in a browser

United States v. Garden State Retail Gasoline Dealers Association, Inc., Anthony Vitolo, and Irving Lichtenstein.
1956 Trade Cases ¶68,493. U.S. District Court, D. New Jersey. Civil Action No. 482-55. Filed September 19, 1956. Case No. 1239 in the Antitrust Division of the Department of Justice.

### Sherman Antitrust Act

**Combinations and Conspiracies—Consent Decree—Practices Enjoined—Price Fixing—Gasoline.**—A retail gasoline dealers' association and two individuals were prohibited by a consent decree from entering into any understanding with any retailer or any association of retailers to fix prices, pricing methods, or other terms for the sale of gasoline to consumers, and from suggesting to any other retailer the prices to be charged by such other retailer or circulating any price list containing any prices for the sale of gasoline agreed upon by two or more retailers.

**Combinations and Conspiracies—Consent Decree—Practices Enjoined—Preventing Persons from Selling.**—A retail gasoline dealers' association and two individuals were prohibited by a consent decree from entering into any understanding with any retailer or association of retailers to hinder, restrict, limit, or prevent any person from selling gasoline to customers, and from hindering, restricting, limiting, or preventing any person from selling gasoline.

**Combinations and Conspiracies—Consent Decree—Practices Enjoined—Membership in Association.**—A retail gasoline dealers' association and two individuals were each prohibited by a consent decree from being a member of, contributing anything of value to, or participating in any of the activities of, any trade association, the activities of which are inconsistent with the provisions of the decree.

**Department of Justice Enforcement and Procedure—Consent Decrees—Specific Relief—Dissolution of Association.**—A retail gasoline dealers' association and two individuals were ordered to institute such action as may be necessary to dissolve the association under the laws of the state of its incorporation, to complete such dissolution within the minimum period of time permitted by such laws, and to file an affidavit setting forth the fact of their compliance upon the completion of such dissolution.

**Department of Justice Enforcement and Procedure—Consent Decrees—Specific Relief—Notice of Judgment.**—A retail gasoline dealers' association was ordered by a consent decree to cause to be published in a specified trade magazine an advertisement setting forth a summary of the substantive provisions of the consent decree.

For the plaintiff: Victor R. Hansen, Assistant Attorney General, and Worth Rowley, John D. Swartz, Charles F. B. McAleer, W. D. Kilgore, Jr., Richard B. O'Donnell, Walter W. K. Bennett, and Bernard Wehrmann, Attorneys, Department of Justice.

For the defendants: Anthony D. Rinaldo for Garden State Retail Gasoline Dealers Association, Inc., and Anthony Vitolo; and Norman Fischbein for Irving Lichtenstein.

### Final Judgment

WORTENDYKE, District Judge[ *In full text*]:The plaintiff, United States of America, having filed its complaint herein on May 25, 1955, and each of the said defendants having appeared herein and the plaintiff and the defendants, by their respective attorneys, having severally consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law herein, and without this Final Judgment constituting evidence or admission by any defendant in respect of any such issue;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

1

Now, therefore, before any testimony or evidence has been taken herein, and without trial or adjudication of any issue of fact or law herein, and upon the consent of all the parties hereto, it is hereby

Ordered, adjudged and decreed as follows:

I

[ *Sherman Act*]

The Court has jurisdiction of the subject matter hereof and all the parties hereto. The complaint states a claim upon which relief may be granted against the defendants and each of them under Section 1 of the Act of Congress of July 2, 1890, entitled "An Act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

II

[ *Definitions*]

As used in this Final Judgment:

(A) "Person" shall mean any individual, partnership, firm, association, corporation or other legal entity;

(B) "Defendant association" shall mean the defendant Garden State Retail Gasoline Dealers Association, Inc.;

(C) "Retailer" shall mean any person who sells gasoline to consumers.

III

[ *Applicability of Judgment*]

The provisions of this Final Judgment applicable to any defendant shall apply to each such defendant and to his or its officers, agents, servants, employees, subsidiaries, successors and assigns, and to all persons in active concert or participation with any defendant who shall have received actual notice of this Final Judgment by personal service or otherwise.

IV

[ *Dissolution of Association*]

The defendants are ordered and directed:

(A) Forthwith to institute such action as may be necessary to dissolve the defendant association under the laws of the State of New Jersey and to complete such dissolution within the minimum period of time permitted by the laws of the State of New Jersey;

(B) Upon the completion of such dissolution of the defendant association, to file an affidavit with this Court and with the Attorney General setting forth the fact of their compliance with this Section.

V

[ *Price Fixing—Restrictions on Sales*]

The defendants are jointly and severally enjoined and restrained from, directly or indirectly, entering into, adhering to, enforcing, maintaining or claiming any rights under any contract, agreement, understanding, plan or program with any retailer or with any association or central agency of or for retailers:

(A) To fix, determine, establish, maintain or stabilize prices, pricing methods, discounts, mark-ups or other terms or conditions for the sale of gasoline to consumers;

(B) To hinder, restrict, limit or prevent any person from selling gasoline to consumers.

VI

---

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

The defendants are jointly and severally enjoined and restrained from, directly or indirectly:

(A) Suggesting, or attempting to suggest to any other retailer the price or prices, or other terms or conditions to be charged by such other retailer for the sale of gasoline to any other person;

(B) Hindering, restricting, limiting or preventing or attempting to hinder, restrict, limit or prevent any person from selling gasoline;

(C) Circulating, exchanging or using, in any manner, any price list or purported price list containing or purporting to contain any prices, terms or conditions for the sale of gasoline agreed upon or established pursuant to agreement between two or more retailers;

(D) Being a member of, contributing anything of value, or participating in any of the activities of, any trade association or other organization, the activities of which are inconsistent in any manner with any of the provisions of this Final Judgment.

VII

[ Notice of Judgment]

Defendant association is ordered and directed, at the earliest practical date, to cause to be published in the trade magazine THE GASOLINE RETAILER an advertisement, in a form first approved by plaintiff, setting forth a summary of the substantive provisions of this Final Judgment.

VIII

[ Inspection and Compliance]

For the purpose of securing compliance with this Final Judgment, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to any defendant made to its principal office, be permitted, subject to any legally-recognized privilege, (A) reasonable access, during the office hours of such defendant, to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of such defendant, relating to any of the matters contained in this Final Judgment, and (B) subject to the reasonable convenience of such defendant, and without restraint or interference, to interview officers and employees of such defendant who may have counsel present, regarding any such matters. Upon such written request said defendant shall submit such written reports with respect to any of the matters contained in this Final Judgment as from time to time may be necessary for the purpose of enforcement of this Final Judgment. No information obtained by the means permitted in this Section VIII shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Department except in the course of legal proceedings in which the United States is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law.

IX

[ Jurisdiction Retained]

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification or termination of any of the provisions thereof, for the enforcement of compliance therewith and punishment of violations thereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

3

\

A-94

US. v. AMERICAN TYPE FOUNDERS CO., INC., ET AL.
Civil No.: 698-58
Year Judgment Entered: 1958

**Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. American Type Founders Co., Inc., U.S. District Court, D. New Jersey, 1958 Trade Cases ¶69,065, (Jun. 20, 1958)**

Click to open document in a browser

United States v. American Type Founders Co., Inc.

1958 Trade Cases ¶69,065. U.S. District Court, D. New Jersey. Civil Action No. 698-58. Dated June 20, 1958. Case No. 1396 in the Antitrust Division of the Department of Justice.

### Sherman Antitrust Act

**Combinations and Conspiracies—Consent Decree—Practices Enjoined—Price Fixing.**—A company engaged in the manufacture and distribution of printing presses and printing equipment was prohibited by a consent decree from entering into any agreement with any distributor having a place of business in the United States, or with any domestic or foreign manufacturer, to fix prices or other terms for the sale of such products in, or exported from, the United States.

**Combinations and Conspiracies—Consent Decree—Practices Enjoined—Allocation of Territories and Markets.**—A company engaged in the manufacture and distribution of printing presses and printing equipment was prohibited by a consent decree from entering into any agreement with any distributor having a place of business in the United States to limit or restrict the territories in which, or the customers to whom, any such distributor might sell such products.

**Combinations and Conspiracies—Consent Decree—Practices Enjoined—Restricting Use of Competitors' Products.**—A company engaged in the manufacture and distribution of printing presses and printing equipment was prohibited by a consent decree from entering into any agreement with any distributor having a place of business in the United States to limit or restrict the right of any such distributor to purchase, distribute, or sell products from any source other than the company. The company was further prohibited from selling or offering to sell products for use or resale in the United States on the condition or understanding that the purchaser not purchase, distribute, or sell products from any source other than the company.

**Combinations and Conspiracies—Consent Decree—Practices Enjoined—Agreements to Control Imports and Exports.**—A company engaged in the manufacture and distribution of printing presses and printing equipment was prohibited! by a consent decree from entering into any agreement with any domestic or foreign manufacturer (1) restricting or preventing any foreign manufacturer from exporting to and selling products in the United States to ultimate consumers, except where the company has an exclusive distributorship for such products in the United States, or (2) restricting or preventing the company from exporting products from the United States.

**Department of Justice Enforcement and Procedure—Consent Decree—Contingent Provision.**—A consent decree entered against a company engaged in the manufacture and distribution of printing presses and printing equipment provided that, in the event the company should engage in the manufacture of a specific product or products, the company would be prohibited from entering into any understanding (1) to fix prices for the sale of such product or products in or exported from the United States, (2) to allocate customers or markets for the manufacture, distribution, or sale of such product or products, (3) to restrict or limit imports of such product or products into or exports of such product or products from the United States, (4) to refrain from selling such product or products or otherwise refrain from doing business in such product or products, or (5) to refrain from competing in or for any customer, territory, or market for the manufacture, distribution, or sale of such product or products.

**Department of Justice Enforcement and Procedure—Consent Decree—Permissive Provisions.**—A consent decree entered against a company engaged in the manufacture and distribution of printing presses and equipment provided that the company, subject to certain provisions of the decree, could choose its distributors and customers and designate geographical areas in which such distributors should be primarily responsible for selling the company's products and could terminate the franchise of any distributor who does not adequately

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

represent the company. The purchase by the company of products under a requirements contract, reasonable in time, was excluded from a prohibition of the decree. The decree further provided that nothing contained therein should be construed to (1) require the company to violate any law or decree of any court of competent jurisdiction in a foreign nation, (2) prevent the company from entering into or adhering to any fair trade contract otherwise permitted under the Miller-Tydings and McGuire acts, or (3) prohibit a covenant, reasonable in time and space, not to compete in the manufacture or sale of products if such covenant is ancillary to the lawful sale of a business or a department of a business.

For the plaintiff: Victor R. Hansen, Assistant Attorney General, and William D. Kilgore, Jr., Baddia J. Rashid, Philip L. Roache, Jr., Charles F. B. McAleer, and Stanley R. Mills, Jr., Attorneys, Department of Justice.

For the defendant: Stroock and Stroock and Lavan by Samuel Hoffman; Victor H. Kramer; and Kresteller, Zucker, Lowenstein and Cohen by Melvin B. Cohen.

### Final Judgment

MENDIN MORRILL, District Judge [ *In full text*] : Plaintiff, United States of America, having filed its complaint herein on June 20, 1958; defendant, American Type Founders Co., Inc., having appeared and filed its answer to the complaint denying the substantive allegations thereof; and the plaintiff and the defendant, by their attorneys, having severally consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law herein and without admission by either of them in respect to any such issue;

Now, therefore, before any testimony has been taken herein, and without trial or adjudication of any issue of fact or law herein, and upon consent of the parties hereto, it is hereby

Ordered, Adjudged and Decreed as follows:

I

[ *Sherman Act*]

This Court has jurisdiction of the subject matter herein and of the parties hereto. The complaint states claims against the defendant, American Type Founders Co., Inc., upon which relief may be granted under Sections 1 and 3 of the Act of Congress of July 2, 1890, entitled "An Act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

II

[ *Definitions*]

As used in this Final Judgment:

(A) "Printing presses and printing equipment" means (1) letter presses and offset presses for making printed impressions on paper or other material from an inked surface, and the equipment and accessories used in connection therewith and as a part thereof and (2) the Solna Vertico 1400 Step and Repeat Machine and the Solna Gatherer; but type and type-setting equipment are neither "printing pressess" nor "printing equipment".

(B) "Products" means printing presses and printing equipment;

(C) "Defendant" means the defendant American Type Founders Co., Inc., a corporation organized and existing under the laws of the State of Delaware;

(D) "United States" means the United States and its territories and possessions;

(E) "Person" means an individual, partnership, firm, association, corporation or other business or legal entity;

(F) "Vickers" means Vickers-Armstrongs, Limited, a holding company organized and existing under the laws of the United Kingdom;

(G) "Engineers" means Vickers-Armstrongs (Engineers), Ltd., a company organized and existing under the laws of the United Kingdom;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

(H) "Mann" means George Mann & Co., Ltd., a company organized and existing under the laws of the United Kingdom;

(I) "A/B Printing" means A/B Printing Equipment, a company organized and existing under the laws of Sweden;

(J) "Honolulu Paper" means Honolulu Paper Company, Limited, a corporation organized and existing under the laws of the Territory of Hawaii;

(K) "Heinsohn" means A. E. Heinsohn Printing Machinery & Supplies, a partnership with its office and principal place of business in Denver, Colorado.

III

[ Applicability of Decree]

The provisions of this Final Judgment shall apply to the defendant and to each of its subsidiaries, successors, assigns, officers, directors, servants, employees and agents, and to those persons in active concert or participation with the defendant who receive actual notice of this Final Judgment by personal service or otherwise.

IV

[ Agreements with Distributors]

Defendant is enjoined and restrained from, directly or indirectly:

(A) Entering into, adhering to, maintaining or claiming any rights under any contract, agreement or understanding with Honolulu Paper, Heinsohn or any other distributor having a place of business in the United States to:

(1) Fix, establish, maintain or adhere to prices, terms or conditions for the sale of products in or exported from the United States to third persons;

(2) Limit or restrict the territories in which or the customers to whom any such distributor may sell products;

(3) Limit or restrict the right of any such distributor to purchase, distribute or sell products from any source other than defendant;

(B) Selling or offering to sell products for use or resale in the United States on the condition or understanding that the purchaser not purchase, distribute or sell products from any source other than defendant.

Subject to the terms of subsections (A) and (B) of this Section IV and of Section VI below defendant may exercise its right to choose and select its distributors and customers and to designate geographical areas in which such distributors shall respectively be primarily responsible for selling defendant's products and may terminate the franchises of distributors who do not adequately represent defendant and promote the sale of all defendant's products in areas so designated as their primary responsibility.

V

[ Agreements with Manufacturers]

Defendant is enjoined and restrained from, directly or indirectly, entering into, adhering to, maintaining or claiming any rights under any contract, agreement or understanding with any domestic or foreign manufacturer:

(A) Fixing, establishing, maintaining, or adhering to prices, terms or conditions for the sale of products in or exported from the United States to third persons;

(B) Restricting or preventing any foreign manufacturer from exporting to and selling products in the United States to ultimate consumers, except where defendant has an exclusive distributorship for said products in the United States from such foreign manufacturer;

(C) Restricting or preventing defendant from exporting products from the United States;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

3

(D) Under which any person refrains from engaging in the manufacture of products; provided, however, that this sub section shall not be deemed to prohibit (1) the purchase by defendant of products under a requirements contract, reasonable in time, or (2) the enforcement of any rights defendant may have under a contract with Van Vlaanderen Machine Company, dated September 7, 1956.

VI

[ Contingent Prohibitions]

In the event that defendant shall engage in the manufacture of a specific product or products, then defendant is enjoined and restrained from, directly or indirectly, entering into, adhering to, maintaining or claiming any rights under any contract, agreement or understanding with any other person to:

(A) Fix, establish, maintain or adhere to prices, terms or conditions for the sale of said specific product or products in or ex ported from the United States to any third person;

(B) Allocate or divide customers, territories or markets for the manufacturer, distribution or sale of said specific product or products;

(C) Restrict or limit imports of said specific product or products into or export of said specific product or products from the United States;

(D) Refrain from selling said specific product or products to, or otherwise refrain from doing business in said specific product or products with any person;

(E) Refrain from competing in or for any customer, territory or market for the manufacture, distribution or sale of said specific product or products.

For the purposes of this Section VI of this Final Judgment (1) the manufacture by defendant of parts of products for the purpose of servicing products in the hands of consumers shall not constitute the manufacture of any product and, (2) the occasional assembling of component parts into any product by defendant shall not constitute the manufacture of any product so long as said parts are not manufactured by, or under a running contract for, defendant.

VII

[ Notice of Judgment]

Defendant is ordered and directed within 60 days from the effective date of this Final Judgment:

(A) To cease adhering to any provision in any contract with Vickers, Engineers, Mann, A/B Printing, Honolulu Paper and Heinsohn, relating to products, which is contrary to or inconsistent with any term of this Final Judgment;

(B) To mail to each of the companies listed in (A) above, a true and complete copy of this Final Judgment, and to advise each of them in writing of the effect of this Final Judgment, and particularly VII(A) above, on any contract to which each may now be a party with defendant.

VIII

[ Permissive Provisions]

Nothing contained in this Final Judgment shall be construed

(A) To require defendant to do, or omit to do, any act in a foreign nation in violation of any law or decree of any court of competent jurisdiction of said foreign nation; provided that defendant shall have the bur den of demonstrating that any act or omission by it otherwise in violation of this Final Judgment was done or omitted be cause of the requirements of the laws or decrees of courts of competent jurisdiction of a foreign nation;

(B) To prevent the defendant from entering into or adhering to any fair trade contract, otherwise permitted by the acts of Congress commonly known as the Miller-Tydings and McGuire acts.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

4

(C) To prohibit a covenant, reasonable in time and space, not to compete in the manufacture or sale of products if said covenant is ancillary to the lawful sale of a business or of a department thereof.

IX

[ *Inspection and Compliance*]

For the purpose of securing compliance with this Final Judgment duly authorized representative of the Department of Justice shall, on written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to the defendant made to its principal office, be permitted, subject to any legally recognized privilege:

(A) Access, during the office hours of the defendant, to all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of the defendant relating to any matters contained in this Final Judgment.

(B) Subject to the reasonable convenience of the defendant and without restraint or interference from the defendant, to interview officers or employees of the defendant, who may have counsel present, regarding any such matters.

Upon such written request the defendant shall submit such reports in writing with respect to the matters contained in this Final Judgment as may from time to time be necessary to the enforcement of this Final Judgment. No information obtained by the means permitted in this Section IX shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Department of Justice except in the course of legal proceedings in which the United States is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law

X

[ *Jurisdiction Retained*]

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the amendment or modification of any of the provisions thereof, for the enforcement of compliance therewith, and for the punishment of violations thereof.

[ *Effective Date*]

This judgment shall become effective sixty (60) days from the date of entry hereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

5

US. v. THE GEMEX CORP.
Civil No.: 1350-58
Year Judgment Entered: 1959

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. The Gemex Corporation., U.S. District Court, D. New Jersey, 1959 Trade Cases ¶69,421, (Jul. 31, 1959)

Click to open document in a browser

United States v. The Gemex Corporation.

1959 Trade Cases ¶69,421. U.S. District Court, D. New Jersey. Civil Action No. 1350-58. Filed July 31, 1959. Case No. 1426 in the Antitrust Division of the Department of Justice.

#### Sherman Antitrust Act

**Combinations and Conspiracies—Consent Decree—Practices Enjoined—Price Fixing —Fixing Prices for Sale of Watchbands.**—A manufacturer of watchbands was prohibited by a consent decree from entering into any agreement with any wholesaler to fix prices for the sale of watchbands to third persons. The decree also enjoined the manufacturer from requiring any wholesaler to sell watchbands at list price or at any other specific price level.

**Combinations and Conspiracies-Consent Decree—Practices Enjoined—Price Fixing —Investigations and Penalties—Policing Adherence to Price Fixing Agreements.**—A manufacturer of watchbands was prohibited from collecting, publishing, or disseminating information regarding price cutting or price deviation by wholesalers or retailers. The decree also enjoined the manufacturer from requiring any wholesaler to report to it regarding any such price deviation by retailers or other wholesalers.

**Combinations and Conspiracies—Consent Decree—Practices Enjoined—Exclusive Dealing.**—A manufacturer of watchbands was prohibited by a consent decree from selling to its wholesalers on the condition that they refrain from dealing in competitors' products.

For the plaintiff: Robert A. Bicks, W. D. Kilgore, Jr., Raymond M. Carlson, Charles L. Beckler, Charles F. B. McAleer, Charles H. McEnerney, Jr., and John L. Wilson, Department of Justice.

For the defendant: Manning, Hollinger & Shea, New York, N. Y., by Bruce A. Hecker; and Platoff, Platoff & Heftler, Union City, N. J., by Robert G. Platoff.

#### Final Judgment

[ *Consent Decree*]

REYNIER J. WORTENDYKE, Jr., District judge [ *in full text*] : The plaintiff, United States of America, having filed its complaint herein ton December 16, 1958; the defendant, the Gemex Corporation, having appeared and filed its answer to the complaint denying the substantive allegations thereof; and the plaintiff and the defendant, by their attorneys, having severally consented to the entry of this Final Judgment without trial or adjudication of any issue or fact, or law herein and without admission by either of them in respect to any such issue ;

Now, Therefore, before any testimony or evidence has been taken herein, and without trial or adjudication of any issue of fact or law herein, and upon consent of the parties hereto, it is hereby

Ordered, adjudged and decreed as follows :

I

[ *Jurisdiction*]

This Court has jurisdiction of the subject matter hereof and of the parties hereto. The complaint states a claim against the defendant, under which relief may be granted under Section .1 of the Act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies" commonly known as the Sherman Act, as amended.

©*2018 CCH Incorporated and its affiliates and licensors. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*

**II**

[ *Definitions*]

As used in this Final Judgment:

(A) "Watchbands" means attachments, whether of precious or non-precious metals, cord, fabric, leather or other materials, or combinations thereof, which are used to hold watches to the wrist.;

(B) "Wholesaler" means a person who purchases watchbands from a manufacturer for resale to retailers;

(C) "Retailer" means a person who purchases watchbands from a wholesaler for resale to ultimate consumers;

(D) "Person" means any individual, partnership, firm, association; corporation or other business: or legal entity;

(E) "Subsidiary" means any existing or future corporation whose stock is, directly or indirectly, wholly owned by defendant.

**III**

[ *Applicability*]

The provisions of this Final Judgment shall apply to the defendant and to each of its subsidiaries, successors, assigns, officers, directors, employees and agents, and to those persons in active concert or participation with the defendant who receive actual notice of this Final Judgment by personal service or otherwise.

**IV**

[ *Price Fixing—Exclusive Dealing*]

Defendant is enjoined and restrained from directly or indirectly:

(A) Entering into, adhering to, maintaining, enforcing or claiming any rights under any contract, agreement, understanding, plan or program, with any wholesaler to fix, establish, maintain, stabilize or adhere to prices for the sale of watch bands to third persons;

(B) Collecting, publishing or disseminating information regarding, or suggesting, soliciting or requiring that any wholesaler report to defendant, any price cutting or price deviation by any wholesaler or retailer ;

(C) Requiring any wholesaler to sell any watchbands at list price or at any other specific price level;

(D) Selling or offering, or attempting to sell, any watchbands on the condition, agreement or understanding that any wholesaler shall not deal in watchbands manufactured by any person other than the defendant.

**V**

[ *Enforcement and Compliance*]

For the purpose of securing compliance with this Final Judgment and for no other purpose, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to the defendant made to its principal office, be permitted, subject to any legally recognized privilege:

(A) Access, during the office hours of the defendant, to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of the defendant which relate to any matters contained in this Final Judgment;

(B) Subject to the reasonable convenience of the defendant and without restraint or interference from the defendant, to interview officers or employees of the defendant, who may have counsel present, regarding any such matters.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

A-103

Upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, the defendant shall submit such reports in writing with respect to the matters contained in this Final Judgment as may from time to time be necessary to the enforcement of this Final Judgment.

No information obtained by the means permitted in this Section V shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Executive Branch of the plaintiff except in the course of legal proceedings in which the United States is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law.

VI

[ *Jurisdiction Retained*]

Jurisdiction is retained by this Court for the purpose of enabling either of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the amendment or modification of any of the provisions thereof, for the enforcement of compliance therewith, and for the punishment of violations thereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

3

A-104

US. v. NEW JERSEY AUTO GLASS DEALER ASS'N
Civil No.: 575-60
Year Judgment Entered: 1960

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. New Jersey Auto Glass Dealer Association., U.S. District Court, D. New Jersey, 1960 Trade Cases ¶69,764, (Jun. 29, 1960)

Click to open document in a browser

United States v. New Jersey Auto Glass Dealer Association.

1960 Trade Cases ¶69,764. U.S. District Court, D. New Jersey. Civil Action No. 575-60. Dated June 29, 1960. Case No. 1547 in the Antitrust Division of the Department of Justice.

### Sherman Antitrust Act

**Price Fixing—Group Boycott—Coercion.**—An association of auto replacement glass dealers was prohibited by a consent decree from entering into any agreement to (1) fix prices for the sale or installation of such glass, (2) investigate or report prices charged, (3) hinder the sale of replacement glass to any person, (4) restrict the free and independent selection of customers or dealers, (5) cause or bring about boycotts, (6) prevent any person from purchasing, or having installed, replacement glass, or (7) prevent any person from vertising the prices charged by him. The association also was prohibited from circulating t o any insurance company any membership list, unless such list names every member and contains a notice that prices are determined by each member, and from picketing any insurance company, purchaser, or user of such glass.

**Consent Decree—Specific Relief—Association Membership.**—An auto replacement glass dealer's association was required by a consent decree to admit to membership any qualified auto glass dealer doing business it its area.

For the plaintiff: Robert A. Bicks, Paul A. Owens, W. D. Kilgore, Jr., Richard B. O'Donnell, John D. Swartz, Walter W. K. Bennett, and Francis E. Dugan, Attorneys, Department of Justice.

For the defendant: Hyman Siegendorf.

### Final Judgment

HARTSHONNE, District Judge [ *in full text*]: The plaintiff, United States of America, having filed its complaint herein on June 29, 1960, and the parties hereto, by their respective attorneys, having consented to the entering of this Final Judgment without trial or adjudication of any issue of fact or law herein, and without admission by any party hereto with respect to any such issue:

Now, therefore, before the taking of any testimony, and without trial or adjudication of any issue of fact or law herein, and upon the consent of the parties hereto, it is hereby Ordered, adjudged and decreed as follows:

I

[ *Jurisdiction*]

This Court has jurisdiction of the subject matter hereof and of the parties hereto. The complaint states claims for relief against the defendant, under Section 1 of the Act of Congress of July 2, 1890, entitled "An Act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

II

[ *Definitions*]

As used in this Final Judgment:

(A)"Person" shall mean any individual, partnership, corporation or any other business or legal entity;

(B)"NJAGDA" shall mean the defendant New Jersey Auto Glass Dealers' Association.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

(C)"Defendant" shall mean the defendant NJAGDA and those members of NJAGDA who have received notices of this Final Judgment pursuant to Section IV(A) hereof;

(D)"Replacement glass" shall mean laminated, tempered, and other types of glass suitable for installation in automobiles, trucks, or other vehicles as windshields, back lites (i. e., rear vision windows), or side windows. The term shall include molded or bent glass, flat, and uncut, as well as precut, or preformed glass;

(E) "Installation of replacement glass" shall mean the necessary fitting, glazing, cutting or grinding, as well as the actual installing of glass in an automobile, truck or other vehicle.

(F) "Automobile glass dealer" shall mean any person engaged in the business of selling at retail and installing replacement glass.

III

[ *Applicability*]

The provisions of this Final Judgment applicable to defendant shall apply to its members, officers, directors, agents, employees, successors and assigns, and to all other persons in active concert or participation with such defendant who shall have received actual notice of this Final Judgment by personal service, or otherwise.

IV

[ *By-Laws—Incorporation of Provisions*]

(A) Defendant is ordered and directed to mail a copy of this Final Judgment to each of its members within sixty days after the date of the entry hereof.

(B) Defendant is ordered and directed within ninety days from the date of entry of this Final Judgment to institute and complete such proceedings as may be appropriate and necessary to amend its Charter and By-Laws so as to incorporate therein Sections V, VI and VII of this Final Judgment, and to require as a condition of membership that all present and future members be bound by such sections of this Final Judgment;

(C) Promptly after compliance therewith defendant shall file with this Court and with the Assistant Attorney General an affidavit of compliance with subparagraphs (A) and (B) of this Section IV attaching copies of the documents used to effect such compliance.

V

[ *Prohibited Agreements*]

The defendant is enjoined and restrained from entering into, adhering to, maintaining, enforcing, or claiming any rights under any contract, agreement, understanding, plan or program with any other person to:

(A) Fix, suggest, establish, determine or maintain prices, terms or conditions to be charged or imposed by any other person for the sale or installation of replacement glass;

(B) Prepare, publish, circulate, or suggest prices, price lists, including discounts from prices, or other terms or conditions to be charged or imposed by any other person in connection with the sale or installation of replacement glass;

(C) Urge, suggest, coerce, require, or attempt to influence such person to boycott, threaten to boycott, or refuse or threaten to refuse to do business with any third person;

(D) Interfere or threaten or attempt to interfere with the business of any person by picketing or other similar activity;

(E) Investigate and report to others, or police, the prices or terms charged or imposed by any person in connection with the sale or installation of replacement glass. This subsection shall not be construed to prohibit an individual automobile glass dealer from independently ascertaining competitive prices;

©*2018 CCH Incorporated and its affiliates and licensors. All rights reserved.*
*Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm*

2

A-107

(F) Hinder, restrict or prevent, or attempt or threaten to hinder, restrict or prevent in any manner, the sale of replacement glass by any manufacturer, distributor or wholesaler to any person, except pursuant to the exercise of such lawful rights as an automobile glass dealer may have under a distributor ship agreement with any manufacturer;

(G) Hinder, restrict or limit or attempt or threaten to hinder, restrict or limit any other person in the free and independent selection of customers or automobile glass dealers;

(H) Hinder, restrict or prevent, or attempt or threaten to hinder, restrict or prevent any person from purchasing replacement glass from, or procuring the installation of replacement glass by, any other person;

(I) Hinder, restrict or prevent, or attempt or threaten to hinder, restrict or prevent any Person from advertising prices, terms or other conditions for the sale or installation of replacement glass to be sold or installed by such person.

Subject to the injunctive provisions here in contained, this Section B is not intended to prevent defendant from engaging in the joint or collective solicitation of business on behalf of its members as a whole.

VI

[ *Prohibited Practices*]

Defendant is enjoined and restrained from directly or indirectly:

(A) Preparing, suggesting, publishing or circulating prices, price lists, price catalogues or discounts therefrom for the sale or installation of replacement glass; provided, however, nothing herein contained shall prevent any automobile glass dealer from preparing, negotiating, publishing or circulating his own prices and price lists or price catalogues containing his own prices for the sale or installation of replacement glass which prices have been individually determined by him, in the normal course of his business;

(B) Preparing, publishing or circulating to any insurance company or any other person any list of the membership of defendant unless such list contains the name of every member and contains a legend in a form, first approved by the Assistant Attorney General in charge of the Anti-trust Division, to the effect that NJAGDA makes no representation as to the price or prices to be charged for replacement glass sold or work performed by any such member and that such prices are determined by each individual member;

(C) Suggesting, or attempting to suggest, to any automobile glass dealer, the price or prices or terms to be charged or imposed by such automobile glass dealer for the sale or installation of replacement glass;

(D) Picketing or threatening to picket any insurance company, purchaser, or user of replacement glass;

(E) Hindering, restricting or preventing, or attempting or threatening to hinder, restrict or prevent, the sale in any manner of replacement glass by any manufacturer, distributor or wholesaler to any person; except pursuant to the exercise of such lawful rights as an automobile glass dealer may have under a distributorship agreement with any manufacturer;

(F) Suggesting or attempting to suggest, to any automobile glass dealer that he should purchase or offer to purchase from any person any materials to be used for automobile glass replacement upon the condition or understanding that such person will refrain from selling any of such materials to any other person.

VII

[ *Opening of Membership*]

(A) Defendant is ordered and directed to admit to and continue in membership therein, upon application, any automobile glass dealer doing business within the State of New Jersey, or within any other area served by its members, who is technically qualified to engage in the business of installation of replacement glass as defined in Section 11(E) of this Final Judgment. In the event defendant rejects any application for membership, it shall (1) advise the applicant, and the Assistant Attorney General, in writing, of the specific reasons for such rejection and

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

3

A-108

(2) on request of the applicant, submit the question of the applicant's qualifications for membership to arbitration under the rules of the American Arbitration Association, whose decision shall be final and binding on the parties thereto, the fee of the American Arbitration Association to be borne by the losing party;

(B) Defendant is enjoined and restrained from expelling from membership or otherwise taking any punitive action against any member; provided, however, nothing herein shall prevent defendant from expelling any member for (1) failure to pay dues; (2) failure to comply with this Final Judgment or (3) for cause unconnected with such member's competitive or pricing activities. In the event of any such expulsion, defendant shall notify the expelled member in writing of the specific grounds for such expulsion and, if the expulsion is for grounds stated in (3) above, shall, upon request of the expelled member, submit the justification for such expulsion to arbitration under the rules of the American Arbitration Association, whose decision shall be final and binding upon the parties thereto, the fee of the American Arbitration Association to be borne by the losing party;

(C) Defendant is ordered and directed to send, within sixty days from the date of entry of this Final Judgment, a letter, in a form first approved by the Assistant Attorney General in charge of the Antitrust Division, to the claim supervisors of all insurance companies to whom price lists and price catalogues have heretofore been sent cancelling such price lists, and setting forth the substantive provisions of this Final Judgment.

VIII

[ Compliance]

For the purpose of securing compliance with this Final Judgment, duly authorized representatives of the Department of Justice shall, upon the written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, upon reasonable notice to defendant at its principal office, subject to any legally recognized privilege, be permitted:

(A) Reasonable access during the office hours of defendant, to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession of or under the control of the defendant, who may have counsel present, relating to any of the matters contained in this Final Judgment; and

(B) Subject to the reasonable convenience of the defendant, and without restraint or interference, to interview officers and employees of the defendant, who may have counsel present, regarding any such matters.

For the purpose of securing compliance with this Final Judgment, defendant, upon the written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, made to its principal office, shall submit such written reports with respect to any of the matters contained in this Final Judgment as from time to time may be necessary for the purpose of enforcement of this Final Judgment.

No information obtained by the means permitted in this Section VIII shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the executive branch of the plaintiff, except in the course of legal proceedings for the purpose of securing compliance with this Final Judgment in which the United States is a party or as otherwise required by law.

IX

[ Jurisdiction Retained]

Jurisdiction of this Court is retained for the purpose of enabling any of the parties to this Final Judgment to apply to the Court at any time for such further orders and directions as may be necessary or appropriate of the provisions thereof, for the enforce-for the construction or carrying out of this ment of compliance therewith, and for the Final Judgment, for the modification of any punishment of violations thereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

US. v. DRIVER-HARRIS CO., ET AL.
Civil No.: 942-56
Year Judgment Entered: 1961

**Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. Driver-Harris Co., Alloy Metal Wire Co., Inc., and its Successor, H. K. Porter Co. (Delaware), Wilbur B. Driver Co., Hoskins Manufacturing Co., C. O. Jelliff Manufacturing Corp., U.S. District Court, D. New Jersey, 1961 Trade Cases ¶70,031, (May 25, 1961)**

Click to open document in a browser

United States v. Driver-Harris Co., Alloy Metal Wire Co., Inc., and its Successor, H. K. Porter Co. (Delaware), Wilbur B. Driver Co., Hoskins Manufacturing Co., C. O. Jelliff Manufacturing Corp.

1961 Trade Cases ¶70,031. U.S. District Court, D. New Jersey. Civil Action No. 942-56. Filed May 25, 1961. Case No. 1312 in the Antitrust Division of the Department of Justice.

## Sherman Act

**Consent Decree—Relief—Patent Licensing—Technical Information and Assistance—Identical Bids —Pricing.**—Two electrical alloy resistance product manufacturers entered into a consent decree in which it was provided that (1) the companies would withdraw present price lists and issue new ones, and sell on non-discriminatory terms to all persons on the same functional industry level as other customers, with exceptions for items no longer offered; (2) make a public dedication or grant royalty-free licenses under specified patents which the government charged had been misused, and make licenses available on all other patents, including those obtained within 5 years following the effective date of the judgment; and (3) give technical information and assistance, at specified maximum charges, to actual or potential manufacturers requesting such help during the five years after the judgment becomes effective, or during the life of patents as to licensees. Practices involving price fixing, territory allocation, and avoidance of competition were prohibited, as were the exchange of information, holding stock or other interests in other manufacturers, or having common "policy" personnel with such manufacturers. The decree also provided that, in any enforcement action by the government, a showing by the plaintiff of an "appreciable number" (not otherwise defined) of identical bids in excess of $50 by a consenting defendant with any other defendant for the sale of electrical resistance materials or products would be *prima facie* evidence of price fixing.

For the plaintiff: George Reycraft and Jay Flocken, Department of Justice.

For the defendants: Pitney, Hardin & Ward, Newark, N. J., for Driver-Harris Co.; Shanley & Fisher, Newark, N. J., for Jelliff Mfg. Co.; Stickel & Stickel, Newark, N. J., for Wilbur B. Driver Co.; Milton, McNulty & Augelli, Jersey City, N. J., for Hoskins Mfg. Co.; McCarter, English & Studer, Newark, N. J., for Alloy Metal "Wire Co.

### Final Judgment

SMITH, District Judge [ *In full text*]: Plaintiff, United States of America, having filed its complaint herein on December 5, 1956; the defendants consenting hereto having appeared and filed their answers to such complaint, denying the substantive allegations thereof; and the plaintiff and the defendants consenting hereto, by their respective attorneys, having consented to the entry of this Final Judgment herein;

Now, therefore, before the taking of any testimony and without trial or adjudication of any issue of fact or law, and upon consent of the parties signatory hereto, and the Court being advised and having considered the matter, it is hereby

Ordered, adjudged and decreed as follows:

I

This Court has jurisdiction of the subject matter of this action and of the parties hereto. The complaint states claims upon which relief may be granted against the defendants consenting hereto, under Sections 1 and 2 of

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

1

the Act of Congress of July, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

## II

### [ *Definitions* ]

As used in this Final Judgment:

(A) "Person" shall mean any individual, partnership, firm, association, corporation, or any other business or legal entity;

(B) "Resistance materials" shall mean (1) electrical resistance materials, and (2) materials sold by a defendant (a) having a composition substantially similar to electrical resistance materials, or (b) for thermocouple or sparkplug purposes, and (3) tubing, wire, ribbon, strip or rod sold by a defendant for heat resistant purposes in connection with the flow of electricity;

(C) "Resistance products" shall mean wire, ribbon, strip, rod or tubing made from resistance materials;

(D) "Electrical resistance materials" shall mean any alloy or any metallic or other element, or any combination of elements now or which may be

(1) produced, processed, sold or received by a defendant, which is recognized or represented by such defendant as having electrical resistance properties (including controllable and reproducible electrical resistivity or temperature coefficients of resistance) suitable for electrical resistance uses; or

(2) manufactured, sold, distributed or received by a defendant for electrical resistance purposes; or

(3) known or recognized generally in the trade as an electrical resistance material;

(E) "Electrical resistance products" shall mean tubing," wire, ribbon, strip or rod made from electrical resistance materials;

(F) "Manufacturer" shall mean any person engaged in the manufacture or drawing or processing (such as enameling, insulating, oxidizing or coiling) of electrical resistance materials or electrical resistance products;

(G) "Patents" shall mean any, some or all claims of patents relating to the manufacture, use or sale of electrical resistance materials or electrical resistance products, including any divisions, reissues or extensions of such patents, or applications there for;

(H) "Subsidiary" shall mean any corporation controlled by, or more than 50% of whose outstanding stock entitled to vote is held by one person;

(I) "Bid" shall mean a bid for furnishing electrical resistance materials or electrical resistance products pursuant to a formal written invitation for a bid made by a prospective customer who, the defendant knows or has reason to know, has also submitted the same request for a bid to another person. It shall not include the ordinary solicitation of orders by a defendant from a customer or prospective customer nor the ordinary quotation to a customer or prospective customer;

(J) "Consenting defendant" or "consenting defendants" shall mean only a defendant or defendants which shall have consented to the terms of this Final Judgment;

(K) "Effective date of this Final Judgment" shall mean the date on which a Final Judgment not subject to further appeal is entered against the remaining defendants.

## III

### [ *Scope of Judgment— Notice*]

(A) The provisions of this Final Judgment shall apply solely to any consenting defendant, to each of its subsidiaries, successors and assigns, and to each of its officers, directors, agents and employees, and to all other persons in active concert or participation with any consenting defendant who shall have received notice

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

of this Final Judgment by personal service or otherwise. The provisions of this Final Judgment shall not apply to acts, contracts, agreements, arrangements, understandings, plans or programs of foreign subsidiaries of any consenting defendant unless such acts, contracts, agreements, arrangements, understandings, plans or programs concern the foreign or domestic commerce of the United States. This Final Judgment shall not apply to transactions solely between a consenting defendant and its subsidiaries and the officers, directors, agents and employees of either when acting in such capacity.

(B) Each consenting defendant is ordered and directed (1) to serve a copy of this Final Judgment upon (a) each present and future member of its Board of Directors; (b) each of its present and future Vice Presidents and chief managerial officers who are not members of its Board of Directors and (c) the present and future chief executive officers of each of its subsidiaries engaged in the manufacture, processing or sale of resistance materials or resistance products, and (2) within thirty (30) days after the effective date of this Final Judgment, to file with this Court, and serve upon the plaintiff, an affidavit as to the fact and manner of its compliance, as to its present officers and directors, with this subsection (B), setting forth in said affidavit the name, position and address of each person upon whom a copy of this Final Judgment at that time shall have been served as herein ordered and directed.

(C) Each consenting defendant is ordered and directed for a period of five (5) years after the effective date of this Final Judgment to furnish, without charge, to any person requesting the same, a copy of this Final Judgment together with a copy of the affidavit required to be filed by subsection (B) of Section V hereof.

IV

### [ Price Lists— Customer Selection]

Each consenting defendant is ordered and directed:

(A) With respect to its domestic and Canadian operations, to cancel each of its current price lists pertaining to resistance materials or resistance products and individually to determine new prices in lieu thereof for such materials and products then being manufactured or offered for sale by the defendant; such new prices to be individually determined by each defendant on the basis of its own costs and its own judgment as to margins of profit and other lawful considerations; and after the effective date of this Final Judgment to issue new price lists containing the prices determined in accordance with this subsection (A) and to serve upon the plaintiff copies of work papers used by it in determining the prices contained in such new price lists. New price lists covering electrical resistance materials and electrical resistance products in the form of rod shall be issued and served upon plaintiff thirty (30) days after the effective date of this Final Judgment. New price lists covering resistance materials and resistance products other than rod shall be issued and served upon plaintiff ninety (90) days after the effective date of this Final Judgment. Cancellation of said current price lists shall be effective as of the date fixed for the issuance of the new price lists covering the respective materials and products.

(B) If a consenting defendant has sold to or processed for, or hereafter sells to or processes for, any person any resistance material or resistance product, either directly or through regularly designated distributors, to sell to or process for, or cause such distributors to sell to or process for, any other person on the same functional industry level as the defendant's other customers, upon request of such other person and upon uniform and non-discriminatory prices and other terms and conditions, except as otherwise permitted by way of defense under the Robinson-Patman Act; and such defendant and such distributors shall hold themselves out as ready and willing so to sell or process? provided, however, that in cases of short supply the defendant shall make a reasonable allocation among its customers, but not to the exclusion of new customers.

This subsection (B) shall not require a defendant (i) to submit any bid, (ii) to continue to sell any size or line of material or products which it discontinues making, or (hi) to sell to a person an electrical resistance material or electrical resistance product designated by such person as having been made by the defendant for a particular customer if (1) such material or product has been made by the defendant according to specification developed by the particular customer without the assistance of the defendant and (2) the defendant has not during the preceding year made an identical or substantially identical material or product for any other customer, and (3)

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

if such defendant after having made a request therefor has not secured the consent of such customer to make such sales*

(C) To file with the Assistant Attorney General in charge of the Antitrust Division within ten (10) days after its execution a copy of any contract or agreement relating to activities covered by this Final Judgment (other than orders, contracts or agreements relating to routine sales and purchases and which do not create any obligation upon either party thereto extending more than six months) entered into within a period of five (5) years after the effective date of this Final Judgment between (i) such defendant and any other defendant and (ii) such defendant and any other manufacturer or distributor;

(D) To retain any and all of its records relating to activities covered by this Final Judgment for a period of ten (10) years from the date of the making thereof except that this subsection (D) shall not require the retention of routine sales and purchase data longer than seven (7) years.

V

[ Patents]

(A) To the extent that a consenting defendant has any interest in the patents listed in Appendix A [1] to this Final Judgment, such defendant shall, at its option, dedicate such interest to the public within thirty (30) days after the effective date of this Final Judgment or shall license to any applicant any right it may have under such patents, without any royalty therefor. If such defendant claims it has no interest in said patents, it shall file an affidavit to that effect at the time of the entry of this Judgment or within ten (10) days thereafter;

(B) Each consenting defendant is ordered and directed, within sixty (60) days after the effective date of this Final Judgment, to file with this Court, and serve upon the plaintiff, an affidavit showing separately, as of the effective date of this Final Judgment, the number, date of issue (or filing as to applications) and name of owner of each existing patent (other than those listed in Appendix A) required to be licensed under this Final Judgment;

(C) Each of the consenting defendants is ordered and directed to grant, to the extent of its legal right to do so, to any person making written request therefor a nonexclusive license for the life of the patent, or patents, to make, have made, use and sell electrical resistance materials or electrical resistance products under any, some, or all of the patents as the applicant may request except those covered by subsection (A) above, which on the effective date of this Final Judgment are owned or controlled by the defendant, or under which it has the right to issue sublicenses, or which within five (5) years from the effective date of this Final Judgment, are issued to, or applied for, or acquired by the defendant, or under which it obtains sublicensing rights within such period;

(D) Each consenting defendant is enjoined and restrained from including in any license issued pursuant to subsection (C) of this Section V any restriction or limitation whatsoever except that:

(1) A reasonable royalty may be charged, which royalty shall be uniform and nondiscriminatory as among licensees procuring the same rights under the same patents;

(2) Reasonable provisions may be made for periodic reports by the licensee to the defendant as to the amount of royalties due and inspection of the books and records of the licensee by an independent auditor or any other person acceptable to both defendant and the licensee, who shall report to the defendant only the amount of the royalty due and payable;

(3) Reasonable provisions may be made for cancellation of the license upon failure of the licensee to pay the royalties or permit inspection of his books and records as herein provided;

(4) The license may be made non-transferable if the licensee is unwilling to agree to notify the defendant of any contemplated transfer and must provide that the licensee may cancel the license at the end of one (1) year and thereafter at any time by giving to the defendant sixty (60) days' notice in writing;

(5) The license may require such patent markings as may be required by statute;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

4

A-114

(E) Upon receipt of a written request for a license under the provisions of subsection (C) hereof, defendant shall advise the applicant, in writing, within thirty (30) days, of the royalty it deems reasonable for the patent or patents to which the application pertains. If such applicant and defendant are unable to agree upon what constitutes a reasonable royalty within sixty (60) days from the date the written application for the license was received by the defendant, either the applicant or defendant may, upon notice to the plaintiff, apply to this Court for the determination of a reasonable royalty. In any such proceeding the burden of proof shall be upon the defendant to establish the reasonableness of any royalty requested. Pending the completion of any such negotiations or court proceeding, the applicant shall have the right to make, have made, use and vend under the patent or patents to which his application pertains without payment of royalty or other compensation, but subject to the following provisions: Defendant may, upon notice to the plaintiff, apply to this Court to fix an interim royalty rate pending final determination of what constitutes a reasonable royalty. If this Court fixes such interim royalty rate, defendant shall then issue and the applicant shall accept a license providing for the periodic payment of royalties at such interim rate from the date upon which the applicant requested the license. If the applicant fails to accept such license or fails to pay the interim royalty in accordance therewith, such action may be grounds for the rejection or dismissal of his application for a license: in the case of such rejection or dismissal, the applicant shall pay any royalties found by the Court to be due to the defendant. Whether or not an interim royalty is fixed by the Court, a final Court determination of a reasonable royalty shall be applicable to the applicant for a license from the date upon which the applicant requested such license, and, from the date of such determination, to any other licensee, at its option, then having the same rights under the same patents;

(F) Nothing herein shall prevent any applicant from attacking, in the aforesaid proceedings or in any other controversy, the validity or scope of any of the patents, nor shall this Final Judgment be construed as imputing any validity or value to any of said patents;

(G) Each consenting defendant is enjoined and restrained from (i) granting, after the effective date of this Final Judgment, any license or sublicense under any patents to which this Section V shall apply, except in accordance with, and pursuant to, the terms of this Final Judgment, and (ii) taking or accepting after the effective date of this Final Judgment, any right, license or immunity, under any patent owned or controlled by any person other than such defendant, which right, license or immunity is by its terms, or in fact, exclusive to the defendant unless such defendant is also granted the right to grant sublicenses to others as required by this Final Judgment (for the purpose of this subparagraph (ii), any right or immunity under a patent shall be deemed to be a license subject to the provisions of this Section V);

(H) Each consenting defendant is enjoined and restrained from making any sale or other disposition of any patent or rights in or under patents which deprives it of the power or authority to grant the licenses required by this Section V unless the purchaser, transferee or assignee shall file with this Court, and serve upon the plaintiff, prior to consummation of any such transaction, its consent to be bound by the applicable provisions of this Section V with respect to such patent;

(I) Each consenting defendant is enjoined and restrained from using or attempting to use any foreign patent, or any rights under any foreign patent, to hinder, restrict, limit or prevent any person licensed pursuant to this Section V from exporting from the United States any electrical resistance materials or electrical resistance products manufactured in the United States pursuant to such license;

(J) Each consenting defendant is enjoined and restrained from maintaining, instituting or threatening to institute any action, counter-claim, set-off, suit or other proceeding against any person for use of or any act of infringement of any existing patent alleged to have occurred prior to the effective date of this Final Judgment.

**VI**

**[ *Technical Information and Assistance*]**

(A) For five (5) years after the effective date of this Final Judgment, each consenting defendant is ordered and directed, upon written request therefor from any actual or potential manufacturer within the United States or any State, territory or possession thereof, to furnish to such applicant copies of any technical manuals, books

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

of instructions, drawings, specifications, blueprints, pamphlets, diagrams or other similar documents (other than those supplied to a defendant by a customer who has developed them for its use without assistance by a defendant, and which the customer, upon request by the defendant to whom the application has been made, refuses to permit to be made available) which the applicant desires owned by or subject to the control of the defendant on the effective date of this Final Judgment, and which documents have been used, or prepared for use, by the defendant in the manufacture or processing of electrical resistance materials or electrical resistance products for the purpose of (i) melting, rolling, drawing and finishing, or (ii) drawing and finishing the same, or (iii) any of the processes enumerated in (i) or (ii) above. For this data the defend ant may charge the applicant a reasonable amount but not to exceed, if all data is furnished (a) $2,000 if the data relates to the processes of melting, rolling, drawing, and finishing or (b) $1,000 if the data relates to the processes of drawing and finishing.

(B) Each consenting defendant is ordered and directed, upon written request of any person licensed under any patent or patents pursuant to Section V of this Final Judgment, to furnish during the life of the patent or patents to such licensee such of the defendant's technical information as the licensee may request as may be necessary in order to practice the invention or inventions of any of the patents licensed by such defendant to the licensee, in such licensee's own manufacture or processing of electrical resistance materials or electrical resistance products. For this information the defendant may make a reasonable charge which shall not be more than the cost to the defendant of furnishing such information.

(C) Upon receipt within a reasonable time of a written application from any actual or potential manufacturer representing that the written technical information furnished to such applicant by the defendant pursuant to sub-sections (A) or (B) of this Section VI is inadequate or insufficient to enable such applicant satisfactorily to practice the inventions, or to perform the said manufacturing processes for which it sought information under said subsections, and specifying in reasonable detail the difficulties experienced, such defendant is ordered and directed to make available to such applicant, if feasible, such additional written information relating to such technical information or manufacturing processes as may be reasonably necessary to enable the applicant to practice the inventions or to manufacture under the specific processes, and if not feasible or sufficient, to make available at reasonable times and for reasonable periods, and without subjecting defendant to hardship, technically qualified personnel from among its own employees for consultation with such applicant at the applicant's place of manufacture regarding the said inventions or manufacturing processes for which the applicant sought information. This subsection (C) shall not require a defendant to send any person outside of the United States. For this data or service the defendant may make a reasonable charge; provided, however, that if such written data were within the control of the defendant at the time when defendant furnished the data under subsections (A) or (B) above, no charge for such written data shall be made unless agreeable to the applicant or unless defendant shows to the satisfaction of the Court that it could not reasonably have contemplated that the applicant would need such written data.

(D) Any person entitled and qualified to receive the documents under subsection (A) of this Section VI, upon written application to a defendant shall be permitted at his own expense and at and for reasonable times, to visit the principal plant of such defendant performing such operations for the purpose of observing and being advised as to the methods, processes, machines and equipment, in use at or before the effective date of this Final Judgment and then being used by such defendant in the manufacture or processing of electrical resistance materials or electrical resistance products, if (1) within five years from such effective date such person shows to the satisfaction of the defendant, or to the satisfaction of the plaintiff in the event of failure to satisfy the defendant, that he does not need or desire information or assistance otherwise provided for in this Section VI, or (2) such person represents that the information or assistance furnished to such applicant by the defendant under this Section VI is inadequate or insufficient to enable such applicant satisfactorily to carry out the manufacture or processing for which the applicant applied for such information or assistance; provided, however, that such visits may be further restricted as follows:

(1) to not more than three officers or employees of the applicant at any one time;

(2) to not more than four such visits per year within three years after such persons first application under this subsection relating to the same information.

---

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

6

For such observations and advice the defendant may make a reasonable charge which, in the case of any person referred to in Clause (1) of this subsection shall not exceed that permitted under subsection (A) above for comparable data and, in the case of any person referred to in Clause (2) of this subsection shall be based on the services and advice given, but not to exceed a rate of $150 per day.

(E) If the applicant and the defendant are unable to agree upon what constitutes a reasonable charge, the applicant, the defendant or the plaintiff may apply to this Court for a determination of a reasonable charge. In any proceedings for a determination of a reasonable charge, the burden of proof shall be upon the defendant to establish the reasonableness of any charge requested by the defendant.

(F) In the event of an application to a consenting defendant for know-how under this Section VI, except subsection (B), by a person, other than a consenting defendant, (a) who is a substantial customer of a consenting defendant for electrical resistance materials or electrical resistance products and not a competitor of any consenting defendant with respect thereto, (b) whose resources are substantially in excess of those of the consenting defendant whose customer applies, and (c) who desires to use such know-how to manufacture such materials or products only for incorporation in products sold by it, any consenting defendant may apply to this Court within thirty (30) days after the application was made, with notice to plaintiff and the applicant, for an order permitting or requiring rejection of such application, which the Court may grant upon the defendant's establishing to the satisfaction of the Court that such rejection is necessary to prevent substantial injury due to the prospective loss of the applicant as a customer and that such rejection would not unduly restrain competition.

(G) No consenting defendant shall be deemed, in connection with the furnishing of any of the foregoing pursuant to this Final Judgment, to have given any implied warranty, representations or guaranty against infringement of patents of others by, or any warranty of success in connection with, its use.

(H) Every agreement under which technical information is furnished pursuant to this Section VI shall contain, if the party furnishing such information shall so request, reasonable provisions requiring the recipient of such information and its subsidiaries to keep such technical information confidential and use the same only for their own manufacturing and selling operations.

(I) Each consenting defendant within ten (10) days from the effective date of this Final Judgment, shall file with the Court and with the plaintiff a listing by categories of all documents it believes come under subsection (A) of this Section VI and a separate list, by customer, of all documents which it believes come under the parenthetical clause in that subsection, and, for a period of five (5) years, to furnish a copy of such lists to any person upon request.

VII

**[ Pricing Practices—Territories-Identical Bids]**

The consenting defendants are jointly and severally enjoined and restrained from entering into, adhering to, maintaining, furthering, renewing or claiming any rights under, any combination, conspiracy, contract, agreement, understanding, plan, program, or common course of action with any other person, directly or indirectly, to:

(A) Establish, fix, determine, maintain or adhere to prices, differentials, discounts, extras or any other term or element of prices, differentials, discounts or extras for the manufacture, processing or sale to or for third persons, including another defendant, of any resistance materials or resistance products, either through the device of establishing technical standards for such materials or such products, or otherwise; provided, however, that this subsection (A) shall not be construed to prohibit the consenting defendants or any of them from participating in a program for the sole purpose of establishing voluntary, uniform technical standards for resistance materials or resistance products. In any proceedings brought by the plaintiff to enforce this Final Judgment against any consenting defendant, a showing by plaintiff, to the satisfaction of the Court of an appreciable number of identical bids in excess of $50.00 by a consenting defendant with any other defendant (except where the bids

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

are minimum charges) for the sale of electrical resistance materials or electrical resistance products, shall be *prima facie* evidence of price fixing;

(B) Divide, allocate or apportion territories, markets or customers for the manufacture, processing or sale of any electrical resistance materials or electrical resistance products;

(C) Refrain from the manufacture, processing or sale of electrical resistance materials or electrical resistance products or refrain from competition with any other person in any territory or market in the manufacture, processing or sale of any such materials or such products;

(D) Hinder, restrict, limit or prevent any other person from manufacturing, processing or selling any electrical resistance materials or electrical resistance products;

(E) Limit the purchase or sale of electrical resistance materials or electrical resistance products to any particular person or group of persons; provided that this shall not prevent lawful contracts for purchases over reasonable periods to secure supplies for such materials or products.

Nothing in this Section VII shall be deemed to prevent a defendant from (i) giving a distributor an exclusive territory provided the distributor is free to sell in any area and to handle electrical resistance materials and electrical resistance products manufactured by others; (ii) selling its business with a one year covenant not to compete or (iii) making lawful contracts with any person other than an actual or potential competitor of a defendant, that they will not reveal trade secrets of the defendant.

## VIII

### [ *Exchange of Information— Interlocking Interests* ]

Each consenting defendant is enjoined and restrained from, directly or indirectly:

(A) Circulating outside its own organization and its own distributors any price list or price information relating to the manufacture, processing or sale of any electrical resistance materials or electrical resistance products in advance of the circulation or dissemination of such price list or price information to its own customers and to the trade generally;

(B) Permitting any of its officers, directors, agents or employees to serve simultaneously as an officer, director, agent or employee of any other manufacturer not a subsidiary of the defendant;

(C) Except for the purchase and sale of products bought and sold in the normal course of business,

(1) acquiring or holding, directly or indirectly, any of the assets or capital stock of, or any financial interest in any other defendant or any other person which becomes a manufacturer other than a wholly owned subsidiary of the consenting defendant, or acquiring, directly or indirectly, any of the assets or capital stock of, or any financial interest in any other manufacturer;

(2) Knowingly permitting any of its officers, directors, or managerial or policy-making agents or employees to acquire or hold, directly or indirectly, any of the assets or capital stock of, or any financial interest in, any other defendant or any person which becomes a manufacturer, or to acquire, directly or indirectly, any of the assets or capital stock of, or any financial interest in, any manufacturer;

(D) Hindering, restricting, limiting or preventing, or attempting to hinder, restrict, limit or prevent any person from serving as a dealer or distributor of or for electrical resistance materials or electrical resistance products manufactured, processed or sold by any other person;

(E) Hindering, restricting, limiting or preventing, or attempting to hinder, restrict, limit or prevent except for lawful action to prevent patent infringement or to protect property rights in trade secrets, any other person from engaging in the manufacture, processing or sale of any electrical resistance materials or electrical resistance products;

(F) Entering into, adhering to, maintaining, furthering, renewing or claiming any rights under, any contract, agreement, understanding, plan or program with any other person, the purpose or effect of which is to hinder,

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

8

restrict, limit or prevent either (i) such defendant or (ii) any other person, from granting a license or sublicense under any patent or patents whether owned or controlled by such defendant or such other person. This subsection shall not be deemed to prohibit the mere assignment of any patent or the grant of any exclusive license under any patent if such license grants sub licensing rights.

IX

(A) Each consenting defendant is ordered and directed:

(1) to cancel within thirty (30) days after the effective date of this Final Judgment each provision of each contract to which it may be a party which is contrary to any of the provisions of this Final Judgment;

(2) to file with this Court and serve upon the plaintiff an affidavit setting forth the fact and manner of its compliance with the foregoing subsection (1).

(B) The consenting defendants, and each of them, are jointly and severally enjoined and restrained from entering into, adhering to, maintaining, furthering or claiming any rights under any contract, agreement, plan or program which is or shall be contrary to or inconsistent with any of the provisions of this Final Judgment.

X

[ Supervision]

(A) For the purpose of securing compliance with this Final Judgment and for no other purpose, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to any consenting defendant made to its principal office, be permitted, subject to any legally recognized privilege:

(1) access, during the office hours of said defendant, to those books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of said defendant which relate to any matter contained in this Final Judgment;

(2) subject to the reasonable convenience of said defendant and without restraint or interference from it, to interview officers or employees of any defendant, who may have counsel present, regarding any such matters.

(B) Upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, said defendant shall submit such reports in writing, and under oath or affirmation if so requested, with respect to the matters contained in this Final Judgment as may from time to time be necessary to the enforcement of this Final Judgment.

(C) No information obtained by the means provided in this Section X shall be divulged by any representatives of the Department of Justice to any person other than a duly authorized representative of the Executive Branch of the plaintiff except in the course of legal proceedings to which the United States is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law.

XI

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the amendment or modification of any of the provisions thereof, for the enforcement of compliance therewith, and for the punishment of violations thereof.

| Footnotes | | | |
|---|---|---|---|
| 1 | Appendix A | | |
| | Patent No. | Patent Date | Inventor | Filing Date |
| | 2,581,420 | 1/8/52 | James M. Lohr .... | 9/23/49 |
| | 2,687,954 | 8/31/54 | James M. Lohr .... | 10/19/51 |

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

9

A-119

| | | |
|---|---|---|
| 2,687,956 | 8/31/54 James M. Lohr .... | 12/28/51 |
| Reissue No. 24,243 | 12/4/56 James M. Lohr .... | 6/29/56 |
| Reissue No. 24,242 | 12/4/56 James M. Lohr .... | 6/29/56 |
| Reissue No. 24,244 | 12/4/56 James M. Lohr .... | 6/29/56 |
| 2,587,275 | 2/26/52 Francis E. Bash .. | 9/23/49 |

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

10

A-120

Cheetah™

 Wolters Kluwer

**Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. Driver-Harris Co., Alloy Metal Wire Co., Inc., and its successor H. K. Porter Co. (Delaware), Wilbur B. Driver Co., Hoskins Manufacturing Co., CO. Jelliff Manufacturing Corp., U.S. District Court, D. New Jersey, 1966 Trade Cases ¶71,658, (Dec. 7, 1965)**

Federal Antitrust Cases

Trade Regulation Reporter - Trade Cases (1932 - 1992) ¶71,658

Click to open document in a browser

United States v. Driver-Harris Co., Alloy Metal Wire Co., Inc., and its successor H. K. Porter Co. (Delaware), Wilbur B. Driver Co., Hoskins Manufacturing Co., CO. Jelliff Manufacturing Corp.

1966 Trade Cases ¶71,658. U.S. District Court, D. New Jersey. Civil Action No. 942-56. Entered December 7, 1965. Case No. 1312 in the Antitrust Division of the Department of Justice.

---

**Headnote**

---

### Sherman Act

**Price Fixing—Electrical Resistance Products—Consent Judgment.**—Two manufacturers of electrical resistance products were required by a consent decree to cancel their current price lists and individually determine new prices and were prohibited from fixing prices, dividing markets, limiting sales to particular customers, or acquiring (for a period of five years) any interest in a manufacturer of electrical resistance products.

**Department of Justice—Compulsory Licensing of Patents—Electrical Resistance Products—Consent Judgment.**—Two manufacturers were required by a consent decree to grant non-exclusive patent licenses for electrical resistance products, at reasonable, nondiscriminatory royalties, under presently owned patents or under patents obtained within a period of five years and to furnish technical information to such licensees at a reasonable charge.

**Superseding** 1961 Trade Cases ¶ 70,031.

For the plaintiff: W. D. Kilgore, Jr., Donald F. Melchior, and Herbert G. Schoepke, Attorneys, Department of Justice.

For the consenting defendants: Fred G. Stickel, Jr., Stickel & Stickel, for Wilbur B. Driver Co.; Harold L. Smith, Hughes, Hubbard, Blair & Reed, and Donald A. Robinson, Shanley & Fisher, for C. O. Jelliff Mfg. Corp.

### Final Judgment

SHAWN, Judge: Plaintiff, United States of America, having filed its complaint herein on December 5, 1956; the defendants consenting hereto having appeared and filed their answers to such complaint, denying the substantive allegations thereof; and the plaintiff and the defendants consenting hereto, by their respective attorneys, having consented to the entry of this Final Judgment herein;

Now, therefore, before the taking of any testimony and without trial or adjudication of any issue of fact or law, and upon consent of the parties signatory hereto, and the Court being advised and having considered the matter, it is hereby

Ordered, adjudged and decreed as follows:

© 2018 CCH Incorporated and its affiliates and licensors. All rights reserved.



I

[ *Jurisdiction* ]

This Court has jurisdiction of the subject matter of this action and of the parties hereto. The complaint states claims upon which relief may be granted against the defendants consenting hereto, under Sections 1 and 2 of the Act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

II

[ *Definitions* ]

As used in this Final Judgment:

(A) "Person" shall mean any individual, partnership, firm, association, corporation, or any other business or legal entity;

(B) "Resistance materials" shall mean (1) electrical resistance materials, and (2) materials sold by a defendant (a) having a composition substantially similar to electrical resistance materials, or (b) for thermocouple or sparkplug purposes, and (3) tubing, wire, ribbon, strip or rod sold by a defendant for heat resistance purposes in connection with the flow of electricity;

(C) "Resistance products" shall mean wire, ribbon, strip, rod or tubing made from resistance materials;

(D) "Electrical resistance materials" shall mean any alloy or any metallic or other element, or any combination of elements now or which may be

(1) produced, processed, sold or received by a defendant, which is recognized or represented by such defendant as having electrical resistance properties (including controllable and reproducible electrical resistivity or temperature co-efficients of resistance) suitable for electrical resistance uses; or

(2) manufactured, sold, distributed or received by a defendant for electrical resistance purposes; or

(3) known or recognized generally in the trade as an electrical resistance material;

(E) "Electrical resistance products" shall mean tubing, wire, ribbon, strip or rod made from electrical resistance materials;

(F) "Manufacturer" shall mean any person engaged in the manufacture or drawing or processing (such as enameling, insulating, oxidizing or coiling) of electrical resistance materials or electrical resistance products;

(G) "Patents" shall mean any, some or all claims of patents relating to the manufacture, use or sale of electrical resistance materials or electrical resistance products, including any divisions, reissues or extensions of such patents, or applications therefor;

(H) "Subsidiary" shall mean any corporation controlled by, or more than 50% of whose outstanding stock entitled to vote is held by one person;

(I) "Bid" shall mean a bid for furnishing electrical resistance materials or electrical resistance products pursuant to a formal written invitation for a bid made by a prospective customer who, the defendants knows or has reason to know, has also submitted the same request for a bid to another person. It shall not include the ordinary solicitations of orders by a defendant from a customer or prospective customer nor the ordinary quotation to a customer or prospective customer;

(J) "Consenting defendant" or "consenting defendants" shall mean only a defendant or defendants which shall have consented to the terms of this Final Judgment;

(K) "Effective date of this Final Judgment" shall be December 2, 1964.

© 2018 CCH Incorporated and its affiliates and licensors. All rights reserved.     2     

A-122



III

[ *Applicability*]

(A) The provisions of this Final Judgment shall apply solely to any consenting defendant, to each of its subsidiaries, successors and assigns, and to each of its officers, directors, agents and employees, and to all other persons in active concert or participation with any consenting defendant who shall have received notice of this Final Judgment by personal service or otherwise. The provisions of this Final Judgment shall not apply to acts, contracts, agreements, arrangements, understandings, plans or programs of foreign subsidiaries of any consenting defendant unless such acts, contracts, agreements, arrangements, understandings, plans or programs concern the foreign or domestic commerce of the United States. This Final Judgment shall not apply to transactions solely between a consenting defendant and its subsidiaries and the officers, directors, agents and employees of either when acting in such capacity.

(B) Each consenting defendant is ordered and directed: (1) to serve a copy of this Final Judgment upon (a) each present and future member of its Board of Directors; (b) each of its present and future Vice Presidents and chief managerial officers who are not members of its Board of Directors; and (c) the present and future chief executive officers of each of its subsidiaries engaged in the manufacture, processing or sale of resistance materials or resistance products; and (2) within thirty (30) days after the effective date of this Final Judgment, to file with this Court, and serve upon the plaintiff, an affidavit as to the fact and manner of its compliance, as to its present officers and directors, with this subsection (B), setting forth in said affidavit the name, position and address of each person upon whom a copy of this Final Judgment at that time shall have been served as herein ordered and directed.

(C) Each consenting defendant is ordered and directed for a period of five (5) years after the effective date of this Final Judgment to furnish, without charge, to any person requesting the same, a copy of this Final Judgment together with a copy of the affidavit required to be filed by subsection (B) of Section V hereof.

IV

[ *Price Lists—Customer Selection*]

Each consenting defendant is ordered and directed:

(A) With respect to its domestic and Canadian operations, to cancel each of its current price lists pertaining to resistance materials or resistance products and individually to determine new prices in lieu thereof for such materials and products then being manufactured or offered for sale by the defendant; such new prices to be individually determined by each defendant on the basis of its own costs and its own judgment as to margins of profit and other lawful considerations; and after the effective date of this Final Judgment to issue new price lists containing the prices determined in accordance with this subsection (A) and to serve upon the plaintiff copies of work papers used by it in determining the prices contained in such new price lists. New price lists covering electrical resistance materials and electrical resistance products in the form of rod shall be issued and served upon plaintiff thirty (30) days after the effective date of this Final Judgment. New price lists covering resistance materials and resistance products other than rod shall be issued and served upon plaintiff ninety (90) days after the effective date of this Final Judgment. Cancellation of said current price lists shall be effective as of the date fixed for the issuance of the new price lists covering the respective materials and products;

(B) If a consenting defendant has sold to or processed for, or hereafter sells to or processes for, any person any resistance material or resistance products, either directly or through regularly designated distributors, to sell to or process for, or cause such distributors to sell to or process for, any other person on the same functional industry level as the defendant's other customer, upon request of such other person and upon uniform and non-discriminatory prices and other terms and conditions, except as otherwise permitted by way of defense under the Robinson-Patman Act; and such defendant and such distributors shall hold themselves out as ready and willing so to sell or process; provided, however, that in cases of short supply the defendant shall make a reasonable allocation among its customers, but not to the exclusion of new customers.

© 2018 CCH Incorporated and its affiliates and licensors. All rights reserved.

3

Aug 29, 2018 from Cheetah™

Case 1:19-cv-13252-RBK-AMD   Document 1-2   Filed 05/31/19   Page 287 of 303 PageID: 315

Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. Driver-Harris Co., Alloy... 

This subsection (B) shall not require a defendant (i) to submit any bid, (ii) to continue to sell any size or line of material or products which it discontinues making, or (iii) to sell to a person an electrical resistance material or electrical resistance product designated by such person as having been made by the defendant for a particular customer if (1) such material or product has been made by the defendant according to specification developed by the particular customer without the assistance of the defendant and (2) the defendant has not during the preceding year made an identical or substantially identical material or product for any other customer, and (3) if such defendant after having made a request therefor has not secured the consent of such customer to make such sales;

(C) To file with the Assistant Attorney General in charge of the Antitrust Division within ten (10) days after its execution a copy of any contract or agreement relating to activities covered by this Final Judgment (other than orders, contracts or agreements relating to routine sales and purchases and which do not create any obligation upon either party thereto extending more than six months) entered into within a period of five (5) years after the effective date of this Final Judgment between (i) such defendant and any other defendant and (ii) such defendant and any other manufacturer or distributor;

(D) To retain any and all of its records relating to activities covered by this Final Judgment for a period of ten (10) years from the date of the making thereof except that this subsection (D) shall not require the retention of routine sales and purchase data longer than seven (7) years.

V

[ Patents]

(A) Each of the consenting defendants is ordered and directed to grant, to the extent of its legal right to do so, to any person making written request therefor, a non-exclusive license for the life of a patent, or patents, to make, have made, use and sell electrical resistance materials or electrical resistance products under any, some, or all of the patents as the applicant may request which on the effective date of this Final Judgment are owned or controlled by the defendant, including the patents listed in Appendix A hereto, or under which it has a right to issue sublicenses, or which within five (5) years from the effective date of this Final Judgment, are issued to or acquired by the defendant, or under which it obtains sublicensing rights within such period.

(B) Each consenting defendant is ordered and directed, within sixty (60) days after the effective date of this Final Judgment, to file with this Court, and serve upon the plaintiff, an affidavit showing separately, as of the effective date of this Final Judgment, the number, date of issue (or filing as to applications) and name of owner of each existing patent (other than those listed in Appendix A) required to be licensed under this Final Judgment.

(C) Each consenting defendant is enjoined and restrained from including in any license issued pursuant to subsection (A) of this Section V any restriction or limitation whatsoever except that:

(1) A reasonable royalty may be charged, which royalty shall be uniform and nondiscriminatory as among licensees procuring the same rights under the same patents;

(2) Reasonable provisions may be made for periodic reports by the licensee to the defendant as to the amount of royalties due and inspection of the books and records of the licensee by an independent auditor or any other person acceptable to both defendant and the licensee, who shall report to the defendant only the amount of the royalty due and payable;

(3) Reasonable provisions may be made for cancellation of the license upon failure of the licensee to pay the royalties or permit inspection of his books and records as herein provided;

(4) The license may be made nontransferable if the licensee is unwilling to agree to notify the defendant of any contemplated transfer and must provide that the licensee may cancel the license at the end of one (1) year and thereafter at any time by giving to the defendant sixty (60) days' notice in writing;

© 2018 CCH Incorporated and its affiliates and licensors. All rights reserved.

4



(5) The licensee may require such patent markings as may be required by statute.

(D) Upon receipt of a written request for a license under the provisions of subsection (A) hereof, defendant shall advise the applicant, in writing, within thirty (30) days, of the royalty it deems reasonable for the patent or patents to which the application pertains. If such applicant and defendant are unable to agree upon what constitutes a reasonable royalty within sixty (60) days from the date the written application for the license was received by the defendant, either the applicant or defendant may, upon notice to the plaintiff, apply to this Court for the determination of a reasonable royalty. In any such proceeding the burden of proof shall be upon the defendant to establish the reasonableness of any royalty requested. Pending the completion of any such negotiations or court proceeding, the applicant shall have the right to make, have made, use and vend under the patent or patents to which his application pertains without payment of royalty or other compensation, but subject to the following provisions: Defendant may, upon notice to the plaintiff, apply to this Court to fix an interim royalty rate pending final determination of what constitutes a reasonable royalty. If this Court fixes such interim royalty rate, defendant shall then issue and the applicant shall accept a license providing for the periodic payment of royalties at such interim rate, from the date upon which the applicant requested the license. If the applicant fails to accept such license or fails to pay the interim royalty in accordance therewith, such action may be grounds for the rejection or dismissal of his application for a license; in the case of such rejection or dismissal, the applicant shall pay any royalties found by the Court to be due to the defendant. Whether or not an interim royalty is fixed by the Court, a final Court determination of a reasonable royalty shall be applicable to the applicant for a license from the date upon which the applicant requested such license, and, from the date of such determination, to any other licensee, at its option, then having the same rights under the same patents.

(E) Nothing herein shall prevent any applicant from attacking, in the aforesaid proceedings or in any other controversy, the validity or scope of any of the patents, nor shall this Final Judgment be construed as imputing any validity or value to any of said patents.

(F) Each consenting defendant is enjoined and restrained from (i) granting, after the effective date of this Final Judgment, any license or sublicense under any patents to which this Section V shall apply, except in accordance with, and pursuant to, the terms of this Final Judgment, and (ii) taking or accepting for a period of five (5) years after the effective date of this Final Judgment, any right, license or immunity, under any patent owned or controlled by any person other than such defendant, which right, license or immunity is by its terms, or in fact, exclusive to the defendant unless such defendant is also granted the right to grant sublicenses to others as required by this Final Judgment (for the purpose of this subparagraph (ii), any right or immunity under a patent shall be deemed to be a license subject to the provisions of this Section V).

(G) Each consenting defendant is enjoined and restrained from making any sale or other disposition of any patent or rights in or under patents which deprives it of the power or authority to grant the licenses required by this Section V unless the purchaser, transferee or assignee shall file with this Court, and serve upon the plaintiff, prior to consummation of any such transaction, its consent to be bound by the applicable provisions of this Section V with respect to such patent.

(H) Each consenting defendant is enjoined and restrained from using or attempting to use any foreign patent, or any rights under any foreign patent, to hinder, restrict, limit or prevent any person licensed pursuant to this Section V from exporting from the United States any electrical resistance materials or electrical resistance products manufactured in the United States pursuant to such license.

(I) Each consenting defendant is enjoined and restrained from maintaining, instituting or threatening to institute any action, counter-claim, set-off, suit or other proceeding against any person for use of or any act of infringement of any existing patent alleged to have occurred prior to the effective date of this Final Judgment.

VI

[ Technical Information]

© 2018 CCH Incorporated and its affiliates and licensors. All rights reserved.

A-125



(A) For five (5) years after the effective date of this Final Judgment, each consenting defendant is ordered and directed upon written request therefor from any actual or potential manufacturer within the United States or any State, territory or possession thereof, to furnish to such applicant copies of any technical manuals, books of instructions, drawings, specifications, blueprints, pamphlets, diagrams or other similar documents (other than those supplied to a defendant by a customer who has developed them for its use without assistance by a defendant, and which the customer, upon request by the defendant to whom the application has been made, refuses to permit to be made available) which the applicant desires owned by or subject to the control of the defendant on the effective date of this Final Judgment, and which documents have been used, or prepared for use, by the defendant in the commercial manufacture of electrical resistance materials or electrical resistance products for the purpose of melting only. For this data the defendant may charge the applicant a reasonable amount not to exceed $1000.

(B) Each consenting defendant is ordered and directed, upon written request of any person licensed under any patent or patents pursuant to Section V of this Final Judgment, to furnish during the life of the patent or patents to such licensee such of the defendant's technical information as the licensee may request as may be necessary for a person skilled in the art of metal melting technology to practice the invention or inventions of any of the patents licensed by such defendant to the licensee, in such licensee's own melting of electrical resistance materials or electrical resistance products. For this information the defendant may make a reasonable charge which shall not be more than the cost to the defendant of furnishing such information, but in no event more than $1000.

(C) Upon receipt within a reasonable time of a written application from any actual or potential manufacturer representing that the written technical information furnished to such applicant by the defendant pursuant to subsections (A) or (B) of this Section VI is inadequate or insufficient to enable such applicant satisfactorily to practice the inventions, or to perform the said manufacturing processes for which it sought information under said subsections, and specifying in reasonable detail the difficulties experienced, such defendant is ordered and directed to make available to such applicant, if feasible, such additional written information relating to such technical information relating to melting as may be reasonably necessary to enable the personnel of the applicant skilled in the art of metal melting technology to practice the inventions or to manufacture under the specific processes, and if not feasible or sufficient, to make available at reasonable times and for reasonable periods, and without subjecting defendant to hardship, technically qualified personnel from among its own employees for consultation with such applicant at the applicant's place of manufacture regarding the said inventions or manufacturing processes for which the applicant sought information. This subsection (C) shall not require a defendant to send any person outside of the United States. For this data or service the defendant may make a reasonable charge; provided, however, that if such written data were within the control of the defendant at the time when defendant furnished the data under subsections (A) or (B) above, no charge for such written data shall be made unless agreeable to the applicant or unless defendant shows to the satisfaction of the Court that it could not reasonably have contemplated that the applicant would need such written data.

(D) Any person entitled and qualified to receive the documents under subsection (A) of this Section VI, upon written application to a defendant shall be permitted at his own expense and at and for reasonable times, to visit the principal plant of such defendant performing such operations for the purpose of observing and being advised as to the methods, processes, machines and equipment, in use at or before the effective date of this Final Judgment and then being used by such defendant in the melting of electrical resistance materials or electrical resistance products, if (1) within five years from such effective date such person shows to the satisfaction of the defendants, or to the satisfaction of the plaintiff in the event of failure to satisfy the defendant, that he does not need or desire information or assistance otherwise provided for in this Section VI, or (2) such person represents that the information or assistance furnished to such applicant by the defendant under this Section VI is inadequate or insufficient to enable such applicant satisfactorily to carry out the manufacture or processing for which the applicant applied for such information or assistance; provided, however, that such visits may be further restricted as follows:

© 2018 CCH Incorporated and its affiliates and licensors. All rights reserved.

Case 1:19-cv-13252-RBK-AMD   Document 1-2   Filed 05/31/19   Page 290 of 303 PageID: 318


(1) to not more than three officers or employees of the applicant at any one time;

(2) to not more than four such visits per year within three years after such persons first application under this subsection relating to the same information.

For such observations and advice the defendant may make a reasonable charge which, in the case of any person referred to in Clause (1) of this subsection shall not exceed that permitted under subsection (A) above for comparable data and, in the case of any person referred to in Clause (2) of this subsection shall be based on the services and advice given, but not to exceed a rate of $150 per day.

(E) If the applicant and the defendant are unable to agree upon what constitutes a reasonable charge, the applicant, the defendant or the plaintiff may apply to this Court for a determination of a reasonable charge. In any proceedings for a determination of a reasonable charge, the burden of proof shall be upon the defendant to establish the reasonableness of any charge requested by the defendant.

(F) In the event of an application to a consenting defendant for know-how under this Section VI, by a person, other than a consenting defendant, (a) who is a substantial customer of a consenting defendant for electrical resistance materials or electrical resistance products, (b) whose resources are substantially in excess of those of the consenting defendant whose customer applies and (c) who desires to use such know-how to manufacture such materials or products only for incorporation in products sold by it, any consenting defendant may apply to this Court within thirty (30) days after the application was made, with notice to plaintiff and the applicant, for an order permitting or requiring rejection of such application, which the Court may grant upon the defendant's establishing to the satisfaction of the Court that such rejection is necessary to prevent substantial injury due to the prospective loss of the applicant as a customer and that such rejection would not unduly restrain competition.

(G) No consenting defendant shall be deemed, in connection with the furnishing of any of the foregoing pursuant to this Final Judgment, to have given any implied warranty, representations or guaranty against infringement of patents of others by, or any warranty of success in connection with, its use.

(H) Every agreement under which technical information is furnished pursuant to this Section VI shall contain, if the party furnishing such information shall so request, reasonable provisions requiring the recipient of such information and its subsidiaries to keep such technical information confidential and use the same only for their own manufacturing and selling operations.

(I) Each consenting defendant within ten (10) days from the effective date of this Final Judgment, shall file with the Court and with the plaintiff a listing by categories of all documents it believes come under subsection (A) of this Section VI and a separate list, by customer, of all documents which it believes come under the parenthetical clause in that subsection, and, for a period of five (5) years, to furnish a copy of such lists to any person upon request.

VII

[ Pricing—Territories]

The consenting defendants are jointly and severally enjoined and restrained from entering into, adhering to, maintaining, furthering, renewing or claiming any rights under, any combination, conspiracy, contract, agreement, understanding, plan, program, or common course of action with any other person, directly or indirectly, to:

(A) Establish, fix, determine, maintain or adhere to prices, differentials, discounts, extras or any other term or element of prices, differentials, discounts or extras for the manufacture, processing or sale to or for third persons, of any resistance materials or resistance products;

(B) Divide, allocate or apportion territories, markets or customers for the manufacture, processing or sale of any electrical resistance materials or electrical resistance products;

© 2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
7
Aug 29, 2018 from Cheetah™

A-127



(C) Refrain from the manufacture, processing or sale of electrical resistance materials or electrical resistance products or refrain from competition with any other person in any territory or market in the manufacture, processing or sale of any such materials or such products;

(D) Hinder, restrict, limit or prevent any other person from manufacturing, processing or selling any electrical resistance materials or electrical resistance products;

(E) Limit the purchase or sale of electrical resistance materials or electrical resistance products to any particular person or group of persons; provided that this shall not prevent lawful contracts for purchases over reasonable periods to secure supplies for such materials or products.

Nothing in this Section VII shall be deemed to prevent a defendant from (i) giving a distributor an exclusive territory provided the distributor is free to sell in any area and to handle electrical resistance materials and electrical resistance products manufactured by others; (ii) selling its business with a one year covenant not to compete or (iii) making lawful contracts with any person other than an actual or potential competitor of a defendant, that they will not reveal trade secrets of the defendant.

VIII

[ Directors—Acquisitions]

Each consenting defendant is enjoined and restrained from, directly or indirectly:

(A) Circulating outside its own organization and its own distributors any price list or price information relating to the manufacture, processing or sale of any electrical resistance materials or electrical resistance products in advance of the circulation or dissemination of such price list or price information to its own customers and to the trade generally;

(B) Permitting any of its officers, directors, agents or employees to serve simultaneously as an officer, director, agent or employee of any other manufacturer not a subsidiary of the defendant;

(C) Except for the purchase and sale of products bought and sold in the normal course of business, for a period of five (5) years from the effective date of this Final Judgment,

(1) acquiring or holding, directly or indirectly, any of the assets or capital stock of, or any financial interest in any other defendant or any other person which becomes a manufacturer other than a wholly owned subsidiary of the consenting defendant, or acquiring, directly or indirectly, any of the assets or capital stock of, or any financial interest in any other manufacturer; (provided, this limitation shall not apply to a defendant acquiring or holding, directly or indirectly, any of the assets or capital stock of, any financial interest in a manufacturer located outside of the United States of America, its territories or possessions);

(2) knowingly permitting any of its officers, directors, or managerial or policymaking agents or employees to acquire or hold, directly or indirectly, any of the assets or capital stock of, or any financial interest in, any other defendant or any person which becomes a manufacturer, or to acquire, directly or indirectly, any of the assets or capital stock of, or any financial interest in, any manufacturer;

(D) Hindering, restricting, limiting or preventing, or attempting to hinder, restrict, limit or prevent any person from serving as a dealer or distributor of or for electrical resistance materials or electrical resistance products manufactured, processed or sold by any other person;

(E) Hindering, restricting, limiting or preventing, or attempting to hinder, restrict, limit or prevent except for lawful action to prevent patent infringement or to protect property rights in trade secrets, any other person from engaging in the manufacture, processing or sale of any electrical resistance material or electrical resistance products;

© 2018 CCH Incorporated and its affiliates and licensors. All rights reserved. 8



(F) Entering into, adhering to, maintaining, furthering, renewing or claiming any rights under, any contract, agreement, understanding, plan or program with any other person, the purpose or effect of which is to hinder, restrict, limit or prevent either (i) such defendant or (ii) any other person, from granting a license or sublicense under any patent or patents whether owned or controlled by such defendant or such other person. This subsection shall not be deemed to prohibit the mere assignment of any patent or the grant of any exclusive license under any patent if such license grants sublicensing rights.

IX

[ Cancellation of Contracts]

(A) Each consenting defendant is ordered and directed:

(1) to cancel within thirty (30) days after the effective date of this Final Judgment each provision of each contract to which it may be a party which is contrary to any of the provisions of this Final Judgment;

(2) to file with this Court and serve upon the plaintiff an affidavit setting forth the fact and manner of its compliance with the foregoing subsection (1).

(B) The consenting defendants,, and each of them, are jointly and severally enjoined and restrained from entering into, adhering to, maintaining, furthering or claiming any rights under any contract, agreement, plan or program which is or shall be contrary to or inconsistent with any of the provisions of this Final Judgment.

X

[ Compliance]

(A) For the purpose of securing compliance with this Final Judgment and for no other purpose, duly authorized representatives of the Department of Justice shall, on written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to any consenting defendant made to its principal office, be permitted, subject to any legally recognized privilege:

(1) access, during the office hours of said defendant, to those books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of said defendant which relate to any matter contained in this Final Judgment;

(2) subject to the reasonable convenience of said defendant and without restraint or interference from it, to interview officers or employees of any defendant, who may have counsel present, regarding any such matters.

(B) Upon written request of the Attorney General, or the Assistant Attorney General in charge of the Antitrust Division, said defendant shall submit such reports in writing, and under oath or affirmation if so requested, with respect to the matters contained in this Final Judgment as may from time to time be necessary to the enforcement of this Final Judgment.

(C) No information obtained by the means provided in this Section X shall be divulged by any representatives of the Department of Justice to any person other than a duly authorized representative of the Executive Branch of the plaintiff except in the course of legal proceedings to which the United States is a party for the purpose of securing compliance with this Final Judgment or as otherwise required by law.

XI

© 2018 CCH Incorporated and its affiliates and licensors. All rights reserved.


[ *Jurisdiction Retained*]

Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the amendment or modification of any of the provisions thereof, for the enforcement of compliance therewith, and for the punishment of violations thereof.

XII

[ *Prior Judgment Superceded*]

This Final Judgment shall supersede and replace the Final Judgment entered herein against the consenting defendants on May 25, 1961, and shall be *nunc pro tunc* to the effective date of this Final Judgment. Action taken by the consenting defendants to comply with said May 25, 1961 Final Judgment shall be deemed compliance with the same requirements of this Final Judgment.

**Appendix A**

| Patent No. | Patent Date | Inventor | Filing Date |
|---|---|---|---|
| 2,581,420 | 1/8/52 | James M. Lohr | 9/23/49 |
| 2,687,954 | 8/31/54 | James M. Lohr | 10/19/51 |
| 2,687,956 | 8/31/54 | James M. Lohr | 12/28/51 |
| Reissue No | | | |
| 24,243 | 12/4/56 | James M. Lohr | 6/29/56 |
| Reissue No | | | |
| 24,242 | 12/4/56 | James M. Lohr | 6/29/56 |
| Reissue No | | | |
| 24,244 | 12/4/56 | James M. Lohr | 6/29/56 |
| 2,587,275 | 2/26/52 | Francis E. Bash | 9/23/49 |

© 2018 CCH Incorporated and its affiliates and licensors. All rights reserved.

A-130

US. v. HUNTERDON COUNTY TRUST CO., ET AL.
Civil No.: 1100-61
Year Judgment Entered: 1962

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. Hunterdon County Trust Co., First National Bank of Clinton, and Clinton National Bank., U.S. District Court, D. New Jersey, 1962 Trade Cases ¶70,263, (Apr. 16, 1962)

Click to open document in a browser

United States v. Hunterdon County Trust Co., First National Bank of Clinton, and Clinton National Bank.

1962 Trade Cases ¶70,263. U.S. District Court, D. New Jersey. Civil No. 1100-61. Entered April 16, 1962. Case No. 1639 in the Antitrust Division of the Department of Justice.

### Sherman Act

**Price Fixing—Bank Service Charges—Schedules.**—Banks were prohibited by a consent decree from combining to fix uniform charges for checks, checking accounts, collection of checks and drafts, and other services and from compiling or distributing among themselves or other banks any schedule or charts containing information regarding their service charges.

#### Final Judgment

LANE, District Judge [ *In full text*]: The plaintiff, U. S. of America, having filed its complaint herein on December 26, 1961, and the defendants, by their respective attorneys, having severally consented to the entry of this Final Judgment without trial or adjudication of any issue of fact or law herein, and without admission by any party with respect to any such issue, and the Court having considered the matter and being duly advised,

Now, therefore, before the taking of any testimony and upon consent of the parties hereto, it is hereby

Ordered, adjudged and decreed as follows:

I.

#### [ *Jurisdiction*]

This Court has jurisdiction of the subject matter hereof and of the parties hereto. The complaint states claims upon which relief may be granted against the defendants under Section 1 of the Act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly known as the Sherman Act, as amended.

II.

#### [ *Definitions*]

As used in this Final Judgment:

(A)"Commercial banking institution" shall mean any bank that is a member of the Federal Reserve System or that has been chartered under any State law applicable to commercial banks though not a member of the Federal Reserve System;

(B)"Customer" shall mean any person who maintains a demand deposit account with one or more of the defendant banks;

(C)"Service charges" shall mean the fees and charges of a commercial bank asserted against the checking account of a customer, including those asserted when the minimum balance in the account is below a fixed amount, charges for deposits made to the checking account of a customer, charges for checks issued by the customer, for collections made by the bank for a customer, for the certification of checks by the bank, for

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

honoring "stop payment" orders of a customer, for the furnishing of blank checks or check forms with or without the imprint of the customer's name and for "late charges" of any kind charged to a customer.

### III.

#### [ *Applicability*]

The provisions of this Final Judgment applicable to any defendant shall apply also to its successors (including the banking institution resulting from the merger of the defendant, First National Bank of Clinton and the defendant, Clinton National Bank), to its assigns, officers, directors, agents and employees, and to all other persons in active concert or participation with such defendant who receive actual notice of this Final Judgment by personal service or otherwise.

### IV.

#### [ *Service Charges*]

The defendants are each enjoined and restrained from entering into, adhering to, participating in, maintaining or furthering any contract, combination, agreement, undertaking, by-law, rule, regulation, plan or program with each other or any other commercial banking institution maintaining an office in Hunterdon, Somerset, Morris or Warren County, New Jersey to fix, determine, maintain, establish, stabilize or make uniform any service charges; provided, however, that the foregoing shall not be deemed to prohibit any defendant acting individually from adopting or using any schedule of service charges which such defendant considers appropriate to its own operations.

### V.

#### [ *Information*]

The defendants are each enjoined and restrained from compiling, publishing or distributing in concert or collaboration with any other defendant or any other commercial banking institution maintaining an office in Hunterdon, Somerset, Morris or Warren County, New Jersey any schedules, lists, bulletins or charts containing or graphically portraying information regarding the service charges of the defendants.

### VI.

#### [ *Schedules*]

The defendants are each ordered and directed to discontinue the use of the "Revised Schedule of Allowances and Costs for Bank Services" effective March 1, (1957, heretofore published in the names of all of the defendants.

### VII.

#### [ *Inspection and Compliance*]

For the purpose of securing compliance with this Final Judgment, duly authorized representatives of the Department of Justice shall, upon written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to any defendant, made to its principal office, be permitted, subject to any legally recognized privilege:

(A) Access during the office hours of said defendant, to all books, ledgers, accounts, correspondence, memoranda and other records and documents in the possession or under the control of such defendant, relating to any matters contained in this Final Judgment; and

---

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

A-133

(B) Subject to the reasonable convenience of such defendant and without restraint or interference from it, to interview officers and employees of such defendant, who may have counsel present, regarding any such matters.

Upon such written request, the defendant shall submit reports in writing in respect to any such matters as may from time to time be reasonably necessary to the enforcement of this Final Judgment. No information obtained by the means provided in this Section VII shall be divulged by any representative of the Department of Justice to any person other than a duly authorized representative of the Executive Branch of the plaintiff, except for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

**VIII.**

**[ *Jurisdiction Retained* ]**

Jurisdiction is retained for the purpose of enabling any of the parties to this Final Judgment to apply to the Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any provision thereof, for the enforcement of compliance therewith, and for punishment of violation thereof.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm
3

US. v. BECTON, DICKINSON AND CO.
Civil No.: 567-60
Year Judgment Entered: 1964

## Trade Regulation Reporter - Trade Cases (1932 - 1992), United States v. Becton, Dickinson and Company., U.S. District Court, D. New Jersey, 1964 Trade Cases ¶71,144, (Jul. 20, 1964)

Click to open document in a browser

United States v. Becton, Dickinson and Company.

1964 Trade Cases ¶71,144. U.S. District Court, D. New Jersey. Civil Action No. 567-60. Entered July 20, 1964. Case No. 1546 in the Antitrust Division of the Department of Justice.

### Sherman Act

**Patents—Compulsory Licensing—Consent Judgment.**—A manufacturer of reusable hypodermic syringes which was charged with violating Section 2 of the Sherman Act by restrictive use of its patents agreed to a consent judgment which required it to grant any domestic applicant nonexclusive, unconditional and unrestricted licenses at a reasonable and nondiscriminatory royalty, together with technical information and drawings at cost, and not to dispose of its patents in any manner which would prevent it from granting licenses.

**Price Fixing—Reusable Hypodermic Syringes—Consent Judgment.**—A manufacturer of reusable hypodermic syringes was prohibited under the terms of a consent judgment from entering into, enforcing or claiming any rights under contracts or agreements fixing, restricting or limiting the price or prices, or terms or conditions of sale, upon which its customers could resell the products, except as authorized by the Miller-Tydings or McGuire Acts.

For the plaintiff: William H. Orrick, Jr.

For the defendant: Toner, Crowley, Woelper & Vanderbilt, by Willard G. Woelper, Newark, New Jersey, H. Allen Lochner, Royall, Koegel, Harris & Caskey, David S. Kane, Kane, Dalsimer & Kane, New York, N, Y.

### Final Judgment

WORTENDYKE, District Judge: Plaintiff, United States of America, having filed its complaint herein on June 28, 1960, and defendant, Becton, Dickinson and Company, having filed its answer thereto denying the substantive allegations thereof; and the parties hereto, by their respective attorneys, having consented to the making and entry of this Final Judgment without trial or adjudication of any issue of fact or law herein, and without admission by any party in respect to any such issue;

Now, therefore, before the taking of any testimony and upon said consent of the parties hereto, it is hereby

Ordered, adjudged and decreed as follows:

I

[ *Sherman Act*]

This Court has jurisdiction of the subject matter hereof and the parties hereto. The complaint states claims against defendant upon which relief may be granted under Sections 1 and 2 of the Act of Congress of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies commonly known as the Sherman Act, as amended.

II

[ *Definitions*]

As used herein:

(A) "Defendant" means Becton, Dickinson and Company, a corporation organized and existing under the laws of the State of New Jersey, and any subsidiary thereof;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

1

(B) "Hypodermic syringe" means any instrument (other than those designed for injection without a needle) used to inject various medicaments, serums, antibiotics, vitamins, palliatives and other liquids under the skin of humans or animals; "reusable hypodermic syringe" means any such instrument which is primarily designed for more than one use; "disposable hypodermic syringe" means any such instrument which is primarily designed for one use only and which is sold prior to being filled with any medicament, serum, antibiotic, vitamin, palliative or other liquid;

(C) "Hospital-surgical product" means any hypodermic syringe or any other product (excluding pharmaceuticals and hypodermic syringes pre-filled therewith) used by physicians, surgeons, veterinarians, hospitals, clinics and others, in connection with the prevention, treatment or study of illnesses or diseases of humans or animals;

(D) "B-D product" means any hospital-surgical product manufactured or sold by defendant;

(E) "Existing patent" means any United States letters patent or patent application, and any division, continuation, reissue or extension thereof, relating to reusable hypodermic syringes (and excluding hypodermic syringes designed for injection without a needle) or processes or machinery for the manufacture thereof, owned or controlled, directly or indirectly, by the defendant on the date of the entry of this Final Judgment, or under which the defendant, on such date, has power or authority to grant licenses or sublicenses to others;

(F) "Future patent" means any United States letters patent or patent application (exclusive of existing patents), and any division, continuation, reissue or extension thereof, relating to reusable hypodermic syringes (and excluding hypodermic syringes designed for injection without a needle) or processes or machinery for the manufacture thereof, owned or controlled, directly or indirectly, by the defendant at any time during the period of five (5) years following the date of the entry of this Final Judgment, or under which the defendant, during such period, has power or authority to grant licenses or sublicenses to others;

(G) "Person" means any individual, corporation, partnership, association, firm or other legal entity and includes, wherever applicable, any federal, state or local government or instrumentality thereof;

(H) "Subsidiary" means a corporation controlled, or more than 50% of whose stock entitled to vote upon election of directors (other than preferred stock entitled to vote upon failure of the corporation to pay certain dividends) is, directly or indirectly, owned or controlled by the defendant;

(I) "Distributor" means any person engaged in the business of purchasing hospital-surgical products from the manufacturers thereof and selling and distributing such products to hospitals and others;

(J) "Distribution agreement" means any agreement between the defendant and any other person (other than an agent of defendant) relating to the distribution by such other person of any B-D product;

(K) "Commercial manufacture" means the manufacture and production by defendant B-D, in its normal and regular course of business, of hypodermic syringes which it regularly sells or offers for sale. The term "commercial manufacture" as used herein does not include exclusively experimental manufacture;

(L) "Domestic applicant" as used in Section X of this Final Judgment means any person resident in, or incorporated under the laws of, the United States or any one of the States thereof.

III

[ *Applicability*]

(A) The provisions of this Final Judgment applicable to the defendant shall also be applicable to each of its subsidiaries, directors, officers, employees and agents, and to its successors and assigns with respect to the business and products acquired from defendant, and to all persons in active concert or participation with it who receive actual notice of this Final Judgment by personal service or otherwise; provided that they shall not be applicable to a person who ceases to be a subsidiary of the defendant and who is not engaged in the manufacture or sale of hypodermic syringes on the date of the entry of this Final Judgment, if defendant in good faith has divested itself completely of all interest, ownership and control, directly and indirectly, in said person.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

2

A-137

(B) Defendant is ordered and directed forthwith to take all such steps as may be necessary to secure compliance by its officers, directors, employees, agents and subsidiaries, with the terms of this Final Judgment.

(C) The provisions of this Final Judgment shall not be applicable to activities of the defendant, its successors or assigns, conducted exclusively outside the United States and not in unreasonable restraint of the domestic or foreign commerce of the United States. Any sale of, or offer to sell, any hospital-surgical product to, or for the use of the plaintiff or any instrumentality or agency thereof shall be deemed to be a sale, or offer to sell, within the United States.

IV

[ Notice Required]

Defendant is ordered and directed:

(A)(1) Forthwith to serve a copy of this Final Judgment upon (a) each member of its Board of Directors? (b) each of its principal managerial officers who are not members of its Board of Directors; (c) each of its sales employees who has sales responsibility over a regional geographical area; (d) each of the principal managerial officers of each of its subsidiaries;

(2) Within ninety (90) days after the date of the entry of this Final Judgment, to file with this Court, and serve upon the plaintiff, an affidavit setting forth the fact and manner of its compliance with the foregoing paragraph (1);

(B) Forthwith to mail a copy of this Final Judgment to each distributor in the United States with whom defendant, on the date of this Final Judgment, has a distribution agreement, and to each distributor outside of the United States with whom defendant, on the date of this Final Judgment, has a distribution agreement, and who, to the knowledge of the defendant, has been selling, or is planning to sell, B-D products in the United States, and thereafter, for a period of five (5) years after the date of entry of this Final Judgment, to each such distributor at the time he first enters into a distribution agreement with defendant;

(C) Within ninety (90) days after the date of the entry of this Final Judgment, to file with this Court and serve upon the plaintiff a full and complete list of all existing patents to which this Final Judgment may be applicable;

(D) For a period of five (5) years after the date of the entry of this Final Judgment, to furnish, without cost, to any person so requesting, a copy of this Final Judgment, and also, to any person so requesting a copy of the list, kept up to date, referred to in the foregoing subsection (C).

V

[ Price Fixing]

(A) Defendant is ordered and directed, not later than ninety (90) days after the entry of this Final Judgment, to cancel each distribution agreement to which, on the date of entry of this Final Judgment, it is a party, where the other party thereto is a distributor in the United States, or is a distributor outside of the United States who, to the knowledge of the defendant, has been selling, or is planning to sell, B-D products in the United States.

(B) Subject to Section VI of this Final Judgment, defendant is enjoined and restrained from entering into, adhering to, maintaining or claiming any rights under, any contract, agreement or understanding, with any other person, any term or provision of which is, or may be, inconsistent with any of the provisions of this Final Judgment, including specifically, but without limitation, any contract, agreement or understanding with any person which (except to the limited extent specifically permitted by Section VI of this Final Judgment) fixes, restricts or limits the price or prices, or the terms or conditions relating thereto, at or upon which such other person may or shall sell any hospital-surgical product purchased from the defendant.

(C) Defendant is enjoined and restrained from entering into, adhering to, maintaining or claiming any rights under, any contract, agreement or understanding, with any other person in the United States, which fixes, restricts, or limits the persons to whom such other person may or shall sell reusable hypodermic syringes purchased from the defendant.

---

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

3

A-138

(D) Defendant is enjoined and restrained from, directly or indirectly, entering into, adhering to, maintaining, enforcing, or claiming any rights (except for the recovery of sums of money already due and payable prior to the date of entry of this Final Judgment) under any contract, agreement or understanding with any other person which requires or obligates such other person to purchase all, or any stated percentage or proportion of such persons' requirements for, reusable hypodermic syringes from defendant Becton, Dickinson, or any source designated by defendant Becton, Dickinson, provided that nothing herein contained shall apply to reusable syringes sold by defendant pursuant to an award received by defendant on invitation for competitive bids, or, if the purchaser has the right to cancel on no more than two (2) weeks' written notice, to reusable syringes sold by defendant which are to be resold under the brand name or private label of a distributor.

(E) Defendant is ordered and directed to cancel within ninety (90) days after the date of the entry of this Final Judgmet any contract, agreement or understanding, to which it may be a party on the date of the entry of this Final Judgment and which is or may be in any manner inconsistent with the foregoing subsection (D) of this Section V.

VI

[ *Fair Trade*]

(A) Nothing contained in Section V of this Final Judgment shall be deemed to prohibit defendant from lawfully exercising such legal rights, if any, as it may have under the Act of Congress of August 17, 1937, commonly known as the Miller-Tydings Act, and of the Act of Congress of July 14, 1952, commonly known as the McGuire Act.

(B) Nothing contained in Section V of this Final Judgment shall be deemed to prevent defendant from issuing and circulating its suggested resale prices for B-D products; provided that (i) each and every paper (for example, price lists, order blanks, packages or advertisements) containing any reference to defendant's suggested resale prices contains on its face, and in bold and conspicuous letters, a clear statement, except where fair trade may be applicable, that the resale prices therein contained are suggested prices; and (ii) defendant takes no action, directly or indirectly (except as specifically authorized by the preceding subsection (A) of this Section VI), to enforce or attempt to enforce, such suggested resale prices against any distributor or other seller of B-D products or any other person.

VII

[ *Refusal to Deal*]

For a period of five (5) years following the entry of this Final Judgment, defendant is ordered and directed to sell upon request and upon its usual and customary terms including credit, and availability in periods of short supply, to any person *in* the United States who, at the time of such request, is a distributor of hospital-surgical products, any reusable hypodermic syringe which it regularly manufactures and sells, or offers for sale, in the normal course of its business in the United States.

VIII

[ *Coercive Practices*]

Defendant is enjoined and restrained from directly or indirectly,

(A) Unreasonably restricting, limiting or preventing or attempting unreasonably to restrict, limit or prevent any person in the United States, including specifically, but without limitation, any distributor of B-D products

(1) from purchasing, distributing, selling (except to a purchaser who specifies at the time of each order that only a B-D product or B-D products be supplied in response to each such order), handling or otherwise dealing in, any reusable hypodermic syringes manufactured or sold, by persons other than the defendant;

(2) from engaging in the manufacture of reusable hypodermic syringes;

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm
4

(3) from selling reusable hypodermic syringes purchased from defendant to any person.

(B) Conditioning the sale of any reusable hypodermic syringe upon the purchase of any other hospital-surgical product or conditioning the sale of any hospital-surgical product upon the purchase of any reusable hypodermic syringe; provided, however, that this subsection (B) shall not be deemed to prohibit defendant from requiring, as a term of its distribution agreements, that its distributors maintain such reasonable stock of B-D products as may be necessary in order to service, from stock, the normal and reasonable demand upon such distributor for such B-D products, and from requiring such distributors to stock new B-D products of a type normally marketed by defendant through distributors and to devote a reasonable amount of promotional and selling effort to such new B-D products.

IX

[ *Acquisitions*]

Defendant is enjoined and restrained:

(A) For the period of five (5) years after the date of the entry of this Final Judgment from, directly or indirectly, acquiring any of the shares of stock, business or assets (other than a nonexclusive license under the United States or foreign Letters Patent or applications therefor) of, or other financial interest in, any other person engaged in the manufacture of reusable hypodermic syringes;

(B) After the expiration of five (5) years after the date of the entry of this Final Judgment, and for an additional period of five (5) years thereafter, from, directly or indirectly, acquiring any of the shares of stock, business or assets (other than a nonexclusive license under the United States or foreign Letters Patent or applications therefor) of, or other financial interest in any other person engaged in the manufacture of reusable hypodermic syringes, except (1) with the prior approval of the plaintiff, or (2) after an affirmative showing to the satisfaction of this Court, upon sixty (60) days' notice to the plaintiff, that the effect of such acquisition will not be substantially to lessen competition or tend to create a monopoly in the manufacture, sale or distribution of reusable hypodermic syringes.

[ *Terms of Sale*]

(C) For a period of ten (10) years after the date of entry of this Final Judgment, by its officers, employees, agents and salesmen, from soliciting, taking or accepting, or requesting its distributors to solicit, take or accept from any purchaser or potential purchaser in the United States, any order to be filled either by defendant or a distributor for reusable hypodermic syringes manufactured or sold by defendant (whether such reusable hypodermic syringes so ordered are to be supplied by direct shipment from the defendant or through a distributor) except to the extent, and only to the extent, that (i) the entire quantity of such reusable hypodermic syringes so ordered are to be, and actually are, shipped to such purchaser as a single shipment, and (ii) the entire amount due from, and payable by, the purchaser for the entire quantity of such reusable hypodermic syringes so ordered and shipped is billed to such purchaser by defendant or its distributor as a single charge and is payable by the purchaser in accordance with the normal and usual trade terms and conditions including credit terms of defendant or its distributor; provided that this subsection shall not apply to (a) any order with respect to which the purchaser or potential purchaser is specifically notified in writing by defendant with respect to each order that any unshipped balance of such order for reusable syringes may be cancelled by the purchaser or potential purchaser upon notice to defendant and without any penalty; (b) orders submitted pursuant to awards received on invitation for competitive bids; and (c) orders for non-catalogued reusable hypodermic syringes manufactured specially for the purchaser. For the purpose of this subsection shipments to more than one destination requested in an order and shipments made to fill an order from more than one shipping point shall be deemed a single shipment;

(D) From including the volume of reusable hypodermic syringes purchased or to be purchased by any person as a factor in determining the extent to which such person shall be given or offered any discount, allowance or rebate from defendant's established prices for hospital-surgical products, where the basis for such discount, allowance or rebate is the total volume of hospital-surgical products purchased or to be purchased by such person from defendant or any source designated by defendant.

©2018 CCH Incorporated and its affiliates and licensors. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm